# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

IN RE:

| | |
|---|---|
| **M.T.G., INC., d/b/a MATRIX** | **Case No. 95-48268** |
| **TECHNOLOGIES GROUP,** | **Chapter 7** |
| | **Judge Thomas J. Tucker** |
| **Debtor.** | |

---

**GUY C. VINING, etc.,**

        **Plaintiff,**        **Adv. No. 03-4950**

**v.**

**COMERICA BANK, et al.,**

        **Defendants.**

---

## OPINION REGARDING SUMMARY JUDGMENT MOTIONS[1]

### I. Introduction

This adversary proceeding is before the Court on motions for summary judgment. Guy C. Vining ("Vining"), the Plaintiff in this adversary proceeding, is the current and third Chapter 7 Trustee in the Debtor M.T.G., Inc.'s bankruptcy case. M.T.G., Inc. (the "Debtor" or "MTG"), through its attorney Todd Halbert ("Halbert"), filed a voluntary petition for relief under Chapter 11 on August 7, 1995.[2] On February 8, 1996, MTG's Chapter 11 case was converted to Chapter 7, and Charles J. Taunt ("Taunt") was appointed as the Chapter 7 Trustee.

After Taunt's appointment was terminated on October 27, 2000, Douglas Ellman was

---

[1] The Court has attached a table of contents to the end of this Opinion.

[2] Halbert represented the Debtor while it was in Chapter 11. Halbert now represents Vining, as special counsel.

appointed as the successor Chapter 7 Trustee. Vining was elected as the successor Chapter 7 Trustee of Douglas Ellman on January 10, 2002.

Defendant Comerica Bank ("Comerica" or the "Bank"), was MTG's primary lender and largest secured creditor.[3]

On August 18, 2003, Vining filed a 21-count complaint against Comerica, Taunt, and other Defendants, commencing this adversary proceeding.[4] Vining alleges in the complaint that he is entitled to an award of compensatory damages in excess of $15 million, based on claims of

---

[3] Comerica filed the following proofs of claim in MTG's bankruptcy case (Case No. 95-48268):

| Claim No. | Amount | Nature of Claim | Date filed |
|-----------|--------|-----------------|------------|
| 24 | $5,303,175.33 | secured | 8/31/1995 |
| 81 | $16,777.44 | secured | 11/6/1995 |
| 82 | $13,479.69 | secured | 11/6/1995 |
| 102 | $23,142.65 | secured | 12/6/1995 |
| 105 | $5,314,660.14 | secured | 12/26/1995 |
| 106 | $2,780.98 | priority | 12/28/1995 |
| 108 | $2,314.85 | unsecured | 1/8/1996 |
| 223 | $500,000 | priority | 6/25/1997 |

Schedule D filed with MTG's voluntary Chapter 11 petition (Docket # 1) listed Comerica as having a fully secured claim in the amount of $1,796,222.48, secured by machinery, equipment, vehicles, and office furniture of various dates, as listed in an attachment to Schedule D, worth $1,962,985; and a fully secured claim in the amount of $548,893.86, secured by land and a building located at 42265 Yearego, Sterling Heights, Michigan 48314 valued at $650,000. Schedule D of the voluntary petition listed only one other secured creditor besides Comerica – "Millutensil TTL, Inc." and scheduled the amount of the claim of that entity at $102,630, with such claim being secured by a "4-12-95 spotting press" worth $160,0000.

[4] Compl. (Docket # 1). A copy of the complaint also can be found at Docket # 168-3.

2

MTG that arose before the filing of MTG's bankruptcy case (the "Pre-Petition Claims"),[5] and an award of damages in excess of $19.5 million, plus attorney fees and punitive damages, based on claims of the bankruptcy estate that arose after the bankruptcy case was filed (the "Post-Petition Claims").[6]

## A. The Pre-Petition Claims

Vining alleges that pre-petition, Comerica and certain of its officers and/or directors, namely, Ronald Marcinelli; Steve Lyons; Paul Dufault; and Michael Collins (collectively, the "Comerica Defendants"), engaged in misconduct which forced MTG to file for relief under Chapter 11 of the Bankruptcy Code, and ultimately, to go out of business. Vining alleges that based on this misconduct, he has lender liability-type claims against the Comerica Defendants with "a value in excess of $15,000,000"[7]

## B. The Post-Petition Claims

Vining alleges further that after the Debtor's Chapter 11 case was converted to Chapter 7, and immediately after Taunt was appointed as the Chapter 7 Trustee, Taunt, through his attorneys Charles J. Taunt & Associates, P.C. (collectively, the "Taunt Defendants") and Comerica entered into an illegal fee agreement (the "Comerica Fee Agreement"), which created a "serious, egregious conflict of interest" for Taunt and was a breach of his fiduciary duties to the

---

[5] The Pre-Petition Claims are the claims in Counts XV through XXI of Vining's complaint.

[6] The Post-Petition Claims are the claims in Counts I through XIV of Vining's complaint.

[7] Compl. (Docket # 1) at 12 ¶ 91(A), 13 ¶ 98(B). Vining also alleges in the complaint that he has "[a] preference claim against the Bank under Section 547 of the Code to the extent of two-thirds of any recovery on the Injectronics treble damage [conversion] claim [under Mich. Comp. Laws Ann. § 600.2919a] (the "Bank Preference Claim")." *Id.* at 12 ¶ 91(C) and (F), 13 ¶ 98(G).

3

bankruptcy estate. Vining further alleges that Taunt and the Comerica Defendants participated in a conspiracy to prevent MTG from pursuing the Pre-Petition Claims, and violated numerous federal criminal statutes. Vining alleges that because the value of the Pre-Petition Claims greatly exceeded the amount MTG owed to Comerica, if Taunt had prosecuted and proven such claims, any damage award to MTG could have been set off against Comerica's approximately $5.3 million dollar secured claim, thereby greatly reducing such claim, or most likely, eliminating it altogether.

### 1. The root of the problem — the Comerica Fee Agreement

The root of the problem in this case is the Comerica Fee Agreement. That agreement was in part a surcharge agreement — *i.e.*, an agreement under which Comerica agreed that the Trustee could surcharge Comerica's collateral under Bankruptcy Code § 506(c)[8] — but it was more than that, as this Court has previously ruled.

This Court described and discussed the Comerica Fee Agreement in detail, in its opinion entitled "Amended Opinion Regarding 'Fraud on the Court' Issues," entered in the main bankruptcy case on April 16, 2007 (the "Fraud on the Court Opinion").[9] The Court reiterates that

---

[8] Section 506(c) provides:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, **including the payment of all ad valorem property taxes with respect to the property**.

11 U.S.C. § 506(c) (emphasis added). The language in bold above was added to § 506(c) by the 2005 amendments to the Bankruptcy Code.

[9] Docket # 1353 in Case No. 95-48268; *In re M.T.G., Inc.,* 366 B.R. 730 (Bankr. E.D. Mich. 2007), *aff'd,* 400 B.R. 558 (E.D. Mich. 2009). A copy of the Comerica Fee Agreement can be found at Docket # 584-22.

4

description and discussion, which includes the following:

The Comerica Fee Agreement provided that Taunt would liquidate the Debtor's estate assets (all of which Comerica claimed as its collateral,) with certain exceptions. Operating under an initial budget totaling $25,000.00, trustee's counsel was to bill Comerica for legal services each month. Fees were to be billed on an hourly-rate basis, at the Taunt firm's usual hourly rates, and "compensation [was] not contingent upon [the] actual or perceived degree of success." Comerica was to pay the monthly invoices through a special "cash collateral account" maintained by Comerica, "from which the Trustee [was permitted to] withdraw payments for all surchargeable items." The agreement further required that all net proceeds from Taunt's liquidation of the assets would be paid to Comerica. It further stated that "[a]ny unresolved disputes concerning any invoice [of trustee's counsel] shall be submitted to the Court for resolution pursuant to motion under 11 [U.S.C. §] 506(c)."

The agreement described the "[s]ervices for which Comerica shall be subject to surcharge" as including "the preservation and liquidation of all of the Debtor's machinery and equipment, the resolution of the Becker situation, and other lesser matters as detailed in the budget." The agreement stated that "[i]t is our understanding that the Bank does not wish the Trustee to pursue the recovery of escrowed funds, collection of accounts receivable, or the "Injectronics" litigation. Surchargeable services would include all services of the type described herein rendered on or after February 8, 1996."

With respect to claims the estate might have against Comerica, including possible lender-liability claims that Halbert and the Debtor believe existed, the Comerica Fee Agreement stated:

Finally, it must be clearly understood that nothing in this proposal constitutes a waiver of any claims the estate might have against Comerica Bank. It is the Trustee's intention to investigate these claims fully, and we anticipate Comerica's full cooperation in that regard.

The Comerica Fee Agreement and its budget did not indicate that Comerica would pay for the [T]rustee's work in investigating or

5

pursuing any claims against Comerica.

With respect to Comerica's secured claim, the agreement stated that Comerica would pay Taunt to evaluate the claim. It stated:

> Further, in order to fix the value of Comerica Bank's secured claim, we shall cause the Debtor's objection to that claim to be brought on for hearing as soon as possible.

The budget attached to the agreement allocated $2,000.00 of the $25,000.00 budget to the following:

> Determination of Comerica Bank Secured Claim

> Obtain hearing date from Court and serve notice of same; **review/analyze Comerica Bank security documents and loan history; prepare written position on same for filing with Court**; appear at hearing; review/approve proposed order.

> Finally, the budget further stated that it "[a]ssumes all uncontested matters. In the event any matter becomes contested, the budget estimates do not apply."[10]

In the Fraud on the Court Opinion, which was issued after this case had been through two appeals to the district court, this Court explained the problems created by the Comerica Fee Agreement. The Court reiterates what it said on that subject, including the following:

> The district court, in its September 7, 2000 bench opinion in the first appeal, held that Taunt's fee agreement with Comerica created a "serious, egregious, conflict of interest and breach of fiduciary duty," and "that a sanction . . . doesn't rectify the injustices that might have been done by a Trustee in such conflict of interest and in constant breach of his fiduciary duty." This Court, of course, is bound by these holdings of the district court, as the law of the case and under the "mandate rule." *See Halbert v. Taunt (In re M.T.G. Inc.)*, 291 B.R. 694, 701 (E.D. Mich. 2003). Thus, Taunt had a "serious, egregious, conflict of interest,"

---

[10] *M.T.G.,* 366 B.R. at 734-35 (footnotes omitted) (bold in original).

6

contrary to his representations to this Court.

A stark illustration of Taunt's undisclosed conflict of interest is that under the Comerica Fee Agreement, Taunt's firm was to be paid on an hourly-rate basis **by Comerica** to review and analyze **Comerica's** secured claim **against the estate**. This aspect of the fee agreement alone destroyed Taunt's disinterestedness. Then, after making the undisclosed fee agreement, Taunt and his counsel signed a stipulation and obtained from the Court the Comerica Claim Allowance Order. That Order allowed Comerica's $5.3 million secured claim and determined that Comerica had a "valid and properly perfected security interest in and lien on all property of Debtor's estate" except Chapter 5 causes of action. At a minimum, it was "reckless" of Taunt and his counsel not to fully disclose the Comerica Fee Agreement before he obtained this Order.

Bankruptcy Code § 506(c) permits a trustee to surcharge a secured creditor's collateral, with or without that creditor's agreement, if certain requirements are met. Under § 506(c),

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). Comerica agreed to a surcharge of its collateral, to the extent and under the terms of the Comerica Fee Agreement.

It may well be that a trustee must always disclose to the court a § 506(c) surcharge agreement. But quite apart from that issue, the Comerica Fee Agreement went well beyond what § 506(c) authorizes. The surcharge authorized by the statute is for the trustee to recover the "reasonable, necessary costs and expenses of preserving, or disposing of," the secured creditor's collateral. The Comerica Fee Agreement gave Taunt more than this. It required Comerica to pay the [T]rustee's law firm for additional work, not involving preservation or disposition of Comerica's collateral, such as the [T]rustee's work in reviewing, analyzing, and determining Comerica's secured claim, discussed above. Moreover, the surcharge authorized by § 506(c) is limited to "the extent of any benefit to" the secured creditor. The Comerica Fee Agreement

7

clearly was not so limited. Rather, Taunt's firm was to be paid for its work on an hourly-rate basis without regard to the amount of benefit to Comerica. The agreement provided that the Taunt firm's "compensation is not contingent upon [its] actual or perceived degree of success." And while there was a $25,000 initial budget for the Taunt firm's work, the agreement permitted fees above and beyond the budget for any covered matters that became contested, and for any "unanticipated and uncontrollable" matters.

Given all of this, the duty of Taunt and his firm to disclose the Comerica Fee Agreement was so clear that their failure to disclose must be viewed as "reckless." Taunt's conduct rose at least to the level of "reckless disregard" of the truth and of his duties.[11]

### 2. Vining's Post-Petition Claims

Vining alleges that rather than prosecuting the Pre-Petition Claims, and before disclosing the Comerica Fee Agreement to the Court, and while Taunt had a "serious, egregious conflict of interest," Taunt and his attorneys sought and obtained, in the bankruptcy case, an order authorizing Taunt to settle the estate's Pre-Petition Claims against Comerica in exchange for the payment of $10,000.00 by Comerica (the "Comerica Settlement Order").[12] According to Vining, $10,000.00 was a pittance compared to what such claims were worth. Vining alleges further that before disclosing the Comerica Fee Agreement, and while Taunt had a "serious, egregious conflict of interest," Taunt and his attorneys obtained entry of two more orders that benefitted Comerica; a consent order granting Comerica relief from the automatic stay (the "Comerica Relief From Stay Order");[13] and a stipulated order allowing Comerica's $5.3 million dollar claim

---

[11] *M.T.G.,* 366 B.R. at 751-52 (footnotes omitted) (italics and bold in original).

[12] *See* Docket # 488 in Case No. 95-48268 ("Order Granting Application to Compromise Causes of Action Against Comerica Bank," filed on August 29, 1996); *see also M.T.G.,* 366 B.R. at 738-39.

[13] *See* Docket # 431 ("Consent Order Granting Comerica Bank Relief From the Automatic Stay," filed on April 30, 1996). Although the Debtor and Taunt filed objections to Comerica's motion

(the "Comerica Claim Allowance Order").[14]  According to Vining, all of these post-petition

actions were a fraud on the court, and gave rise to claims that entitled him to an order vacating

the Comerica Settlement Order, the Comerica Relief From Stay Order, and the Comerica Claim

Allowance Order, and any other orders entered before the disclosure of the Comerica Fee

Agreement; "deny[ing] all relief to Comerica as a creditor in this bankruptcy case, such as, for

example, disallowing Comerica's secured claim and requiring Comerica to disgorge all sums that

_____

for relief from the automatic stay, those objections were settled and a consent order was entered granting
Comerica relief from the stay, and "permitting Comerica to liquidate 'specifically defined collateral[.]'"
*M.T.G.,* 366 B.R. at 735-36.

[14]  *See* Docket # 422 in Case No. 95-48268 ("Order Allowing Claim of Comerica Bank," filed on
April 19, 1996 (stipulated order to allow claim of Comerica in amount of $5,304,563.63)).  "[T]he
Comerica Claim Allowance Order . . . was signed as stipulated and agreed to by Taunt, [Taunt's]
counsel, Kevin Ball, and John D. Hertzberg as counsel for Comerica."  *M.T.G., Inc.,* 366 B.R. at 737.

> The Debtor (through its attorney Halbert) had objected to Comerica's
> secured claim while the case was still in Chapter 11, on November 27,
> 1995.  In that objection, the Debtor stated, in part:
>
> > [T]he Debtor hereby objects to the amount, validity and
> > enforceability of the Loan [alleged by Comerica Bank]
> > and to the validity, perfection, priority and
> > enforceability of the security interests and liens
> > allegedly securing the Loan. The Debtor denies that
> > such Loan and the alleged security therefore constitute
> > allowable claims, secured or otherwise, against the
> > Debtor, its assets or its estate.
>
> > No hearing on the Debtor's claim objection was held before the
> case was converted to Chapter 7 on February 8, 1996. A hearing had
> been scheduled for February 22, 1996, but was adjourned to April 4,
> 1996.  That hearing apparently was adjourned until April 18, 1996, at
> which point the Court's minute entry indicates that the objection was
> settled.

*Id.* at 737 (footnotes omitted)(citing Docket ## 153 at 1-2 ¶ 3 (Debtor's objection to Comerica's claim),
327 (minute entry regarding adjournment of hearing on the Debtor's objection to Comerica's claim), and
416 (minute entry indicating that the objection was settled).

9

it has received on its claim," *see M.T.G.,* 366 B.R. at 756; and awarding him actual compensatory damages, attorney fees, and punitive damages. *Id.* at 756-58.

### C. This Court's April 16, 2007 Opinion and Order vacating orders procured by fraud on the court

In its Fraud on the Court Opinion, this Court ruled in favor of Vining on some of the issues raised by his fraud on the court claim.[15]  In that opinion, this Court held that Taunt and his attorneys "committed fraud on the court by failing to properly disclose [the Comerica Fee Agreement], . . . and then obtaining [the Comerica Claim Allowance Order; the Comerica Relief From Stay Order; and the Comerica Settlement Order] from the Court that benefitted Comerica." *In re M.T.G., Inc.*, 366 B.R. 730, 732, 748, 753 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich. 2009).[16]  Based on its holding "that Taunt and his counsel committed a fraud upon the court in obtaining" those three orders, this Court concluded that "[t]hose orders must be vacated." *Id.* at 753.

However, the Court concluded that, on the record before it, it could not rule on other issues raised by Vining's fraud on the court claim; including whether Taunt and his attorneys

---

[15]  Vining's fraud on the court claim is Count I of the complaint.

[16]  In its opinion, the Court stated, regarding these three orders:

> Each of these orders benefitted Comerica, and each order was entered at Taunt's request, or in the case of the Comerica Relief From Stay Order, based on Taunt's written consent and with his assistance.  Each order was entered after Taunt made [the Comerica Fee Agreement], and without Taunt having properly disclosed that fee agreement to the Court.

*M.T.G.,* 366 B.R. at 748.

*intended* to deceive the Court;[17] whether Taunt and his attorneys, on the one hand, and the

Comerica Defendants and their attorneys, on the other hand, participated in a conspiracy to

defraud the bankruptcy estate; whether Taunt and his attorneys and the Comerica Defendants and

their attorneys violated numerous federal statutes; and whether Vining is entitled to

compensatory damages, punitive damages, and/or attorney fees. *Id*. at 756-58. The Court

concluded that those issues/claims were the subject of this adversary proceeding, and "should be

litigated and determined in the pending adversary proceeding." *Id.* at 757.

The Court noted that

> it is still far from clear whether any of this ultimately will result in
> a benefit to the bankruptcy estate and its creditors. For example,
> while the Court is vacating the Comerica Claim Allowance Order,
> it is unknown at this point whether in the end, Comerica's claim
> once again will be allowed. Similarly, while the Court is vacating
> the Comerica Settlement Order, it is unknown whether Vining,
> Trustee ultimately will succeed on any claim against Comerica,
> such as a lender-liability claim.

*Id.* at 757-58.

On April 16, 2007, after filing its Fraud on the Court Opinion, the Court entered an order

vacating the Comerica Settlement Order; the Comerica Claim Allowance Order; and the

Comerica Relief From Stay Order**.**[18] That order was later affirmed by the district court. 400 B.R.

558 (E.D. Mich. 2009).

---

[17] The Court found only "that the conduct of Taunt and his attorneys was at least 'in reckless disregard for the truth' and in reckless disregard of their disclosure duties," which state of mind was sufficient for a finding of fraud on the court. *M.T.G.,* 366 B.R. at 750, 755.

[18] Docket # 1354 in Case No. 95-48268 ("Amended Order Regarding 'Fraud on the Court' Issues and Pending Summary Judgment Motions," filed April 16, 2007) at 2 ¶¶ 6-8; *M.T.G.,* 366 B.R. at 730.

11

**D. The remaining claims to be decided in this adversary proceeding**

The Pre-Petition Claims and the Post-Petition Claims that were not decided in the Court's

Fraud on the Court Opinion are being litigated in this adversary proceeding. Now before the

Court are the following six motions (collectively, the "Summary Judgment Motions"):

- "Trustee's Motion for Default Judgment, or in the Alternative, for Summary Judgment Against Defendants" (Docket # 583, the "Plaintiff's Summary Judgment Motion"), seeking a default judgment, or alternatively, summary judgment in favor of Vining on all of the claims in his complaint;

- "Taunt Defendants' Motion for Summary Judgment" (Docket # 588), seeking summary judgment in favor of the Taunt Defendants on all claims for damages against the Taunt Defendants in Vining's complaint (Counts I, II, IV, VI, VIII, IX, X, XI, XII, XIV);[19]

- "Defendant Plunkett & Cooney's Motion for Summary Judgment" (Docket # 578), seeking summary judgment in favor of Plunkett & Cooney on all claims in Vining's complaint;

- "Motion for Summary Judgment of Defendants Comerica Bank, Ronald Marcinelli, Steven Lyons, Paul Dufault and Michael A. Collins" (Docket # 579, the "Comerica Defendants' Summary Judgment Motion"), seeking summary judgment in favor of the Comerica Defendants on all of the claims in Vining's complaint;

- Trustee's Motion for Summary Judgment Against Defendant American Casualty Company of Reading, P.A. ("American Casualty") (Docket # 581), seeking summary judgment on Count XIII of his complaint in the amount of $1,000,000, plus prejudgment interest, costs, and reasonable attorney fees; and

- Defendant American Casualty's Motion for Partial Summary Judgment (Docket # 586), seeking "an Order determining that [American Casualty's] maximum liability under the Bond it issued naming Charles Taunt as Principal is $1,000,000."

After extensive briefing, the Court held hearings on the Summary Judgment Motions over

---

[19] Part of this motion was stricken, by the Court's "Opinion and Order Regarding Defendant Plunkett & Cooney, P.C.'s Motion to Strike Exhibit A to Trustee's Summary Judgment Motion" (Docket # 656) at 5 ¶ 4 ("4. The Taunt Defendants' motion for summary judgment (Docket # 588) is stricken in part; namely, everything in that motion from the caption 'Introduction' on page 2 through the end of page 27 is stricken, and will not be considered by the Court.").

12

a period of eight days.[20]

In this Opinion, the Court first will address the Summary Judgment Motions as they relate to the Pre-Petition Claims, and then will address the Summary Judgment Motions as they relate to the Post-Petition Claims.[21]

## II. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). At a minimum, this Court has "related-to" subject matter jurisdiction over each of the claims in Vining's complaint, because each of the claims seeks to reduce or eliminate the Debtor's and the bankruptcy estate's liability on Comerica's secured claim, and/or obtain a money judgment, and therefore resolution of the claims could have a direct and significant impact on the amount of funds in the bankruptcy estate available for distribution to unsecured creditors. *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co.* (*In re Wolverine Radio Co.*), 930 F.2d 1132, 1141 (6th Cir. 1991) (citation

---

[20] Transcripts of the hearings on the Summary Judgment Motions are available at Docket ## 682, 678, 679 (amending transcript at Docket # 677), 681, 694, 733, 735, 720 and 730.

[21] The Court notes that Vining seeks a default judgment as his primary form of relief against all of the Defendants, including the Comerica Defendants, and seeks summary judgment only as an alternative form of relief. The basis for Vining's request for a default judgment against the Defendants is the Defendants' alleged discovery fraud, discovery abuses and spoliation of evidence. (*See* Trustee's Substitute Br. in Supp. of Pl.'s Summ. J. Mot. ("Trustee's Br.") (Docket # 657) at 8-15.) The Court addresses this part of Vining's motion in a separate opinion and order filed today, which also rules on another pending motion; namely, Vining's motion entitled "Motion for Order Finding Comerica Bank and Counsel in Contempt of Court and Granting Monetary Sanctions and Other Relief Based on Violations of Discovery Orders, Violations of Discovery Duties, and Discovery Fraud" (Docket # 505). For the reasons stated in the Court's separate opinion filed today, the Court will deny Vining's request for a default judgment. This Opinion will address Vining's arguments for summary judgment. And in yet another opinion and order being filed today, the Court addresses the unresolved parts of the motions entitled "Trustee's Motion to Compel Defendant Plunkett Cooney to Answer Interrogatories . . ." (Docket # 322); and "Trustee's Motion to Compel Comerica Bank Defendants to Answer Interrogatories . . ." (Docket # 324).

omitted) (italics in original) (explaining that "for purposes of determining section 1334(b) jurisdiction, it is necessary only to determine whether a matter is at least 'related to' the bankruptcy" and that "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*"). To the extent that the claims are only related to the bankruptcy case, they are non-core.

Even if the claims are non-core, and if and to the extent this Court might otherwise lack statutory or constitutional authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462 (2011), that is not a concern in this case. That is because all of the parties have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[22] Given that consent, this bankruptcy court has statutory and constitutional authority to enter a final judgment on Vining's claims. *See Ralph Roberts Realty, LLC v. Savoy* (*In re Ralph Roberts Realty* ), 562 B.R. 144, 147-48 (Bankr. E.D. Mich. 2016) (discussing, among other cases, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015)); *Dery v. Karafa* (*In re Dearborn Bancorp, Inc.*), 583 B.R. 395, 400 (Bankr. E.D. Mich. 2018).

### III. The jury trial issue

Any trial in this adversary proceeding would not be tried before a jury. Although Vining timely demanded a jury trial on all of the claims in the adversary complaint, the Court struck

---

[22] *See* Docket ## 716, 723-726.

such demand with regard to the Pre-Petition Claims.[23]  Vining withdrew the jury demand with regard to the Post-Petition Claims.[24]  Such a withdrawal is effective if all parties consent to it.  *See* Fed. R. Civ. P. 38(d), made applicable to this adversary proceeding by Fed. R. Bankr. P. 9015(a) ("A proper [jury] demand may be withdrawn only if the parties consent.").  In the Court's opinion and order entitled "Opinion and Order Regarding Jury Trial and 'Stern v. Marshall'-Related Issues," filed on May 27, 2016, "[t]he Court conclude[d] that every remaining Defendant in this adversary proceeding has expressly consented to the withdrawal of [Vining's] jury demand."[25]  Therefore, to the extent there were to be a trial, it would be a bench trial.

## IV.  Summary Judgment Motions regarding the Pre-Petition Claims

### A.  Facts relating to the Pre-Petition Claims

Pre-petition, MTG was "engaged in the business of rapid prototype and tooling for plastics in the automotive industry from 1986 through February 1996."[26]  Comerica was MTG's primary lender.  MTG's and Comerica's commercial relationship was governed by various agreements MTG and Comerica executed, and various promissory notes MTG executed (collectively, the "Loan Documents").

### 1. The Loan Documents between Comerica and MTG

---

[23]  *See* "Order Granting in Part and Denying in Part 'Comerica Defendants' Motion to Strike Jury Demand (Docket # 168),'" filed July 16, 2008 (Docket # 209) at ¶ 1 (striking Vining's jury demand "with respect to all of [Vining's] claims against the Comerica Defendants contained in Counts XV through XXI of [Vining's] Complaint (Docket # 1)(the so-called 'Pre-Petition Claims'")).

[24]  *See* Docket # 270.

[25]  Docket # 705 at 2.

[26]  December 12, 1998 Am. Aff. of Kirk Vercnocke ("Vercnocke Am. Aff.") (Docket # 589-16) at 1 ¶ 3; *see also* Am. Voluntary Pet. (Docket # 30 in Case No. 95-48268) at 1.

### a. The $3.5 million Master Revolving Note

On March 8, 1995, MTG obtained an increase in a revolving line of credit Comerica previously granted it, to supply working capital for MTG's operations (also known as the "Working Capital Facility"). The cap on the amount that MTG could borrow on this line of credit was the lesser of $3.5 million or the amount specified under the "Borrowing Formula." In connection with this line of credit, MTG executed a $3.5 million note entitled "Master Revolving Note" ("Note # 26"),[27] which was a variable rate promissory note that was payable on demand.[28] MTG granted Comerica a security interest in certain specified assets, to secure MTG's obligations under the note.[29] The terms of this promissory note are important, so the Court will quote them at length:

> For Value Received, the undersigned promise(s) to pay ON DEMAND to the order of Comerica Bank ("Bank"), at any office of the Bank in the State of Michigan, <u>Three Million Five Hundred Thousand and no/100</u> Dollars (U.S) (or that portion of it advanced by the Bank and not repaid as later provided) with interest **until demand or an Event of Default**, as later defined, at a per annum rate equal to the Bank's prime rate from time to time in effect plus <u>1.0</u> % per annum and after that at a rate equal to the rate of interest otherwise prevailing under this Note plus 3% per annum (but in no event in excess of the maximum rate permitted by law) . . . .

> The principal amount payable under this Note shall be the sum of

---

[27] *See* Docket # 584-2.

[28] The Master Revolving Note indicated for the "MATURITY DATE" of the loan: "ON DEMAND."

[29] The Security Agreements in which Q.C. Technologies, Inc. and MTG granted Comerica a security interest in their respective Accounts Receivable, Chattel Paper, Inventory, and Equipment are attached at Docket # 584-21. Q.C. Technologies, Inc. was one of MTG's predecessor's companies. It was a "stand-alone company" that merged into MTG. (*See* Oct. 29, 1996 Dep. of Michael A. Collins ("Collins 10/29/96 Dep. Tr.") (Docket # 529-19) at 9-10. It was a customer of Comerica. (*Id*. at 9.)

16

all advances made by the Bank **to or at the request of the undersigned**, less principal payments actually received in cash by the Bank. **The books and records of the Bank shall be the best evidence of the principal amount and the unpaid interest amount owing at any time under this Note and shall be conclusive absent manifest error** . . . . **At no time shall the Bank be under any obligation to make any advances to the undersigned pursuant to this Note (notwithstanding anything expressed or implied in this Note or elsewhere to the contrary, including without limit if the Bank supplies the undersigned with a borrowing formula) and the Bank, at any time and from time to time, *without notice*, and in its sole discretion, may refuse to make advances to the undersigned without incurring any liability due to this refusal and without affecting the undersigned's liability under this Note for any and all amounts advanced.**

**This Note and any other indebtedness and liabilities of any kind of the undersigned (or any of them) to the Bank**, and any and all modifications, renewals or extensions of it, whether joint or several, contingent or absolute, now existing or later arising, and however evidenced (collectively "Indebtedness") **are secured by and the Bank is granted a security interest in all items deposited in any account of any of the undersigned with the Bank** and by all proceeds of these items (cash or otherwise), all account balances of any of the undersigned from time to time with the Bank, by all property of any of the undersigned from time to time in the possession of the Bank **and by any other collateral, rights and properties described in each and every mortgage, security agreement, pledge, assignment and other security or collateral agreement which has been, or will at any time(s) later be, executed by any (or all) of the undersigned to or for the benefit of the Bank (collectively "Collateral").**
. . . .

The undersigned acknowledge(s) that **this Note matures upon issuance, and that the Bank, at any time, *without notice*, *and without reason*, may demand that this Note be immediately paid in full. The demand nature of this Note shall not be deemed modified by reference to a Default in this Note or in any agreement to a default by the undersigned or to the occurrence of an event of default (collectively an "Event of Default").** For purposes of this Note, to the extent there is

17

**reference to an Event of Default this reference is for the purpose of permitting the Bank to accelerate Indebtedness not on a demand basis and to receive interest at the default rate provided in the document evidencing the relevant Indebtedness. It is expressly agreed that the Bank may exercise its demand rights under this Note whether or not an Event of Default has occurred.** The Bank, with or without reason and without notice, may from time to time make demand for partial payments under this Note and these demands shall not preclude the Bank from demanding at any time that this Note be immediately paid in full.  All payments under this Note shall be in immediately available United States funds, **without setoff or counterclaim**.
. . . .

**The undersigned waive(s) presentment, demand, protest, notice of dishonor, notice of demand or intent to demand. notice of acceleration or intent to accelerate, and all other notices and agree(s) that no extension or indulgence to the undersigned (or any of them) or release, substitution or nonenforcement of any security, or release or substitution of any of the undersigned. any guarantor or any other party, whether with or without notice, shall affect the obligations of any of the undersigned.** The undersigned waive(s) all defenses or right to discharge available under Section 606 of the Uniform Commercial  Code and waive(s) all other suretyship defenses or right to discharge. . . .

The undersigned agree(s) to reimburse the holder or owner of this Note for any and all costs and expenses (including without limit, court costs, legal expenses and reasonable attorney fees, whether inside or outside counsel is used, whether or not suit is instituted and, if suit is instituted, whether at the trial court level, appellate level, in a bankruptcy, probate or administrative proceeding or otherwise) incurred in collecting or attempting to collect this Note or incurred in any other matter or proceeding relating to this Note.

**The undersigned  acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be  amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note.**  As used in this Note, the word "undersigned" means, individually and collectively, each maker;

18

accommodation party, indorser and other party signing this Note in a similar capacity. If any provision of this Note is unenforceable in whole or part for any reason, the remaining provisions shall continue to be effective. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN.

THE UNDERSIGNED AND THE BANK ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.[30]

**b. The Advance Formula Agreement**

An "Advance Formula Agreement" executed on June 1, 1994, between MTG and

---

[30] Docket # 584-2 at pdf. pp. 2-3 (bold and italics added).

Comerica,[31] as amended in late October 1994,[32] and as amended on March 8, 1995,[33] applied to

the $3.5 Million Master Revolving Note, and limited MTG's ability to borrow from Comerica on

that note to the lesser of $3.5 million, or the amount specified under the "Borrowing Formula,"

which was:

> A) 80% of [MTG's] eligible accounts receivable (which exclude over 90 day[s], affiliated, contra, foreign or U.S. government accounts and such other accounts determined by Comerica to be ineligible), plus
>
> B) The lesser of $500,000 or 40% of [MTG's] eligible

---

[31] *See* Docket # 584-8. The Advance Formula Agreement covered "Formula Loans" and defined those loans as follows:

> 1. FORMULA LOANS. The credit which Bank may now or hereafter extend to Debtor subject to the limitations of this Agreement and to the conditions and limitations of any other agreement between Debtor and Bank is identified as follows:
>
> All Indebtedness under a $2,250,000.00 note dated 6-1-94 made by Debtor to Bank.
>
> and any extensions, renewals or substitutions, whether in·a greater or lesser amount, including any letters of credit issued thereunder ("Formula Loans").

*Id.* at pdf. p. 2 ¶ 1.

[32] Docket # 584-9. This amendment, in relevant part, increased the amount of the Working Capital Facility to the lesser $2,350,000 or the amount specified under the Borrowing Formula.

[33] There is no copy of the amendment to the Advance Formula Agreement which was executed on March 8, 1995 in the record, and a copy of it cannot be located. *See* Docket # 678 (Tr. of Hr'g) (statements of Halbert) at 31 ("[T]he March 1995 amended advanced formula agreement . . . remains missing to this day."), 34 (The "March 8, 1995 advance formula agreement "remains missing to this day."). The parties are apparently in agreement that the March 8, 1995 amended advance formula agreement allowed an over-formula $400,000 advance to MTG, which was to be repaid within 60 days at the rate of $200,000 per month plus interest, and that such advance was repaid according to the terms of that agreement. *See* Docket ## 584-45 at 59-60, 85-86 (testimony of Kirk Vercnocke), 584-47 at 277-78 (testimony of John Hertzberg), 584-48 at 180-82, 215 (testimony of Todd Halbert), 584-38 at 96-98, 138, 140 (testimony of Michael Collins).

20

work-in-process inventory (as determined by Comerica).[34]

Under the Advance Formula Agreement, MTG "warrant[ed] and agree[d] that [MTG's] indebtedness to [the] Bank for the Formula Loans [would] never exceed the sum" as determined by the Borrowing Formula.[35]  The Advance Formula Agreement did not require Comerica to make any advances "on demand basis formula loans."  In this regard, it provided:

> 10.   DEMAND BASIS FORMULA LOANS. Notwithstanding anything to the contrary set forth in this Agreement, in the event that the Formula Loans are at any time on a demand basis, [MTG] hereby acknowledges and agrees that the formula set forth in paragraph 2 hereof is merely for advisory and guidance purposes and **Bank shall not be obligated to make any loans or advances under the Formula Loans**, **and**, notwithstanding the terms of paragraph 3 above, **Bank may at any time, at its option, demand payment of any or all of the Formula Loans, whereupon the same shall become due and payable.**[36]

The Advance Formula Agreement also stated that any failure by MTG to comply with that Agreement also would "constitute a default under the Formula Loans and under the Security Agreement and the Indebtedness, as defined therein."[37]

To verify that MTG was in compliance with the Borrowing Formula on the Formula Loans, MTG had certain reporting obligations under the Advance Formula Agreement, as modified.  These were listed as the following:

Reporting

---

[34]  Docket # 584-9.

[35]  Docket # 584-8 at pdf. p. 2 ¶ 2.

[36]  *Id.* at pdf. p. 3 ¶ 10 (emphasis added).

[37]  *Id.* at pdf p. 3 ¶ 8.

A) Transactional borrowing base reports, plus
B) Monthly accounts receivable and accounts payable agings within 10 days after end of each month, plus
C) Monthly inventory reports within 10 days after end of each month, plus
D) Monthly company prepared interim financial statements within 20 days after end of each month, plus
E) Annual CPA prepared financial statement prepared on a reviewed basis within 90 days after end of each year, plus
F) Annual personal financial statements.[38]

The "transactional borrowing base reports" requirement meant that MTG had to submit "borrowing base reports" ("BBRs"), also known as "cash collateral reports," and "reports of accounts receivable" ("A/R Reports") "at least once a month," and *every* time MTG requested a credit advance from Comerica.[39]   If an A/R Report was not submitted, or if an A/R Report was submitted, but, when compared to the information in the commercial loan accounting system ("CLAS") on Comerica's computer, showed that MTG was out of formula, the loan processor lacked the authority to advance any funds into MTG's accounts without first getting approval from a loan officer at Comerica.[40]   In the normal course of business, at the end of every business

---

[38]  Docket # 584-9 at pdf. p. 3.

[39]  Vercnocke Dep. Tr. (Docket # 584-45) at 85, 88-89, 91; Tr. of Oct. 6, 2008 Dep. of Michael Collins ("Collins 10/6/08 Dep. Tr.") (Docket 599-17) at 16, 85, 88, 131-32.

[40]  Tr. of Sept. 26, 2008 Dep. of Charity Ware (loan processor for Comerica) ("Ware Dep. Tr.") (Docket # 589-44) at 25-26, 41-43, 50, 58-59; Vercnocke Am. Aff. (Docket # 589-16) at 5 ¶ 26 ("Cash collateral reports indicate whether [MTG] is 'in formula' or 'out of formula'.  Under normal circumstances, each time that [MTG] requested a credit line advance when 'out of formula', special approval would have to be obtained within the Bank, even possibly by the Bank's Loan Committee."); Collins 10/29/96 Dep. Tr. (Docket # 529-19) at 75; Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 18-19, 25, 29, 41; Tr. of Oct. 14, 2008 Dep. of Tammy Bensinger ("Bensinger Dep. Tr.") (Docket # 599-16) at 19 ("[W]e were not allowed to borrow once we were out-of-formula unless it was approved.").

day, loan officers at Comerica received notifications of out-of-formula situations.[41]  The loan processing department had a lot of checks and balances to make sure that loans were processed correctly.[42]  "[A]  processor would process a loan . . . and another group ["specifically designed to check the work of the loan processors"] would check what they did."[43]  There was a department that "checked the paperwork after an advance was granted . . . on a daily basis."[44]

Under the Advance Formula Agreement, as amended in October 1995, MTG granted Comerica a "[f]irst security interest in all of [MTG's] accounts receivable, inventory, machinery and equipment, and [MTG's] real estate located at 42265 Yearego, Sterling Heights, Michigan."[45]  Also, under the Advance Formula Agreement, as amended, Richard May, as President of MTG, and Kirk Vercnocke, as Secretary of MTG, gave Comerica unlimited unsecured personal guaranties for MTG's debt, and Q.C. Technologies, Inc., provided an "unlimited corporate guaranty . . . secured by accounts receivable, inventory, machinery and equipment."[46]

### c. The $1.5 million Master Revolving Note

In addition to the $3.5 million line of credit, MTG also obtained a line of credit in the

---

[41]  Collins 10/29/96 Dep. Tr. (Docket # 529-19) at 75; Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 26.

[42]  Tr. of Dep. of Catherine Riley (supervisor to Charity Ware in the loan processing department of Comerica) ("Riley Dep. Tr.") (Docket # 589-45) at 10, 21, 31.

[43]  *Id.* at 10.

[44]  *Id.* at 31.

[45]  Docket # 584-9 at pdf. p. 3 ¶ I.

[46]  *Id.* at pdf. p.3.

amount of $1.5 million for the purchase of equipment (known as the "Term Loan Facility" or the

"Equipment Facility").[47]  In connection with that line of credit, MTG executed a variable rate

Master Revolving Note, dated October 28, 1994, which was payable on demand ("Note 67").[48]

Credit advances under that note were limited by a "Borrowing Formula" in the Advance Formula

Agreement, as amended, which was "80% of [the] cost of new equipment to be purchased, and

---

[47]  *See* Docket # 584-5.  The $1.5 million Master Revolving Note was executed the day after Collins, on behalf of Comerica, sent a letter to addressed to "Richard G. May, President" and "Kirk R. Vercnocke, Secretary" of MTG which stated, in relevant part:

> I am pleased to inform you that Comerica Bank has agreed to modify our existing working capital loan and [E]quipment [F]acility to M.T.G., Inc. as outlined on the following pages. . . .
>
> Please indicate your acceptance of this Commitment by signing below where indicated, and return your signed copy of this letter to me within 20 days from the date of this letter.  If your written acceptance is not received by me within said period of time, this Commitment shall automatically become null and void. This Commitment may only be accepted as drawn, and may not be accepted in part, conditionally or subject to modification.
>
> Please call me . . . if you have any questions regarding this Commitment or the closing of this transaction.

(Docket # 584-9) at pdf. p. 2.  The letter was signed by "Michael A. Collins" as the Vice President of Comerica and "Richard May" as the President of MTG.  Curiously, the signed copy of the letter indicates that Richard May signed it on October 26, 1994, the day before the letter was dated.  The "Amount" of the "Term Loan Facility" is "[t]he lesser of $1,500,000 or the Borrowing Formula." *Id.* at pdf. p. 4.  Next to the caption "Term" regarding the "Term Loan Facility," the letter states: "Individual term notes of four years payable in equal monthly principal payments plus interest." *Id.*  Despite this description of the payment term for the Term Loan Facility, the next day on October 28, 1994, MTG signed the $1,500,000 Master Revolving Note, which contained the following same language as the other demand notes MTG signed: "The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note, and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note."  (Docket # 584-5) at pdf. p. 3.

[48]  *See* Docket # 584-5.

24

70% of the cost of used equipment and computer."[49]  MTG also had the same reporting

obligations with regard to the Equipment Facility as it had under the $3.5 million demand note.

MTG had to submit "[t]ransactional borrowing base reports," *every* time MTG requested a credit

advance from Comerica under the Equipment Facility, to verify that MTG was in compliance

with the Borrowing Formula.[50]  And as with $3.5 million demand note, MTG granted Comerica a

security interest in certain specified assets to secure the loan; Richard May and Kirk Vercnocke

signed personal guarantees for the loan; and Q.C. Technologies provided an "[u]nlimited

corporate guaranty . . . secured by accounts receivable, inventory, machinery and equipment."[51]

### d.  Other promissory notes

In addition to the $3.5 million and $1.5 million lines of credit, MTG or related parties

obtained other loans from Comerica.  In connection with those other loans, MTG or a related

party executed other promissory notes and a Mortgage Note, and granted Comerica security

interests in specified assets and a mortgage to secure those loan obligations.[52]  With the exception

of the Mortgage Note, all of the promissory notes in the record are variable rate-demand notes,

---

[49]  Docket # 584-9 at pdf. p. 4 ¶ II.

[50]  *See* Vercnocke Dep. Tr. (Docket # 584-45) at 88-89.

[51]  *See* Docket # 584-5.

[52]  *See, e.g.*, Docket ## 584-3, 584-4, 584-6, 584-7 (a "Variable Rate-Demand Note Single Disbursement in the amount of $63,000.00, dated November 2, 1993 (Note # 34) (Docket # 584-3); a "Variable Rate-Demand Note Single Disbursement" in the amount of $300,000.00, dated June 1, 1994 (Note # 59) (Docket # 584-4); a "Variable Rate-Demand Note Single Disbursement" in the amount of $161,600.00, dated September 8, 1994 (Note # 109) (Docket # 584-6); and a Mortgage Note for the principal amount $660,000.00, dated November 10, 1993, secured by a mortgage on "[p]roperty located at 42265-42315 Yearego Drive[,] Sterling Heights, Michigan" and "other instruments of even date herewith, the terms and provisions of which [were] . . . incorporated [into the Mortgage Note] by reference" (Docket # 584-7).  A summary of all of the notes signed by MTG or a related party can be found in "Comerica Bank's Response to Motion for Contempt" (Docket # 521) at pages 8-9.

and contain language nearly identical to the Master Revolving Variable Rate-Demand Notes:

> The undersigned acknowledge(s) that this Note matures upon issuance, and that the Bank, at any time, without notice, and with or without reason, may demand that this Note be immediately paid in full.[53]

Although the Mortgage Note was not a demand note, it contained a cross-default provision, which gave Comerica the ability to call the note if other, demand obligations were not met. The Mortgage Note provided, in relevant part: "This Note is secured by a mortgage and other instruments of even date herewith, . . . . Any default under said mortgage or any other instruments securing this Note shall be a default hereunder entitling the holder to accelerate the indebtedness hereunder."[54]

## 2. MTG's financial distress following its acquisition of Sterling Mold & Engineering

In June 1994, MTG acquired Sterling Mold & Engineering (the "Mold Shop"), in order to expand its business to include the manufacturing of production tools to make plastic production parts.[55] Before the acquisition, MTG could only provide early phase engineering services and prototypes for plastic parts, for the interior and exterior of automobiles. These services were provided to original equipment manufacturers, such as General Motors Corporation, Ford Motor

---

[53] *See* Docket ## 584-3, 584-4, 584-6.

[54] Docket # 584-7. The Mortgage Note was signed by Protech, Inc. According to Comerica, "Prototech, Inc. was a predecessor company to MTG. This note related to a loan and mortgage for [Prototech Inc.'s] (later MTG's) building. . . . It has nothing to do with the lender liability claims." ("Comerica Bank's Response to Motion for Contempt" (Docket # 521) at 13.)

[55] *See* Vercnocke Am. Aff. (Docket # 589-16) at 2 ¶ 10; Vercnocke Dep. Tr. (Docket # 584-45) at 21-25. A production tool "is basically a mold that's a hollow cavity tool that would get attached to . . . a plastic injection molding machine, and plastic would get injected into the cavity and create the part." (Vercnocke Dep. Tr. (Docket # 584-45) at 24.)

Company, and DaimlerChrysler Corporation, and to Tier One suppliers in the automotive industry.[56] With the addition of the Mold Shop, the expectation was that MTG could provide services for all three phases involved in manufacturing production parts: the engineering phase; the prototyping phase; and the manufacturing phase.[57]

Kirk Vercnocke ("Vercnocke"), a certified public accountant, was the Chief Financial Officer of MTG. He became the President of MTG on January 1, 1995, upon the resignation of Richard May ("May") as President of MTG. According to Vercnocke, the acquisition of the Mold Shop caused severe cash flow problems for MTG and hurt its profitability.[58] MTG had to incur a significant amount of new debt to acquire the Mold Shop,[59] but the Mold Shop was unprofitable. According to Vercnocke, after the acquisition of the Mold Shop, MTG discovered that "the receivables [of the Mold Shop] were basically garbage, uncollectible, and the person [who] had owned [the Mold Shop] had been in such financial [straits] for so long, he had not maintained the hardware that was there; and essentially it was all useless."[60] Due to the condition of the equipment, MTG could not make production tools properly, nor could it make them within

---

[56] Vercnocke Dep. Tr. (Docket # 584-45) at 21-25.

[57] *Id*. at 21.

[58] *See id*. at 29.

[59] Vercnocke had estimated that if MTG were to acquire the Mold Shop, its debt to equity ratio "would increase from 3:1 to 4:1 to 10:1, which would be very high for companies in [their] industry." (Vercnocke Am. Aff. (Docket # 589-16) at 2 ¶ 7; *see also* Vercnocke Dep. Tr. (Docket # 584-45) at 31 (Vercnocke told Mike Collins, MTG's loan officer at Comerica, that MTG acquired the Mold Shop, MTG would "have a leveraged ratio of 10 or 12 to 1.")).

[60] Vercnocke Dep. Tr. (Docket # 584-45) at 8, 16, 28.

the necessary time-frame prescribed by MTG's customers.[61]  In order to manufacture production tools, MTG would need to purchase "more reliable equipment."[62]  The Mold Shop, as it existed, was losing money, and was a drain on the cash of MTG.[63]

To deal with the financial stress caused by the Mold Shop, Vercnocke decided that MTG had only three options: (1) close the Mold Shop, liquidate its assets, and continue operating MTG (according to projections made by Vercnocke, the operation of MTG's other companies could generate enough profits to make up for any shortfall resulting from the liquidation of the Mold Shop's assets); (2) sell the Mold Shop as a stand-alone entity; or (3) sell the whole group of companies that made up MTG.[64]  Vercnocke decided to try to find a buyer for the Mold Shop or for all of MTG.  Vercnocke decided that, based on the amount of money the Mold Shop was losing monthly, he had "at least two or three months" to consummate a sale of the Mold Shop as a stand-alone company or a sale of the entire group of companies.[65]

### 3.  Preliminary negotiations with Chuck Becker and Bruce Becker of the Becker Group

In May 1995, Vercnocke entered into discussions with a number of companies regarding the sale of the Mold Shop or of MTG as a whole.  One of those companies was Becker Group,

---

[61]  *Id.* at 33.

[62]  *Id.*

[63]  *Id*. at 31-32.

[64]  *Id.* at 33.

[65]  *Id.* at 34.

Inc. (the "Becker Group"), a large Tier One automotive supplier.[66]  Chuck Becker ("C. Becker"),

the Vice President of the Becker Group, and his brother, Bruce Becker ("B. Becker"), Chief

Financial Officer of the Becker Group, initially discussed the possibility of each of them

individually purchasing a 25% interest in MTG (a total of a 50% interest) for $7,500,000, half of

the estimated $15 million value of MTG.[67]  Some of the proposed terms of such purchase

discussed were that May, the President and a shareholder of MTG, and Gregg Robert Waelchli

("Waelchli"), a shareholder of MTG and the person responsible for running the operations of

Q.C. Technologies, Inc., each would give up their stock in MTG in return for the release of

personal guarantees they had signed; Vercnocke, Ellis Eugene Gosnell ("Gosnell"), a shareholder

of MTG and the person responsible for bringing in business to MTG, C. Becker, and B. Becker

each would own a 25% share of MTG; Vercnocke and Gosnell each would be paid $150,000

annually as employees of MTG under employment contracts; MTG would receive a loan up front

from B. Becker and C. Becker to cover capital shortfalls caused by the Mold Shop operations;

and B. Becker and C. Becker would assume the liabilities of MTG, personally guarantee the

MTG debt, and take over MTG's finances.[68]

### 4.  The June 21, 1995 Renaissance Club meeting

In furtherance of an anticipated transaction between MTG and B. Becker and C. Becker,

based on the terms listed above, a meeting was held on June 21, 1995.  The people who attended

---

[66]  *Id.* at 35, 52-53.

[67]  *Id.* at 38-39

[68]  Vercnocke Dep. Tr. (Docket # 584-45) at 38; Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 65-66, 74-76.

the meeting were Vercnocke, Gosnell, and B. Becker, and three representatives of Comerica

(Michael A. Collins ("Collins"), Vice President of, and MTG's loan officer at, Comerica;

Michael Bourke ("Bourke"), First Vice President of Comerica and Collins's "boss;" and Ronald

Marcinelli ("Marcinelli"), Senior Vice President of Comerica).[69]  The meeting was held in a

private room at the Renaissance Club in Detroit.[70]  During the meeting, after receiving assurances

from Comerica that it had no problem with the stated terms of the proposed transaction between

MTG, B. Becker and C. Becker, as outlined at the meeting, B. Becker stated that "he would have

an agreement drawn up and delivered to [Vercnocke] within a few days."[71]  On this much, the

parties agree.

However, what, if anything, was discussed regarding MTG's financial condition, and the

need for Comerica to agree to provide necessary financing from that date forward through the

due diligence period of the agreement, and the closing of the sale, is contested.  Vercnocke's

testimony about the discussion that occurred during the Renaissance Club meeting was as

follows:

> 20. At the Renaissance Club meeting, I told Mr. Becker and
> Mr. Marcinelli that I needed assurances from both [the] Becker
> [Group] and the Bank that they were committed to doing the sale to

---

[69]  Marcinelli attended the Renaissance Club meeting at the request of B. Becker and C. Becker. The Becker Group had been a prior customer of Comerica and Marcinelli had been its loan officer and was familiar with Becker's operations.  (See Tr. of Feb. 24, 2009 Dep. of B. Becker ("B. Becker Dep. Tr.") (Docket # 599-14) at 33-34.)

[70]  See Collins 10/29/96 Dep. Tr. (Docket # 529-19) at 60-62; Vercnocke Am. Aff. (Docket # 589-16) at 4 ¶ 18.  The chain of command at Comerica, was that Collins "reported to . . . Bourke . . . . . Bourke reported to Judy Love.  At one point, Judy Love reported to . . . Marcinelli."  But, it is uncertain whether on the date of the Renaissance Club meeting, Judy Love reported to Marcinelli.  (Collins 10/6/08 Dep. Tr. (Docket 599-17) at 105-06.)

[71]  Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 64.

[the] Becker [Group]. If they were not, I told them, the Debtor would immediately shut down its mold operations, terminate its old employees and liquidate its mold equipment.

21. [The] Becker [Group] wanted the Debtor to continue its mold operations through the date of sale for the purposes of keeping all [M]old [S]hop employees on board, for whom weekly payroll approximated $60,000. If the Debtor were to continue [the M]old [S]hop operations, it needed the Bank's assurances that it would fully fund its operations through the date of sale.

22. [B.] Becker told me that "we're absolutely committed to doing this deal."

23. I responded by saying, "Gee, that's great. But how am I going to fund payroll? That'll put us way out of formula."

24. Mr. Marcinelli then stated, "Don't worry. We're going to be your partner and do everything that we can do" to assist the Debtor in closing [the] Becker [Group] deal.

25. Mr. Marcinelli also instructed me that pending the Becker [Group] closing, the Bank would prefer to advance funds on the credit line without first receiving required cash collateral reports from the Debtor.
. . . .

28. After the Renaissance Club meeting, all the Bank's credit line advances to the Debtor continued to be 'out of formula'. Immediately after the meeting, Michael Collins, the Bank's loan officer, confirmed to me that I should not submit cash collateral reports with requests for credit line advances pending a closing on the Becker [Group] deal.[72]

Collins's account of the Renaissance Club meeting conflicts with Vercnocke's account.

Collins admits that at the Renaissance Club Meeting, he became aware that MTG was

experiencing a serious cash shortfall problem. But Collins denies that there was ever a

discussion about or an agreement made between Comerica and MTG at the Renaissance Club

---

[72] Vercnocke Am. Aff. (Docket # 589-16) at 4-5 ¶¶ 20-25, 28.

31

meeting, that Comerica would advance funds to MTG to cover payroll and other expenses though the date of the sale to B. Becker and C. Becker, without first receiving the required signed cash collateral reports, and determining that MTG was in-formula.[73]  According to Collins, although he knew that MTG was suffering serious financial problems and a cash shortfall, there were no discussions at the meeting on how to deal with such problems through the contemplated closing of the sale of shares of MTG to B. Becker and C. Becker; MTG made no requests to Comerica for additional financing during the meeting; and when he left the meeting, there was nothing in place to deal with MTG's financial problems.[74]

Marcinelli does not remember making a statement to Vercnocke during the Renaissance Club meeting that "the [B]ank would be a partner with MTG going forward to explore the possibility of an acquisition by the Becker Group."[75]

B. Becker has only a vague recollection of some questions directed at Marcinelli during

---

[73]  Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 114-16.

[74]  *Id.* at 116-17.

[75]  Marcinelli's 9/2/08 Dep. Tr. (Docket # 589-51) at 23-24.  Marcinelli testified at a deposition regarding that purported statement as follows:

> Q.  Do you recall indicating to Mr. Vercnocke that the [B]ank would be a partner with MTG going forward to explore the possibility of an acquisition by the Becker Group?
>
> A.  No.
>
> Q.  Do you deny making that type of statement or do you simply not recall?
>
> A.  I simply don't recall.

(*Id..*)

32

the Renaissance Club meeting, about whether Comerica would hold off on taking any action

against MTG pending a decision on whether there was going to be an acquisition of MTG. But

he cannot remember the specifics of that conversation.[76]

---

[76] B. Becker, while being asked about certain statements Collins made in a memo to Michael Main, counsel for Comerica, dated August 16, 1995 (the "Collins-Main Memo"), testified as follows:

> Q. Next sentence: [B. Becker] asked us if we had a problem with continuing to lend to the company under this scenario. Does that refresh your recollection?
>
> A. I just remember there was some conversation saying would you hold off any action until we could decide whether we were going to go forward or not.
>
> Q. And that question was directed at Comerica?
>
> A. Yes. I mean [Marcinelli] at the luncheon.
>
> Q. And what, if anything, was [Marcinelli's] response?
>
> A. I'm assuming he said yes because we didn't have any – but I don't have a specific memory of what he said, to be honest with you.
>
> Q. Why was this important for you to ask that question?
>
> A. Because at the time we thought there was a possibility that we were going to acquire this company.
>
> Q. And why would you want Comerica to hold off on any action against MTG while you were looking to acquire the company?
>
> A. Because we weren't looking to buy -- we were looking to buy the company as it was.
>
> Q. As a going concern?
>
> A. Yes.

B. Becker 2/24/09 Dep. Tr. (Docket # 599-14) at 36-37.

### 5. The Loan Advances on MTG's $3.5 million Line of Credit after the Renaissance Club meeting

After the Renaissance Club meeting, negotiations between MTG and the Beckers, and the operations of the Mold Shop, continued, and for a month, Comerica continued to make loan advances to MTG on MTG's $3.5 million line of credit to fund MTG's operations. Comerica made those loan advances between June 21, 1995 (the date of the Renaissance Club meeting) and July 21, 1995 (the date on which a deal between MTG and the Becker Group began to unravel).[77] During this period, according to a hand-written summary Comerica produced (the "Comerica Summary"),[78] and MTG's A/R Reports, which are also known as BBRs, MTG requested, and Comerica made, the following advances to MTG on its $3.5 million line of credit, totaling $1,225,798.64:

$336,500.00 on June 25, 1995

$363,298.64 on June 30, 1995

$80,000.00 on July 9, 1995

$146,000.00 on July 12, 1995

$84,000.00 on July 13, 1995

$53,000.00 on July 16, 1995

$22,000.00 on July 18, 1995

---

[77] *See infra* Part IV.A.10 of this Opinion ("The Impending Termination of the Asset Purchase Agreement").

[78] *See* Docket # 426-1.

34

$141,000.00 on July 20, 1995[79]

---

[79]  *See* Comerica Summary (Docket # 426-1); MTG's A/R Reports Nos. 66-73 (Docket ## 584-14. 584-15, 584-16).  Line 5 of each of MTG's A/R Reports lists the total amount of MTG's accounts receivable as of a stated date.  It is that date that the Court is using to identify the amount and date of each loan advance amount made, although from other Comerica records, it appears that such advances were actually made on other dates, and some of the loan advance amounts on the A/R Reports represented the sum total of multiple advances made on several dates.  (*See* table in this footnote below.)  The way the Court is identifying these advances also appears to be the way the Comerica Summary identifies the various loan advances that Comerica made to MTG on its $3.5 million line of credit between June 21, 1995 and July 21, 1995.  (*See* Docket # 426-1.)  With one insignificant exception, the Comerica Summary contains the same amounts and dates of loan advances as is contained in MTG's A/R Reports.  That exception is that on the Comerica Summary, the amount of the loan advance for June 30, 1995 is listed as $363,299 rather than $363,298.64, which is the amount indicated on MTG's A/R Report dated June 30, 1995 (a difference of 35 cents).  It appears that Comerica simply rounded up to the next whole dollar amount.

Also, with one exception, the amounts of the loan advances on MTG's $3.5 million line of credit (covered by Note # 26) listed on Comerica's "Loan Interest and Principal Statement" for Note # 26 matches those listed on the Comerica Summary and MTG's A/R Reports. (*See* Comerica Summary (Docket # 426-1); Comerica "Loan Interest and Principal Statement" for Note # 26 (Docket # 701-1).)  Following is a table comparing the credit advance amounts on MTG's $3.5 million line of credit between June 21, 1995 and July 21, 1995, listed in the Comerica Summary and MTG's A/R Reports on one hand, with the credit advance amounts for this line of credit on Comerica's "Loan Interest and Principal Statement" for Note # 26 on the other hand.

| Date | Advances Reported on Comerica's Loan Interest and Principal Statement | **Subtotal of advances made starting 6/26/95** | Advances Reported on MTG's Reports of Account Receivables and Comerica Summary |
|---|---|---|---|
| 6/22/95 | $82,000 | | |
| 6/25/95 | | | $336,500 (BBR # 66) (covering period from 6/15/95 to 6/25/95) |
| 6/26/95 | $1,500 $113,799 | | |
| 6/27/95 | $20,000 | | |
| 6/28/95 | $100,000 $6,000 | | |
| 6/30/95 | $122,000 | **$363,299** (appears to be rounded up) | $363,298.64 (BBR # 67) (covering period 6/26/95 - 6/30/95) |

35

| 7/05/95 | $30,000 | | |
|---------|---------|-----------|-----------------------------------------------|
| 7/07/95 | $50,000 | **$80,000** | $80,000 (BBR # 68) (covering period from 7/01/05 to 7/09/95 |
| 7/10/95 | $15,000 | | |
| 7/13/95 | $131,000 | **$146,000** | $146,000 (BBR # 69) (covering period from 7/10/95 to 7/12/15) |
| 7/14/95 | $84,000 | **$84,000** | $84,000 (BBR # 70) (covering 7/13/95) |
| 7/14/95 | $53,000 | **$53,000** | $53,000 (BBR # 71) (covering period from 7/14/95-7/16/95) |
| 7/18/95 | $22,000 | **$22,000** | $22,000 (BBR # 72) (covering period from 7/17/95 to 7/18/95 |
| 7/20/95 | $38,000 | **$38,000** | $38,000 (after accounting for $103,000 advance that Collins denied) (BBR # 73) (covering period from 7/19/95 to 7/20/95 |

Comerica's loan advances to MTG in both Comerica's records and MTG's records are consistent.

The amounts loaned to MTG and the dates of the loans between June 26, 1995 and July 18, 1995 on Comerica's "Commercial Loan Processing Approval Forms" that are in the record correspond to the amounts and dates of loans stated on Comerica's Loan Interest and Principal Statement. (*See* Docket ## 429-1, 429-2; Docket # 529-10.)

| Date | Advances Reported on Comerica's Loan Interest and Principal Statement | Approval Form Loan Processor | Approved by |
|------|---------------------------------------------------------------------|-----------------------------|-------------|
| 6/22/95 | $ 82,500 | | |
| 6/26/95 | $ 1,500 | Val | "MAC" (Collins) |
| | $113,799 (rounded up) | | |
| 6/27/95 | $ 20,000 | Charity | (horizontal line) |
| 6/28/95 | $100,000 | Charity | "MLB" (Bourke) |
| | 6,000 | Charity | "MAC" (Collins) |
| 6/30/95 | $122,000 | Charity | (horizontal line) |
| 7/05/95 | $ 30,000 | Charity | (horizontal line) |
| 7/07/95 | $ 50,000 | | |
| 7/10/95 | $ 15,000 | Tierra Fulson | "MAC" |
| 7/13/95 | $131,000 | Tierra Fulson | (horizontal line) |
| 7/14/95 | $ 84,000 | Tierra Fulson | "EKF" |

36

Out of these eight credit advances, MTG only submitted an A/R Report concurrently with its request for the June 25, 1995 advance of $336,500.00 (A/R Report No. 66), and that A/R Report was unsigned.[80]  A/R Report No. 66 showed that the "Total Loanable Collateral" was $3,035,967.85, and that the "Total Liability" was $2,992,183.19.[81]

According to Tammy Bensinger ("Bensinger"), the accounting manager of MTG and the person at MTG who was responsible for requesting credit advances from Comerica, Vercnocke instructed her to deviate from her normal practice of calling Comerica to request an advance and then faxing Comerica an A/R Report showing that MTG was in formula, pending the acquisition of MTG by the Becker Group.  Bensinger testified that Vercnocke instructed her that pending the deal with the Becker Group, "[she] did not need to submit [A/R Reports] . . . and when [she] needed an advance if there was an issue, [she] would just tell Charity [Ware of Comerica] she needed to contact Mike Collins."[82]  It was Bensinger's understanding, based on her conversation with Vercnocke, that "the [B]ank was working with [MTG] and with [the Becker Group], so

---

|         | $ 53,000 |          |                   |
|---------|----------|----------|-------------------|
| 7/18/95 | $ 22,000 | Charity  | (horizontal line) |
| 7/20/95 | $ 38,000 | Charity  |                   |

All but two of Comerica's "Commercial Loan Processing Approval Forms" above, which are in the record, indicate that MTG was overformula either due to a notation on the form or due to the fact that the "Loan Balance" exceeded the "Total Loanable Collateral" on A/R Report No. 66, which was the last MTG A/R Report that was faxed concurrently with a loan advance request.

[80]  *See* A/R Report No. 66 (Docket # 584-14) (received by Comerica on June 26, 1995).

[81]  *Id*. at Lines 12, 18.

[82]  Bensinger Dep. Tr. (Docket # 599-16) at 2; *see also id.* at 25-26, 45-46.

37

[she] didn't need to submit reports until it was all figured out."[83]  But Bensinger testified that she could not remember anyone from Comerica telling her that.[84]

Although, with the exception of the June 25, 1995 unsigned report, A/R Reports were not faxed to Comerica concurrently with requests for loan advances during the one-month period between June 21, 1995 and July 21, 1995, MTG's accounting team still prepared such reports daily, and Vercnocke used them "as an internal cash control mechanism."[85]  Vercnocke testified that he did not expect any unsigned A/R Reports to be submitted to Comerica "through the normal process."[86]

Line 15 of each A/R Report indicated the amount of the loan advance.  That loan advance amount was added to the "Total Liability" of MTG ("Customer Number 5245191892") to Comerica on "Loan Number 26" (corresponding to the $3.5 million "Master Revolving Note" ("Note # 26")), which "Total Liability" was indicated on Line 18 of each A/R Report.[87]

The only A/R Report submitted to Comerica between June 21, 1995 and July 21, 1995 in connection with a loan advance request (A/R Report No. 66), indicated that MTG was in formula.[88]  All of the other A/R Reports that corresponded to MTG's requests to Comerica for loan advances during this time frame (A/R Report Nos. 67-73), which were prepared by MTG

---

[83]  *Id.* at 21.

[84]  *Id*. at 21-22.

[85]  Vercnocke Dep. Tr.  (Docket # 584-45) at 94-95.

[86]  *Id.*

[87]  *See* A/R Report Nos. 66-73 (Docket ## 584-14, 584-15, 584-16); $3.5 million "Master Revolving Note" (Docket # 584-2).

[88]  *See* A/R Report No. 66 (Docket # 584-14) (received by Comerica on June 26, 1995).

but not faxed to Comerica concurrently with the loan advance requests, showed that MTG was out of formula.[89]  These reports were not received by Comerica until July 26, 1995, and also were unsigned.[90]

MTG recorded the advances it requested and received after the Renaissance Club meeting on its books and records.[91]

### 6.  The advances under the $1.5 million Master Revolving Note

During the period after the Renaissance Club meeting, between June 21, 1995 and July 21, 1995, Comerica also made an advance to MTG on its $1.5 million line of credit, for the purchase of a piece of equipment for the Mold Shop.  Prior to this period, on October 31, 1994, MTG had obtained a quote from FPT Industries S.P.A. ("FPT") for a milling machine for the total amount of $431,545.00, less a $10,000 deposit, leaving a total owing of $421,545.00.[92]  On November 1, 1994, MTG issued a purchase order to FPT for the milling machine under the terms of that quote.[93]  In order to fund its purchase of the FPT machine, on January 24, 1995, MTG submitted to Comerica an application (the "Application") for an irrevocable letter of credit (the "Letter of Credit").[94]  The Application stated, in relevant part: "Drafts must be presented to:

---

[89]  *See* A/R Report Nos. 67-73 (Docket ## 584-15, 584-16).

[90]  *See id.*

[91]  *See* Docket # 701-2 (General Ledger Detail Report of MTG) (showing $523,000.00 in advances taken in July).  Comerica's records show advances to MTG of $626,000 in July.  *See* Comerica Summary (Docket # 426-1).

[92]  *See* Docket # 507-38 at pdf. pp. 4-5.

[93]  *See id.*

[94]  *See id.* at pdf. pp. 1-3.

negotiation or presented to drawee on or before June 15, 1995," which date was designated as the "Expiry Date" on the Application.[95]  In the Application, MTG granted Comerica a security interest in certain defined collateral to secure MTG's obligation under the Letter of Credit.[96] Under the terms and conditions of the Letter of Credit, MTG was required to reimburse Comerica in cash, "on demand," all amounts required by the Letter of Credit and

> all reasonable costs and expenses, (including without limitation, reasonable attorneys' fees and legal expenses) incurred in connection with the enforcement of [the] Application, and such other documents which may be delivered in connection with [the] Application or any action or proceeding relating to a court order, injunction or other process or decree restraining or seeking to restrain the Bank from paying any amount under the [Letter of] Credit.[97]

Also, on January 24, 1995, Collins provided the Letter of Credit Division of Comerica's International Department with authority to issue a Commercial Letter of Credit in the amount of $421,545 on MTG's $1.5 million line of credit, with an expiration date of June 15, 1995, for the purchase of the FPT milling machine.[98]  There is no copy of the Letter of Credit that was issued in the record, but such Letter of Credit apparently was issued on January 31, 1995, according to a shipping invoice from FPT to MTG, which is discussed below.[99]

On May 16, 1995, Collins approved an extension of the Equipment Facility loan until

---

[95] *See id.* at pdf. p. 1.

[96] *See id.* at pdf. pp. 2-3 ¶ 11.

[97] *See id.* at pdf. p. 2 ¶¶ 1, 5.

[98] *See id.* at pdf. p. 6.

[99] *See* Docket # 521-21.

July 1, 1995.[100]  According to a notation Vercnocke made in a document entitled "Chronological History," which contains notes he allegedly was taking during MTG's negotiations with B. Becker and C. Becker, as of May 25, 1995, Vercnocke was still committed to getting the FPT milling machine for the Mold Shop.  Vercnocke's notation reads: "Keep FPT."[101]

However, nearly 5 months after filing the Application for the Letter of Credit, and shortly after his notation regarding keeping the FPT milling machine, in a letter dated June 6, 1995, by Vercnocke to Collins, Vercnokce stated, in relevant part: "Please cancel our [L]etter of [C]redit on the FPT Milling Machine."[102]  There is no mention of this letter in Vercnocke's "Chronological History."

On June 7, 1995, FPT invoiced and shipped the milling machine to MTG.  Regarding payment for the milling machine, the invoice stated:

> Payment:   100 pct of Invoice value against **irrevocable** documentary credit No. 526888 issued by Comerica Bank Detroit, Detroit on 950131[103]

On June 26, 1995, Comerica recorded a $316,292.26 advance to MTG on its $1.5 million line of credit for the purchase of a milling machine for the Mold Shop from FPT.[104]  Three days later, on June 29, 1995, Vercnocke delivered FPT documents to Leo Jensen of the Becker

---

[100]  *See* Docket # 507-38 at pdf. p. 8.

[101]  Vercnocke's "Chronological History" (Docket # 598-11) at pdf. p. 1.

[102]   *See* Docket # 507-38 at pdf. p. 7.

[103]  *See* Docket # 521-21 (emphasis added).

[104]  *See* Docket # 507-38 at pdf. pp. 14-15.

41

Group.[105]

Vercnocke's "Chronological History" indicates that on July 13, 1995, Leo Jensen of the Becker Group met with Vercnocke and Gosnell at MTG "to say FPT is a great machine."[106]

Several months later, on January 4, 1996, when MTG entered into an "Amended Asset Purchase Agreement" with Specialty Stampings, Inc. as part of the process of liquidating certain assets under Chapter 11, MTG represented that the FPT machine was one of its assets. The Amended Asset Purchase Agreement, recited, in relevant part: "B. Seller also is the owner of the machinery and equipment described in the attached Exhibit B (the 'Equipment')."[107] Included on Exhibit B to that agreement was "1 FPT Machine."[108]

### 7.   The Asset Purchase Agreement between MTG and the Becker Group

During the time period when MTG was making credit advance requests to Comerica but not submitting A/R Reports, negotiations continued between MTG and the Beckers. Various draft agreements were exchanged between the parties, and the terms of the agreement that had been discussed at the Renaissance Club meeting changed significantly.[109] An agreement ultimately was executed on July 18, 1995 by and between the Becker Group, as "Buyer," MTG, as "Seller," and the shareholders of MTG, and delivered to the Becker Group on July 20, 1995 (the "Asset Purchase Agreement"). In that agreement, the Becker Group agreed to purchase most

---

[105]   *See* Vercnocke's "Chronological History" (Docket # 598-11) at pdf. p. 2.

[106]   *Id.*

[107]   *See* "Amended Asset Purchase Agreement" between MTG as the "Seller" and Specialty Stampings, Inc. as the "Buyer" (Docket # 701-6) at pdf. p 2 (Recital B).

[108]   *See id.* at pdf. p. 4.

[109]   *See* Vercnocke Dep. Tr.  (Docket # 584-45) at 46-47, 221-22, 229-30.

of the assets of MTG and assume certain specified liabilities of MTG.[110] The Asset Purchase Agreement contemplated a closing of the agreement at a future date, and contained various representations and warranties, and conditions precedent to closing. Under a paragraph captioned "Closing and Closing Date," the Asset Purchase Agreement stated that "[t]he sale and purchase transactions contemplated by this Agreement shall be consummated at 10:00 a.m., on August 31, 1995, at the offices of [the Becker Group], Warren, Michigan, or such other date and time or such other place as may be agreed upon by Seller and Buyer . . . ."[111]

In Section 2.1 of the Asset Purchase Agreement, MTG and its shareholders made certain representations and warranties to the Becker Group, including:

- "The May 3l, 1995 Balance Sheet and Income Statement . . . fairly presents the financial condition of Seller and the results of its operations for the period shown, and discloses all liabilities and obligations of Seller as of the date of the Balance Sheet as required by generally accepted accounting principles."[112]

- "All of Seller's books and records, including the May 31, 1995 Balance Sheet and Income Statement, are true and accurate in all material respects and have been maintained in accordance with good business and generally accepted accounting

---

[110] *See* "Asset Purchase Agreement" (Docket # 598-3) at ¶¶ 1.1-1.1.9 ("Sale and Purchase of the Assets"), 1.2 ("Excluded Assets"), 1.4-1.4.3 ("Liabilities Assumed by Buyer"), 1.5-1.5.7 ("Liabilities Not Assumed by Buyer"); Vercnocke Dep. Tr. (Docket # 584-45) at 46-47, 54; Vercnocke's "Chronological History" (Docket # 598-11) at pdf. pp. 2-3. Although the Asset Purchase Agreement is undated, the date that it was signed by all of the parties can be determined by reference to an employment agreement that was entered into between the Becker Group and Vercnocke, which references that Asset Purchase Agreement and indicates that it was signed on July 18, 1995. (B. Becker Dep. Tr. (Docket # 599-14) at 48-49.) Although it appears that this employment contract is not in the record, a part of it was read into the record at the deposition of B. Becker.

[111] Asset Purchase Agreement (Docket # 598-3) at ¶ 1.8 ("Closing and Closing Date").

[112] *Id.* at ¶ 2.1.3 ("Financial Statements: Liabilities").

43

principles."[113]

- With certain specified exceptions, "since May 31, 1995, there has not been (i) any material adverse change in the financial condition of Seller or any other event or condition of any character which has had or which may have a material adverse effect on Seller's business, the Assets or the financial condition of Seller . . . (iv) any labor dispute or notice of dispute which would materially or adversely affect the business or financial condition of Seller; or (v) any notice of any material change in the purchase orders of or relationships with any of the customers of the Seller."[114]

- "Since May 31, 1995, Seller (i) has carried on its business in the same manner as such business was conducted prior to May 31, 1995, (ii) has not taken or engaged in any action or transactions other than actions or transactions in the ordinary course of business; and (iii) there has been no material adverse change in the business, operations, prospects, properties or financial condition of Seller[.]"[115]

- "There are no service contracts or work in process which were not contracted for in the ordinary course of Seller's business or which have been billed in advance, and there are no conditions or state of facts known to Seller which would result in any material loss to Seller in completing such service contracts or work in process. Seller has not rendered billings for or collected progress or other advance payments under any sales orders, contracts, or commitments providing for such payments in excess of amounts which could be reasonably billed or collected on the basis of work actually completed thereunder."[116]

Under the Asset Purchase Agreement, MTG agreed "to conduct its business through the

---

[113] *Id.*

[114] *Id.* at ¶ 2.1.4 ("No Adverse Changes").

[115] *Id.* at ¶ 2.1.5 ("Transactions Since May 31, 1995").

[116] *Id.* at ¶ 2.1.22 ("Service Contracts: Work in Process Payments").

44

Closing Date in its ordinary and usual course, to continue normal policies and practices regarding suppliers and customers, and to perform its obligations under all contracts, agreements and commitments to be assigned hereunder without material breach and consistent with past practices."[117]

Section IV of the Asset Purchase Agreement covered the conditions precedent to the Becker Group's obligation to consummate the purchase of MTG's assets. It provided, in relevant part:

> 4.2 <u>Conditions to Buyer's Obligations</u>. The obligation of Buyer to consummate the transaction contemplated by this Agreement shall be subject to the fulfillment by Seller on or prior to the Closing Date of the following conditions (any one or more of which may be waived in whole or in part by Buyer if such waiver is in writing signed by an authorized officer of Buyer):
>
> 4.2.1 <u>Performance By Seller</u>. On and as of the Closing Date, all of the representations and warranties set forth in Section 2.1 hereof shall be true and correct in all material respects and Seller shall have performed all of the agreements and covenants, and executed and delivered all instruments and documents contemplated by this Agreement to be performed or delivered by it prior to or on the Closing Date. Seller and the Shareholders shall have delivered to Buyer a certificate dated as of the Closing Date in form and in substance reasonably satisfactory to Buyer and its counsel, reaffirming such representations and warranties as of the Closing Date and certifying to the fulfillment of such agreement and covenants.
>
> 4.2.2 <u>Certified Resolutions: Executed Documents</u>. At the Closing, Seller shall have delivered to Buyer such certificates dated the Closing Date and in form and in substance reasonably satisfactory to Buyer and its counsel, certifying that the Board of Directors and Shareholders of Seller have adopted or consented to resolutions approving the transactions contemplated hereby, and Seller shall have executed and delivered to Buyer the instruments

---

[117] *Id.* at ¶ 3.4 ("Conduct of Business Pending the Closing").

and documents referenced in Section 1.9 hereof.

4.2.3  Officers' Certificates.  Seller shall have delivered to Buyer a certificate, dated as of the Closing Date and executed by its President or Vice President and Secretary, certifying as to the fulfillment of the conditions set forth in Section 4.1 hereof at or prior to the Closing.

4.2.4  Representations and Warranties.  The representations and warranties made by Seller in this Agreement, and the statements of Seller contained in the Schedules hereto or in any other agreement, instrument or certificate delivered by Seller pursuant to this Agreement, shall be true and correct in all material respects when made and at and as of the Closing Date as though made at and as of the Closing Date.

4.2.5  Absence of Litigation.  No action, suit or proceeding shall have been instituted or threatened seeking to enjoin or restrain or which would materially or adversely affect the transactions contemplated hereby.
. . . .

4.2.8  Required consents.  Receipt by Seller of all third party consents or approvals necessary or appropriate in connection with Seller's  obligations and agreements pursuant to this Agreement, including without limitation consents of the Seller's customers, and confirmation thereof by Seller to Buyer.

4.2.9  Deeds to Real Property.  Receipt by Buyer of executed warranty deeds to the Real Property, in accordance with Section 1.1.5 hereof.

4.2.10  Restructuring of Comerica Loans. Satisfactory agreement between Buyer and Comerica as to the restructuring of the Assumed Liabilities to Comerica.

4.2.11  Completion of Buyer's Due Diligence. Satisfactory completion of Buyer's due diligence;  provided, however, that there shall be a presumption that the due diligence condition set forth in this Section 4.2.11 shall have been satisfied unless the aggregate amount of (a) reduction in book value of the Assets, plus (b) increase in the liabilities of Seller, whether reflected on Seller's Balance Sheet or otherwise, or whether accrued, absolute,

46

contingent or otherwise, and excluding any unrecorded, contingent liability in connection with Seller's Agreement with the International Association of Machinists and Aerospace Workers, Warren Local Lodge PM 2848, exceed Fifty Thousand and 00/100 ($50,000.00) Dollars, in which event satisfactory completion of Buyer's due diligence shall be subject to Buyer's sole and absolute discretion.[118]

Section VI of the Asset Purchase Agreement was titled "Termination; Amendment and Waiver" and provided, in relevant part:

6.1    Termination of Agreement.  This Agreement may be terminated at any time prior to the Closing·upon written notice delivered by Buyer or Seller to the other, in accordance with the following:
. . . .

(c)    By Buyer,  if any of the conditions set forth in Section 4.2 shall not have been fulfilled and shall not have been waived  by Buyer[.]
. . . .

6.2    Effect of Termination. In the event of termination of this Agreement as provided above, this Agreement shall forthwith become null and void and there shall be no liability on the part of any party hereto (or any of their respective officers, directors or affiliates); provided that nothing contained in this Section 6.2 shall relieve any party from liability for any breach of  this Agreement.[119]

The Asset Purchase Agreement contained an integration clause which provided:

7.5    Complete Agreement. This Agreement sets forth the entire understanding of the parties hereto and supercedes all prior agreements, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, director, employee or representative of either party.[120]

---

[118]  *Id*. at pdf. pp. 18-20.

[119]  *Id*. at pdf. p. 22.

[120]  *Id*.

47

**8. The employment agreement between Vercnocke and the Becker Group**

At or around the same time the Asset Purchase Agreement was executed, B. Becker, on behalf of the Becker Group, signed an employment contract with Vercnocke, which provided that Vercnocke's employment with the Becker Group would "commence on the [C]losing [D]ate as defined in a certain [A]sset [P]urchase [A]greement by and between the [Becker Group] and MTG dated July 18 1995."[121]

**9. The due diligence period**

The events that occurred during the due diligence period, and the legal significance of such events, are contested by the parties. The record contains conflicting versions of what happened during this time period.

**a. Vercnocke's version**

According to Vercnocke, B. Becker, and Kathy Crochett ("Crochett"),[122] Controller and Accountant for the Becker Group, were "the two financial heads of the Becker Group" who spearheaded the due diligence for the Becker Group.[123] Leo Jensen ("Jensen") of the Becker Group was given keys to, and was working in, the Mold Shop during this period.[124] According to Vercnocke, B. Becker, Crochett, and Jensen were "in charge" of, "had taken control" of, and

---

[121]  B. Becker Dep. Tr. (Docket # 599-14) at 48-49.

[122]  The spelling for the Controller and Accountant for the Becker Group is inconsistent in the record. It is sometimes spelled "Crochett" and sometimes spelled "Crockett." The Court has decided to use the Crochett spelling.

[123]  Vercnocke Dep. Tr. (Docket # 584-45) at 43-44; Vercnocke "Chronological History" (Docket # 589-11) at 2 (entry dated "7/19/95").

[124]   Vercnocke Dep. Tr. (Docket # 584-45) at 189-90.

48

were "running the company" during the due diligence period, and at that point, although "he was not being paid on [the] Becker [Group] paychecks," he considered himself an employee of the Becker Group.[125]  According to Vercnocke, B. Becker and Crochett were conducting meetings with employees of MTG, and directing them on what to do, such as when to take a draw to pay bills; what bills to pay; what employees to fire; and how to collect accounts receivable.[126] Vercnocke alleges that he "was taking direction from them on what to do with regards to cash management, hiring and firing employees, and a variety of other things."[127]  Vercnocke alleges that the Becker Group is responsible for all of the loan advances Comerica made to MTG after the Renaissance Club meeting on June 21, 1995 and until July 21, 1995.  He alleges that "[MTG's] out of formula was created by [B.] Becker telling Tammy [Bensinger] to mail out checks because [the Becker Group was] putting in [$500,000]."[128]  In his amended affidavit, Vercnocke states:

> 30. In early July, [the] Becker [Group] took control of the Debtor's business operations pending the anticipated closing.  At this time, [the] Becker [Group] held a meeting at its offices and announced to its employees that [the] Becker [Group] had purchased the Debtor's business operations.
>
> 31. [The] Becker [Group] also took complete control over the Debtor's accounting and sales functions.  In so doing, [the] Becker [Group] made substantial draws against the Debtor's credit line, which substantially increased the debt to the Bank.  In obtaining these funds, [the] Becker [Group] represented to the Debtor and the

---

[125]  *Id.* at 70-71, 189-90, 246-47.

[126]  *Id.*

[127]  *Id.* at 70.

[128]  Vercnocke "Chronological History" (Docket # 598-11) at 2 (entry dated "7/24/95").

49

> Bank that it would loan $500,000 to the Debtor within a few days
> after closing to pay down the credit line.[129]

Vercnocke testified that although the Becker Group represented to MTG and Comerica that it would loan MTG $500,000 within a few days after closing to pay down the credit line, he doesn't recall ever seeing that promise in writing, and so it was probably "verbal."[130] Vercnocke alleges that the signing of the Asset Purchase Agreement constituted the "closing" of that agreement, which triggered the obligation of the Becker Group to loan MTG $500,000 to pay down the credit line.[131]

**b. Bensinger's version**

Bensinger's deposition testimony contradicts Vercnocke's assertion that Bensinger, the accounting manager of MTG, requested loan advances from Comerica because of instructions from B. Becker:

> Q. . . . Did you ever take any instructions from somebody named Bruce Becker as to whether to submit these [AR R]eports or not?
>
> A. No.
>
> Q. Or when to submit them?
>
> A. No.
>
> Q. Did you ever take any instructions from Bruce Becker as to whether to get advances from the [B]ank or not?

---

[129] Vercnocke Am. Aff. (Docket # 589-16) at 5 ¶¶ 30-31 *see also* Vercnocke "Chronological History" (Docket # 598-11) at 2 (entry dated "7/18/95") (indicating that B. Becker wants signed documents and reiterated that $500,000 was waiting to put into MTG to get it back in formula).

[130] Vercnocke Dep. Tr. (Docket # 584-45) at 68-69.

[131] *Id.* at 69-70, 72.

A. No.

Q. Did you ever get instructions from Bruce Becker that you
were to pay certain bills or not pay certain bills?

A. No.

. . . .

Q. And, again, you don't have any memory of some guy
named Bruce Becker telling you mail out checks to pay
bills which in turn created an overformula condition on the
MTG line?

A. I don't remember, no.[132]

Bensinger's deposition testimony also contradicts Vercnocke's allegation that B. Becker

was running MTG during the due diligence period:

Q. Do you have any recollection during the period of time that
the Becker Group was considering the acquisition of MTG
that this guy that I've referred to as Bruce Becker . . ., do
you have any memory that he was in effect running the
financial affairs of MTG?

A. No, I do not remember that.

Q. If Mr. Becker had actually been running the financial affairs
of MTG, you would have known it, right, because you were
there every day?
. . . .

A. Yes.[133]

Bensinger's testimony also contradicts Vercnocke's allegation that he considered himself,

and the employees of MTG, employees of the Becker Group after the Asset Purchase Agreement

---

[132] Bensinger Dep. Tr. (Docket # 599-16) at 23, 34.

[133] *Id.* at 32-33.

was executed by all of the parties, pending the closing of the agreement:

> Q. Did Mr. Vercnocke ever advise you that he had arranged for himself to become a potential employee of the Becker Group?
>
> A. No.
>
> Q. At any time in June or July of 1995, were you aware of any employment change status for you other than being employed by MTG?
>
> A. No.
>
> Q. Did anybody ever make any announcements to you about . . . the Becker Group operating MTG?
>
> A. No.[134]

Bensinger's testimony also contradicts Vining's argument that Comerica was wrong in recording the amounts advanced to MTG, pending the closing of the Asset Purchase Agreement, as liabilities under MTG's $3.5 million credit line, rather than as liabilities of the Becker Group. Bensinger testified that when she called Charity Ware, a loan processor at Comerica, she "would just call and say I need an advance and tell her the dollar amount" and that she never told Charity Ware that it was an advance for the Becker Group and so don't charge it against MTG's $3.5 million credit line.[135]

### c. Collins's version

In his deposition, Collins denied ever telling Vercnocke that, pending the closing of the Asset Purchase Agreement with the Becker Group, MTG did not have to submit A/R Reports

---

[134]  *Id.* at 59.

[135]  *Id.* at 26.

when requesting a loan advance on its $3.5 million line of credit, or that MTG could be out of formula during the due diligence period.[136]  Collins says that he first learned about MTG being over formula, and obtaining advances on its $3.5 million line of credit without submitting A/R Reports, as a result of a telephone call on either July 18 or 19, 1995 from B. Becker.  In a memo dated August 16, 1995, from Collins to Michael Main, counsel for Comerica (the "Collins-Main Memo"), which Collins alleges was written to "recap [Collins's] involvement in the proposed purchase of [MTG] by [t]he Becker Group/Bruce and Chuck Becker (Becker) as well as subsequent events related to this credit," Collins stated:

> On either July 18th or 19th, [B.] Becker called me to ask again whether we had a problem with the Becker Group filing a lien behind us if they were to put money into MTG prior to having their deal closed.  In fact he stated that the [A]sset [P]urchase [A]greement was in MTG's hands and as soon as it was executed by all four owners and returned to [B. Becker] that the Becker Group was prepared to put $535m into MTG immediately, perhaps even later that day.  I told him that we had no objection to filing behind us.  He also mentioned in passing that MTG had borrowed $21m that day or the day before and he was surprised that we would allow them to continue to borrow when they were already overformula by $200m.  I was not aware that MTG was overformula, but I did not indicate this to [B. Becker] and instead I changed the topic without answering.  After hanging up with [B. Becker] I looked up on the computer and noticed that MTG had not filed a borrowing base report since June 26th even though they were on DOF, transactional reporting and should have been reporting with each borrowing.  The company had borrowed a number of times since June 26th but had not sent in any reports.  The borrowings should not have been put through by CLAS without reports, but since the borrowings kept the loan balance below [the] Total Loanable Collateral figure on the June 26 report no overformulas were reported.  Based on the fact that the Becker [Group] agreement to purchase MTG and subsequent loan to MTG appeared to be imminent, I took no immediate action with the

---

[136]  *See* Collins 10/6/08 Dep. Tr. (Docket 599-17) at 114-17.

company when I learned of the overformula. I did notify CLAS of the problem, telling both the clerk who handles MTG, Charity Ware, and her supervisor, Cathy Riley, that under no circumstances should MTG be allowed to borrow without supplying us a report that showed them in formula.

On July 19th and/or July 20th I tried to reach [Vercnocke] to see if he had gotten the paperwork back to [B. Becker] and if the Becker Group had put cash into the company yet. [Vercnocke] was playing in an invitational golf tournament at Indianwood and was not available. The message(s) that I left for [Vercnocke] were on his voice mail which automatically activates his pager. [Vercnocke] later told me that his pager had been accidentally turned off. On Friday morning I was able to get ahold of [Vercnocke] and asked him about the Becker [Group] agreement. He said that it was a little slow in getting everybody to sign it - especially Rich May who was no longer working at the company - but that it either had gotten back to [the] Becker [Group] on Thursday or would on Friday. I also asked him about the overformula situation and the lack of reports. He said that he did not know that we were not getting reports but that he would have one sent to us immediately. I received an **unsigned** report numbered as Internal Report 68F at 9:36 Friday morning showing the company $400m overformula, though it included a $103m borrowing on Friday which I did not put through. [Vercnocke] responded to my question of why they were overformula and he said that they had to do it [to] meet payroll and pay some urgent bills.[137]

---

[137] Collins-Main Memo (Docket # 589-28) at pdf. pp. 1, 3-4 (emphasis added).

According to the Collins-Main Memo, B. Becker had also previously called Collins to ask whether Comerica had any objection to B. Becker and C. Becker filing a lien on MTG's assets:

At some point during [the 3 weeks after the Renaissance Club meeting], [B.] Becker called me to ask me whether the Bank would have a problem with the Beckers filing behind us on MTG's assets if they put money into the company prior to finalizing the purchase. I told him that we did not have a problem with that as long as they had an agreement in place and were working towards a final deal.

Collins-Main Memo (Docket # 589-28) at pdf. p. 2; *see also* Collins 10/6/08 Dep. Tr. (Docket # 599-17) at 51 ("Once a transaction was complete, yes, I believe [the Becker Group was] putting in sufficient monies to bring [MTG] within formula."); *see also id.* at 55 (Collins took no immediate action after

54

Internal A/R Report No. 68F, referenced in the Collins-Main Memo, is part of the record.[138] The top of it indicates that MTG faxed it to Comerica on July 21, 1995 at 9:36 a.m.; it indicates that MTG was "out of formula" in the amount of $400,318.54; and that MTG was seeking an advance of $141,000.00.[139] Collins was incorrect when he stated in the Collins-Main Memo that Internal A/R Report No. 68F was unsigned. Internal A/R Report No. 68F was in fact signed by Vercnocke, on behalf of "MTG Inc."[140]

---

learning that MTG was over formula because "it appeared that [B.] Becker would be putting $535,000 into the company within the next day or so, making the over formula a moot point.").

[138]  *See* Docket # 601-18.

[139]  *Id.*

[140]  *Id.* Although the Collins-Main Memo states that Internal A/R Report No. 68F was "unsigned," Internal A/R Report No. 68F contains the signature of Vercnocke. (*See* Docket # 601-18). Counsel for Vining, relying on this inconsistency, speculated, during oral argument on the Summary Judgment Motions, that Vercnocke did not actually sign or fax Internal A/R Report No. 68F to Comerica, and that his signature must have been added to the document either by the unauthorized use of a signature stamp or by cutting and pasting Vercnocke's signature from another document. This allegation is pure speculation, and is contradicted by the evidence in the record, including Vercnocke's own testimony. Vercnocke, when shown a copy of Internal A/R Report No. 68F at his deposition, which was Exhibit 4 at such deposition, testified: "I submitted Exhibit Number 4 after I was requested to by Michael [Collins] and his team." (Vercnocke Dep. Tr. (Docket # 584-45) at 99.) When asked why he would submit Internal A/R Report No. 68F showing that he was out of formula when the Becker Group had committed to putting $500,000 into MTG, Vercnocke responded: "Because they asked me to submit it." (*Id.* at 101.) A copy of deposition Exhibit 4 (Internal A/R Report No. 68F) is in the Court record as Docket # 721-1 and is a re-fax by Comerica on July 24, 1995 of Internal A/R Report No. 68F, which MTG faxed to Comerica on July 21, 1995, and is identical to that document. It too was signed by Kirk Vercnocke on behalf of "MTG Inc." A Comerica bate-stamped copy of that re-faxed document is also in the record as Docket # 721-2 (Bate Stamped "Comerica 005288"). This testimony is consistent with the Collins-Main Memo saying that on July 21, 1995, when Collins asked Vercnocke about the lack of reporting, Vercnocke told Collins that he would have a report sent immediately, and that Collins received Internal A/R Report No. 68F on July 21, 1995. It is also consistent with the entry for July 24, 1995 on Vercnocke's "Chronological History," which references an A/R Report that Comerica received from MTG on July 21, 1995. (Vercnocke's "Chronological History" (Docket # 598-11 at pdf. p. 3 ("Comerica questions me on lack of reporting. They say MTG has not provided a report since 6/25 until **7/21**.") (emphasis added).)

55

Collins does not remember any discussions with Marcinelli, Bourke, or anyone else at Comerica about allowing MTG to take over-formula advances on it $3.5 million credit line because B. Becker was going to loan MTG money. Collins testified that he assumes that if there had been such a discussion, he would have described it in the Collins-Main Memo. Also, according to Collins, an over-formula advance could not be approved without internal bank documentation signed by both MTG and Comerica and without his involvement, and there should have been no advances without an A/R Report because MTG was "under transactional reporting requiring a report with each borrowing request."[141] Collins says that if Comerica had agreed to advance funds over formula there would be internal documentation signed by both MTG and Comerica. Therefore, according to Collins, the over-formula loan advances to MTG on its $3.5 million line of credit between June 21, 1995 and July 21, 1995 were due to significant clerical errors.[142] Collins believes that MTG was deceiving Comerica by not submitting A/R Reports when requesting loan advances.[143]

---

Given the admission by Vercnocke in his deposition that he faxed Internal A/R Report No. 68F to Comerica, and the other evidence in the record corroborating that admission, and given the fact that all of the A/R Reports submitted after the June 21, 1995 Renaissance Club meeting (with the exception of Internal A/R Report No. 68F) were unsigned (*see* Part IV.A.5 of this Opinion (discussing A/R Report No. 66 (dated on June 25, 1995 and received by Comerica on June 26, 1995), and A/R Report Nos. 67-73 dated June 30, 1995; July 9, 1995; July 12, 1995; July 13, 1995; July 16, 1995; July 18, 1995 and July 20, 1995, respectively) but not received by Comerica until July 26, 1995), a more plausible explanation for the discrepancy caused by the Collins-Main Memo, which was dated August 16, 1995, after A/R Report Nos. 66-73 (all of which were unsigned) were received by Comerica, is that Collins simply erred when he stated that Internal A/R Report No. 68F was unsigned, not that Collins received an unsigned copy of Internal A/R Report No. 68F, and later someone forged Vercnocke's signature on that document.

[141] Collins 10/6/08 Dep. Tr. (Docket 599-17) at 80-82, 85, 88, 114, 116.

[142] *Id.* at 81-82, 120.

[143] *Id.* at 118-19.

56

Collins denied having knowledge of any loan advances by Comerica to MTG being made at the request of an agent or a representative of the Becker Group. And Collins testified that there had been no discussions of the Becker Group taking over the management of MTG prior to the closing of the Asset Purchase Agreement.[144]

---

[144] Collins 10/29/96 Dep. Tr. (Docket # 529-19) at 62-63, 65. Collins testified as follows:

Q: Was there any discussion of the Becker Group actually becoming actively involved in the management or operation of the business almost immediately and prior to a sale?

A: No.

Q: At any time after this meeting, did you have any dealings with any representatives or agents of the Becker Group with regard to loan transactions?

A: Loan transactions from Comerica?

Q: Between Comerica and MTG?

A: No.

Q: Were any requests ever made by any representatives or agents of the Becker Group for loans on the line of credit or any other loans that might be available?

A: Not to my knowledge. On our line of credit, we have a touch tone borrowing system. To the extent that anyone at MTG gave them access to that and MTG's code word, they could have accessed borrowings on the automated line.
. . . .

Q: Okay. Are you aware of any loan requests made by the Becker Group on behalf of MTG at any time following your meeting in approximately June of '95?

A: Not requests of the [B]ank. The Becker Group, the only loan they talked to me about was the loan the Becker Group was going to make to MTG.

*Id.*

57

Collins does remember B. Becker talking to him about the Becker Group making a loan to MTG prior to the closing of the Asset Purchase Agreement.[145]

### d. B. Becker's version

B. Becker denies that "Comerica made loans to [t]he Becker Group relating to MTG[.]"[146] According to B. Becker:

> [The] Becker [Group] never sought or applied for credit from Comerica related to MTG, there were no loans whatsoever to [t]he Becker Group related to MTG and, thus, I am not aware of any loan documents such as promissory notes, security agreements, mortgages, advance agreements or any other documents which would evidence amounts to be loaned or the terms of repayment. Had there been any such documentation, I, as [Chief Financial Officer] of the Becker Group, would have seen it.[147]

B. Becker denies that during the due diligence period, either Crochett or himself ever requested advances on MTG's line of credit. B. Becker stated that he didn't "even know how it could happen when we weren't responsible for [MTG.]"[148] During the due diligence period, B. Becker does not remember requesting MTG to pay certain vendors, and he does not remember anyone from the Becker Group asking MTG to fire any employee of MTG.[149] B. Becker also had "absolutely no memory" of making any agreement with either MTG or Comerica that the Becker Group would be responsible for MTG's over-formula borrowings, and alleges that such an

---

[145] Collins 10/29/96 Dep. Tr. (Docket # 529-19) at 65 ("The Becker Group, the only loan they talked to me about was the loan the Becker Group was going to make to MTG.").

[146] Aff. of B. Becker, dated Oct. 10, 2011 (Docket # 645-11) at 1 ¶ 4.

[147] *Id.* at 1-2 ¶ 4.

[148] B. Becker Dep. Tr. (Docket # 599-14) at 44, 123.

[149] *Id.* at 44-45.

58

agreement, if it were made, would have had to be in writing.[150] B. Becker had "some recollection that there was an amount and time talked [about for the Becker Group to put money into MTG,] if things progressed properly."[151] According to B. Becker, the Becker Group "had made a commitment [to put an amount of money into MTG, 'if things progressed properly'] but it never happened because things didn't progress the way we thought they would."[152]

According to B. Becker, the closing of the Asset Purchase Agreement never occurred, and as a result, Vercnocke was never an employee of the Becker Group, because the Asset Purchase Agreement stated, and the intent of the agreement was, that Vercnocke would become an employee of the Becker Group only upon the closing of that agreement.[153] B. Becker, in refuting Vining's allegation that there was a closing of the Asset Purchase on July 18, 1995, stated:

> The [T]rustee's brief states at page 35 that "On July 18, 1995, the Debtor [MTG], under duress, and [the] Becker [Group] closed their deal." In reality, the [Asset Purchase] Agreement contemplated closing at a later date, if ever, following due diligence. Since MTG was never able to satisfy the conditions precedent to closing, the contemplated asset purchase never closed.[154]

### 10. The impending termination of the Asset Purchase Agreement

On Friday, July 21, 1995, B. Becker called Collins and told him that the Becker Group was seriously considering terminating the Asset Purchase Agreement, but would reconsider that

---

[150] *Id.* at 136.

[151] *Id.* at 43.

[152] *Id.*

[153] *Id.* at 110-111, 128.

[154] Aff. of B. Becker, dated Oct. 10, 2011, (Docket # 645-11) at 2 ¶ 5.

decision over the weekend.  Jensen, whose job it was to conduct due diligence for Becker regarding MTG, had serious concerns regarding the financial health of MTG, and the quality of the tooling, and had advised B. Becker to "[w]alk away" from the deal with MTG.[155]  In conducting due diligence, Jensen had found "quite a few" invoices for tooling (molds) in a drawer rather than in a job folder, where he would expect to find them.[156]  These invoices were on the A/R Reports, but there was no corresponding documentation, such as purchase orders or letters from the customer, showing that the invoices had been sent to the customer or that the customer had given its approval for MTG to invoice it due to the tooling having received ISIR (Initial Sample Inspection Report) approval.[157]  And only customer-approved invoices were supposed to be included on the A/R Reports, because invoices which were not approved by the customer could not be used as collateral for purposes of the borrowing formula in MTG's agreements with Comerica.[158]  Although Jensen asked for documents showing that the invoices were legitimately processed, he never received them.[159]  According to Jensen, Crochett had found the same problem with invoices being on the A/R Reports with no back-up documentation, had also asked for the back-up documentation, and had not received it.[160]  Jensen and Crochett

---

[155]  Tr. of Dep. of Leo Jensen ("Jensen Dep. Tr.") (Docket # 584-42) at 56.

[156]  *Id.* at 24-25, 30, 32.

[157]  *Id.* at 24-28.  If  MTG did not receive ISIR approval, it was not permitted to invoice the customer.  *Id.* at 26-27.

[158]  *See id.* at 30-32, 34, 40.

[159]  *Id.* at 25, 31, 36.

[160]  *Id.* at 37.

determined that with regard to the invoices, MTG was "making it up."[161] Jensen also had concerns regarding the yearly financial statements,[162] and the quality of the tooling, which could result in warranty work that would have to be done.[163]

      After receiving the phone call from B. Becker regarding his possible termination of the Asset Purchase Agreement, Collins called Vercnocke to tell him of this development. During that telephone conversation, Collins also told Vercnocke that Comerica had not approved MTG's request that day for an advance of $103,000, and would be "returning non payroll checks on their accounts as it was overdrawn."[164] Later, Collins discussed MTG's current situation with Bourke and Judy Love ("Love") and then called Stephen Lyons ("Lyons"), a group manager in the Special Assets Group of Comerica.[165]

      On Monday morning, July 24, 1995, after a telephone conversation with B. Becker, Collins notified Bourke "that the deal [between MTG and the Becker Group] appeared to be off."[166] Collins and Bourke set up a meeting for 4:00 p.m. that day to discuss the situation with MTG.[167]

---

[161] *Id.*

[162] *Id.* at 40.

[163] *Id.* at 28-29.

[164] Collins-Main Memo (Docket # 589-28) at pdf. pp. 4-5; Vercnocke Dep. Tr. (Docket # 584-45) at 232; *see also* Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

[165] Collins-Main Memo (Docket # 589-28) at pdf. p. 5; Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

[166] Collins-Main Memo (Docket # 589-28) at pdf. p. 5; Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

[167] Collins-Main Memo (Docket # 589-28) at pdf. p. 5.

61

Meanwhile, according to Vercnocke, on July 24, 1995 in the morning, he met with attorney Joseph Fischer of the law firm of Carson Fischer PLC, and with Don MacKenzie of Conway MacKenzie Inc., a financial and management consulting firm specializing in turning around companies in financial distress, and in the afternoon, he met with an attorney from the law firm of Howard & Howard.[168] Also sometime on July 24, 1995, Vercnocke sent a letter to B. Becker by facsimile and by first class mail regarding the "Asset Purchase Agreement Dated July 18, 1995," which stated in relevant part:

> Dear Mr. Becker:
>
> Pursuant to the closing of Becker Group, Inc.'s purchase of M.T.G., Inc.'s assets referenced above, as your employee I was instructed to disburse funds creating an overformula in M.T.G. Inc's credit facility with Comerica. This was done pursuant to your specific representation that $500,000 would be deposited immediately to cover the overformula.
>
> As you are now aware, Comerica has made demand that M.T.G., Inc. cover the overformula immediately. I request that Becker Group, Inc. provide direction to me or your representatives as to how to address Comerica's concerns.
>
> Awaiting your response.[169]

At 4:00 p.m., on July 24, 1995, the Comerica-MTG meeting that had been scheduled earlier in the day took place, with Vercnocke, Gosnell, Waelchli, MacKenzie, Lyons, Eric Rolf ("Rolf"), the Special Asset Group lender assigned to MTG, Love, and Bourke in attendance.[170]

---

[168]  Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

[169]  Letter to B. Becker from Vercnocke dated July 24, 1995 (Docket # 645-9).

[170]  Collins-Main Memo (Docket # 589-28) at pdf. p. 5; Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

Collin's description of the meeting includes the following:

> Don Mackenzie asked that we work out a two week standstill agreement to allow [him] and the company a chance to figure out the best way to reorganize now that the Becker deal was dead. [Vercnocke] provided us with updated breakeven analysis' based on paring the workforce down immediately and also when they would be able to shut the [M]old [S]hop down. He also provided a monthly cashflow indicating that the company could paydown the overformula within a couple months and paydown the loans altogether within eight or nine months. [Lyons] said that we would be glad to look at a two week forbearance agreement but that the company needed to provide us with a bare bones daily cash budget in order to do this. **He also made it clear that the company should not release any work on its floor without getting paid in full by the customer for all outstanding invoices.** . . . . At some point in the meeting it came out that I found out the company was overformula from [B.] Becker. [Vercnocke] was indignant that this happened and asked why I did not call him immediately. . . . I told him that I did call him within a day or two, but that I did not call him immediately because a) at that time it appeared that Becker would be putting $535m into the company within the next day or so making the overformula a moot point, and more importantly, b) [Vercnocke] was doing the borrowing and the report generation so he would have known that they were overformula. [Vercknocke] said that [B.] Becker had essentially been running the financial end of the company, making borrowings, determining which checks to be mailed out and having [Vercnocke's] assistant, [Bensinger], fill out borrowing reports but not send them in. I told [Vercnocke] that that was news to me and that I assumed that he was running the financial end of the company as he had since he joined the company. . . . I did ask [Vercnocke] to provide us with all of the borrowing base reports that had been prepared in between the report of June 26th and the one he had provided on July 21st. I also asked him to provide us with daily reports and accounts receivable agings at least until we had a forbearance agreement.[171]

Vercnocke's notes regarding the July 24, 1995 meeting for the most part are consistent

---

[171] Collins-Main Memo (Docket # 589-28) at pdf. pp. 5-6 (emphasis added); Collins 10/6/08 Dep. Tr. (Docket 599-17) at 148, 150-51; *see also* Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3.

63

with Collins's account. Vercnocke's notes state:

> Comerica questions me on lack of reporting. They say MTG has
> not provided a report since 6/25 until 7/21. I ask [Collins] why
> they still advanced us $. He says its because their acct. department
> screwed up. He says he wants the interim reports after I tell him
> we prepare them daily. I tell Comerica we were probably not out
> of formula. [Collins] says we've been out of formula for some
> time. I say how do you know. He says he has reports from last
> week. I asked him where he got them from, he says [B.] Becker
> called him Monday or Tuesday to tell him that we were out of
> formula and faxed him those interim reports. I asked [Collins] why
> he still advanced us $, he said because Bruce Becker told him they
> were going to put in 500K on Wednesday. I asked [Collins] why
> he never informed me of all this, he had no answer.[172]

## 11. The Termination Letter

Although as early as July 21, 1995, Collins had told Vercnocke of the likelihood that

the Becker Group would terminate the Asset Purchase Agreement, and Comerica and MTG were

acting on the assumption that the deal between MTG and the Becker Group was "off,"

Vercnocke did not hear anything regarding termination directly from B. Becker until he received

a letter dated July 27, 1995. The letter was from B. Becker to MTG, directed to the attention of

Vercnocke, Gosnell, Waelchli, and May (the "Termination Letter"). In that letter, B. Becker

notified MTG of the Becker Group's

> election to terminate the Asset Purchase Agreement . . . pursuant
> to Paragraph 6.1 of the [Asset Purchase] Agreement, and [that the
> election to terminate the Asset Purchase Agreement was] based
> upon (i) failures in the proper execution and delivery of the [Asset

---

[172] Vercnocke "Chronological History" (Docket # 598-11) at pdf. p. 3. On the entry in his notes for July 26, 1995, Vercnocke states that at a meeting he attended with Collins, Rolf, and Gosnell, Collins denied that he had received A/R Reports from B. Becker. *Id.* The Collins-Main Memo does not mention Collins receiving any reports from B. Becker. *See* Collins-Main Memo (Docket # 589-28). In his deposition testimony, Lyons stated "I don't believe . . . there was a report delivered by [B.] Becker." (Tr. of Sept. 24, 2008 Dep. of Stephen Lyons ("Lyons Dep. Tr.") (Docket # 589-38) at 121.)

Purchase] Agreement as required by its terms; (ii) [the] Becker Group's dissatisfaction with material issues revealed in the due diligence investigation; and (iii) the failure of certain conditions precedent to [the] Becker Group's obligations under the [Asset Purchase] Agreement.[173]

The Termination Letter further provided, in relevant part:

> With respect to the failure in the execution and delivery of the [Asset Purchase] Agreement, we believe that MTG's manner of execution and delivery of the [Asset Purchase] Agreement, the failure to deliver and agree upon the terms of material Schedules to the [Asset Purchase] Agreement, and notations added in the margin of the signed [Asset Purchase] Agreement present significant issues as to the integrity of the [Asset Purchase] Agreement.
>
> As you are also aware, [the] Becker Group proceeded in good faith with its due diligence investigation. During the course of our investigation, numerous and material issues regarding the financial conditions and operations of [MTG] were disclosed, including, but not limited to, the following: (i) discrepancies between the May 31, 1995 Balance Sheet and the actual financial condition of MTG; (ii) operational problems, including the existence of material complaints, demands, and warranty claims for repairs on tooling previously shipped by MTG; (iii) various personnel issues, including breaches of the collective bargaining agreement between MTG and its union workforce; and (iv) the existence of invoices issued without purchase orders consisting of approximately $800,000.00 reflected as accounts receivable on recent accounts receivable agings. Based on the existence of such issues, the $50,000.00 threshold amount referenced in Section 4.2.11 of the [Asset Purchase] Agreement was exceeded, and in [the] Becker Group's <u>sole and absolute </u>discretion, the results of its due diligence investigation are unsatisfactory.
>
> Furthermore, MTG has either failed to comply with certain conditions precedent to any obligation to close the transaction, or such conditions are incapable of being satisfied or cured prior to the Closing Date, including the following: (i) MTG has not provided [the] Becker Group with certified copies of the Board of Directors and Shareholders resolutions authorizing MTG to enter

---

[173]  Docket # 645-5 at 1.

65

into the [Asset Purchase] Agreement as required by Section 4.2.2; (ii) pursuant to Section 4.2.10, a mutually satisfactory agreement as to the restructuring of the Comerica debt of MTG was not and cannot be reached (i.e., based upon the irregularities disclosed during the due diligence investigation, [the] Becker Group does not believe that a satisfactory agreement <u>can</u> be reached with Comerica); and (iii) certain representations and warranties regarding MTG are materially untrue.

Therefore, based in part upon the reasons set forth above, [the] Becker Group has elected to exercise its right to terminate the [Asset Purchase] Agreement in accordance with the provisions thereof, which renders the [Asset Purchase] Agreement null and void and of no further effect.[174]

## 12. The removal of tooling from the Mold Shop

Richard Schneider ("Schneider") was the MTG account manager and salesman responsible for the Injectronics, Inc. ("Injectronics") account, and Bill Mood ("Mood") ran the operations of MTG's Mold Shop. On either Thursday, July 27, 1995 (the date of Becker's Termination Letter) or on Friday, July 28, 1995, at a time after operations of the Mold Shop had ceased, Schneider and Mood each separately delivered various items of tooling that MTG was making under purchase orders issued by Injectronics, and that were not complete, to a company named Multi Form. Multi Form was a company that MTG had never previously dealt with before but that was recommended by Injectronics. The tooling was delivered to Multi Form so that Multi Form could run parts for Injectronics, at Injectronic's expense.[175] Whether Schneider and Mood had actual authority on behalf of MTG to deliver the tooling to Multi Form, and some of the circumstances surrounding these deliveries, are contested.

---

[174] *Id.* 1-2 (underlining in original).

[175] Tr. of Jan. 27, 2009 Dep. of Richard Schneider ("Schneider Dep. Tr.") (Docket # 584-43) at 9-11, 14, 23, 43, 46, 49, 52, 54-55, 59-60,

## a. Schneider's version

According to Schneider, Vercnocke gave him the authority to deliver the tools to Multi

Form, and the "delivery to Multi Form [was] pursuant to an agreement with Injectronics."[176]

Vercnocke gave Schneider that authority at a meeting that Schneider set up at the request of

Injectronics on July 27, 1995.[177]  Injectronics needed the tools to make parts for its customers for

the pre-production build of a vehicle for testing, but Vercnocke had told Schneider that under

instructions from Comerica, he could not give Injectronics the tools until Injectronics first paid

for them.[178]  According to Schneider, the requirement that Injectronics must pay for the tooling

before it was completed was a violation of the terms of Injectronics's purchase orders.[179]

Injectronics always issued purchase orders when acquiring tooling from MTG.[180]  Each

purchase order contained the terms and conditions applying to the order.[181]  If there was a change

in the terms and conditions of a purchase order, it had to be in writing.[182]  Injectronics's purchase

orders required Injectronics to pay 30 days after ISIR (Initial Sample Inspection Report)

approval.  That meant that Injectronics would have no obligation to pay MTG until 30 days after

all of the following had occurred: (1) MTG completed the tooling; (2) MTG delivered the tooling

---

[176] *Id.* at 42-43, 51-52, 115.

[177] *Id.* at 51.

[178] *Id.* at 45-46, 48, 145-47.

[179] *See id.* at 48, 60, 64.

[180] *Id.* at 23-24.

[181] *Id.* at 23.

[182] *Id.* at 24.

67

to Injectronics; (3) Injectronics tested the tooling; and (4) Injectronics approved the tooling.[183] The problem was that none of the tooling was complete,[184] and MTG was not going to complete the tooling because it had shut down the Mold Shop.[185] According to Schneider, MTG had been prematurely invoicing Injectronics for tools that were not complete and including the amounts on these premature invoices in MTG's A/R Reports.[186]

On July 27, 1995, a meeting was held to find a solution to the problem of Injectronics needing parts for its customers, while Comerica prohibited MTG from delivering any tooling to Injectronics without payment in full for the tooling, even though payment was not yet due under the purchase orders.[187] The July 27, 1995 meeting was attended by Schneider, Vercnocke, and Gosnell on behalf of MTG, and Mike Simmons and Dale Hadle on behalf of Injectronics.[188] Schneider testified about the meeting as follows:

> A.      Okay [Injectronics] had to supply these parts. [Vercnocke] said, I can't release these tools to you. [Vercnocke is] looking, what do I do? Gene Gosnell -- he looks to Gene Gosnell for automotive manufacturing protocol, because Gene had been doing it for thirty-five, forty years at this point, [Vercnocke] had not. [Gosnell] says, Well, they do have to make these parts. The only way they are going to continue on and have a chance of getting paid from their

---

[183]  *Id.* at 25-26.

[184]  *Id.* at 43, 55-56, 58-60, 64, 153-54.

[185]  *Id.* at 46.

[186]  *Id.* at 29-32, 68, 70-73, 76-82,161-62, 172-73.

[187]  *See id.* at 44-48.

[188]  *Id.* at 45, 47-48, 100. Mike Simmons started out as an engineering manager at Injectronics and then became Vice President of Engineering at Injectronics. *Id.* at 18. Schneider dealt primarily with Mike Simmons and Steve Foley at Injectronics. *Id.*

68

customer, which in this particular case on the mode doors were Valeo, on some of the oil drip shields were Ford Motor Company. The only way they have a chance of getting some money from Ford so that they can afford to pay us is they got to make parts. What do we do? That's when Dale Hadle says -- because we already said in the meeting, we can't send them down to PMD[, a company who did tool tryouts for MTG but who had stopped because MTG owed it $130,000,] and have PMD run them, they won't run anything for us.

So Dale Hadle says, We utilize Multi Form, they do some of our service work for stuff that's out of production where we have to make fifty to two hundred parts a year. They are here in Sterling Heights. They will run these tools -- will you take these tools over there, make us the parts that we need, and you can get the tools back.

That's when Kirk agreed and said, Yes, we can do that, but you can't -- you can't have the tools. Didn't say it quite like that as far as the tone, but he said, You cannot have the tools, but we can take them over there and make parts for you. Because Injectronics said we'll pay for the part runs, you don't even have to do that. We need these parts, we'll pay to have the tools run.

Q.      But Mr. Vercnocke told the Injectronics representative, Mr. Hadle, that Injectronics could not have these tools?

A.      Correct.

Q.      It's your testimony, however, that Mr. Vercnocke authorized the release to Multi Form?

A.      To Multi Form, not to Injectronics.[189]

According to Schneider, Vercnocke did not tell him personally to get in a truck and take

the tools to Multi Form, but there were only two people left in the Mold Shop (Schneider and

---

[189] *Id.* at 113-15.

Mood), so they had to do it. Mood and Schneider loaded up the truck with the tooling during normal business hours, with Vercnocke in the building at the time.[190] Schneider alleges that "[Vercnocke] walked out of the plant and saw [Schneider and Mood] load [the tools] on the truck."[191] Bill Mood delivered tooling to Multi Form on July 27, 1995 and Schneider delivered tooling to Multi Form on July 28, 1995.[192] Schneider testified that no one from Injectronics was in the building when the tooling was removed from MTG, no one from Injectronics in any way aided him in removing the tooling from MTG, and no one from Injectronics was at Multi Form when he delivered the tooling there.[193] According to Schneider, he never talked to May at the end of July 1995 regarding delivering the tooling to Multi Form, and May had nothing to do with him delivering the tools to Multi Form.[194]

According to Schneider, in addition to delivering some tooling to Multi Form on July 27 or 28, relating to purchase orders from Injectronics, on Monday, July 31, 1995, he signed a shipper to ship tooling "in care of Injectronics" to Jo-Ad, a prototype component tool manufacturer. He does not think he helped load the tooling described on that shipper, and does not remember who authorized a delivery to Jo-Ad.[195]

### b. Vercnocke's version

---

[190] *Id.* at 115-16.

[191] *Id.* at 121.

[192] *Id.* at 51-52.

[193] *Id.* at 52-53, 85.

[194] *Id.* at 83, 201.

[195] *Id.* at 139.

70

Vercnocke's version of the facts surrounding the removal of tooling from MTG in July 1995, is, in some ways, different from Schneider's version. Vercnocke gave his version of such facts in an affidavit:[196]

> 7. On July 24, 1995, the Bank instructed the Debtor that deliveries of tooling, including the Injectronics Tooling, should be made only on a cash on delivery basis.

> 8. On July 25, 1995, consistent with the Bank's demands, I advised all employees of the Debtor, including Richard Schneider ("Schneider"), that tooling, including the Injectronics Tooling, should be delivered to customers only on a cash on delivery basis.

> 9. On July 27, 1995, Dale A. Hadel ("Hadel"), president of Global Technology, Inc., the exclusive sales agent for Injectronics in Michigan ("Global"), met at the Debtor's office with Schneider, Gene Gosnell, an officer of the Debtor, and myself (the "July 27th Meeting").

> 10. At the July 27th Meeting, I told Hadle that (a) the Debtor would be closing its [M]old [S]hop and would not be completing the manufacture of the Tooling that had not as of such date already been completed, and (b) the Debtor would deliver Tooling to Injectronics only on a cash on delivery basis.

> 11. As of the July 27th Meeting, the Tooling was anywhere from 60% to 100% complete.

> 12. At the July 27th Meeting, Hadel on behalf of Injectronics delivered to the Debtor a check in the amount of $49,800 so that the Debtor would deliver to Injectronics one item of Tooling.

> 13. At the July 27th Meeting, I asked Hadel what arrangements Injectronics might like to make regarding the payment and delivery of the remaining Tooling. Hadel responded that Injectronics would

---

[196] *See* "Affidavit of Kirk Vercnocke in Support of Objection to Motion for Preliminary Injunction" (Docket # 584-31). In this affidavit, Vercnocke defined the "Tooling" to mean "certain custom-made tooling" manufactured by MTG according to purchase orders issued by Injectronics to MTG, which was "to be used by Injectronics in the manufacture of products for the automotive industry." *Id.* at pdf. pp. 2-3 ¶ 4.

make such arrangements for payment and delivery of Tooling "on an item by item basis" as Injectronics' need for such Tooling arose.

14. On the night of either July 27 or 28, 1995, after the Debtor's offices were closed and all employees had left, Schneider on behalf of Injectronics removed from the Debtor's premises the following Tooling (the "Stolen Tooling") and loaded it on a truck:

(A) Oil Drip Shield, Part No. F65A-6N634-AC, 2 Cavity Mold, which had a value of at least $94,435.00;

(B) 4.2L Engine Cover, 2 cavity. Mold, Part No. F65A-9E766-NA, which had a value of at least $81,595.00;

(C) Wiring Shield, 2 cavity Mold, Part No. P55B-14A099-YD, which had a value of at least $l30,368.75;

(D) Retainer (Air Extractor), 4 Cavity Mold, Part No. JR0l80013D, which had a value of at least $58,050.00;

(E) U-van Mode door-Nylon (only), Partial, 1 Cavity Mold, Part No. D601254D, which had a value of at least $28,500.00; and

(F) U-Van Temp Door-Nylon (only), Partial, 1 cavity Mold, Part No. D601253D, which had a value of at least $28,500.00.

15. Schneider then drove the truck to Multiform, where [Steve] Foley and Multiform accepted possession of the Stolen Tooling on behalf of Injectronics.

16. Schneider was a salesman for the Debtor. His responsibilities did not include, nor did he ever before July 27, 1995, load and deliver tooling on a company truck to a customer of the Debtor. Further, he had no authority to do so.

17. Late in the afternoon of July 31, l995, I discovered that the Stolen Tooling was missing. I then contacted Schneider at home that night by telephone and asked him where was the Stolen Tooling.

l8. Schneider told me that he had delivered the Stolen Tooling on behalf of Injectronics to Multiform.  He further stated that he had my permission to do so, which was a lie.[197]

Vercnocke filed a police report regarding the Stolen Tooling on August 1, 1995.[198]

### 13.  Injectronics takes possession of tooling from Multi Form

Some time after the tooling was delivered to Multi Form, Injectronics caused it to be

removed from Multi Form and took possession of it.  According to Vercnocke, on August 2,

1995, he learned that Injectronics was in possession of MTG's tooling that had been delivered to

Multi Form, and made an unsuccessful attempt to recover it:

19.  On the morning of  August 2, 1995, Brian Mood, an employee of the Debtor contacted Multiform pursuant to my instructions.  Multiform advised Mr. Mood that it no longer had possession of the Stolen Tooling, but refused to disclose to Mr. Mood to whom and where it had delivered such Tooling.

20. That same morning after discovering that Multiform was no longer in possession of the Stolen Tooling, I immediately called Hadel, who was at that time meeting with Carlos Baranano, who represented himself to be the owner of Injectronics.  Hadel, with Baranano present, (a) acknowledged that the Stolen Tooling "is in my possession, I won't say where," and (b) advised me that the Debtor had caused Injectronics problems with its customers and "that's why I had to take the Tooling."

21. During such telephone conversation, I advised Hadel and Baranano that if the Stolen Tooling were not returned immediately, I would have to report the theft to the police to pursue recovery.  Hadel then advised me that Injectronics would not return the Tooling.

---

[197]  *Id.* at pdf. pp. 2-4 ¶¶ 7-16.  Steve Foley was employed as a tool engineer at Injectronics. (Schneider Dep. Tr. (Docket # 584-43) at 18.)  In his Chronological History, Vercnocke stated that he called Schneider at home on July 31, 1995 about the Stolen Tooling but could not get in touch with him. (Vercnocke's Chronological History (Docket # 598-11) at pdf. p. 3.)

[198]  Vercnocke's Chronological History (Docket # 598-11) at pdf. p. 4.

22. That same morning after my telephone conversation with Hadel and Baranano, I immediately reported the theft of the Stolen Tooling to the Sterling Heights police department and filed a police report.

23. On August 2, 1995, Hadel telefaxed to the Debtor certain documents relating to its theft of the Stolen Tooling. These documents consist of (a) document entitled "Tooling in Injectronics Possession", and (b) two "shipper lists" purportedly reflecting the Debtor's consensual shipment of the Stolen Tooling to Multiform on July 27 and 28, 1995, one of which lists was apparently executed by Foley as follows: "Rec'd 7/27/95 MPI."[199]

## 14. Comerica's actions in August 1995 after learning of the removal of tooling from MTG

Collins states that on August 1, 1995, outside counsel for Comerica informed him that "a customer of MTG's had absconded with $900m of machinery from MTG's [M]old [S]hop."[200] After Collins visited MTG to learn more about the Stolen Tooling, a meeting was scheduled for August 2, 1995 at Conway MacKenzie. In attendance at the August 2, 1995 meeting were Vercnocke, his attorney, another attorney from the law firm that was representing Vercnocke, Don MacKenzie, Lyons, Rolf, John Hertzberg (outside counsel for Comerica) ("Hertzberg"), and Collins. During the August 2, 1995 meeting, the parties discussed security for Comerica's remaining collateral and the possibility of Comerica entering into a forbearance agreement with MTG. Collins says that during the meeting, "Vercnocke became very upset and said that he would not sign any agreement because [Comerica was] not dealing in good faith and that he was planning on suing the Bank for lender liability because [Collins] had conspired with the Beckers

---

[199] "Affidavit of Kirk Vercnocke in Support of Objection to Motion for Preliminary Injunction" (Docket # 584-31) at pdf. pp. 5-7 ¶¶ 19-23.

[200] Collins-Main Memo (Docket # 589-28) at pdf. p. 7.

against MTG."[201]  Collins says that Vercnocke refused to sign a forbearance agreement, even though Comerica agreed that it would fund the payroll of MTG for the next two weeks, and would not require a lender liability waiver in the forbearance agreement.[202]

On August 3, 1995, according to Vercnocke, Comerica "bounced prior weeks [sic] paychecks," and on August 4, 1995, "Comerica refuse[d] to honor payroll."[203]

Also, on August 4, 1995, Comerica sent out letters to MTG's receivable accounts notifying them that they were to send payments to Comerica,[204] and Comerica sent a demand letter to MTG accelerating the Mortgage Loan portion of MTG's liabilities to Comerica, and demanding full payment of all of MTG "Liabilities" to Comerica from both MTG and the "Guarantors" (the "Demand Letter").[205]  The Demand Letter stated that as of August 4, 1995, MTG's total Liabilities to Comerica for principal was $9,253,870.08 and for interest was $855,890.22.[206]  The Demand Letter further stated, in relevant part:

---

[201]  *Id.* at 7-9.

[202]  *Id.* at 8-9.

[203]  Vercnocke's Chronological History (Docket # 598-11) at pdf. p. 4.

[204]  *See* Collins-Main Memo (Docket # 589-28) at pdf. p. 9.

[205]  *See* Docket # 645-8.  The Demand Letter defined "Guarantors" as "Kirk R. Vercnocke, Richard G. May, Gregg Waelchli, Ellis Gosnell, Matrix Sales Group, Inc., Thomas M. Kocsis, Spec Check, Inc., and Spec Technologies, Inc." (*Id.* at pdf. p. 2.)  The Demand Letter defined MTG's "Liabilities" as: "All amounts due from [MTG] to Bank, whether now or in the future, contingent, fixed, primary, and/or secondary, including, but not limited to, principal, interest, inside and outside counsel fees, audit fees, costs, expenses, and any and all other charges provided for in the Loan Documents . . . in the aggregate."  The Demand Letter defined "Loan Documents" as "any and all documents, instruments, and agreements executed in connection with the financing arrangements from Bank to [MTG] and Guarantors." (*Id.*)

[206]  *Id.*

As you are aware, [MTG] has failed to timely and properly submit all of the required [A/R] Reports to [the] Bank over the past several weeks and, most recently, [MTG] is now out of formula on the Line of Credit by approximately $600,000. Further, the accounts receivable due to [MTG] from both Textron Automotive Company and lnjectronics, Inc., totaling approximately $2 million, are now being contested in their entirety by the applicable account debtors. Pursuant to the terms of the Continuing Collateral Mortgage dated November 10, 1993, with [MTG], as mortgagor, and [the] Bank, as mortgagee, [the] Bank deems the margin of collateral securing [MTG's] Liabilities insufficient and deems itself insecure, in good faith believing that the prospect of payment of [MTG's] Liabilities is impaired.

The Line of Credit and the Equipment Loans are demand obligations and the Mortgage Loan is a term obligation. As a result of and for the reasons outlined above, [the] Bank hereby accelerates the Mortgage Loan portion of [MTG's] Liabilities and demands payment in full of all of [MTG's] Liabilities from [MTG] and Guarantors.

Please contact [the] Bank at your earliest convenience to arrange for the payments of all of [MTG's] Liabilities.

**B. MTG's Pre-Petition Claims in the Complaint**

Vining's complaint alleges that the foregoing facts give rise the following lender-liability type Pre-Petition Claims against the Comerica Defendants, contained in Counts XV-XXI of his complaint: Breach of Contract (Count XV); Promissory Estoppel (Count XVI); Equitable Estoppel (Count XVII); Fraudulent Misrepresentation (Count XVIII); Breach of Fiduciary Duty (Count XIX); Tortious Interference With Contractual Relations and Business Expectancies (Count XX); and Business Defamation (Count XXI). The Comerica Defendants allege that they are entitled to summary judgment on all of the Pre-Petition Claims.

**V. Discussion of the Pre-Petition Claims**

**A. Summary judgment standards**

76

This Court described the standards governing motions for summary judgment in

*Schubiner v. Zolman* (*In re Schubiner*), 590 B.R. 362, 376-77 (Bankr. E.D. Mich. 2018):

> Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary proceedings under Fed.R.Bankr.P. 7056, provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149–50 (6th Cir.1995), the court elaborated:

>> The moving party has the initial burden of proving that no genuine issue of **material** fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue.

>> If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a . . . verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.
>> . . .

>> Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)], *Celotex* [*Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct.

77

> 2548, 91 L.Ed.2d 265 (1986)] and *Matsushita* [*Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)], trial courts have been afforded considerably more discretion in evaluating the weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted.
>
> *Id.* (internal quotation marks and citations omitted). In determining whether the moving party has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant." *Ingram v. City of Columbus*, 185 F.3d 579, 586 (6th Cir.1999) (relying on *Russo v. City of Cincinnati*, 953 F.2d 1036, 1041–42 (6th Cir.1992)).

*Id.* (emphasis added) (quoting *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 774-75 (Bankr. E.D. Mich. 2011)).

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002) (citing *Liberty Lobby*, 477 U.S. at 248) ("The substantive law identifies facts that are 'material.' Facts are 'material' only if establishment thereof might affect the outcome of the lawsuit under governing substantive law."). "An issue of fact is 'genuine' if the evidence is such that a reasonable trier of fact could return a verdict for the nonmovant." *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002) (citing *Liberty Lobby*, 477 U.S. at 248).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).[207]

Applying these standards, the Court concludes that the Comerica Defendants are entitled to summary judgment on all of the Pre-Petition Claims in Vining's complaint.

## B. Vining's breach of contract claim against the Comerica Defendants (Count XV)

For the reasons stated in Part V.B.3.c of this Opinion, Vining's breach of contract claim against the Comerica Defendants (Count XV) is barred by Michigan's statute of frauds applicable to financial institutions. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

### 1. Vining's position that the Debtor was not in default under the Loan Documents when Comerica declared a default

Vining's breach of contract claim against Comerica begins with the following. Vining argues that all loan advances Comerica made between June 21, 1995 (the date of the Renaissance Club meeting) and July 21, 1995 (the date that B. Becker told Collins that the Becker Group was

---

[207] Fed. R. Civ. P. 56 is made applicable to adversary proceedings by Fed. R. Bankr. P. 7056.

seriously considering terminating the Asset Purchase Agreement),[208] "were made pursuant to negotiations and agreements strictly between Comerica and [the] Becker [Group] (the 'Becker Loans')" and that such loans "were not obligations under [the] Debtor's line of credit . . . or equipment facilities or enforceable against [the] Debtor as secured debt or otherwise."[209]

The relevant allegations in the Complaint regarding this argument include the following:

> 57. Mr. Marcinelli . . . represented to Mr. Vercnocke that the Bank would make all loans **in addition to the Debtor's line of credit** required to continue operations pending the closing.

> 58. Mr. Marcinelli told Mr. Vercnocke that he and [B.] Becker would negotiate the terms of required additional loans.

> 59. [The] Becker [Group] and the Bank negotiated the terms of all additional, required loans (the "Becker Overformula Loans").

> 60. The Debtor was never a party to any agreement to make or repay the Becker Overformula Loans. Nor was the Debtor asked to enter into any such agreement.

> 61. If the Becker Overformula Loans had been made under the loan agreements between the Debtor and the Bank (the "Loan Documents"), the Becker Overformula Loans would have constituted overformula loans.
> . . . .

> 65. A few days after the Renaissance Club meeting, Mr. Collins told Mr. Vercnocke that pending the Becker closing:

>> (A) The Debtor should not file cash collateral reports required under the Loan Documents;

>> (B) When Becker Overformula Loans were required

---

[208]  Vining alleges that "Comerica made 14 credit advances totaling $786,000 and a $316,000 loan to fund the purchase of an FPT Machine pending a Becker Group closing." (Trustee's Br. (Docket # 657) at 1.)

[209]  Trustee's Br. (Docket # 657) at 4.

to continue operations, the Debtor should tell Ms. Ware to call Mr. Collins for approval of the Loans; and

(C) The Bank would make all required Becker Overformula Loans.

66. In early July 1995, [the] Becker [Group] took control of the Debtor's business operations pending the closing.

67. At that time, [the] Becker [Group] announced to its employees that it had purchased the Debtor's business operations.

68. At that time, [the] Becker [Group] took complete control of the Debtor's business operations, including accounting and sales functions.

69. Through the closing date on the Becker [Group] sale, the Bank made $500,000 of Becker Overformula Loans to [the] Becker [Group] to continue the Debtor's business operations.

70. In obtaining these Loans, [the] Becker [Group] represented to the Debtor and the Bank that it would pay the Loans in full within a few days after closing.

71. The Becker Overformula Loans were made under an agreement between [the] Becker [Group] and the Bank.

72. The Becker Overformula Loans were not loans made to the Debtor under the Loan Documents.[210]

According to Vining, the Debtor was not in default when Comerica declared a default and accelerated all the debt MTG owed. Comerica alleged that MTG was in default based on MTG's failure to submit A/R Reports when it requested advances pending the closing of the Asset Purchase Agreement, and based on MTG being overformula. But, according to Vining, the advances made to the Debtor between June 21, 1995 and July 21, 1995 were loans *to the Becker*

---

[210] Compl. (Docket # 1) at 8-10 (emphasis added).

*Group* and not loans under the Debtor's $3.5 and $1.5 million lines of credit, and Comerica, through Collins, had instructed the Debtor not to submit A/R Reports pending the closing of the Asset Purchase Agreement. Therefore, according to Vining, the Debtor was not in default under the Loan Documents. Vining argues that the "Debtor was in fact current and not in default of its line of credit on July 24, 1995" and that "[t]here was substantial formula eligibility for continuing advances."[211] According to Vining, Comerica's declaration of a default when the Debtor was not in default, and without first giving the Debtor notice of the default and an opportunity to cure the default, and the collection actions Comerica took after declaring a default, were in breach of the terms of the Loan Documents and invalid. And Vining argues that the fact that Comerica made the advances after the Renaissance Club meeting without receiving A/R Reports and when MTG was overformula is evidence that Comerica had made an agreement to modify the Loan Documents.

Vining argues, in the alternative, that to the extent that the overformula advances were not loans to the Becker Group, but were loans to MTG under its $3.5 million line of credit, Comerica is barred from asserting the statute of frauds as a defense to MTG's breach of contract claim against it by the doctrines of promissory estoppel, equitable estoppel, and partial or full performance.[212] According to Vining, Comerica's wrongful declaration of default, its efforts to

---

[211] Tr. of Hr'g on Summ. J. Mots. (Docket # 694) at 73.

[212] *See*, *e.g.*, Trustee's Resp. to the Comerica Defs.' Summ. J. Mot. (Docket # 639) at 12 (where Vining, citing *Giordano v. Markovitz*, 531 N.W.2d 815, 816-17 (Mich. Ct. App. 1995), asserted that "full and part performance by Comerica in knowingly making alleged [line of credit] advances (thereby increasing [the] Debtor's approved overformula status) takes any alleged [line of credit] default by [the] Debtor outside the statute of frauds" and also asserted that his "prepetition claims against Comerica, including the promissory and equitable estoppel claims, are meritorious"); *see also* Tr. of Hr'g on Summ. J. Mots. (Docket # 694) at 75 ("Comerica Bank's full performance in making alleged line of credit

collect from MTG not only MTG's debt to Comerica, but also the debt owed to Comerica by the Becker Group which was not enforceable against MTG, and Comerica's refusal to advance any more funds to MTG, also were breaches of Comerica's duty of good faith and fair dealing under the Loan Documents. Vining argues that such duties are a part of every contract under the Uniform Commercial Code and common law, and therefore apply to performance under, and enforcement of, the Loan Documents.

Vining also argues that the $1.5 million Equipment Facility loan was a term loan, and not a demand obligation as Comerica alleges, and therefore was not payable on demand. Comerica's demand that MTG immediately pay in full the total amount owed under the Equipment Facility was therefore a breach of contract, according to Vining.

According to Vining, Comerica's breach of the Loan Documents forced the Debtor to file bankruptcy and ultimately caused the Debtor's loss of its business.[213] The relevant allegations in

---

advances and thereby increasing the [D]ebtor's approved [out] of formula status, takes any alleged line of credit default by the [D]ebtor outside the statute of frauds.").

[213] "Trustee's Response to the Motion for Summary Judgment of Defendants Comerica Bank, Ronald Marcinelli, Steven Lyons, Paul Dufault and Michael A. Collins" (Docket # 539) at 8-10. The Court cites to Vining's response to the Comerica Defendants' Summary Judgment Motion because Plaintiff's Summary Judgment Motion contains only bare legal conclusions with no arguments regarding the merits of the Pre-Petition Claims (including the breach of contract claim), no record citations, and no case citations, in support of the motion. Plaintiff's Summary Judgment Motion relies entirely on the Court preventing the Comerica Defendants from defending against the Pre-Petition Claims, including the breach of contract claim, due to alleged discovery abuses. The entire section devoted to why Vining is entitled to summary judgment on all of the Pre-Petition Claims states:

> **IX. THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT AGAINST COMERICA FOR ITS BREACH OF THE LOAN AGREEMENTS, ITS BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING, ITS BREACH OF FIDUCIARY DUTY, AND FRAUDULENT MISREPRESENTATIONS.**
>
> Comerica breached its loan obligations to [the] Debtor, breached its

83

the complaint regarding this argument include the following:

> 76. Upon learning of the termination [of the Asset Purchase Agreement], Michael Collins, on the Bank's behalf, told Mr. Vercnocke that the Bank was declaring a default under the Loan Documents because the Debtor was over formula on its line of credit and because it had failed to submit required cash collateral reports.

> 77. At that time, the Bank and Mr. Collins knew that the Debtor was not in default under the Loan Documents because, among other reasons:

> (A) The Bank itself directed the Debtor not to submit cash collateral reports pending the Becker [Group] closing;

> (B) The Bank made the Becker Overformula Loans under an agreement between [the] Becker [Group] and the Bank; and

> (C) The Bank made no such Loans to the Debtor under the Loan Documents.

> 78. After declaring the Debtor's default, the Bank refused to honor the Debtor's checks, refused further credit line advances, accelerated and demanded full payment of Bank debt, initiated collection action against the Debtor's account debtors, and demanded that the Debtor and its principals each execute a release of all claims against the Bank.

> 79. The Bank never gave the Debtor any written or prior notice

---

duties of good faith and fair dealing owed to [the] Debtor, breached fiduciary duties owed to [the] Debtor, and made fraudulent representations to [the] Debtor, all of which damaged [the] Debtor. Pursuant to *F.R.C.P. 37* and the Court's inherent power, the Court should prohibit Comerica from asserting defenses against or presenting evidence opposing these claims and the Trustee's proofs regarding damages. Summary judgment should be entered on the Trustee's [P]repetition [C]laims against Comerica, awarding damages in the amount of at least $6,251,300.00, plus prejudgment interest, costs and attorney fees.

(Trustee's Br. (Docket # 657) at 46-47.)

of default or any opportunity to cure the alleged defaults.

80. The Bank breached its obligations to the Debtor under the Loan Documents by taking the foregoing actions.

81. As a result of the Bank's breaches, the Debtor had no means of funding and continuing operations.
. . . .

345. The Bank breached the Loan Documents as follows:

(A) By declaring the Debtor in default under the Loan Documents because of the Debtor's alleged overformula status;

(B) By declaring the Debtor in default under the Loan Documents because of the Debtor's failure to submit cash collateral reports;

(C) By refusing to honor the Debtor's checks after the declared default;

(D) By refusing further credit line advances after the declared default;

(E) By accelerating and demanding full payment of the Bank debt after the declared default;

(F) By demanding that [the] Debtor's account debtors forward account payments directly to the Bank after the declared default;

(G) By demanding that the Debtor and its principals each execute a release of all claims against the Bank after the declared default;

(H) By failing to give the Debtor prior notice of the alleged defaults or any opportunity to cure the alleged defaults;

(I) By failing to liquidate collateral in a commercially reasonable fashion.

346. The Bank also breached its duty of good faith and fair

dealing.

347.  As a result of the Bank's breaches of the Loan
Documents, the Debtor was damaged.[214]

## 2. The Comerica Defendants' position

The Comerica Defendants argue that the fact that Comerica made advances without first

receiving the required A/R Reports is not evidence that a new agreement was reached between

Comerica and MTG at the June 21, 1995 Renaissance Club meeting, to permit MTG to take

advances which were over formula and without submitting A/R Reports, pending the closing of

the Asset Purchase Agreement.  Comerica says that there was no new agreement made to permit

this.  This is so, according to the Comerica Defendants, because even before the Renaissance

Club meeting, Comerica made multiple advances to MTG without first receiving A/R Reports.[215]

---

[214]  Compl. (Docket # 1) at 10-11, 47-48.

[215]  *See* page 70 of the hand-out entitled "Comerica Defendants' Rebuttal Argument," which was
made available to the Court and the parties, both in written form and as part of a slide presentation at the
hearing on the Summary Judgment Motions.  For the record, the Court appends a copy of this hand-out to
this Opinion.  Record citations supporting the information in the hand-out are listed in this footnote,
below.

The hand-out provided the following information in chart form regarding the advances Comerica
made before the Renaissance Club meeting on June 21, 1995 and after termination of the Asset Purchase
Agreement.  The chart indicates that some of the advances were made without Comerica first receiving
A/R Reports.  Below is the information included in the chart.  (In the chart, "BBR" refers to the A/R
Reports).

| Date | Advance | BBR? | Date | Advance | BBR? |
| --- | --- | --- | --- | --- | --- |
| 4/17/95 | $392,000 | No | 6/2/95 | $229,000 | Yes - # 64 |
| 4/18/95 | $16,000 | No | 6/5/95 | $88,000 | No |
| 4/19/95 | $5,000 | Yes - # 54 | 6/7/95 | $13,000 | No |
| 4/20/95 | $89,000 | No | 6/9/95 | $89,000 | No |
| 4/24/95 | $17,500 | Yes - # 55 | 6/13/95 | $20,000 | No |

86

In months leading up to the Renaissance Club meeting, the practice was that MTG did not always submit A/R Reports when it took advances. The Comerica Defendants allege that nothing changed after the Renaissance Club meeting. They note that even after the Renaissance Club meeting and after being allegedly told that MTG should not submit A/R Reports, MTG submitted an A/R Report.[216]

The Comerica Defendants argue that under the Loan Documents, Comerica had a

| 4/25/95 | $3,000 | No | 6/14/95 | $11,500 | Yes - # 65 |
| 4/26/95 | $48,500 | No | 6/16/95 | $110,000 | No |
| 4/28/95 | $108,000 | No | 6/17/95 | $63,000 | No |
| | | | 6/22/95 | $82,500 | No |
| | | | 6/26/95 | $1,500 | Yes- # 66 |

It was also noted in the chart that "[b]etween 5/1/95 and 6/1/95, MTG took 13 more advances, while it submitted 8 BBRs."

(Docket # 701-1 at pdf. pp. 4-6 (Comerica's Loan Interest and Principal Statement for Period Starting 12-30-94 and 12-31-95); Docket # 601-17 at pdf. pp. 7-8 (emphasis omitted)(explaining that "[a] review of the BBRs and line of credit (LOC) printouts available from April and May, 1995 show that [the] requirement ["that no money be advanced without an up-to-date borrowing base report [(BBR)]"] was simply never enforced . . . [a]s long as the balance due on the loan stayed below" the borrowing limit "according to the accounts receivable and work in process numbers from the most recent BBR filed by Vernocke"), 9-26 (BBR ## 66, Internal BBR 68F, 68, 69, 70, 71, 72, 73, 74), 27 (CHART SHOWING ALLEGED LINE OF CREDIT ADVANCES UNDER COMERICA SUMMARY AND LOC PRINTOUT), 28 (capitalization and underlining in original) (chart showing "MTG, INC. DAYS BETWEEN SUBMISSION OF REPORT OF ACCOUNTS RECEIVABLE APRIL 17, 1995 THROUGH JULY 20, 1995); Docket # 426-1 (Comerica summary of loan advances); Docket # 598-22 (BBR ## 54, 55, 56, 57, 58, un-numbered report stamped May 9, 1995, 59,60, 61 64, 65, 66); Docket # 634-14 (BBR # 67); Docket # 507-49 (Excerpt from 3/06/09 Production of 1090 pages of Data Base Reports showing advance of $48,500.00 (one of the three advances that add up to the $365,500.00 of advances identified in Line Item 15 of BBR # 56).)

[216] *See supra* note 215.

87

contractual right to take all of the complained of actions it took.[217]  The Comerica Defendants

argue that the promissory notes MTG executed in connection with its $3.5 million and $1.5

million lines of credit were demand obligations, which "matured upon issuance and [were]

payable in full upon demand."[218]  The promissory notes expressly gave Comerica the right to

demand full payment from MTG at any time, without reason, without notice, without providing a

right to cure, and without declaring a default by MTG.[219]  According to the Comerica Defendants,

this right was absolute, and was not limited by any implied duty of good faith and fair dealing.[220]

   The Comerica Defendants argue further that, because "Comerica expressly disavowed

any obligation to make advances to MTG under the [$3.5 million] Demand Note," the failure to

make advances to MTG cannot be a valid basis for a breach of contract claim.[221]  And because

that demand note (also known as Note # 26) did not require Comerica to give MTG an

opportunity to cure any defaults, Comerica's failure to do so also cannot be a valid basis for a

breach of contract claim against it.[222]

   The Comerica Defendants point out that Vining has failed to cite any provisions in the

Loan Documents that Comerica allegedly breached.[223]  And to the extent that, for his claim that

---

[217]  Br. in Supp. of Comerica Defs.' Summ. J. Mot. ("Comerica Defs.' Br.") (Docket # 584) at
12-15.

[218]  *Id.* at 12.

[219]  *Id.* at 12-13.

[220]  *Id.*  at 14-15.

[221]  *Id.* at 13.

[222]  *Id.* at 12.

[223]  *Id.* at 12, 14.

88

Comerica wrongfully declared a default, Vining is relying on an alleged oral agreement between Comerica and MTG, Vining's breach of contract claimed is barred by Michigan's statute of frauds.[224]  Such an alleged oral agreement would have been contrary to the express terms of the Loan Documents, which were demand instruments, and which did not permit MTG to take overformula loans or suspend its reporting requirements under the Advance Formula Agreement, Comerica argues that under Michigan's statute of frauds specifically applicable to financial institutions, Vining was required to present evidence of a written agreement that *Comerica signed and delivered to MTG* "that modified the demand nature of MTG's obligations" under the promissory notes.  Comerica argues that "[w]ithout such a document, none of the facts presented by [Vining] is material."[225]

Comerica argues further that, to the extent Vining is claiming that there was a written or oral agreement between the Becker Group and Comerica that the Becker Group would be responsible for the loan advances at issue, such an agreement never existed.  Comerica argues further that even if such an agreement did exist, it would not evidence an agreement between Comerica and MTG to modify MTG's obligations under the Loan Documents to repay any advances it requested on its $3.5 million line of credit.[226]

### 3. Explanation of the Court's rulings

   **a. All of the evidence in the record demonstrates that the over-formula loan advances Comerica made between June 21, 1995 and July 21, 1995 were loan advances to MTG, not to the Becker Group.**

---

[224] *Id.* at 15-18.

[225]  *See id.*

[226] *See id.* at 31.

89

The Comerica Defendants allege that there was never any oral or written agreement between Comerica and the Becker Group, under which Comerica agreed to loan money to the Becker Group to operate MTG.  They also argue that there was never any oral or written agreement between Comerica and the Becker Group, under which the Becker Group was responsible for repaying Comerica the amount of any advances Comerica made to MTG, pending the closing of the Asset Purchase Agreement.  The Comerica Defendants argue that all of the evidence in the record demonstrates that the loan advances Comerica made between June 21, 1995 and July 21, 1995 were advances *to MTG*, not to the Becker Group; and that such advances caused MTG to be out of formula.  Therefore, they argue, even though Comerica did not need a reason to declare a default, due to the demand nature of MTG's obligation to it under the $3.5 million line of credit, Comerica's declaration of default based on MTG being over formula on its $3.5 million line of credit was proper under the unambiguous terms of the Loan Documents.  The Comerica Defendants rely primarily on the Loan Documents; Comerica's internal records; MTG's internal records; the affidavit and deposition testimony of B. Becker; the deposition testimony of Bensinger; the deposition testimony of Halbert; and Vining's failure to produce any evidence in support of his position that the advances at issue were loans from Comerica to the Becker Group.

Comerica points out that MTG signed promissory notes for both the $3.5 million and $1.5 million lines of credit which provided: "The principal amount payable under this Note shall be the sum of all advances made by the Bank **to or at the request of the undersigned [(MTG)]**

03-04950-tjt    Doc 767    Filed 10/07/22    Entered 10/07/22 10:23:21    Page 90 of 419

less principal payments actually received in cash by the Bank."[227]   The Comerica Defendants argue that there is no "genuine" dispute that (1) MTG requested the loans at issue; (2) the loans were deposited into MTG's accounts; and (3) the loans were used by MTG to pay MTG's business expenses and to purchase a piece of equipment that MTG had ordered for the Mold Shop (the FPT machine) long before MTG even entered into negotiations with the Becker Group. The Comerica Defendants rely on the following undisputed facts in the record for this argument:

- During the due diligence period, Bensinger, the accounting manager of MTG, requested the over-formula advances from a loan processor at Comerica, without being instructed to do so by B. Becker, and she did so without telling the Comerica loan processor that these advances were not to be debits on MTG's loan accounts.[228]

- Comerica recorded the advances as liabilities on MTG's lines of credit.[229]

- ***MTG included the amounts of the advances on its own records as line of credit liabilities of MTG***.[230]

- MTG used the advances to pay its operating expenses and to pay for the purchase of a piece of equipment for MTG's Mold Shop (the FPT machine).[231]

---

[227]   *See* Docket # 584-2 at pdf. p. 2 (Note # 26) (for the $3.5 million line of credit), Docket # 584-5 at pdf. p. 2 ($1.5 million promissory note) (emphasis added).

[228]   Bensinger Dep. Tr. (Docket # 599-16) at 23, 26, 34-35; *see also supra* Part IV.A.9.b of this Opinion.

[229]   *See, e.g.*, Docket # 701-1 (Comerica's Loan Interest and Principal Statement); MTG's A/R Reports.

[230]   *See, e.g.*, Docket # 701-2 (Excerpt of MTG's General Ledger Detail Report) (showing that MTG recorded $523,000.00 in advances against MTG's line of credit for July 1995); *see also* Docket ## 584-14, 584-15, 584-16 (A/R Report Nos. 66-73).

[231]   *See* Docket # 584-48 (Tr. of Deposition of Todd Halbert ("Halbert Dep. Tr.")) at 204 ("It's my understanding that the [over-formula advances] were used in [MTG] operations pending the asset purchase agreement closing."), 205 ("My understanding is that all the funds that were advanced by the [B]ank after June 21, [1995] before the Becker [Group] deal fell through, were advances that were made and funds placed, I presume, in the [D]ebtor's bank account with Comerica."), 207 (The overformula advances "did go into the [D]ebtor's operations."), 212 ("[The advances] were used in [MTG]'s

- Note # 26, the promissory note for the $3.5 million line of credit, required MTG to repay all advances and provided that "[t]he books and records of the Bank shall be the best evidence of the principal amount and the unpaid interest amount owing at any time under this Note and shall be conclusive absent manifest error.[232]

- MTG listed the FPT machine as an asset of MTG in the "Amended Asset Purchase Agreement" it later entered into with Specialty Stampings, Inc.[233]

- The Letter of Credit that MTG applied for and Comerica issued to MTG, in January 1995, for the purchase of the FPT machine was irrevocable until its expiration date of June 15, 1995, and FPT invoiced against the Letter of Credit on June 7, 1995.[234]

The Comerica Defendants also cite the fact that no witness has testified that they ever saw a written loan agreement between Comerica and the Becker Group. The Comerica Defendants also cite the affidavit of B. Becker, the Chief Financial Officer of the Becker Group, in which he denied that the Becker Group ever applied for credit, or received any loans whatsoever from Comerica related to MTG, and stated that he had no knowledge "of any loan documents [between the Becker Group and Comerica] such as promissory notes, security agreements, mortgages, advance agreements or any other documents which would evidence amounts to be loaned or the terms of repayment," and that if such documents had existed, he would have knowledge of them due to his position as Chief Financial Officer of the Becker Group.[235] The Comerica Defendants

---

operations. . . . [MTG ] used them in the business operations. . . . But at the time they were used, they were used, I presume, to pay the [D]ebtor's legitimate business expenses, probably payroll and payments to creditors.").

[232] Docket # 584-2 at pdf. p. 2.

[233] *See* "Amended Asset Purchase Agreement" between MTG as the "Seller" and Specialty Stampings, Inc. as the "Buyer" (Docket # 701-6) at pdf. p 2 (Recital B).

[234] *See supra* Part IV.A.6 of this Opinion.

[235] Aff. of B. Becker, dated Oct. 10, 2011 (Docket # 645-11) at 1-2 ¶ 4; *see also supra* discussion at Part IV.A.9.d of this Opinion.

92

also cite the deposition testimony of B. Becker that he has no recollection of the Becker Group making an agreement with either MTG or Comerica to be responsible for any over-formula loans Comerica made to MTG, but if there had been such agreement, it would have had to be in writing.[236] The Comerica Defendants also cite the purported admission of Halbert in a deposition that what he refers to as the "Becker Loans" were not actually documented actual loans, but rather this was a "characterization" for the purpose of "legal argument." During his deposition, Halbert was asked whether the statement he made in a pleading before Judge Graves, that Vercnocke would testify that after the Renaissance Club meeting on June 21, 1995, Comerica continually made over-formula advances *to MTG*, was true. Halbert testified in response to that question, in relevant part, that "[t]here's more than one way to characterize [the advances Comerica made to MTG after the June 21, 1995 Renaissance Club meeting];" that "[w]hether one characterizes it as an out-of-formula loan or an advance to Becker is a legal argument;" and that at the point of time that he made that statement he didn't know if it was true because he "hadn't prepared Mr. Vercnocke for testifying."[237] Halbert testified that although the loan advances to MTG after the June 21, 1995 Renaissance Club meeting "were used in [MTG's] operations[, t]he extent to which it's a legally binding obligation for [MTG] to pay, that's a matter of law to be addressed by the attorneys."[238]

Because Comerica has pointed to specific evidence in the record that supports its position

---

[236] B. Becker Dep. Tr. (Docket # 599-14) at 136; *see also supra* discussion at Part IV.A.9.d of this Opinion.

[237] Halbert Dep. Tr. (Docket # 584-48) at 195-99.

[238] *Id.* at 211-12.

that the loans at issue from Comerica were to MTG, and MTG was responsible for paying them back, the summary judgment burden shifted to Vining to point to admissible evidence in the record that would support his contrary position. Vining has failed to meet that burden.

Vining has not produced *any* evidence supporting his position. He has not produced any *written* agreement between Comerica and the Becker Group under which the Becker Group obtained loans from Comerica or under which the Becker Group promised to pay back any loans Comerica made to MTG, pending the closing of the Asset Purchase Agreement. Nor has Vining produced any evidence that such a written agreement ever existed. Halbert, who was the Debtor's Chapter 11 attorney, and who is now Vining's attorney, admitted that he "ha[s] not seen a copy of a written loan document" or a promissory note or anything of that nature between Comerica and the Becker Group, and that he does not know what the terms of the purported loans to the Becker Group were.[239] Vercnocke also admitted that he had not seen a written promise by the Becker Group to pay back the loan advances at issue.[240] And B. Becker has denied under oath that there were any negotiations, much less any agreement, between Comerica and the Becker Group regarding loan advances to be made to MTG pending the closing of the Asset Purchase Agreement.[241]

Despite all of this, Vining alleges that there was a loan agreement between Comerica and the Becker Group, but it was lost or destroyed or concealed by Comerica. In a document entitled "Trustee's Brief in Support of Motion for Orders Finding Comerica Bank and Counsel in

---

[239] Halbert Dep. Tr. (Docket # 584-48) at 205-06.

[240] Vercnocke Dep. Tr. (Docket # 584-45) at 57-58, 68-69.

[241] *See supra* notes 146-152 and accompanying text.

94

Contempt of Court and Granting Other Relief Based on Discovery Fraud, Spoliation of Evidence and Fraud on the Court" (Docket # 507, the "Contempt Brief"), Vining alleged that a handwritten "memo" written by an officer of Comerica, Tom Williams (the "Williams Memo"), is evidence of negotiations and a loan agreement between Comerica and the Becker Group regarding the over-formula advances Comerica made to MTG after the Renaissance Club meeting.[242]  The Williams Memo stated:

> Steve, Eric R
>
> These came to me for processing/minuting at about the same time we learned that the Becker deal had fallen apart.
>
> I don't know if we want to do these now. If so, they should have your support as "6"s.
>
> Thanks,
>
> Tom Williams[243]

And there were handwritten notations on the bottom of the Williams Memo that read in part:

> Dave Cr (rest of last name illegible) 773 0701
>
> Approval of a overform amount of _____.
>
> Enter into a Forbearance Agreement through 8/11/95.[244]

In the Contempt Brief, referring to the Williams Memo, Vining alleged that "[s]hortly after Special Assets Group ("SAG") took over the Debtor's account, Comerica officer Tom

---

[242]  *See* Contempt Br. (Docket # 507) at 36, 91 n.59.

[243]  Williams Memo (Ex V to Contempt Br. (Docket # 507)) at pdf. p. 1 (line through "Steve" in the Williams Memo omitted).

[244]  *Id.*

Williams forward[ed] a memo to Lyons referring to the **Becker Loan Recaps** and Committee Minutes[.]"[245]  Vining alleged in the Contempt Brief: "The Becker deal that 'had fallen apart,' as Williams references, is the deal between [the] Becker Group and Comerica."[246]

This is nothing but speculation by Vining, unsupported by any evidence.  And as Comerica points out, there is strong evidence that the "deal" Williams referenced in his Memo must have been the purchase agreement deal between the Becker Group and MTG, not any deal between the Becker Group and Comerica.

Comerica, in its brief in response to the Contempt Motion, says that the Williams Memo is not evidence that there were Becker Loans.[247]  As a preliminary matter, Comerica notes that Vining has attached another document to the Williams Memo.  That document is entitled

---

[245]  Contempt Br. (Docket # 507) at 36 (emphasis added).

According to Vining:

- "Recaps" is an acronym for "Records Evidencing Committee Approval.'" (*See id.* at 20).

- According to Comerica's "Corporate Credit Policy A25" (attached to the Contempt Brief at Ex. S), loan officers prepare Recaps "for new loans and loan modifications" and distribute them "[a]s part of the loan approval process." (*Id.* at 29).  "'The recap plays an important part of the loan approval process by defining key pieces of information on the borrower as well as specifics of the loan requests, in addition to it being a formal document evidencing approval.'" (*Id.* (quoting Comerica's "Corporate Credit Policy A25").)

- "Comerica prepares Senior Loan Committee and Loan Group minutes evidencing loan approvals ('Minutes')." (*Id.* at 30 (footnote omitted.).)

[246]  *Id.* at 36.

[247]  Comerica's Resp. to Contempt Mot. (Docket # 521) at 21-22.

"Comerica Incorporated Senior Loan Committee #1 September 6, 1995." Regarding the

Williams Memo and this attachment, Comerica states:

> There is no evidence that these two documents go together, or that Williams is referring to the September, 1995 minutes in his "memo." From the way the documents were kept, it is not possible to show conclusively what document was attached to the Williams "memo," though . . . it was most likely a RECAP prepared on or about July 31, 1995.[248]

Comerica argues that "a better reading, especially in context, is that [Tom Williams] was

referring to [the Becker Group's] potential purchase of MTG, which, the record shows, 'fell

apart' in late July, 1995."[249] This is so according to Comerica because

> in the "memo," [Tom] Williams tells Steve Lyons that, "[i]f [we want to do these], they should have your support as '6's.'" The "6" refers to MTG's risk rating, which was downgraded by the Bank (from 5 to 6) on July 31, 1995, following [the Becker Group's] decision to pull out of the proposed purchase. [The Becker Group], which was a very strong company, would not have received a "6" risk rating, which is quite poor. From the context of the document (and the fact that there is no evidence that any "Becker Loans" ever existed), [Tom] Williams must have been talking about an MTG RECAP.[250]

The Court agrees with Comerica on all of its arguments regarding the Williams Memo.

First, the Court notes that the document attached to the Williams Memo bears the bate stamp

"Comerica 001184," but the Williams Memo does not contain any bate stamp.[251] It is therefore

readily apparent that these two documents were not attached together when Comerica produced

---

[248] *Id.* at 21.

[249] *Id*. at 22.

[250] *Id.*

[251] *See* Ex. V to Vining's Contempt Br. (Docket # 507-31).

97

the document with the Comerica bate stamp.

Second, there is nothing in the Williams Memo or any evidence in the record that would indicate that the Williams Memo had anything to do with the document Vining attached to it.

Third, Comerica's argument as to what the Williams Memo referred to by the "Becker deal" is much more logical, given the context of what was occurring between MTG and the Becker Group during the time frame when the memo was written, compared to Vining's mere speculation as to the meaning of the Williams Memo. The Becker deal with MTG embodied in the Asset Purchase Agreement had fallen apart and MTG's risk rating had been downgraded from a "5" to a "6." And as Comerica points out, and Vining does not contest, the Becker Group was a strong company and would not have been given a "6" risk rating.

Fourth and finally, the notations on the bottom of the Williams Memo, quoted above, show that the memo relates to Comerica's line of credit loan to MTG. It is undisputed that MTG was requesting loans at a time when the balance of its line of credit loan was overformula, and that Comerica was considering entering into a Forbearance Agreement with MTG during this time frame. There is no evidence that the Becker Group had any loan with Comerica, let alone a loan that was overformula, and so there would be no basis for Comerica entering into a forbearance agreement with the Becker Group.

Given all of this, the Court concludes that the Williams Memo is not evidence of a purported loan agreement between Comerica and the Becker Group, and that Vining has failed to produce any such written agreement, or any evidence that any such loan agreement ever existed. Nor has Vining produced any written agreement between the Becker Group and MTG under which the Becker Group promised to repay any loan advances MTG requested under its lines of

98

credit during the due diligence period.

Rather than relying on a written agreement, Vining relies on an alleged *oral* agreement between Comerica and the Becker Group, which purportedly was reflected in the July 24, 1995 letter Vercnocke wrote to the Becker Group after he learned from Collins that the deal with the Becker Group was probably not going to be consummated.[252] When Halbert was asked whether he had "seen anything that indicates that there was an oral agreement made between [the] Becker [Group] and the [B]ank regarding these over[-]formula loans," he responded: "I just recall that the documents were there discussing this issue of putting funds in at closing, and I believe Mr. Vercnocke's July 24th, '95, letter reflects an agreement. But whether [Vercnocke] knew there was a specific agreement between the [B]ank and [the] Becker [Group], I don't know."[253]

Vining's argument, that the loan advances were the responsibility of the Becker Group under an agreement negotiated between Comerica and the Becker Group, is based on Vercnocke's unsupported and incorrect allegations and faulty legal conclusions underlying the letter he wrote to the Becker Group on July 24, 1995. Those were that: (1) the Asset Purchase Agreement closed upon its execution on July 18, 1995; (2) Vercnocke became an employee of the Becker Group on July 18, 1995; (3) B. Becker controlled all of the operations of MTG during the period the advances were made and directed MTG to request the over-formula advances on its $3.5 million line of credit from Comerica; (4) the Becker Group had negotiated with Comerica for the loan advances; and (5) B. Becker orally agreed to loan MTG $500,000 within a few days of the closing of the Asset Purchase Agreement.

---

[252] *See supra* Part IV.A.10 of this Opinion.

[253] Halbert Dep. Tr. (Docket # 584-48) at 206-07.

99

Because the above allegation nos. (1) - (4) are not supported by any evidence in the record, and in fact are refuted by the evidence, they cannot be used to create a genuine issue of fact regarding who was obligated to repay the loan advances at issue. Regarding the above allegation no. (5), even if true, it would not alter MTG's obligation under the Loan Documents to repay any advances Comerica made to MTG pending the closing of the Asset Purchase Agreement.

Moreover, of the above allegations, nos. (1) and (2) are refuted by unambiguous contracts. "'[Where] the language of the contract is unambiguous, [a court must] construe and enforce the contract as written.'" *Coates v. Bastian Bros.*, *Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007) (footnote omitted) (quoting *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003) (citation omitted)) ("'[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law,'" and "'[i]f the language of the contract is unambiguous, we construe and enforce the contract as written.'"). As to point no. (1) above, the Asset Purchase Agreement expressly and unambiguously provided that the "Closing Date" of the contract would be on August 31, 1995 or upon another date that may be agreed to by the parties (*not* upon the execution of the contract on July 18, 1995), and that the closing was conditioned on, among other things, the "[s]atisfactory completion of [the Becker Group's] due diligence."[254] As to point no. (2) above, the employment contract between Vercnocke and Becker also expressly stated that Vercnocke's employment with the Becker Group would begin on the "[C]losing [D]ate" as that term was defined in the Asset Purchase Agreement (August 31,

---

[254] *See* Asset Purchase Agreement (Docket # 598-3) at ¶¶ 1.8 ("Closing and Closing Date"), 4.2.11 ("Completion of Buyer's Due Diligence").

100

1995).[255]

There is evidence in the record that during the ongoing negotiations between the Becker Group and MTG, the Becker Group discussed the possibility of "loaning" $500,000 to MTG to cover over-formula advances *after* the closing of the Asset Purchase Agreement. Both Vercnocke and Collins state that such discussions occurred, and B. Becker admitted that there was a discussion about some amount of money being loaned to MTG *after* closing. But even assuming, without deciding, that B. Becker had orally promised Vercnocke that the Becker Group would loan MTG $500,000 to pay down its line of credit "within a few days after [the] closing [of the Asset Purchase Agreement]" as Vercnocke alleged,[256] such promise was contingent on the closing of the Asset Purchase Agreement, and at most, it was a promised loan, not a promise to assume MTG's liability to Comerica for Comerica's loan advances. And such promise was unenforceable against the Becker Group by MTG, because B. Becker elected to terminate the Asset Purchase Agreement, and the Asset Purchase Agreement did not close. In any event, such an oral promise could not modify *MTG's* obligations under the Loan Documents to pay back any advances MTG requested from Comerica.[257]

For all of these reasons, there is no genuine dispute that the Comerica loan advances were made to MTG, not the Becker Group; that MTG was responsible for repayment of the loans; and that the loan advances were governed by the terms of the Loan Documents.

**b. Comerica's declaration of default under the Loan Documents, based on**

---

[255] *See* B. Becker Dep. Tr. (Docket # 599-14) at 48-49.

[256] *See* Vercnocke Am. Aff. (Docket # 589-16) at 5 ¶ 31.

[257] *See infra*, discussion of the Statute of Frauds below.

**MTG's failure to submit A/R Reports and MTG being out of formula, was not improper.**

The Comerica Defendants rely on the express terms of the Loan Documents to support their position that Comerica's declaration of default was proper, based on MTG's failure to submit A/R Reports and MTG being out of formula. The Comerica Defendants also rely on the Loan Documents to show that Comerica was not contractually obligated to provide MTG with notice of the default and an opportunity to cure the default. It is undisputed that the Loan Documents required MTG to submit A/R Reports each time it requested a loan advance from Comerica, and that under the Loan Documents, MTG's loan advances could not exceed the borrowing formula.[258] It is also undisputed that if the loan advances at issue were to MTG, as the Court has found, then MTG was not in compliance with the borrowing formula and the reporting requirements in the Loan Documents. Vining admitted this in his complaint.[259] And MTG admitted that it was significantly out of formula, by the $400,318.54 "out of formula" notation on MTG's A/R Internal Report No. 68F.[260]

It is also undisputed that under the promissory notes, MTG expressly waived notice of a default or acceleration and that the promissory notes contained no language that would provide MTG with a right to cure any default. And it is undisputed that the $3.5 million and $1.5 million promissory notes MTG signed contained a clause under which MTG acknowledged and agreed

---

[258] *See supra* Part IV.A.1 of this Opinion.

[259] *See* Compl. (Docket # 1) at ¶ 61 ("If the Becker Overformula Loans had been made under the loan agreements between the Debtor and the Bank (the 'Loan Documents'), the Becker Overformula Loans would have constituted over-formula loans.").

[260] *See supra* text accompanying notes 138-140.

102

that there could be no oral modification or waiver of the note terms.[261]

Vining has failed to cite any language in the promissory notes or any of the Loan Documents that supports his position. Nor has Vining produced any other written loan agreement signed by the Bank that supports his position. This is rather striking now, because Vining previously opposed a motion to dismiss by the Comerica Defendants by arguing that there were written agreements that supported his claim. Specifically, early in this case Vining argued the statute of frauds does not bar his lender liability Pre-Petition Claims because, contrary to the Bank's assertions, he was not suing "to enforce (a) 'financial accommodations' orally agreed to by Comerica officers Ronald Marcinelli and Michael Collins, and (b) 'an alleged [oral] agreement between Comerica and a third party [the Becker Group].'" Rather, Vining stated, he "was suing the Bank for breaching *written* loan agreements signed by both the Bank and the Debtor" and "documents signed by the Bank evidencing [loans to the Becker Group]."[262]

Now, at the summary judgment stage, Vining has failed to produce any such written agreements, or to present any evidence that any such written agreements ever existed. Instead,

---

[261] *See* $3.5 million and $1.5 million promissory notes (Exs. Docket ## 584-2, 584-5), each of which stated:

> The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note.

[262] *See* Docket # 66 ("Trustee's Objections to Comerica Bank's Motion to Dismiss under Fed.R.Civ.P. 12(b)(6) and Fed.R.Bankr.P. 7012(b)," filed on May 31, 2007) at 8-9 (emphasis added); *see also* Tr. of H'rg on Summ. J. Mots. (Docket # 694) at 80 ("What I told the Court, and I quote, . . . the statute of frauds is inapplicable because 'the [T]rustee is suing the [B]ank for breaching written loan agreements signed by both the [B]ank and the [D]ebtor.").

Vining now argues that, contrary to the no-oral-modification-or-waiver language in the promissory notes, during the Renaissance Club meeting, Marcinelli *orally* promised to waive the reporting and formula requirements in the Loan Documents, pending the closing of the Asset Purchase Agreement. For this argument, Vining relies on Vercnocke's allegations in his amended affidavit, and Vercnocke's deposition testimony, that during the Renaissance Club meeting, Marcinelli stated that MTG did not have to submit A/R Reports and that Comerica would advance all necessary funds to MTG even if such advances were over formula, pending the closing to the Asset Purchase Agreement. Vercnocke also testified that this oral promise was later confirmed by Collins.

The Comerica Defendants deny that Marcinelli orally agreed to a waiver of any of the requirements in the Loan Documents at the Renaissance Club meeting, and say that the fact that MTG submitted an A/R Report on June 26, 1995 (A/R Report No. 66 showing MTG was in formula) after that meeting belies Vernocke's story. However, even assuming that Marcinelli made the statements attributed to him by Vercnocke, the Comerica Defendants argue that the Michigan statute of frauds bars *all* of Vining's claims against Comerica or its agents based on such an oral promise or commitment, and therefore bars all of the Pre-Petition Claims. As discussed next, the Court agrees with the Comerica Defendants.

### c. The Michigan statute of frauds bars all actions against Comerica or its agents based on an oral promise or commitment.

The Michigan statute of frauds bars all actions against Comerica or its agents based on an oral promise or communication. In 1994, Michigan's statute of frauds provided the following with respect to an action against "a financial institution:"

104

(2) An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

(b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

(c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation.

(3) As used in subsection (2), "financial institution" means a state or national chartered bank, a state or federal chartered savings bank or savings and loan association, a state or federal chartered credit union, a person licensed or registered under the mortgage brokers, lenders, and servicers licensing act, Act No. 173 of the Public Acts of 1987, being sections 445.1651 to 445.1683 of the Michigan Compiled Laws, or Act No. 125 of the Public Acts of 1981, being sections 493.51 to 493.81 of the Michigan Compiled Laws, or an affiliate or subsidiary thereof.

Mich. Comp. Laws Ann. § 566.132(2)-(3) (West).[263]

---

[263] Mich. Comp. Laws Ann. § 566.132 was amended by 2020 Michigan Public Acts No. 63, immediately effective March 17, 2020. But the amendment does not affect the outcome in this case. As amended, that statute states, in relevant part:

(2) A person shall not bring an action against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution:

(a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.

(b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

(c) A promise or commitment to waive a provision of a loan, extension

105

There is no dispute that Comerica is a "financial institution" within the meaning of the statute, and, therefore, that Comerica cannot be sued based on a financial accommodation it purportedly made unless such financial accommodation is in a writing signed by an authorized representative of Comerica.[264]  And there is no genuine dispute that there are no signed written agreements that modified the demand nature of the applicable promissory notes or any of the terms of the Loan Documents, or that assigned liability for the over-formula loans to the Becker Group.

Vining argues that documents existed which modified the terms of the Loan Documents, and/or that memorialized loans to the Becker Group, but that such documents were destroyed or concealed by the Comerica Defendants.  But there is no evidentiary support in the record for

---

of credit, or other financial accommodation.
. . . .

(4) As used in this section, "financial institution" means a state or national chartered bank, a state or federal chartered savings bank or savings and loan association, a state or federal chartered credit union, a person licensed or registered under the mortgage brokers, lenders, and servicers licensing act, 1987 PA 173, MCL 445.1651 to 445.1684, or the secondary mortgage loan act, 1981 PA 125, MCL 493.51 to 493.81, or an affiliate or subsidiary thereof.

The changes in the amended version of Mich. Comp. Laws Ann. § 566.132 are immaterial to the Court's analysis.  The Court need not determine which version of the statute applies; the result is the same under either version.

[264]  There is also no dispute that MTG is *not* a financial institution.  Because Mich. Comp. Laws Ann. § 566.132 only applies to actions *against "a financial institution,"* it does not bar a lawsuit by Comerica *against MTG* to collect the debt MTG owes to Comerica under the promissory notes and Loan Documents.  This legal conclusion refutes one of Vining's apparent arguments, which appears to be that because Comerica made loan advances even though MTG did not submit A/R Reports when it requested the advances, and the advances were over formula, all contrary to the terms of the Loan Documents, then Comerica cannot collect the loan advances from MTG or its bankruptcy estate.  Vining seems to argue that the statute of frauds bars any action by Comerica to collect the loan advances.  (*See* Tr. of H'rg on Summ. J. Mots. (Docket # 694) at 70-86.)  But that is simply incorrect.  The statute of frauds at issue here does not apply at all to, or bar, any action against MTG or its bankruptcy estate.

Vining's argument that written documents ever existed that were relevant to, or memorialized,

Comerica's alleged oral agreements with either MTG or the Becker Group.

- When Hertzberg, Comerica's counsel, was asked at his deposition, whether he was "aware of any destroyed records essential[] for pursuing a lender liability claim," Hertzberg testified that he was "not aware of records that were destroyed for any purposes or related to anything."[265]  Hertzberg also testified at his deposition that Vercnocke and his attorney never claimed that there were any documents evidencing an agreement between Comerica and MTG that permitted MTG to take over-formula advances.  Hertzberg testified as follows:

> Q. At that point in time did you ask Mr. Fisher [who was then counsel for MTG] or Mr. Vercnocke or anyone at [MTG] what documents they were relying on that indicated that this overformula was approved or permitted by the [B]ank?

> A. No, we didn't ask the question because **they told us, it wasn't an issue of documents. So there were no documents that they were relying on, nobody suggested that there was.**

> Q. It was all verbal?

> A. That's what they said, yes.[266]

- B. Becker swore in an affidavit:

> 4.  I have reviewed various portions of the Trustee's brief in which the Trustee asserts that Comerica made loans to [t]he Becker Group relating to MTG, and that, therefore, Comerica must be concealing documentation of such loans.  Becker never sought or applied for credit from Comerica related to MTG, there were no loans whatsoever to [t]he Becker Group related to MTG and, thus, I am not aware of any loan documents such as promissory notes, security agreements, mortgages, advance agreements or any other documents which would evidence amounts to be loaned or the terms of repayment.  Had there been any such documentation, I, as CFO of

---

[265]  Tr. of Dep. of John T. Hertzberg ("Hertzberg Dep. Tr.") (Docket # 584-47) at 161-62.

[266]  *Id.* at 30 (emphasis added).

the Becker Group, would have seen it.[267]

- B. Becker also testified at his deposition that he had no knowledge of any written materials between Comerica and the Becker Group discussing any of the MTG over-formula loans.[268]

- Vercnocke himself testified at his deposition that he never saw anything in writing regarding B. Becker's purported promise to put $500,000 into MTG upon the closing of the sale to the Becker Group.[269]

- Halbert, who represented the Debtor when it was in Chapter 11 and who now represents Vining as special counsel, testified at his deposition that "[o]ther than [the Asset Purchase Agreement, he was] not aware of any signed agreement where [the] Becker [Group] was going to satisfy [the over-formula advances by putting $500,000 into MTG]"; that he had not "seen any documents that were originated by [the] Becker [Group]" that "may indicate some aspect of [the] Becker [Group] taking control of [MTG]"; and that "[c]oncerning advances, [he did not recall] . . . seeing an agreement signed by [the] Becker [Group] and [Comerica] to [the] effect" that the Becker Group would be responsible for satisfying MTG's obligation to pay back the over-formula advances to Comerica, nor did he recall seeing an agreement signed by MTG and the Becker Group under which the Becker Group would be responsible for over-formula loans to MTG.[270]

There is no genuine dispute that for his lender liability claims, Vining is relying on promises or commitments that are not a part of the Loan Documents, but rather only alleged oral representations of employees of Comerica, including the statements that Comerica would be MTG's partner; that MTG could take over-formula advances; and that MTG did not have to submit A/R Reports.[271] Indeed, Vining stated in his deposition testimony that the problems

---

[267]  Aff. of B. Becker, dated Oct. 10, 2011 (Docket # 645-11) at 1-2 ¶ 4.

[268]  B. Becker Dep. Tr. (Docket # 599-14) at 131-32.

[269]  Vercnocke Dep. Tr. (Docket # 584-45) at 69-70.

[270]  Halbert Dep. Tr. (Docket # 584-48) at 172-75.

[271]  *See, e.g.,* Compl. at ¶ 376 ("By making the Becker Overformula Loans, the Bank provided extra services and Loans for the benefit of [the] Becker [Group] and the Debtor **outside of the Loan**

between Comerica and MTG were based on Comerica's "failing to honor its commitment to work with [MTG] **outside the terms of the loan agreement.**"[272]  In this regard, Vining's testimony was as follows:

> BY MR. BROWER [TO VINING]:
>
> Q.   Outside the terms of the loan agreement?
>
> A.   Yes.
>
> Q.  What was this commitment?  What terms were outside of the terms of the loan agreement that you claim Comerica offered?
>
> A.  Well, for instance, when the whole initial proposition when Mr.· Veronocke was instructed not to forward cash collateral reports.  To make -- I think it was make calls to Mr. Collins through his secretary when money was needed outside of the loan agreement.
>
> So in other words, it was the relationship outside the earlier commercial relationship that they had had.[273]

Because MTG is seeking to enforce an alleged oral promise by Comerica to waive provisions of the Loan Documents (a type of "financial accommodation" under the statute of frauds), the statute is clearly applicable and bars the action.  This conclusion is strongly supported by a series of decisions by the Michigan Court of Appeals, and a decision by at least one decision by the United States Court of Appeals for the Sixth Circuit.

In *Crown Tech. Park v. D&N Bank, FSB*, 619 N.W.2d 66 (Mich. Ct. App. 2000), Crown Technology Park and its attorney filed claims of promissory estoppel and negligence against

---

**Documents**.") (emphasis added).

[272] Tr. of Dep. of Guy G. Vining ("Vining Dep. Tr.") (Docket # 521-3) at 100 (emphasis added).

[273] *Id.*

109

D&N Bank, FSB ("D&N Bank"), based on the alleged oral promise by a commercial loan officer of D&N Bank to Crown Technology Park's attorney, that D&N Bank would waive enforcement of the prepayment restriction and prepayment penalty provisions in the promissory note at issue. *Id.* at 67, 69, 73. Crown Technology Park alleged that the refusal of D&N Bank to honor its oral promise caused it to incur a substantial prepayment penalty. *Id.* at 74.

On D&N Bank's appeal of "the trial court's judgment and order based on a jury verdict" for Crown Technology Park on its claims, the Michigan Court of Appeals reversed the judgment, and held that the trial court had erred in failing to grant summary judgment for D&N Bank. *Id.* at 67. The court held that Mich. Comp. Laws Ann. § 566.132(2)(c) applied; that "[the] language [in Mich. Comp. Laws Ann. § 566.132(2)(c)] is unambiguous"; and that "[i]t plainly states that a party is precluded from bringing a claim—no matter its label—against a financial institution to enforce the terms of an oral promise to waive a loan provision." *Id.* at 67, 72.

In *Huntington Nat'l Bank v. Daniel J. Aronoff Living Tr.*, 853 N.W.2d 481 (Mich. Ct. App. 2014), the Michigan Court of Appeals relied *on Crown Technology Park* in interpreting Mich. Comp. Laws Ann. § 566.132(2). In *Aronoff*, various borrowers asserted a lender liability claim as a defense to a lawsuit by Huntington National Bank ("Huntington") against them to enforce various notes, letters of credit, and guaranties, after the borrowers defaulted. *Id.* at 483-84. The lender liability claim was based on the allegation that Huntington "'reneged' on a $5 million loan commitment that it made to [the defendants] in October 2007" which caused them to be in a "'distressed economic position and near insolvency.'" *Id.* at 484. The defendants argued that if Huntington had honored its October 2007 loan commitment to them, they would not have defaulted on the loans, and they would have been able to repay more of the loans on

which they were being sued. For this reason, the defendants requested that the court offset the amount they would have been able to pay on the loans at issue had Huntington not breached its purported October 2007 loan commitment to them, against the amount of Huntington's claim. The defendants also alleged that Huntington's breach "of the October 2007 loan commitment amounted to fraud or misrepresentation, which negated their own liability under the notes, letters of credit, and guaranties." *Id.* at 484-85.

The trial court found that Mich. Comp. Laws Ann. § 566.132(2) applied to the defendants' lender liability defense. *Id.* at 485. The trial court held that in order for the bank's alleged promise to be enforceable, the borrowers had the burden of showing that Huntington's alleged promise to lend the defendants money in October 2007 was memorialized in a writing signed by an authorized representative of Huntington. *Id.* at 485-86. Because "the undisputed evidence showed that Huntington never actually committed to make the disputed loan in writing," the trial court held that the lender liability defense was barred by the statute of frauds, and granted Huntington's motion for summary disposition. *Id.* at 486.

The trial court also rejected the defendants' argument that it was premature to grant Huntington's motion for summary disposition before allowing further discovery, because "the statute of frauds could be satisfied through 'internal documents [of Huntington] which were never shared with [them].'" *Id.* at 486-87. The court of appeals described the trial court's ruling on this issue as follows:

> The trial court first examined [Mich. Comp. Laws §] 566.132(2) and noted that it required a written promise or commitment in contradistinction to the requirements stated under [Mich. Comp. Laws §] 566.132(1), which can be satisfied with a memorandum. Because a promise is a manifestation of an intent by the promisor

111

that justifies reliance by the promisee, the trial court concluded that **[Mich. Comp. Laws §] 566.132(2) requires proof that . . . the party seeking to enforce the promise or commitment actually received the writing signed by an authorized person.** Accordingly, further discovery to see if Huntington generated an internal document signed by an authorized person would not be of use to defendants.

*Id.* at 486-87 (emphasis added).

The Michigan Court of Appeals agreed with the holdings and reasoning of the trial court.

First, the court of appeals further elaborated on what is necessary to satisfy the statute of frauds

applicable to financial institutions. The court of appeals explained, in relevant part:

> As the proponents of this alleged loan commitment, defendants have the burden to prove its existence.
> . . . .
>
> As the trial court recognized, it is noteworthy that the Legislature did not provide that a party may meet the writing requirement of [Mich. Comp. Laws §] 566.132(2) with evidence of a "note or memorandum of the agreement, contact, or promise", as it did under [Mich. Comp. Laws §] 566.132(1). Instead, it barred any "action" to enforce a promise or commitment to lend money unless the "promise or commitment" is in writing and signed with an authorized signature. [Mich. Comp. Laws §] 566.132(2). By requiring that the "promise or commitment"—as opposed to some other document—must be in writing and have an authorized signature, it is evident that the Legislature intended to provide financial institutions with a greater degree of protection than that afforded generally under [Mich. Comp. Laws §] 566.132(1). *See Crown Technology Park v. D & N Bank, FSB*, 242 Mich. App. 538, 550, 619 N.W.2d 66 (2000) (construing [Mich. Comp. Laws §] 566.132(2) and concluding that the Legislature's use of the term "action" was meant to provide an "unqualified and broad ban" to protect financial institutions from any action to enforce a covered promise or commitment, however labelled). Accordingly, the party seeking to enforce a promise or commitment must present evidence that the promise or commitment itself was reduced to writing and properly signed. It is not, therefore, sufficient to show that the financial institution memorialized a portion of the agreement or

reduced a preliminary understanding to writing and then later orally agreed to proceed under that framework, nor is it sufficient to present a series of documents—some signed and others not signed—that together purport to be the agreement; rather, the proponent must present evidence that the financial institution actually agreed to the essential terms of the promise or commitment, and each of those essential terms must be accompanied by the required signature.

. . . .

Because defendants did not provide any evidence that Huntington executed a written agreement, with an authorized signature, to provide a loan under the terms that they claimed were negotiated in October 2007, the trial court did not err when it concluded that their "lender liability" defense amounted to an "action" to enforce a promise or commitment to loan money that was barred under [Mich. Comp. Laws §] 566.132(2).

*Id.* at 488-90 (citation omitted).

Second, the court of appeals in *Aronoff* agreed with the trial court that a bank's internal documents cannot satisfy the statute of frauds; rather, only a document that was received by the other party can do so:

However, . . . defendants argued that further discovery might reveal that Huntington prepared internal documents . . . which might satisfy MCL 566.132(2).  **We, however, agree with the trial court's determination that such internal documents cannot satisfy the statute**. . . .  A purely internal document cannot satisfy the requirements stated under MCL 566.132(2) because such a document could not induce reliance.  Consequently, we agree with the trial court's determination that extending discovery to permit defendants to try to discover an internal document to establish the elements of their "lender liability" defense would not aid them in establishing their factual position.

*Id.* at 491 (citation omitted) (emphasis added).

In *Comerica Bank v. Maniaci*, No. 321251, 2015 WL 5488252, at *3 (Mich. Ct. App. Sept. 17, 2015), the Michigan Court of Appeals, relying on *Aronoff* and *Crown Technology Park,*

again held that to be enforceable under Michigan's statute of frauds (Mich. Comp. Laws § 566.132(2)), promises by financial institutions that constitute a loan modification must be in a writing which contains the terms of the loan modification, and the writing must be signed "'with an authorized signature of the financial institution.'" These requirements cannot be evaded by theories such as promissory estoppel, equitable estoppel, or partial performance.

In *Maniaci*, in 2008, Prickles, L.L.C. ("Prickles") obtained a business loan in the amount of $277,500 from Comerica, and the owner of Prickles, Cheryl Maniaci ("Cheryl"), gave Comerica her personal guaranty for the loan. *Id.* at *1. The terms of the loan required Prickles to pay $2,356.94 monthly, which amount was applied toward interest and a reduction in the principal amount of the loan. Prickles was required to pay the loan in full by October 15, 2013, the date the loan matured.

In 2012, Prickles defaulted under the terms of the loan by failing to make its monthly payments for October, November, and December. After being contacted by a member of Prickles, Comerica orally "agreed that Prickles could make interest-only payments until" the commercial property of Prickles could be sold. *Id.* After the oral agreement was made, various emails between the parties were exchanged regarding the amount of the interest payments and how the payments were to be made. Prickles made, and Comerica accepted, interest-only payments for October, November, and December 2012, and for January and February 2013. But then in March 2013, Comerica refused to accept an interest-only payment from Prickles, and "filed suit against Prickles for breach of the loan contract and against Cheryl for breach of her personal guaranty, and sought full payment of the loan." *Id.* The defendants argued that Comerica's oral promise to accept interest-only payments and its 5-month course of performance

114

in accepting interest-only payments constituted a modification of the loan agreement, or a

forebearance agreement, which barred Comerica from filing suit based on the terms of the

original agreement. The trial court held that Mich. Comp. Laws § 566.132 requires loan

modifications by financial institutions to be in writing and granted summary disposition for

Comerica. *Id.*

The Michigan Court of Appeals affirmed. The court of appeals reasoned:

> In the case of financial institutions, . . . the Legislature has enacted specific statutes placing certain contracts squarely within the statute of frauds. [Mich. Comp. Laws §] 566.132(2)(b) provides that "[a]n action shall not be brought against a financial institution to enforce" "[a] promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan" "unless the promise or commitment is in writing and signed with an authorized signature by the financial institution." This Court has interpreted the statute to require even defendants to prove the existence of written, properly signed documents when challenging a financial institution's lawsuit. See *Huntington Nat. Bank v. Daniel J. Aronoff Living Trust*, 305 Mich.App. 496, 508–510, 853 N.W.2d 481 (2014). Regardless of which party brings a lawsuit, "the party seeking to enforce a promise or commitment must present evidence that the promise or commitment itself was reduced to writing and properly signed." *Id*. at 510511, 853 N.W.2d 481.

> Here, the alleged loan modification reached with [Comerica's representative] was oral. Although the parties communicated by email regarding the amount, payment, and acceptance of interest-only payments in January, February, and March 2013, those messages were not "signed with an authorized signature by the financial institution." Moreover, those emails do not contain the terms of any alleged loan modification or any statement that Comerica was forbearing on principal-reduction payments. Rather, the messages include only directions regarding the amount and withdraw[al] of interest payments. As this evidence of a loan modification does not comply with [Mich. Comp. Laws §] 566.132's statute of frauds, defendants were barred from raising it in defense of Comerica's contract action.

115

Defendants also assert that [Comerica's representative's] oral promise entitles them to raise a promissory estoppel defense to Comerica's claims. In *Crown Tech Park v. D & N Bank*, FSB, 242 Mich.App. 538, 550–551, 619 N.W.2d 66 (2000), however, this Court definitively held that [Mich. Comp. Laws §] 566.132(2) is inconsistent with a promissory estoppel claim or defense. Therefore, defendants are barred from relying on promissory estoppel. Absent any valid defense to their breaches of the clear requirements of the loan documents and personal guaranty, Prickles and Cheryl could not avoid their responsibilities under the contracts and the circuit court properly granted summary disposition in Comerica's favor.

*Id.* at *2-3 (footnote omitted).

*Maniaci* and the other Michigan cases discussed above clearly require that any claim asserted against a financial institution, and any defense to a lawsuit initiated by a financial institution, that involves a financial accommodation, must be supported by a signed written agreement that satisfies the requirements of Mich. Comp. Laws § 566.132(2). *Maniaci* and the other cases also make clear that the doctrines of promissory estoppel, equitable estoppel, and partial performance are unavailable to circumvent the statute of frauds that applies to financial institutions. In *Maniaci*, the court stated that Mich. Comp. Laws § 566.132(2) "is inconsistent with a promissory estoppel claim or defense," and it strictly enforced the terms of the loan documents between Comerica and the borrower requiring monthly interest and principal payments, despite the 5-month performance by Comerica of its oral promise to accept interest-only payments until the commercial property could be sold.

The United States Court of Appeals for the Sixth Circuit, applying Mich. Comp. Laws § 566.132(2) and the Michigan case law interpreting it, has likewise rejected performance as a way to circumvent the writing requirement of the statute of frauds applicable to financial

institutions.  *See Derbabian v. Bank of Am., N.A.*, 587 F. App'x 949, 954 (6th Cir. 2014) (citations omitted) (rejecting the plaintiffs' argument "that an oral agreement to reinstate a mortgage can be binding where performance is tendered" and explaining that *"Michigan state courts have consistently reaffirmed that agreements relating to loans from a financial institution must be in writing to be enforceable*).

Vining cites *Giordano v. Markovitz*, 531 N.W.2d 815 (Mich. Ct. App. 1995) in support of his position, that the signed writing requirement of Mich. Comp. Laws § 566.132(2) is overridden by Comerica's alleged partial performance of its alleged oral promise, to advance funds over MTG's credit limit and without MTG providing A/R Reports.  But *Giordano* predated all of the Michigan appellate cases discussed above, and is not on point.  *Giordano* did not involve a financial institution and thus did not concern Mich. Comp. Laws § 566.132(2).  That case concerned an agreement "for the sale or subscription of securities" and therefore the applicable statute of frauds in *Giordano* was Mich. Comp. Laws § 450.1305 (covering subscription agreements) or Mich. Comp. Laws § 440.8319 (covering agreements for the sale of securities).  *Girodano*, 531 N.W.2d at 817.  *Giordano* therefore does not support Vining's position.

Finally, in *Barclae v. Zarb*, 834 N.W.2d 100, 113 (Mich. Ct. App. 2013), the court held that  officers and employees of a "financial institution," as well as the financial institution itself, may assert the statute of frauds as a defense to a lawsuit based on an alleged oral promise of a financial accommodation.  The court explained that it was unnecessary to determine whether an officer or an employee of a financial institution was an "affiliate" of that financial institution

117

under Mich. Comp. Laws Ann. § 566.132(3),[274] because "[b]asic agency principles allow [an officer or employee of the financial institution] to assert the statute of frauds defense." *Id.*

Under Michigan's statute of frauds, and especially the *Aronoff* case discussed above, it was Vining's evidentiary burden to produce, *from MTG's records,* a written agreement signed by an authorized representative of Comerica, which waived the provisions of the Loan Documents requiring MTG to submit A/R Reports each time it requested any loan advance under its lines of credit, and to not seek advances that exceeded the sum determined by the borrowing formula. Having failed to meet this burden, Vining is barred by Michigan's statute of frauds, as well as by the express no-oral modification and no-waiver language in the Comerica promissory notes, from arguing that there was such a waiver. For these reasons, the Vining's breach of contract claim based on Comerica's alleged wrongful declaration of a default fails as a matter of law.

> **d. It was unnecessary for Comerica to declare a default in order to demand full payment on the promissory notes, and to stop advancing funds.**

The Comerica Defendants argue that Vining's focus on Comerica's alleged wrongful declaration of default under the $3.5 million promissory note is "legally irrelevant."[275] The Court agrees. Comerica had the contractual right to demand payment of the full amount owed under any or all of the demand promissory notes at any time, for any reason, or for no reason.[276] It was

---

[274] Mich. Comp. Laws Ann. § 566.132 was amended by 2020 Michigan Public Acts No. 63 (Imd. Eff. March 17, 2020). The definition of a financial institution to include affiliates, which was previously in § 566.132(3) how appears in § 566.132(4).

[275] Comerica Defs.' Br. (Docket # 584) at 12.

[276] As discussed in Part IV.A.1.d of this Opinion, the Mortgage Note was not a demand note, but it contained a cross-default provision, which gave Comerica the ability to accelerate the Mortgage Note indebdtedness if other, demand obligations were not met.

118

unnecessary for Comerica to declare a default, or for there to even be a default. It is undisputed that MTG signed promissory notes for both the $3.5 million Working Capital Facility and the $1.5 million Equipment Facility, and that each of those promissory notes was a demand note, which matured upon its issuance. Each note provided, in relevant part:

> For Value Received, the undersigned promise(s) to pay ON DEMAND to the order of Comerica Bank ("Bank"), at any office of the Bank in the State of Michigan, [the full amount on the face of the note in U.S. dollars] (or that portion of it advanced by the Bank and not repaid as later provided) with interest **until demand or an Event of Default**.
> . . . .
>
> The undersigned acknowledge(s) that **this Note matures upon issuance, and that the Bank, at any time, *without notice*, *and without reason*, may demand that this Note be immediately paid in full. The demand nature of this Note shall not be deemed modified by reference to a Default in this Note or in any agreement to a default by the undersigned or to the occurrence of an event of default (collectively an "Event of Default").** For purposes of this Note, to the extent there is reference to an Event of Default this reference is for the purpose of permitting the Bank to accelerate Indebtedness not on a demand basis and to receive interest at the default rate provided in the document evidencing the relevant Indebtedness. **It is expressly agreed that the Bank may exercise its demand rights under this Note *whether or not an Event of Default has occurred.***[277]

It is also undisputed that Comerica had the express contractual right to stop advancing funds under the Working Capital Facility and the Equipment Facility, "at its sole discretion," without notice, and without declaring a default. Each of the promissory notes at issue provided, in relevant part:

> At no time shall the Bank be under any obligation to make any advances to the undersigned pursuant to this Note (notwithstanding

---

[277] *See* Docket ## 584-2, 584-5 (emphasis added).

anything expressed or implied in this Note or elsewhere to the contrary, including without limit if the Bank supplies the undersigned with a borrowing formula) and the Bank, at any time and from time to time, *without notice*, and *in its sole discretion*, may refuse to make advances to the undersigned without incurring any liability due to this refusal and without affecting the undersigned's liability under this Note for any and all amounts advanced.[278]

In addition, the Advance Formula Agreement expressly provided that with regard to "demand basis formula loans," Comerica had no obligation to advance funds to MTG. The Advance Formula Agreement stated, in relevant part, that "[MTG] hereby acknowledges and agrees that the formula . . . is merely for advisory and guidance purposes and [Comerica] shall not be obligated to make any loans or advances under the Formula Loans, and . . . [Comerica] may at any time, at its option, demand payment of any or all of the Formula Loans, whereupon the same shall become due and payable."[279]

### e. Comerica's express contractual rights under the demand promissory notes were not limited by an implied duty of good faith and fair dealing.

Vining cannot dispute that the language of the demand promissory notes gave Comerica the right to demand full payment of the amounts owed on the notes, and to stop advancing funds under MTG's lines of credit, at any time, without notice, without reason, and without declaring a default. But Vining argues that Comerica's express contractual rights were limited by an implied duty of good faith and fair dealing which, Vining says, applies to all contracts.[280]

Vining argues that "Comerica had a duty of good faith under the [$3.5 million line of

---

[278]  *See id.* (emphasis added).

[279]  Docket # 584-8 at pdf. p. 3 ¶ 10.

[280]  *See* Trustee's Resp. to the Comerica Defs.' Summ. J. Mot. (Docket # 639) at 9.

credit] and [the E]quipment [F]acility agreements" and "Comerica had a duty to perform its obligations in good faith under those agreements at least until a valid demand on the [$3.5 million line of credit] note."[281]   Vining argues further that "[a] demand note does not override a party's good faith obligations owed pursuant to other agreements between the parties or where there is a 'consistent and uninterrupted' course of performance between the parties."[282]   For this argument, Vining relies on the Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *Beck's Off. Furniture & Supplies, Inc. v. Haworth, Inc.*, 94 F.3d 655, 1996 WL 466673 (10th Cir. 1996) (unpublished table decision), and *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985).[283]   Vining argues that under Michigan law, "[t]he duty of good faith and fair dealing between a lender and borrower arises from both [Michigan's] Uniform Commercial Code [(the "Michigan UCC")] and the common law."[284]  Vining argues that Comerica breached its duty of good faith and fair dealing, and thus breached its contractual obligations to MTG, "when it accelerated and made demand on *all* [the] Debtor's notes" (including "the [E]quipment [F]acility and equipment notes," which, according to Vining "were term obligations to which the duty of good faith attached"); and "demanded [the] Debtor pay not only its loans but also the Becker [Group] Loans."[285]

---

[281]   *Id.*

[282]   *Id.* at 10.

[283]   *Id.* at 9.

[284]   *Id.*

[285]   *Id.* at 8-10 (emphasis added).

The Comerica Defendants argue that Comerica's express contractual rights under the demand promissory notes were not limited by an implied duty of good faith and fair dealing. They rely on *Check Reporting Servs., Inc. v. Mich. Nat'l Bank-Lansing*, 478 N.W.2d 893 (Mich. Ct. App. 1992).

### i. The duty of good faith under the Michigan UCC

Article 3 of the Michigan UCC applies to "negotiable instruments." Mich. Comp. Laws Ann. § 440.3102(1) (West); *see also Hoerstman Gen. Contracting, Inc. v. Hahn*, 711 N.W.2d 340, 346 (Mich. 2006) (citing Mich. Comp. Laws Ann. § 440.3102) ("Article 3 of the [Michigan] UCC is comprehensive. It is intended to apply to nearly every situation involving negotiable instruments.").

The $3.5 and $1.5 million promissory notes at issue meet all of the requirements of Article 3's definition of "negotiable instrument." They are demand negotiable instruments governed generally by Article 3 of the Michigan UCC.[286]

---

[286] Under Article 3's definition of "negotiable instrument,"

"negotiable instrument" means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if all of the following apply:

(a) It is payable to bearer or to order at the time it is issued or first comes into possession of a holder.

(b) It is payable on demand or at a definite time.

(c) It does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain an undertaking or power to give, maintain, or protect collateral to secure payment, an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or a waiver of the benefit of any law intended for the advantage or protection of an obligor.

Mich. Comp. Laws Ann. § 440.1203 (West), which was in effect when MTG signed the

$3.5 and $1.5 million promissory notes, stated: "Every contract or duty within this act imposes

an obligation of good faith in its performance and enforcement."[287] The version of Mich. Comp.

Laws Ann. § 440.1201 that was in effect in 1994 stated: "'Good Faith' means honesty in fact in

the conduct or transaction concerned." Mich. Comp. Laws Ann. § 440.1201(19).[288] The

Uniform Commercial Code Comment to Mich. Comp. Laws Ann. § 440.1203 stated, in relevant

part:

> This section sets forth a basic principle running throughout this Act. The principle involved is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. **Particular applications of this general principle appear in specific provisions of this Act such as the option to accelerate at will (Section 1-208)** . . . .

Mich. Comp. Laws Ann. § 440.1203 cmt. (emphasis added).[289]

---

Mich. Comp. Laws Ann. § 440.3104(1)(a)-(c). "A promise or order is 'payable on demand' if it . . . [s]tates that it is payable on demand or at sight, or otherwise indicates that it is payable at the will of the holder." Mich. Comp. Laws Ann. § 440.3108(1)(a).

[287] Vining relied on Mich. Comp. Law Ann. § 440.1203, which was effective January 1, 1964. Mich. Comp. Laws Ann. § 440.1304 replaced it, effective July 1, 2013, but contains the identical language as in Mich. Comp. Law Ann. § 440.1203.

[288] The definition was later amended, effective July 1, 2013, to state that "'Good faith,' [for purposes of Article 3 of Michigan UCC] except as otherwise provided in article 5, means honesty in fact and the observance of reasonable commercial standards of fair dealing." Mich. Comp. Laws Ann. § 440.1201(2)(t).

[289] The Uniform Commercial Code Comment to § 440.1304, which replaced Mich. Comp. Laws Ann. § 440.1203, states, in relevant part:

> The principle [in this section] is that in commercial transactions good faith is required in the performance and enforcement of all agreements or duties. While this duty is explicitly stated in some provisions of the Uniform Commercial Code, the applicability of the duty is broader than merely these situations and applies generally, as stated in this section, to

Mich. Comp. Laws Ann. § 440.1208 (captioned "Right to accelerate or require collateral"), in turn, stated:

> A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.[290]

But the Uniform Commercial Code Comment to this section stated in relevant part:

**"Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason.** This section applies only to an agreement or to paper which in the first instance is payable at a future date." Mich. Comp. Laws

---

> the performance or enforcement of every contract or duty within this Act. . . . [T]his section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract . . . .

Mich. Comp. Laws Ann. § 440.1304 cmt.

[290]  Mich. Comp. Laws Ann. § 440.1309 replaced Mich. Comp. Laws Ann. § 440.1208, effective July 1, 2013.  Section 440.1309 is captioned "Option to accelerate at will" and states:

> A term providing that one party or that party's successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or when the party "deems itself insecure", or words of similar import, means that the party has power to do so only if that party in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against which the power has been exercised.

Mich. Comp. Laws Ann. § 440.1309.

124

Ann. § 440.1208 cmt. (emphasis added).[291]

Michigan courts cite to and rely on the official comments in the Michigan UCC when

interpreting its provisions.  In *Prime Fin. Servs. v. Vinton*, 761 N.W.2d 694, 705 n.6  (Mich. Ct.

App. 2008) (citation omitted), the court explained:

> Although the official comments [to the Michigan UCC] do not
> have the force of law, they are useful aids to interpretation and
> construction of the UCC.  Further, the comments were intended to
> promote uniformity in the interpretation of the UCC. Therefore, it
> is appropriate for this Court to consider the official comments
> when interpreting Michigan's UCC.

*Id.*; *see also Hoerstman Gen. Contracting, Inc. v. Hahn*, 711 N.W.2d 340, 346-47 (Mich. 2006)

(citing and quoting the Michigan UCC comment to Mich. Comp. Laws § 440.3311 in

interpreting the meaning of Mich. Comp. Laws § 440.3311).

As the official comment to Mich. Comp. Laws Ann. § 440.1208 clearly shows, demand

notes are excepted from the good faith requirement that applies generally to other contracts.

Therefore, the Michigan UCC does not support Vining's position that any duty of good faith and

fair dealing applied to the demand promissory notes at issue.  It did not.

### ii.  Case law regarding application of the duty of good faith and fair dealing to demand notes

The cases cited by Vining do not support his position that, under Michigan law, an

---

[291]  The Uniform Commercial Code Comment to Mich. Comp. Laws Ann. § 440.1309 states, in relevant part: "**Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an obligation of payment or performance which in the first instance is due at a future date**."  Mich. Comp. Laws Ann. § 440.1309 cmt. (emphasis added).  Although the wording of Mich. Comp. Laws Ann. § 440.1309 and its comment, which were effective July 1, 2013, vary slightly from the prior version of the U.C.C., the difference in wording is not material.  The Court therefore does not need to decide whether the current version of Article 3 applies retroactively to the promissory notes at issue.  For purposes of this Opinion the Court will assume that the pre-2013 version cited by Vining applies.

implied duty of good faith and fair dealing applies to demand promissory notes.  The facts in *Beck's Off. Furniture & Supplies, Inc. v. Haworth, Inc.*, 94 F.3d 655, 1996 WL 466673 (10th Cir. 1996) (unpublished table decision) are readily distinguishable from those in this case.  The court in *Haworth* applied Utah common law on contracts, not Michigan contract law which is applicable here; and it concerned a provision in a dealership agreement which provided that the agreement was "terminable at will" by either party, rather than a provision in a promissory note that provided that the note was payable on demand, as is the case here.  Also, because *Haworth* did not concern a "negotiable instrument," the court in *Haworth* did not need to rely on or interpret any provision of Utah's Uniform Commercial Code.[292]  But even to the extent that a "terminable at will" provision in a dealer agreement can be viewed as analogous to a demand provision in a promissory note, the court's reasoning in *Haworth* actually supports the Comerica Defendants' position rather than Vining's position.

In *Haworth*, a manufacturer of modular panel furniture and related structures ("Haworth") was sued for, among other things, breach of contract and wrongful termination by one of its dealers (the "Becks").  94 F.3d 655, 1996 WL 466673, at *1.  Haworth and the Becks had executed a "Dealer Agreement," which was "terminable at will."  *Id.*

"The Dealer Agreement contained an integration clause, stating, 'This is our complete

_____

[292]  In *Hoerstman General Contracting, Inc. v. Hahn*, 711 N.W.2d 340, 346-47 (Mich. 2006), the Michigan Supreme Court held that the enactment of Mich. Comp. Laws Ann. § 440.3311 of the Michigan UCC abrogated the common law on accord and satisfaction.  711 N.W.2d 346-47.  The court cited the comprehensive nature of Article 3 of the Michigan UCC in general, and of the provision governing accord and satisfaction in particular.  Arguably, the same reasoning would apply to the implied covenant of good faith and fair dealing, making Michigan common law on that subject irrelevant.  But in any case, as discussed below, Michigan cases hold that the obligation of good faith does not apply to demand instruments.

126

agreement. Any changes or additions must be in writing and signed by Haworth.'" *Id.* at *3 n.1. Despite the integration clause, and because the Dealer Agreement used vague terms, the meaning of certain provisions were unclear, and the agreement "purport[ed] to be a 'document [that] set[] forth the major guidelines of the working relationship between Haworth and our dealers[,]'" the trial court allowed the jury to consider if there were additional terms in the Dealer Agreement based on a purported "Gentlemen's Agreement" between the parties which arose out of "a several-year course of performance between [the] Becks and Haworth." *Id.* at *3 & n.1.

The jury found that there were additional terms in the Dealer Agreement based on the Gentlemen's Agreement and the course of performance by the parties, and found that Haworth breached those terms. *Id.* The jury also found that Haworth breached "the implied covenant of good faith and fair dealing in the Dealer Agreement." *Id.* at *3. The jury found in favor of Haworth on the Becks' wrongful termination claim. *Id*. at *1.

On appeal, the court explained that under Utah law, an implied covenant of good faith and fair dealing applies to "every contract;" "[e]ssentially, the covenant protects parties' reasonable expectations in the contract;" and "a party can breach the covenant by wrongfully exercising the discretion given to it by the contract." *Id.* at *4 (citations omitted). The court explained further, however, that under Utah law, the covenant of good faith and fair dealing does not apply to "at-will employment contracts," because "**an implied covenant cannot be used to alter the rights agreed upon by the parties**." *Id.* (emphasis added) (citations omitted).

The *Haworth* court did not have to determine if the implied covenant of good faith and fair dealing extended to "terminable at will" provisions such as the one at issue in the case, because "[e]ven if the at-will exception to enforcing the implied covenant extends beyond

127

employment contracts, it [was] still inapplicable in this context where the claimed breach [was] not [the] Beck's termination [of the Dealer Agreement], but actions Haworth took before it terminated [the] Becks." *Id.* (citations omitted). The court cited *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1267-68 (10th Cir.1988).

The court in *Big Horn Coal Co.,* a case on which *Haworth* relied in part, also held that the implied duty of good faith and fair dealing could not alter the parties' rights in provisions that the parties had agreed to include in their contract. The court in *Big Horn Coal Co.* explained:

> Although good faith is generally applicable to all contract provisions, "**it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant.**" *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C.Cir.1984) (quoting *MacDougald Construction Co. v. State Highway Department*, 125 Ga.App. 591, 594, 188 S.E.2d 405, 407 (1972)). This kind of provision occurs, for example, when either party is given an unconditional power to terminate the contract or reduce the supply by merely giving written notice within a specified time. *See, e.g.*, *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 135–39 (5th Cir.) (either party could terminate contract "at any time 'with or without cause' on ten days' notice to the other party"), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). **In such a case the reason for invoking the provision is irrelevant. The reason may be purely a whim or caprice;** all that matters is that proper notice is given. **The rationale behind these cases is that the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection from terminating the contract** other than the proper written notice.

*Big Horn Coal Co.*, 852 F.2d at 1267 (emphasis added).

The "payable on demand" provisions in each of the promissory notes at issue in this case is the type of contract provision described in *Big Horn Coal Co*., and is like an at-will provision in an employment contract discussed in in *Hayworth*. It is the kind of provision that is agreed

128

upon by the contracting parties; that provides a party to the contract with an unconditional right; and that right cannot be altered by an implied covenant of good faith and fair dealing. The language in the promissory notes clearly and unambiguously gave Comerica "uncontrolled discretion" to demand full payment at any time, and without a reason or for a reason that was "purely a whim or caprice." *See Big Horn Coal, Co.,* 852. F.2d at 1267. But the "payable on demand provision" in each of the promissory notes gave Comerica even more of an absolute right to act than the kind of provisions described in *Big Horn Coal Co.* The language in the promissory notes allowed Comerica to demand full payment from MTG, without notice to MTG, and without giving MTG a right to cure any default. Under both *Big Horn Coal Co.* and *Haworth*, this type of unconditional right agreed to by the parties cannot be modified by an implied covenant of good faith and fair dealing.

Therefore, even assuming that the Utah case of *Haworth* can serve as persuasive authority in this case, it would require the court to find that the promissory note provisions on which Comerica and MTG agreed, and which gave Comerica uncontrolled discretion to demand full payment on the notes without reason or notice at any time, were not limited by any duty of good faith and fair dealing. Under the reasoning in *Haworth*, the same is true for the provisions that gave Comerica the right to stop advancing funds at any time, without notice, and at its sole discretion. These provisions were drawn in such a way as to give Comerica uncontrolled discretion to demand full payment on the promissory notes and to decide whether to advance funds.

The second case cited by Vining, is *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985). Superficially, at least, this case would appear to support Vining's position. But

*K.M.C.* applied New York law, not Michigan law; is distinguishable; now appears to be outdated; and has been rejected by Michigan cases, and even by a later New York case.

In *K.M.C.*, Irving Trust Company ("Irving") entered into a financing agreement with K.M.C., a "wholesale and retail grocery business," under which Irving granted K.M.C. a $3.5 million maximum line of credit, which was secured by all of K.M.C.'s inventory and accounts receivable. *Id.* at 754. K.M.C.'s ability to access the line of credit was limited by a borrowing formula which was a percentage of its inventory value plus its eligible receivables. *Id.* The parties also executed a supplementary letter to the financing agreement which provided that "all receipts of K.M.C. would be deposited into a 'blocked account,' to which Irving would have sole access." *Id.* at 759. After Irving refused a request by K.M.C. for an $800,000 advance, which "would have increased the loan balance to just under the $3.5 million limit," K.M.C. sued Irving for breach of the financing agreement, contending "that Irving's refusal *without prior notice* to advance the requested funds breached a duty of good faith performance implied in the agreement and ultimately resulted in the collapse of the company as a viable business entity." *Id.* at 754 (emphasis added). The trial court entered a judgment in favor of K.M.C. and against Irving for breach of the financing agreement, and Irving appealed. *Id.*

One of the issues on appeal was whether the magistrate had erred in his instructions to the jury.

> The essence of the Magistrate's instruction to the jury was that there is implied in every contract an obligation of good faith; that this obligation may have imposed on Irving a duty to give notice to K.M.C. before refusing to advance funds under the agreement **up to the $3.5 million limit**; and that such notice would be required if necessary to the proper execution of the contract, unless Irving's decision to refuse to advance funds without prior notice was made

in good faith and in the reasonable exercise of its discretion.

*Id.* at 759 (emphasis added).

On appeal, Irving argued that the magistrate's jury instructions were erroneous, because

> the decision whether to advance funds under the financing
> agreement was solely within the bank's prerogative . . . [and] an
> implied requirement that the bank provide a period of notice before
> discontinuing financing up to the maximum credit limit would be
> inconsistent with the provision in the agreement that all monies
> loaned are repayable on demand.

*Id.* at 759-60.

In *K.M.C.*, the Sixth Circuit Court of Appeals, applying New York law, held that the implied duty of good faith applied to, and limited, Irving's right under the financing agreement to refuse to advance funds to K.M.C. up to the $3.5 million credit limit; and its right under the financing agreement to demand full payment of K.M.C.'s debt to Irving.  *Id.* at 760.   With regard to Irving's right to stop advancing funds, the Sixth Circuit held that Irving's "obligation of good faith performance" under the financing agreement required it to provide "a period of notice to K.M.C. to allow it a reasonable opportunity to seek alternate financing, absent valid business reasons precluding Irving from doing so."  *Id.* at 759 (citing case law and a "*cf.*" to a portion of Official Comment 8 to U.C.C. § 2-309 ("[T]he application of principles of good faith and sound commercial practice normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.").)[293]

---

[293]  Article 2 of the U.C.C. applies to "transactions in goods," including sales.  *See* Mich. Comp. Laws § 440.2102."  The portion of the Official Comment 8 not cited in *K.M.C.* states: "An agreement dispensing with notification or limiting the time for the seeking of a substitute arrangement is, of course, valid under this subsection, unless the results of putting it into operation would be the creation of an unconscionable state of affairs."

The court reasoned that because K.M.C.

> was a medium-sized company in the wholesale grocery business
> . . . [which] could not operate without outside financing[,] . . ."the
> literal interpretation of the financing agreement . . . as
> supplemented by the "blocked account" mechanism, would leave
> K.M.C.'s continued existence entirely at the whim or mercy of
> Irving, absent an obligation of good faith performance.

*Id.*

With regard to Irving's right to demand full payment, the court likened the demand

provision to "a kind of acceleration clause, upon which the Uniform Commercial Code and the

courts have imposed limitations of reasonableness and fairness." *Id.* at 760 (citing a Ninth

Circuit case and U.C.C. § 1-208). The *K.M.C.* court held that the "[m]agistrate did not err in

refusing the requested charge on the demand provision." *Id.*

The facts in *K.M.C.* are readily distinguishable from the facts in this case. In *K.M.C.*,

New York law governed the rights of the parties to the financing agreement; the borrower was

apparently not in default under any provisions of the financing agreement when the lender

refused to advance funds; the lender refused to grant the borrower's request for advances when

the requested advances would not increase the borrower's total debt to the lender beyond the

contractual maximum limit on its credit line; and the borrower had virtually no access to its

receivables due to the "blocked account" arrangement, and was therefore totally dependent on

outside sources for operating capital. The "blocked account" arrangement was a key factor in the

*K.M.C.* court's finding that the lender had a good faith performance obligation under the

financing agreement.

Here, Michigan law, not New York law, governs MTG's and Comerica's rights and

obligations under the Loan Documents; MTG was in default of its reporting requirements and the borrowing formula under the Loan Documents; MTG's total debt to Comerica was well over the maximum borrowing limit on its credit line when Comerica refused to advance more funds and made a demand for repayment on all of MTG's debt to Comerica; Comerica had sound business reasons for failing to advance further funds; and Comerica entered into negotiations with MTG and gave MTG an opportunity to obtain some limited further financing by entering into a forbearance agreement, but MTG refused to enter into any forbearance agreement with Comerica. Given the material difference between the facts in *K.M.C.* and the facts in this case, the Court finds that *K.M.C.* is not persuasive.

The Court also is not persuaded by the reasoning in *K.M.C.* regarding the application of the implied covenant of good faith to demand and discretionary advance provisions in financing agreements. More recent cases of the Sixth Circuit Court of Appeals have "declined to ascribe a covenant of good faith and fair dealing in the interpretation of a contract 'to override express contract terms.'" *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826-27 (6th Cir. 2003) (citations omitted) (applying Michigan law); *see also FCA US LLC v. Eagle Auto-Mall Corp.,* 702 F. App'x 301, 306 (6th Cir. 2017) (citing *Stephenson*, 328 F.3d at 826–27) ("[A]n implied covenant cannot 'override express contract terms.' In other words, there can be no implied covenant where the parties have 'unmistakably expressed their respective rights' and obligations.").

The Court also notes that New York courts applying New York law have declined to follow *K.M.C.* on this issue, finding that in *K.M.C.* the Sixth Circuit incorrectly applied New York law. For example, in *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 680

133

(S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir. 1992), the

court stated:

> The [*K.M.C.* c]ourt . . . held that Irving . . . had a duty to act in
> good faith in exercising its right to demand payment of the loan
> under U.C.C. § 1–208.
>
> With respect to this . . . holding, the Sixth Circuit's decision in
> *K.M.C.* is in conflict with the New York Court of Appeals'
> decision in *Murphy* [*v. American Home Products, Corp.*, 461
> N.Y.S.2d 232, 232 (N.Y. App. Div.1983),] and has been widely
> criticized for having overlooked the Comment to U.C.C. § 1–208.
> *See, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of
> Whiting*, 908 F.2d 1351 (7th Cir.1990); *Spencer Cos., Inc. v. Chase
> Manhattan Bank, N.A.*, 81 B.R. 194 (D. Mass.1987). The
> Comment unequivocally indicates that § 1–208 has no application
> to demand instruments. Accordingly, this [c]ourt declines to
> follow *K.M.C.* to the extent that the obligation of good faith
> performance enunciated there would imply an obligation of good
> faith upon the Bank inconsistent with the express terms of its
> contractual relationship with RPC [Corporation].

The *National Westminster Bank* court also rejected the holding in *K.M.C.* that "'an

obligation of good faith performance'" applies to a "'discretionary advance clause.'" *Id.* The

court reasoned:

> In both [*National Westminster Bank v. Ross*, 676 F. Supp. 48
> (S.D.N.Y.1987) ("*Natwest* I")] and [*National Westminster Bank v.
> Ross*, 86 Civ. 6277, slip op., 1988 WL 96032 (S.D.N.Y. August
> 30, 1988) ("*Natwest II*")], this Court, quoting *Murphy v. American
> Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448
> N.E.2d 86 (1983), held that "no obligation [of good faith] can be
> implied . . . which would be inconsistent with other terms of the
> contractual relationship." 676 F. Supp. at 54; *Natwest II* at 9. In so
> holding, this Court followed the New York Court of Appeals
> mandate that although the obligation of good faith is implied in
> every contract, it is the terms of the contract which govern the
> rights and obligations of the parties. **The parties' contractual
> rights and liabilities may not be varied, nor their terms
> eviscerated, by a claim that one party has exercised a**

134

**contractual right but has failed to do so in good faith.** *See Murphy*, 461 N.Y.S.2d at 232, 448 N.E.2d at 86; *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787 (1988); *Sharma v. Skaarup Ship Management Corp.*, 699 F. Supp. 440 (S.D.N.Y.1988).

Because the covenant of good faith implied in every contract cannot frustrate the operation of an express term of an agreement bargained for at arms length, the defendants are entitled to summary judgment dismissing the complaint's fourth (breach of good faith dealing) claim. Under the Loan Agreements, the Bank was not obligated to advance any particular sums to RPC nor was it bound to finance RPC for any determinate period. Paragraph "1(a)" of the Accounts Receivable Loan Agreement states that the Bank would, in its sole discretion, make available to RPC advances totalling up to 80% of eligible receivables. *See* Meyer Aff. Ex. "1". Paragraph "1(j)" of that agreement provides that the agreement "may be cancelled by the Bank, at any time without notice . . ." *Id.* A similar discretionary advance provision is contained in the Inventory Loan Agreement at Paragraph "1". **The Loan Agreements therefore establish that the Bank was contractually entitled to sever its lending relationship with RPC at its discretion, for any reason or no reason at all. Accordingly, the Court refuses to imply an obligation of good faith inconsistent with other express terms of the parties contractual relationship.**

*Id.* at 679-80 (emphasis added).

In *Check Reporting Services., Inc. v. Michigan National Bank-Lansing*, 478 N.W.2d 893, 899 (Mich. Ct. App. 1991), a case relied on by the Comerica Defendants, the Michigan Court of Appeals, applying Michigan law, held "that the obligation of good faith does not apply to demand instruments." The *Check Reporting* court stated that

although [in *K.M.C.*,] the Sixth Circuit stated that a "demand provision is a kind of acceleration clause" to which the obligation of good faith in § 1208 applies, Irving . . . did not "call" the loan, but merely refused further financing. This statement by the Sixth Circuit is thus dictum and, because of the distinctive facts in that case, is not persuasive.

135

*Id.* The *Check Reporting* court, like the court in *National Westminster Bank*, relied on the

Official Comment to UCC § 440.1208 ("'Obviously this section has no application to demand

instruments or obligations whose very nature permits call at any time with or without reason.'").

*Id.* at 898. The *Check Reporting* court also relied on case law from other jurisdictions for its

holding. It stated:

> When interpreting uniform laws, such as the UCC, we may look to decisions from other states for guidance. *Old Kent Bank–Southeast v. Detroit*, 178 Mich. [Ct. App.] 416, 423, 444 N.W.2d 162 (1989).
>
> Courts in other states that have considered this issue have held that the obligation of good faith does not apply to demand instruments. *Pavco Industries, Inc. v. First National Bank of Mobile*, 534 So. 2d 572 (Ala.1988); *Taggart & Taggart Seed, Inc. v. First Tennessee Bank National Ass'n*, 684 F. Supp. 230 (E. D. Ark.1988), *aff'd*, 881 F.2d 1080 (CA 8, 1989); *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42 (Mo. App. 1985); *Fulton National Bank v. Willis Denney Ford, Inc.*, 154 Ga. App. 846, 269 S.E.2d 916 (1980). **We agree with these courts that the obligation of good faith does not apply to demand instruments**.
> . . . .
>
> Accordingly, we find that [the] lender liability claim based upon [the] allegation of breach of an obligation of good faith was properly dismissed pursuant to MCR 2.116(C)(8).

*Id.* at 898-99 (emphasis added).

The Court concludes that under Michigan law, Comerica's express right to demand full

payment of MTG's debt to Comerica under the $3.5 million and $1.5 million promissory notes at

any time, without reason or notice, was not limited by any implied obligation of good faith. The

Court also finds the reasoning in *National Westminster Bank, U.S.A. v. Ross* persuasive, and

concludes that because the promissory notes expressly permitted Comerica to refuse to advance funds at any time without notice and without incurring any liability, Comerica did not have a good faith obligation to provide notice prior to enforcing this right, or any other good faith obligation which limited Comerica's right to stop advancing funds to MTG.[294]

For all of the reasons stated above, Vining's claim for breach of contract, based on Comerica demanding full payment on all the promissory notes and refusing to advance further funds to MTG on its $3.5 million line of credit, is entirely without merit as a matter of law. The Court must grant summary judgment to the Comerica Defendants.[295]

_____

[294] The Court notes that even if Comerica had a good faith obligation to provide notice to MTG, before enforcing its contractual rights to demand full payment on the promissory notes and to refuse to advance further funds under MTG's $3.5 million line of credit, Comerica certainly satisfied that obligation. Rather than immediately demanding full payment of all debt and refusing to advance any funds, Comerica continued to advance some funds to MTG, and on July 24, 1995, even entered into negotiations with MTG for a forbearance agreement. One of the terms of Comerica not taking any immediate action to enforce its rights while the parties were attempting to negotiate a forbearance agreement was that MTG would not release any of Comerica's collateral to MTG's customers without first being paid in full for it. It was not until after MTG had released some of Comerica's collateral without receiving payment, and only after MTG still refused to enter into a forbearance agreement, despite multiple concessions made by Comerica, that on August 4 1995, Comerica sent the Demand Letter to MTG. Under these circumstances, the Court would find that, even if an obligation of good faith performance and enforcement could be implied into Comerica's contract with MTG and required Comerica to provide some notice before taking any action to enforce its rights under the Loan Documents, Comerica's actions satisfied such obligation.

[295] Vining's arguments regarding Comerica's alleged breach of contract and breach of the duty of good faith and fair dealing are not properly supported. In his brief in support of Plaintiff's Summary Judgment Motion, in the fact section entitled "Comerica Breached Loan Agreements and Duties Forcing Debtor into Bankruptcy," many of the purported "facts" in this section are actually legal conclusions or characterizations couched as facts. And Vining states his version of the alleged "facts" related to his breach of contract and breach of good faith duty claims, with no record citations to any evidence that supports specific factual allegations. It is not until the very end of the fact section that Vining uses a string citation. (See Trustee's Br. (Docket # 657) at 1 ("See, e.g., AD529 at 4-12, ExA-E, G, X; AD507 at 30-36, Ex V, AA, LL; ExAF2; ExAF4; ExDT16; ExDT13; ExAF3."). The string citation is to arguments in other briefs, and to exhibits Vining attached to various briefs, without any explanation of how the exhibits support the specific facts he has alleged or which exhibits support which of the alleged facts. In the fact section, Vining also lists a litany of purported wrongful actions that Comerica took pre-petition that constitute a breach of the Loan Agreements:

Between July 24, 1995 and August 4, 1995, Comerica breached its loan agreements, duty of good faith, and fiduciary duties by, among other things, refusing further LOC advances while depriving Debtor of operating funds through continued lockbox collections, taking impermissible collection action, choosing which Debtor checks should be honored or dishonored, interfering with Debtor's management, and forcing Debtor to breach contracts with customers such as Injectronics. On August 4, 1995, Comerica wrongfully accelerated Debtor's loan obligations, demanded Debtor pay not only its loans but also Becker Loans, and notified Debtor's account debtors. Comerica's debt acceleration and demand for payment were fraudulent, invalid and unenforceable. Comerica's misconduct necessitated the Debtor's Chapter 11 filing and ultimately resulted in the loss of its business.

Trustee's Br. (Docket # 657) at 1.

In a later section of the brief, Vining concludes that these alleged actions give rise to a myriad of Pre-Petition Claims including breach of contract and breach of the duty of good faith and fair dealing. Vining lumps his argument that Comerica breached the Loan Documents and the implied duty of good faith and fair dealing in the same section which contains his arguments on other Pre-Petition Claims in his complaint. That section is captioned: "THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT AGAINST COMERICA FOR ITS BREACH OF THE LOAN AGREEMENTS, ITS BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING, ITS BREACH OF FIDUCIARY DUTY, AND FRAUDULENT MISREPRESENTATIONS." After the caption, Vining's entire argument consists of the following:

Comerica breached its loan obligations to Debtor, breached its duties of good faith and fair dealing owed to Debtor, breached fiduciary duties owed to Debtor, and made fraudulent representations to Debtor, all of which damaged Debtor. Pursuant to [*Fed. R. Civ. P.*] *37* and the Court's inherent power, the Court should prohibit Comerica from asserting defenses against or presenting evidence opposing these claims and the Trustee's proofs regarding damages. Summary judgment should be entered on the Trustee's [P]re[-]petition [C]laims against Comerica, awarding damages in the amount of at least $6,251,300.00, plus prejudgment interest, costs and attorney fees.

(Trustee's Br. (Docket # 657) at 46-47.)

These are only bare legal conclusions. Vining fails to distinguish between the various Pre-Petition Claims. He does not state what elements he needs to prove with regard to each claim, and he makes no effort to tie the purported wrongs he lists in the fact section to the required elements of each claim. Rather, he leaves the Court to ferret through the fact section and decide if any of the "facts" establish the elements of any of his Pre-Petition Claims. At a bare minimum, with regard to his breach of contract claim, the Court would expect Vining to identify and quote specific contract provisions that Comerica violated in performing or enforcing the Loan Documents, and to state what the alleged implied

138

### C. Vining's promissory estoppel claim against the Comerica Defendants (Count XVI)

Vining alleges a claim of promissory estoppel in Count XVI of his complaint. For the reasons stated in Part V.B.3.c of this Opinion, this cause of action is barred by Michigan's statute of frauds. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

In support of this claim, Vining's complaint alleges, in relevant part:

> 349. The Bank's promises to the Debtor **as set forth above** were clear, definite, and unequivocal and made specifically to induce the Debtor to pursue and enter into the Becker [Group Asset P]urchase [A]greement, to continue its mold operations pending the closing on such agreement, to use Becker [Group] Overformula Loans pending such closing, and to cease submitting cash collateral reports.
>
> 350. In reliance on the Bank's promises and to its substantial detriment, the Debtor pursued and entered into the Becker [Group Asset P]urchase [A]greement, continued its mold operations pending the closing on the agreement, used Becker [Group] Overformula Loans pending the closing, and ceased submitting

---

duty of good faith required Comerica to do that it did not do, or what it required Comerica to refrain from doing that it did. Vining has failed to do this. For this reason alone, judgment should be entered in favor of the Comerica Defendants and against Vining on the breach of contract and breach of the duty of good faith and fair dealing claims. In *Seoane-Vazquez v. Ohio State University*, 577 F. App'x 418, 434 (6th Cir. 2014), the court explained:

> We have cautioned that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal quotations and citation omitted); *see also United States v. Robinson*, 390 F.3d 853, 885–86 (6th Cir.2004); *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (invoking this rule to deem an issue forfeited).

Nonetheless, the Court has attempted to understand exactly what Vining is arguing and to address those arguments.

139

cash collateral reports to the Bank pending the closing.

> 351. To avoid injustice, this Court must specifically enforce
> the Bank's promises to the Debtor by estopping the Bank from
> declaring the Debtor in default of the Loan Documents and from
> enforcing remedies otherwise provided to the Bank under the Loan
> Documents and applicable law.

> 352. As a direct and proximate result of the Bank's failure to
> perform and honor its promises, the Debtor has been damaged.

> 353. At the time of making such promises and inducing such
> action by the Debtor, the Bank could reasonably foresee that its
> failure to perform and honor the promises would cause the damage
> that the Debtor has suffered.[296]

Construing the allegations in the complaint in the light most favorable to Vining, the

Court concludes that Vining cannot establish the elements of a promissory estoppel claim.

> The elements of promissory estoppel are (1) a promise, (2) that the
> promisor should reasonably have expected to induce action of a
> definite and substantial character on the part of the promisee, and
> (3) that in fact produced reliance or forbearance of that nature in
> circumstances such that the promise must be enforced if injustice is
> to be avoided.

*Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999) (citation

omitted). Michigan courts "are to exercise caution in evaluating an estoppel claim and should

apply the doctrine only where the facts are unquestionable and the wrong to be prevented

undoubted." *Id.* (citation omitted).

With regard to the first element, it is unclear which promises Vining is referring to in

Paragraph 349 of the complaint. Vining does not specify what purported promises by Comerica

support his promissory estoppel claim. This failure to plead requires the Court to pick which

---

[296] Compl. (Docket # 1) at 48-49 (emphasis added).

allegations in the preceding 348 paragraphs in the complaint contain promises by Comerica which apply to the promissory estoppel count in the complaint. The Court assumes, based on the other paragraphs under the promissory estoppel count, that the promises to which Paragraph 349 refers are the Bank's alleged *oral* promise "to make loans in addition to the Debtor's existing line of credit which might be required to continue [the] Debtor's operations pending the closing on the sale,"[297] and the Bank's alleged *oral* promise that MTG would not be required to file A/R Reports pending the closing of a sale to the Becker Group.[298]

Vining's brief in support of Plaintiff's Summary Judgment Motion does not clarify the factual allegations in the complaint with regard to the promissory estoppel claim. It contains no argument whatsoever regarding his estoppel claim. And in response to the Comerica Defendants' Summary Judgment Motion, the only statement that Vining makes in support of his promissory estoppel claim is the following: "The Trustee's [P]re[-P]etition [C]laims against Comerica, including the promissory and equitable estoppel claims, are meritorious."[299]

Under these circumstances, Vining has waived his promissory estoppel claim. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 618 n.9 (6th Cir. 2014) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) (internal citation and quotation marks omitted).'").

---

[297] *Id.* at 7-8 ¶¶ 51, 56-57.

[298] *See id.* at 8 ¶ 65.

[299] *See* Trustee's Resp. to the Comerica Defs.' Summ. J. Mot. (Docket # 639) at 12.

141

In addition, the Court must grant summary judgment for the Comerica Defendants on this claim because it is based on certain alleged *oral* promises Comerica made to waive certain requirements in the Loan Documents, and thus is barred by the statute of frauds. *See* discussion in Part V.B.3.c of this Opinion. Michigan courts have held specifically that this statute of frauds bars promissory estoppel claims.

In *Crown Technology Park v. D&N Bank, FSB*, 619 N.W.2d 66, 71-73 (Mich. Ct. App. 2000), the court, in discussing Mich. Comp. Laws § 566.132(2), explained:

> The plain language in . . . the statute of frauds addresses the area of conduct promissory estoppel ordinarily governs—oral promises. . . . .
>
> [Mich. Comp. Laws §] 566.132(2); MSA 26.922(2) expressly states that "[a]n action *shall not be brought against a financial institution* to enforce [a promise or commitment to waive a provision of a loan] unless the promise or commitment is in writing and signed with an authorized signature by the financial institution" (emphasis supplied). **This language is unambiguous. It plainly states that a party is precluded from bringing a claim—no matter its label—against a financial institution to enforce the terms of an oral promise to waive a loan provision.**
>
> Crown Technology's argument that [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) does not eliminate promissory estoppel as a cause of action for an unfulfilled oral promise to waive a loan term is unpersuasive. The statute of frauds specifically bars "an action." By not specifying what sort of "action" [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) prohibits, we read this as an unqualified and broad ban. We also note that the subsections of [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) use generic and encompassing terms to describe the types of promises or commitments that the statute of frauds now protects absolutely. This is consistent with interpreting [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) to preclude *all* actions for the enumerated promises and commitments, including actions for promissory estoppel. Further, it would make absolutely no sense to conclude that the Legislature enacted a new section of the statute of frauds specifically addressing oral agreements by

142

financial institutions but, nevertheless, the Legislature still intended to allow promissory estoppel to exist as a cause of action for those same oral agreements. The plain language of the statute of frauds is also inconsistent with Crown Technology's argument that the Legislature intended to permit promissory estoppel actions because [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) differs from model legislation the American Bar Association drafted in response to the dramatic increase of "lender liability" in the 1980s. See Culhane & Gramlich, *Lender liability limitation amendments to state statutes of frauds,* 45 Bus Law 1779, 1779–1781 (1990). The model legislation refers to barring "legal or equitable" actions absent a written commitment or agreement. *Id.* at 1792. The model legislation would, therefore, plainly bar an equitable action like promissory estoppel. The Legislature's decision to deviate from the model act when adopting [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) does suggest that it rejected the differing language in the model act.  See *Husted v. Auto–Owners Ins. Co.,* 459 Mich. 500, 509–510, 591 N.W.2d 642 (1999). However, as we noted above, the Legislature used the broadest possible language in [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) to protect financial institutions by not specifying the types of "actions" it prohibits, eliminating the possibility of creative pleading to avoid the ban. Thus, the difference in the language between the model act and the statute does not persuade us that [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) permits actions for promissory estoppel. . . . .

[T]he Legislature was not silent concerning promissory estoppel in [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2).  It banned "an action," meaning any action. **To overstate the obvious, "an action" for promissory estoppel clearly is "an action" within the meaning of the identical language of the statute of frauds.** . . . .

By bringing its promissory estoppel claim, Crown Technology asked the trial court to enforce D&N Bank's alleged oral promise to waive the prepayment term in the promissory note.  In clear and unambiguous language, [Mich. Comp. Laws] § 566.132(2); MSA 26.922(2) specifically bars this type of action. The trial court should have summarily disposed of this claim because there was no relief available.  [Mich. Ct. R.] 2.116(C)(8) and (C)(10).

*Id.* (emphasis added); *see also Comerica Bank v. Maniaci,* No. 321251, 2015 WL 5488252, at *3

143

(Mich. Ct. App. Sept. 17, 2015) (holding that "[Mich. Comp. Laws §] 566.132(2) is inconsistent with a promissory estoppel claim or defense"); *Barclae v. Zarb*, 834 N.W.2d 100, 111 (Mich. Ct. App. 2013) (same).

Because Vining's claim of promissory estoppel is barred by the statute of frauds, the Comerica Defendants are entitled to summary judgment on that claim.

### D. Vining's equitable estoppel claim against the Comerica Defendants (Count XVII)

Vining's equitable estoppel claim against the Comerica Defendants is asserted in Count XVII of the Complaint. For the reasons stated in Part V.B.3.c of this Opinion, this cause of action is barred by Michigan's statute of frauds. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

Vining's complaint alleges, in relevant part:

> 355. As set forth above, the Bank by its representations and silence intentionally or negligently induced the Debtor to believe the Bank would not declare a default under the Loan Documents based on the Becker [Group] Overformula Loans or the Debtor's failure to submit cash collateral reports at the Bank's request.

> 356. The Debtor justifiably relied on such representations and silence and its belief.

> 357. To avoid injustice, this Court should equitably estop the Bank from declaring the Debtor in default of the Loan Documents and from enforcing remedies otherwise provided to the Bank under the Loan Documents and applicable law.

> 358. As a direct and proximate result of the Bank's representations and silence, the Debtor has been damaged.

> 359. At the time of making such representations and such silence, the Bank could reasonably foresee that its assertion of the

144

Debtor's default under the Loan Documents and exercise of
remedies based upon such default would cause the damage that the
Debtor has suffered.[300]

In *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 405 (Mich. Ct. App. 1999), the

court explained:

> Equitable estoppel may arise where (1) a party, by representations,
> admissions, or silence intentionally or negligently induces another
> party to believe facts, (2) the other party justifiably relies and acts
> on that belief, and (3) the other party is prejudiced if the first party
> is allowed to deny the existence of those facts.

For all of the reasons stated above, as to why the Court must grant summary judgment

against Vining's promissory estoppel claim, the Court must grant summary judgment for the

Comerica Defendants on Vining's equitable estoppel claim.

Vining's brief in support of Plaintiff's Summary Judgment Motion contains no argument

whatsoever regarding his equitable estoppel claim. And in response to the Comerica Defendants'

Summary Judgment Motion, the only statement Vining makes in support of his equitable

estoppel claim is the same one he made regarding his promissory estoppel claim: "The Trustee's

[P]re[-P]etition [C]laims against Comerica, including the promissory and equitable estoppel

claims, are meritorious."[301] Under these circumstances, just as with his promissory estoppel

claim, Vining has waived his equitable estoppel claim. *See Hayward v. Cleveland Clinic Found.*,

759 F.3d at 618 n.9; *McPherson v. Kelsey*, 125 F.3d at 995-96.

In addition, the Court must grant summary judgment for the Comerica Defendants on this

claim because it is based on alleged *oral* promises Comerica made to waive certain requirements

---

[300]  Compl. (Docket # 1) at 49.

[301]  *See* Trustee's Resp. to the Comerica Defs.' Summ. J. Mot. (Docket # 639) at 12.

145

in the Loan Documents, and thus is barred by the statute of frauds. *See Crown Tech. Park*, 619 N.W.2d at 71-73 (applying Mich. Comp. Laws § 566.132(2)); *Barclae*, 834 N.W.2d at 111.

An additional reason the Court must grant summary judgment on Vining's equitable estoppel claim is that "equitable estoppel can only preclude an opposing party from asserting or denying the existence of a particular fact; it cannot form the basis of an independent cause of action." *Frederick v. Fed.-Mogul Corp.*, 733 N.W.2d 57, 61 n.7 (Mich. Ct. App. 2006) (citation omitted); *see also Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 285 (Mich. Ct. App. 2006) (footnote omitted) (citations omitted) ("It is well established under Michigan law that equitable estoppel is not a cause of action unto itself; it is available only as a defense.").

### E. Vining's fraudulent misrepresentation claim against the Comerica Defendants (Count XVIII)

In Count XVIII of the complaint, Vining alleges a fraudulent misrepresentation claim against the Comerica Defendants. For the reasons stated in Part V.B.3.c of this Opinion, this claim is barred by Michigan's statute of frauds. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

> To state a claim for fraudulent misrepresentation under Michigan law, Plaintiffs must sufficiently allege the following: "(1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury."

*Etts v. Deutsche Bank Nat'l Trust Co.*, 126 F. Supp. 3d 889, 896–97 (E.D. Mich. 2015) (quoting *Hi–Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976)). Not every

146

misrepresentation gives rise to a fraud claim.

> Under Michigan law, "an action for fraud must be predicated upon a false statement relating to a past or existing fact; promises regarding the future are contractual and do not support a claim for fraud." *Bennett* [*v. MIS Corp.*], 607 F.3d [1076,] 1101 [(6th Cir. 2010)]; *Cook v. Little Caesar Enters., Inc.*, 210 F.3d 653, 658 (6th Cir.2000) (same). However, under the "bad faith" exception to this rule, a party may maintain a fraud claim if the "promise [was] made in bad faith without the intention to perform it." *Blackward Props., LLC v. Bank of Am.*, 476 Fed.Appx. 639, 643 (6th Cir.2012) (applying Michigan law); *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816 (1976). Because a broken promise itself is not evidence of fraud, *Blackward*, 476 Fed.Appx. at 643, "[e]vidence of fraudulent intent . . . must relate to conduct of the actor at the very time of making the representations, or almost immediately thereafter," *Needa Parts Mfg., Inc. v. PSNet, Inc.*, 635 F.Supp.2d 642, 648 (E.D.Mich.2009).

*Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp. 3d 711, 728 (E.D. Mich. 2016).

In addition, under Michigan law, to establish a fraud claim, the Plaintiff's reliance on the misrepresentation must be "reasonable." *McCallum v. Pixley* (*In re Pixey*), 456 B.R. 770, 781 (Bankr. E.D. Mich. 2011) (stating that "in *Cooper v. Auto Club Ins. Ass'n*, 481 Mich. 399, 751 N.W.2d 443, 451–52 (2008), the Michigan Supreme Court held that 'reasonable' reliance is a necessary element of fraud"). "Unreasonable reliance includes relying on an alleged misrepresentation that is expressly contradicted in a written contract that the plaintiff reviewed and signed." *MacDonald v. Thomas M. Cooley Law Sch.,* 880 F. Supp. 2d 785, 795 (W.D. Mich. 2012), *aff'd*, 724 F.3d 654 (6th Cir. 2013).

"The absence of any one of these elements '"is fatal to a recovery."'" *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 784 (E.D. Mich. 2014) (quoting *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976)). "The burden of proof rests with

147

plaintiffs. Fraud will not be presumed but must be proven by clear, satisfactory and convincing evidence." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976) (citing *Youngs v. Tuttle Hill Corp.*, 128 N.W.2d 472, 473 (Mich. 1964)).

Fed. R. Civ. P. 9(b), which applies to this adversary proceeding under Fed. R. Bankr. P. 7009, requires fraud to be pled "with particularity." It states: "(b) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

> That means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir.2009) (quotation marks and citation omitted). In addition, a party must identify the "alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of [the other party]; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir.1993) (quotation marks and citations omitted).

*Llewellyn-Jones*, 22 F. Supp. 3d at 780; *see also Derbabian v. Bank of Am., N.A.,* 587 F. App'x 949, 952 (6th Cir. 2014) (quoting *Rautu v. U.S. Bank*, 557 F. App'x 411, 414 (6th Cir. 2014)) ("Plaintiffs alleging fraud should . . . 'specify the statement they contend is fraudulent, identify the speaker, time, and location of the statement, and explain why the statement is indeed untrue or a misrepresentation.'"); *Gold v. Winget* (*In re NM Holdings Co., LLC*), 407 B.R. 232, 258 (Bankr. E.D. Mich. 2009) (quoting *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir.2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir.2007)) ("[U]nder Rule 9(b), a plaintiff must 'allege the time, place,

148

and content of the alleged misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'").

The allegations in Vining's fraudulent representation portion of the complaint fail to meet the "particularity" standard in Fed. R. Civ. P. 9(b). Under the fraudulent representation count of the complaint, Vining fails to (1) specify what statements he contends were fraudulent; (2) identify who, among the Comerica Defendants, made each statement; (3) state where and when the statements were made; (4) explain why the statements were fraudulent; (5) state which statements the Debtor MTG relied on; (6) explain why MTG's purported reliance on the statements was reasonable; and (7) state how MTG was damaged by relying on the statements. This portion of the complaint is little more than a formulaic recitation of the elements of a fraudulent representation claim. After incorporating by reference Paragraphs 1 through 356 of the complaint, Vining alleges the following regarding his fraudulent misrepresentation claim against the Comerica Defendants:

> 361. As set forth above, the Bank and its Officers made false representations or omissions of material fact to the Debtor **concerning the Bank's financing of the Becker [Group] deal, the Becker [Group] Overformula Loans, and the submission of cash collateral reports**.

> 362. The representations were false when made.

> 363. The Bank and its Officers knew that their representations were false when made or they made them recklessly without knowing whether they were true.

> 364. The Bank and its Officers intended that the Debtor rely on the representations.

> 365. The Debtor relied on the representations.

> 366. The Bank and its Officers made the false representations

149

and omissions intentionally and maliciously.

367.  As a direct and proximate result of the false representations and omissions, the Debtor was damaged.

368.  The Bank and its Officers are jointly and severally liable for the damages.[302]

Vining's substitute brief in support of Plaintiff's Summary Judgment Motion provides even less detail on what alleged false statements support his fraudulent misrepresentation claim. He states only the following legal conclusion with no support in the record: "**Comerica** breached its loan obligations to Debtor, breached its duties of good faith and fair dealing owed to Debtor, breached fiduciary duties owed to Debtor, and **made fraudulent representations** to Debtor, all of which damaged Debtor."[303]  He does not specify a single false representation; does not state which of the Comerica Defendants made a representation that was false; does not cite a single case; and does not cite to evidence in the record.

Vining's response to the Comerica Defendant's Summary Judgment Motion is essentially a repetition of the vague allegations in the complaint.  His entire argument in support of his fraudulent representation claim is as follows:

> Comerica also made false representations and omissions to Debtor relating to the Becker [Group] Loans, Debtor's alleged overformula status, and Debtor's submission of cash collateral reports pending the Becker [Group] closing. Comerica knew their representations were false when made or it made them recklessly without knowing whether they were true. Comerica intended the Debtor to rely on its representations and Debtor did rely. The Trustee's prepetition claim against Comerica for fraudulent

---

[302]  Compl. (Docket # 1) at ¶¶ 361-68 (emphasis added).

[303]  Docket # 657 at 46 (emphasis added).

150

misrepresentations is meritorious.[304]

Again, there is no specification of any false statements, let alone the detail required by Rule 9(b). The Court is left with the daunting task of ferreting through hundreds of allegations in the complaint to determine what purported misrepresentation relate to the three broad topics Paragraph 361 mentions.

The Court assumes that the alleged misrepresentations were the same ones that form the basis of the other Pre-Petition Claims already discussed above; namely that (1) the Bank would advance necessary funds pending the closing of the sale with the Becker Group; (2) MTG did not have to submit A/R Reports pending the closing of the sale with the Becker Group; and (3) any over-formula loans would be the obligation of the Becker Group, not MTG. These statements allegedly were made by Marcinelli at the Renaissance Club meeting and later reiterated by Collins.

Even assuming these statements were made, they cannot be the basis for a fraud claim against any of the Comerica Defendants, for several reasons. First, because these alleged statements are oral promises by Comerica to waive provisions of the Loan Documents (a type of "financial accommodation"), the Michigan statute of frauds clearly bars any action to enforce such promises. *See* Mich. Comp. Laws Ann. § 566.132(2).

Second, oral promises regarding future performance generally cannot be the basis for a fraud claim. *Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp. 3d 711, 728 (E.D. Mich. 2016). Although there is a bad faith exception to this general rule, when the defendant makes a promise that he did not intend to keep at the time he made it, Vining does not allege, nor

---

[304] Docket # 639 at 11.

is there any evidence in the record, that at the time Marcinelli purportedly made promises to Vercnocke, Marcinelli did not intend to keep those promises.

Third, Vining cannot establish the reasonable reliance element of its fraud claim. The Loan Documents clearly and unambiguously required MTG to submit A/R Reports every time it requested an advance on its line of credit, and clearly provided a limit on how much MTG could borrow under its lines of credit based on borrowing formulas. The $3.5 million promissory note also clearly required that any modification of those terms would have to be in a writing signed by an officer of Comerica. MTG signed the $3.5 million Master Revolving Note which stated:

> The undersigned acknowledge(s) and agree(s) that there are no contrary agreements, oral or written, establishing a term of this Note and agree(s) that the terms and conditions of this Note may not be amended, waived or modified except in a writing signed by an officer of the Bank expressly stating that the writing constitutes an amendment, waiver or modification of the terms of this Note.[305]

Given these terms, it would have been unreasonable for MTG to rely on any oral representations that it did not have to submit A/R Reports and could take over-formula advances.

### F. Vining's breach of fiduciary duty claim against the Comerica Defendants (Count XIX)

In Count XIX of the complaint, Vining alleges that Comerica owed a fiduciary duty to MTG and that Comerica breached that fiduciary duty. For the reasons stated in Part V.B.3.c of this Opinion, this cause of action is barred by Michigan's statute of frauds. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

Vining alleges, in relevant part:

---

[305] Docket # 584-2 at 1.

370.  The Debtor had a long standing relationship in which it had exclusive and repeated dealings with the Bank.

371.  In the course of their prepetition banking relationship, the Bank and Mr. Collins, its Officer, **exercised dominion, control and influence over the Debtor's business affairs**.

372.  The Debtor's **course of dealing** with the Bank and Mr. Collins, its Officer, created the Debtor's reasonable expectation that over-formula advance requests would be honored.

373.  The Debtor's **course of dealing** with the Bank and Mr. Collins, its officer, created the Debtor's expectation that the Bank would not declare a default under the Loan Documents because of an over-formula status.

374.  The Bank and its Officers, Mr. Marcinelli and Mr. Collins, hoped to resume the Bank's banking relationship with [the] Becker [Group] by making the Becker [Group] Over-formula Loans.

375.  By agreeing to make and by making the Becker [Group] Over-formula Loans, the Bank effectively entered into a **joint venture** with the Debtor.

376.  By making the Becker [Group] Over-formula Loans, the Bank provided extra services and Loans for the benefit of [the] Becker [Group] and the Debtor **outside of the Loan Documents**.

378.  By making the Becker [Group] Over-formula Loans, the **Bank gained effective control of the Debtor and its business**.[306]

379.  Because of the facts and circumstances set forth in Paragraphs 370 through 378 above, the Bank and its Officers, Mr. Marcinelli and Mr. Collins, owed fiduciary duties to the Debtor's estate.

380.  The Bank and its Officers, Mr. Marcinelli and Mr. Collins breached their fiduciary duties to the Debtor as follows:

(A) By declaring the Debtor in default under the

---

[306] The complaint does not contain a paragraph number "377."

153

Loan Documents because of the Debtor's alleged over-formula status;

(B) By declaring the Debtor in default under the Loan Documents because of the Debtor's failure to submit cash collateral reports;

(C) By refusing to honor the Debtor's checks after the declared default;

(D) By refusing further credit line advances after the declared default;

(E) By accelerating and demanding full payment of the Bank debt after the declared default;

(F) By demanding that Debtor's account debtors forward account payments directly to the Bank after the declared default;

(G) By demanding that the Debtor and its principals each execute a release of all claims against the Bank after the declared default; and

(H) By failing to give the Debtor prior notice of the alleged defaults or any opportunity to cure the alleged defaults.

381. By taking the actions described above, the Bank as a fiduciary, acted in its own self interests to the detriment of the Debtor, its beneficiary.

382. As a direct and proximate result of such breaches, the Debtor was damaged.

383. The Bank and its Officers, Mr. Marcinelli and Mr. Collins, are jointly and severally liable for such damages.[307]

In his brief in support of Plaintiff's Summary Judgment Motion, Vining fails to

meaningfully set forth or develop his argument regarding his breach of fiduciary duty claim.

---

[307] Compl. at 50-52 (emphasis added).

Vining lumps his argument that Comerica breached its fiduciary duty to MTG in the same section which contains his arguments on other pre-petition claims in his complaint. That section is captioned: "THE TRUSTEE IS ENTITLED TO SUMMARY JUDGMENT AGAINST COMERICA FOR ITS BREACH OF THE LOAN AGREEMENTS, ITS BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING, ITS BREACH OF FIDUCIARY DUTY, AND FRAUDULENT MISREPRESENTATIONS." After the caption, Vining's entire argument consists of the following bare legal conclusions, with no citations to the record or any meaningful application of the law to the facts:

> Comerica breached its loan obligations to Debtor, breached its duties of good faith and fair dealing owed to Debtor, breached fiduciary duties owed to Debtor, and made fraudulent representations to Debtor, all of which damaged Debtor. Pursuant to [*Fed. R. Civ. P.*] *37* and the Court's inherent power, the Court should prohibit Comerica from asserting defenses against or presenting evidence opposing these claims and the Trustee's proofs regarding damages. Summary judgment should be entered on the Trustee's prepetition claims against Comerica, awarding damages in the amount of at least $6,251,300.00, plus prejudgment interest, costs and attorney fees.[308]

Vining does attempt to develop his argument on his breach of fiduciary duty claim in his response to the Comerica Defendants' Summary Judgment Motion.[309] For this reason, the Court will not deem Vining to have waived the claim that Comerica breached its fiduciary duty to MTG.

In his response, Vining admits that "a normal bank-depositor relationship does not give

---

[308] Trustee's Br. (Docket # 657) at 46-47.

[309] *See* Trustee's Resp. to the Comerica Defs.' Summ. J. Mot. (Docket # 639) at 10-11.

rise to a fiduciary duty."[310]  Nevertheless, Vining argues that "[u]nder 'the unique facts of this

case,' Comerica assumed fiduciary duties to [the] Debtor."[311]  Vining argues, in relevant part:

> Comerica abandoned any normal, arms-length lending relationship
> with [the] Debtor when it (1) negotiated with [the] Becker [Group],
> a potential purchaser of [the] Debtor and former largest customer
> of Comerica, to fund [the] Debtor's operations pending a Becker
> [Group] closing in an attempt to secure future Becker [Group]
> business, (2) acted in its own self interests and to the detriment of
> [the] Debtor, its customer, (3) effectively became [the] Debtor's
> joint venturer or "partner," and (4) failed to disclose the substance
> of its Becker [Group] negotiations, including any agreements or
> even expectations concerning repayment of [the] Becker [Group]
> Loans.  Based on its long-standing relationship with Comerica,
> [the] Debtor "reposed faith, confidence, and trust" in Comerica and
> relied on Comerica to act in good faith in connection with [the]
> Becker [Group] negotiations and [the] Becker [Group] Loans.
> Comerica "acquired, abused, and betrayed" that trust.[312]

Vining relies on *Smith v. Saginaw Savings & Loan Association*, 288 N.W.2d 613 (Mich. Ct. App.

1979) for his breach of fiduciary duty claim.

The Comerica Defendants argue that Vining's breach of fiduciary duty claim, like his

other Pre-Petition Claims, is barred by the statute of frauds.[313]  The Comerica Defendants argue

further that under Michigan law, "Comerica was not MTG's fiduciary" because "Michigan courts

neither recognize nor impose a fiduciary duty on banks arising from ongoing business

relations."[314]  For this argument, the Comerica Defendants rely on *Oja v. Kin*, 581 N.W.2d 739

---

[310]  *Id.* at 11.

[311]  *Id.*

[312]  *Id.*

[313]  Comerica Defs.' Br. (Docket # 584) at 21.

[314]  *Id.* (citations omitted).

(Mich. Ct. App. 1998); *Ulrich v. Federal Land Bank of St. Paul*, 480 N.W.2d 910 (Mich. Ct. App. 1991); *Portage Aluminum Co. v. Kentwood National Bank*, 307 N.W.2d 761, 764 (Mich. Ct. App. 1981) and *Farm Credit Services of Michigan's Heartland, P.C.A. v. Weldon*, 591 N.W.2d 438 (Mich. Ct. App. 1998).

The Comerica Defendants argue that Comerica did not exercise the type of control required under Michigan law to take the relationship between MTG and Comerica outside of the general rule of there being no fiduciary relationship between a lender and borrower. For this argument, the Comerica Defendants rely on *Boyd v. Sachs* (*In re Auto Specialties Manufacturing Co.*), 153 B.R. 457 (Bankr. W.D. Mich. 1993), *opinion adopted*, 153 B.R. 503 (W.D. Mich. 1993).[315]

The Comerica Defendants argue further that the evidence in the record does not support Vining's allegation that Comerica exercised control over MTG.[316] The Comerica Defendants rely on the deposition testimony of Vercnocke that "all the decisions that were made that put the company in jeopardy were made by a guy who owned 85 percent of the company [Richard May]."[317] The Comerica Defendants also rely on the letter Vercnocke wrote to B. Becker on July 24, 1995, in which Vercnocke indicated that he relied on the "specific representation" of B. Becker (not Comerica) "that $500,000 would be deposited immediately to cover the over-formula" when he took the over-formula advances.[318]

---

[315] *Id.* at 28.

[316] *Id.* at 21 n.15.

[317] *Id.* (relying on Vercnocke Dep. Tr. (Docket # 584-45) at 141).

[318] *See* Letter to B. Becker from Vercnocke dated July 24, 1995 (Docket # 645-9).

157

The Court agrees with the Comerica Defendants that, as with Vining's other Pre-Petition Claims, Vining's breach of fiduciary duty claim is barred by the statute of frauds. Just as with Vining's breach of contract and promissory estoppel claims, the breach of fiduciary duty claim is simply another "action" that seeks to enforce alleged oral promises by Comerica, and as such is barred by the state of frauds.[319]

Even if Vining's breach of fiduciary duty claim were not barred by the statute of frauds, this claim would still fail, because Comerica did not have a fiduciary relationship with MTG, and as a result, did not owe any fiduciary duty to MTG.

"'The elements of a fiduciary duty claim are (1) the existence of a fiduciary duty, (2) a breach of that duty, (3) proximately causing damages.'" *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D. Mich. 2016), *modified*, No. 15-cv-13966, 2016 WL 1156741 (E.D. Mich. Mar. 24, 2016) (quoting *Stryker Corp. v. Ridgeway*, No. 1:13–CV–1066, 2015 WL 8759220, at *3 (W.D. Mich. Dec. 14, 2015)).

Under Michigan law,

> [a] fiduciary duty arises between parties in a fiduciary relationship. "A fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another." Traditional examples of fiduciary relationships are: trustees to beneficiaries; guardians to wards; attorneys to clients; and doctors to patients. . . . Michigan courts . . . have "been reluctant to extend the cause of action for breach of fiduciary duty beyond the traditional context." "[Breach of fiduciary duty] [r]elief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." "A person in a fiduciary relation[ship with] another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation."

---

[319] *See supra* discussion at Parts V.B.3.c, V.C, V.D, and V.E of this Opinion.

*Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 865 (E.D. Mich. 2013) (citations

omitted).

Under Michigan law,

> "Fiduciary relationships [usually] arise in one of four situations: (1)
> when one person places trust in the faithful integrity of another,
> who as a result gains superiority or influence over the first, (2)
> when one person assumes control and responsibility over another,
> (3) when one person has a duty to act for or give advice to another
> on matters falling within the scope of the relationship, or (4) when
> there is a specific relationship that has traditionally been
> recognized as involving fiduciary duties, as with a lawyer and a
> client or a stockbroker and a customer." *Calhoun Cnty. v. Blue
> Cross Blue Shield Michigan*, 297 Mich. App. 1, 20, 824 N.W.2d
> 202, 213 (2012).

*Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 753 (E.D. Mich. 2014).

"Whether a [fiduciary] duty exists is a question of law for the court to decide." *Prentis Fam.

Found., Inc. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App.

2005) (citing *Harts v. Farmers Ins. Exch.*, 597 N.W. 2d 47, 50 (Mich. 1999)) ("Whether a duty

exists is a question of law that is solely for the court to decide."); *see also Delphi Auto. PLC*, 167

F. Supp. 3d at 884 (citing *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 765-66 (6th

Cir. 2012)) ("Courts determine whether a fiduciary duty exists.").

Under Michigan law, the general rule is that a lender owes no fiduciary duty to a

borrower, and there is generally no fiduciary relationship between a lender and a borrower.  In

*Van Arnem Co. v. Manufacturers Hanover Leasing Corp.*, 776 F. Supp. 1220, 1223 (E.D. Mich.

1991), the court, applying Michigan law, stated:

> A lender which enters a contract for a line of credit with a borrower
> does not thereby become the borrower's fiduciary. The lender
> remains entitled to advance its own interests by enforcement of

159

> contract terms, and is not required to forego enforcement of
> contract terms to put the borrower's interests ahead of its own.
> *Production Credit Ass'n. v. Croft*, 423 N.W.2d 544, 143 Wis.2d
> 746 (1988); *Price v. Wells Fargo Bank*, *supra*, 261 Cal.Rptr. 735,
> 740, 213 Cal.App 3d 465 (1989); *Kham & Nate's Shoes v. First
> Bank of Whiting*, *supra* [908 F.2d 1351 (7th Cir. 1990)]*; M/A-Com
> Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990).

*Id.*; *see also Kevelighan v. Trott & Trott, P.C.*, 771 F. Supp. 2d 763, 779 (E.D. Mich. 2010)

(citation omitted) ("Generally, no fiduciary duties arise within the lender borrower context.");

*Jarbo v. BAC Home Loan Servicing,* No. 10-12632, 2001 WL 5173825, at *15 (E.D. Mich. Dec.

15, 2010) (citation omitted) ("Michigan courts have not recognized [a fiduciary] duty in the

bank/lender relationship."); *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 744 (6th

Cir. 1998) (relying on *Van Arnem Co.*, 776 F. Supp. at 1222) (finding no wrongful conduct on

the part of Chrysler International Corporation ("Chrysler") toward Cherokee Export Company

("CEC"), with whom it had entered into a contract, that would support a lender liability

counterclaim by CEC against Chrysler, because "the relationship between Chrysler and CEC was

an "'arms length business transaction'" and "even if the relationship between Chrysler and CEC

were analogous to lender and borrower, Chrysler would be entitled to assert its contractual

rights"); *Farm Credit Servs. of Michigan's Heartland, P.C.A. v. Weldon*, 591 N.W.2d 438, 447

(Mich. Ct. App. 1998) (citation omitted) (explaining that "[a] fiduciary relationship . . . generally

does not arise within the lender-borrower context" and "a lender generally is not liable for harm

caused to a borrower by refusing to advance additional funds"); *Boyd v. Sachs* (*In re Auto

Specialties Mfg. Co.*), 153 B.R. 457, 479 (Bankr. W.D. Mich. 1993), *opinion adopted*, 153 B.R.

503 (W.D. Mich. 1993) (citations omitted) ("The borrower-lender relationship is one of

debtor-creditor, and the typical debtor-creditor relationship is not normally one including

fiduciary duties.").

Furthermore, under Michigan law, "a fiduciary duty cannot exist where the interests of the party are adverse." *German Free State of Bavaria v. Toyobo Co., LTD*, 480 F. Supp. 2d 958, 966 (W.D. Mich. 2007) (citing *Beaty v. Hertzberg & Golden, P.C.*, 571 N.W.2d 716, 722 (Mich. 1997)).

Despite the general rule that there is no fiduciary relationship between a lender and a borrower, Michigan courts have found that such a relationship can arise in three narrowly construed situations. The first situation is where the borrower places trust in, and relies on the judgment and advice of, the lender, who as a result gains superiority or influence over the borrower, and then abuses that trust. *See Farm Credit Servs.*, 591 N.W.2d at 447 (relying on *Smith v. Saginaw Sav. & Loan Ass'n*, 288 N.W.2d 613, 618 (Mich. Ct. App. 1979)) ("[a] fiduciary relationship, which generally does not arise within the lender-borrower context, exists when there is a reposing of faith, confidence, and trust and the placing of reliance by one on the judgment and advice of another" and that "[r]elief is granted when such position of influence has been acquired and abused, when confidence has been reposed and betrayed") and *Ulrich v. Fed. Land Bank of St. Paul*, 480 N.W.2d 910, 911 (Mich. Ct. App. 1991) (citing *Smith*, 288 N.W.2d at 618, for the proposition that "[a] fiduciary relationship arises from the reposing of faith, confidence, and trust, and the reliance of one upon the judgment and advice of another").

However, under Michigan law, "only where the debtor is so 'easily dominated, old, or weak-minded,' and reliance upon the lender for business making decisions is inevitable may a reposing of trust in the lender be a basis for a finding that there is a fiduciary duty owed." *Auto Specialties*, 153 B.R. at 479 (relying on *Harris Trust & Sav. Bank v. Keig (In re Prima Co.)*, 98

161

F.2d 952, 965 (7th Cir. 1938), *cert. denied*, 305 U.S. 658 (1939)).

In *Prima Co.*, the case relied on by *Auto Specialties*, the court declined to find that a fiduciary relationship existed between several banks and an Illinois corporation that had borrowed money from the banks. *Prima Co.*, 96 F.3d at 964. In *Prima Co.*, the debtor corporation alleged that one of the banks "became dissatisfied with the debtor's management, and suggested the employment of one Garnett C. Skinner [("Skinner")] as manager"; and that the debtor "understood and had reasonable grounds for believing that if the debtor did not enter into the contract with Skinner, with the approval of its directors, the banks would call the loans and endeavor to enforce their payment against it and its guarantors." *Id.* at 961-62. The debtor alleged that due to undue influence by the banks, it entered into a contract with Skinner, who mismanaged the debtor and caused it to suffer losses. After the debtor corporation filed for relief under the Bankruptcy Act, the bankruptcy trustee sought to recover from the banks the losses the debtor had suffered as a result of Skinner's mismanagement of the corporation.

The *Prima Co.* court assumed for the purpose of its Opinion that the debtor had reasonable grounds for believing that the banks would call the loans and seek to enforce its rights if the debtor did not hire Skinner. Nevertheless, the court found no fiduciary relationship between the banks and the debtor. The court reasoned:

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful. See 5 Williston on Contracts (1937 Ed.) sec. 1606.
>
> Of course a threat of ordinary litigation may be made under such circumstances as to render the threat wrongful as a means of

162

> coercion, such as **where one of the parties is in a position to be easily dominated by the other, or is old and weak-minded.** Where, however, ordinary legal procedure is used or threatened by one who believes he has a claim of the kind for which such procedure was provided, there must doubtless be some actual or threatened abuse of process. See Williston, sec. 1607. Here there was no threatened abuse of process, and **it was neither alleged nor found that the [debtor corporation was] easily dominated, old, or weak-minded, or in any other analogous situation.** [The debtor corporation's] business experience as disclosed by this record would strongly indicate the contrary. No doubt the debtor, because of its inability to meet its maturing obligations, acquiesced in [the bank's] recommendations, but this we think is not sufficient to constitute domination of its will. Clearly, the earlier decisions support this conclusion.

*Prima Co.*, 98 F.2d at 965 (emphasis added).

The *Prima Co.* court cited cases that found a fiduciary duty because of a significant disparity in the parties' mental capacity, age, health, business experience or acumen, or some other sort of disability or impediment or close familial relationship or dependency, that resulted in an unequal bargaining position between the parties. These include a case where "an uncle took advantage of his young nephew, who lived with him, and obtained an unlawful usurious contract;" a case where "inherently wrongful [acts] . . . were perpetrated by a young wife upon her aged husband to secure gifts from him, at a time when he was senile, physically weak, and in a state of extreme dependence when death was imminent;" and a case where "a deed . . . was obtained for a grossly inadequate consideration . . . [and] had been procured by the defendant who had been guilty of fraud and usury, and who had taken unconscionable advantage of the ignorant plaintiffs who had relied upon him for advice." *Prima*, 98 F.2d at 965 (citing cases).

The case of *Smith v. Saginaw Savings & Loan Ass'n*, 288 N.W.2d 613 (Mich. Ct. App. 1979), a case relied on by Vining, was one such case, where the court found that the bank owed a

163

fiduciary duty to the borrowers due to the inferior position of borrower's relative to the bank.

In *Smith*, Joseph D. Smith and his wife, Mary Ann Smith, obtained a $25,000 construction loan from Saginaw Savings & Loan Association ("Saginaw Savings") in order to build a retirement home for themselves. *Smith*, 288 N.W.2d at 614-15. The Smiths deposited the $25,000 loan and $1,500 of their own money into a "Due Borrower's Account" at Saginaw Savings, from which draws could be made periodically to pay their builder for completed work. Saginaw Savings required the Smiths to pay a $250 "construction" fee to cover "[Saginaw Savings'] expenses in sending a man out to inspect the progress of the construction prior to the release of any progress payments to the builder." *Id.* at 615. The only person the Smiths dealt with at Saginaw Savings was Eugene Sauer ("Sauer"), the Saginaw Savings' branch manager in the Saginaw Savings' Gaylord office. "Sauer personally approved the builder and the building agreement signed by the Smiths." *Id.* at 615, 618. He also approved the building specifications. *Id.* at 618. Sauer "assured [the Smiths] that sufficient funds to complete the house would always be in the Due Borrower's Account" and that Saginaw Savings "would make certain that any work claimed by [the builder] to have been completed was actually done prior to the release of any payment to [the builder] and that all required waivers of lien would be obtained." *Id.* at 615.

The Smiths were "unable to oversee the day-to-day activities" of the home construction because they lived a great distance from where the home was being built ("some 250 miles from the construction site"), and Mr. Smith was seriously ill and had been "in and out of the hospital" during construction of the home. *Id.* at 615, 618. "The Smiths . . . stated that they had placed complete trust and confidence in Sauer and relied upon his judgment regarding the builder and the agreement with him as well as Sauer's representations regarding the quality and the progress

164

of the construction." *Id.* at 615.

During the home construction, Sauer gained knowledge that the builder was experiencing "severe financial difficulties," but did not share that knowledge with the Smiths, nor did he take any actions to protect their interests in the home. Sauer did, however, take actions to protect his interests in a home he was having built by the same builder. *Id.* at 615. In *Smith*, the court held that "[t]hese facts plainly established the existence of a fiduciary obligation [on the part of Saginaw Savings to the Smiths] and the breach thereof." *Id.* at 618.

The relationship between MTG and Comerica is more like the borrower/lender relationship of the parties in *Prima Co.,* and is not similar to the borrower/lender relationship of the parties in *Smith*. The Loan Documents which governed the relationship between MTG and Comerica were entered into between sophisticated parties on both sides of arms-length transactions, and both parties understood that each of them was advancing its own interests. Vining has not alleged, nor is there any evidence in the record that would indicate, that Vercnocke or any other employee of MTG was weak or easily dominated by Comerica.

Rather, Vining is alleging that Marcinelli's alleged promise at the Renaissance Club meeting, that Comerica would be MTG's "partner" in MTG's effort to close a sale transaction, transformed the relationship between MTG and Comerica from an ordinary debtor/creditor relationship into a fiduciary relationship. Vining argues that because of that alleged promise, Comerica, in effect, became MTG's "partner" or "joint venturer." According to Vining, MTG reasonably reposed trust and confidence in Comerica that it would continue to loan MTG whatever funds MTG needed to continue its operations pending the sale regardless of the contractual limit on MTG's line of credit, and that Comerica would not declare a default, or seek

165

to enforce its contract rights.

Under Michigan law, partners owe a fiduciary duty to other partners.  *See, e.g.*, *Band v. Livonia Assocs.*, 439 N.W.2d 285, 294 (Mich. Ct. App. 1989) ("The courts universally recognize the fiduciary relationship of partners and impose on them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs.").  And under Michigan law, "[j]oint venturers owe a fiduciary duty to each other."  *Schmude Oil Co. v. Omar Operating Co.*, 458 N.W.2d 659, 664 (Mich. Ct. App. 1990) (citing *Van Stee v. Ransford*, 77 N.W.2d 346 (Mich. 1956)).  However, to the extent Vining argues that there was a fiduciary relationship between Comerica and MTG because Comerica, through Marcinelli, formed a partnership, or joint venture by his promise to be MTG's "partner," the Court must reject that argument.  There was no such partnership or joint venture.

Under Michigan law,

> [t]he elements of a partnership are generally considered to include a voluntary association of two or more people with legal capacity in order to carry on, via co-ownership, a business for profit. Co-ownership of the business requires more than merely joint ownership of the property and is usually evidenced by joint control and the sharing of profits and losses.

*Miller v. City Bank & Trust Co.*, *N.A.*, 266 N.W.2d 687, 690 (Mich. Ct. App. 1978).

> In contrast to a partnership, which is an association of persons to carry on as coowners a business for profit, [Mich. Comp. Laws §] 449.6, a joint venture or joint "adventure" is defined as "an association to carry out a single business enterprise for a profit." *Berger v. Mead*, 127 Mich.App. 209, 214, 338 N.W.2d 919 (1983). As the *Berger* [c]ourt further explained at 214–215, quoting *Meyers v. Robb*, 82 Mich.App. 549, 557, 267 N.W.2d 450 (1978):
>
> > A joint venture has six elements:
> >
> > > "(a) an agreement indicating an intention to

166

undertake a joint venture;

"(b) a joint undertaking of

"(c) a single project for profit;

"(d) a sharing of profits as well as losses;

"(e) contribution of skills or property by the parties;

"(f) community interest and control over the subject matter of the enterprise."

*Kay Inv. Co., L.L.C. v. Brody Realty No. 1, L.L.C.*, 731 N.W.2d 777, 781 (Mich. Ct. App. 2006).

None of the elements for a partnership or a joint venture were satisfied by Marcinelli's purported statement that Comerica would be MTG's partner. There is no genuine dispute that Comerica and MTG did not become co-owners of MTG or any other business venture. Nor did Comerica and MTG agree to share the profits and losses of a business. The most that can be concluded from Marcinelli's statement at the Renaissance Club meeting is that Comerica, in furtherance of its own business interests, was supportive of MTG entering into the proposed sale transaction with the buyer that MTG had selected.

Vining may be arguing that even though there was no partnership or joint venture, Marcinelli's alleged statement that Comerica would be MTG's "partner" created a fiduciary relationship between the parties, when considered in conjunction with Marcinelli's alleged statements that Comerica would advance funds in excess of the borrowing limits and without the necessity of submitting A/R Reports pending the contemplated sale. To the extent this is Vining's argument, such argument, at first blush, seems to be consistent with an Eastern District of Michigan case, which applied Michigan law, and held that Comerica Bank-Detroit owed a fiduciary duty to a borrower.

167

In *Borock v. Comerica Bank-Detroit*, 938 F. Supp. 428 (E.D. Mich. 1996), the plaintiff, the bankruptcy trustee for Sardo Corporation ("Sardo"), brought a claim for breach of fiduciary duty against Comerica Bank-Detroit ("CBD") and an employee of CBD. The plaintiff alleged that the CBD employee created a fiduciary duty on the part of CBD to Sardo

> by **becoming its financial adviser**, entertaining its owners at bank functions, and convincing them to pursue an unsound business strategy. Provost also allegedly told the owners of Sardo that [CBD] was "with Sardo for the long haul" and that [CBD] would "work with Sardo" regarding its rapidly growing debt.

*Borock*, 938 F. Supp. at 429 (emphasis added). The plaintiff further alleged that CBD breached its fiduciary duty to Sardo when CBD, "among other actions, unexpectedly pulled Sardo's line of credit and refused a reasonable pay down plan." *Id.* at 429-30. The court held that "the fiduciary duty to Sardo was created when [CBD's employee's] **financial advice and commitments** were offered, accepted, and relied upon by Sardo." *Id.* at 431 (emphasis added).

The *Borock* court relied on *Smith*, and on *Williams v. Griffin*, 192 N.W.2d 283 (Mich. Ct. App. 1971). The facts of the *Smith* case were discussed above. The *Griffin* case was not a case between a lending institution and a borrower. Rather, it was a case between individuals. In *Griffin*, the court held that one individual ("Griffin") owed a fiduciary duty to another ("Donnelly") where "Donnelly, because of his feeble physical condition, was incapable of looking after himself" and it was inconceivable to the court "that Donnelly was capable of attending to his business and financial matters;" "Griffin readily admitted that he had occupied a position of trust with both . . . Donnelly [and his wife] and testified that Donnelly often heeded his advice concerning business matters;" "Griffin managed all of Donnelly's business affairs including the payment of taxes, the collection of debts, and the sale of real estate;" and

168

"Donnelly's advanced age and his physical infirmness led to his complete reliance on Griffin." *Id.* at 285.

CBD's employee's statements *in Borock,* that CBD was "with Sardo for the long haul" and that CBD would "'work with Sardo' regarding its rapidly growing debt" when viewed in isolation from the other facts and circumstances in the case and the case law cited, arguably are analogous to Marcinelli's alleged statement that Comerica would be MTG's "partner" in conjunction with his alleged commitment to work with MTG pending the impending proposed sale. But on closer examination, there is a key distinction between *Borock* and this case. The *Borock* court, in finding in favor of the borrower, necessarily found, as the borrower alleged, that CBD had become the "financial advisor" of the borrower, and had a more intimate relationship with the borrower than in customarily found in the typical lender/borrower context. The new and special role of "financial advisor" and the extra duties to the borrower CBD assumed as a result of that role, and the closer-than-average relationship that CBD nurtured with the borrower, must necessarily have been the basis of the court finding that a fiduciary relationship existed between CBD and the borrower, in light of the *Borock* court's reliance on *Smith* and *Griffin*.

The *Borock* court did not find that any officer or employee in control of the borrower was weak, feeble, or easily dominated, as were the borrowers in *Smith* or *Griffin*. The only facts in *Smith* and *Griffin* that are somewhat analogous to those in *Borock* were that in both *Smith* and *Griffin*, the party held to be bound by a fiduciary duty to the other party was acting in the role of financial advisor, or at the very least, a role analogous to that of a financial advisor, to the party suing for breach.

"Although there is no generally recognized fiduciary duty between a financial advisor and

his client [under Michigan law], this does not prevent the creation of a fiduciary relationship under the right facts." *Hamameh v. Gilson*, No. 317232, 2014 WL 6679261, at *17 (Mich. Ct. App. Nov. 25, 2014). In *Hamameh*, the plaintiff, who had relied on financial/investment advice from a vice president of Comerica, brought suit against the vice president and Comerica, among others, for breach of fiduciary duty, among other claims. The court explained that

> [t]o establish **a fiduciary duty pertaining to [the vice president's] role as a Comerica financial advisor** to a Comerica customer, [the plaintiff] would have to show:
>
>> [a] relationship in which one person is under a duty to act for the benefit of the other on matters within the scope of the relationship. Fiduciary relationships—such as trustee-beneficiary, guardian-ward, agent-principal, and attorney-client—require the highest duty of care. Fiduciary relationships [usually] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) *when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship*, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer. [*Calhoun Co. v. Blue Cross & Blue Shield of Mich.*, 297 Mich.App 1, 20; 824 NW2d 202 (2012) (quotation marks and citations omitted, emphasis added).]

*Hamameh,* 2014 WL 6679261, at *16–17 (bold added) (italics in original). In *Hamameh*, it was the role of financial adviser rather than the role of lender, which, under the circumstances, gave rise to a fiduciary relationship between the borrower and the lender.

Other courts, in jurisdictions outside of Michigan, also have held that a fiduciary relationship between a bank and a customer arose when the bank assumed the role of financial advisor to that customer. *See, e.g.*, *Deist v. Wachholz*, 678 P.2d 188, 193 (Mont. 1984) (citation

170

omitted) (explaining that "[t]he relationship between a bank and its customer is generally described as that of debtor and creditor, and as such does not give rise to fiduciary responsibilities" and therefore "any fiduciary duty owed to [the customer] by the [b]ank and its officers had to arise from the [b]ank's role as [the customer's] financial advisor"); *Stewart v. Phoenix Nat'l Bank,* 64 P.2d 101, 106 (Ariz. 1937) ("[W]here it is alleged [that] a bank has acted as the financial advisor of one of its depositors for many years, and that the latter has relied upon such advice, it is a sufficient allegation that a confidential relationship in regard to financial matters does exist and that, if it is proved, the bank is subject to the rules applying to confidential relations in general.").

Vining has not alleged, nor does the record support, the conclusion that Comerica had become the financial advisor of MTG through its interactions with Vercnocke. Vining also has not alleged facts that would show, nor does any evidence in the record tend to show, that Comerica had some other type of special relationship with MTG that is different from, and closer than, the typical lender/borrower relationship.[320]

Another situation where Michigan courts have found that a fiduciary relationship can arise between a lender and borrower is where the lender assumes control and responsibility over the borrower. *See Auto Specialties*, 153 B.R. at 479 ("Where excessive lender control or influence

---

[320] During oral argument, Halbert alluded to certain statements that Vercnocke made about Collins colluding with or giving business advice to May regarding the purchase of the Mold Shop. The interactions between Collins and May occurred before May's resignation from MTG, and before Vercnocke took over as President of MTG. To the extent Halbert is arguing that those interactions established a special relationship between Comerica and MTG that gave rise to a fiduciary relationship, the Court rejects that argument. It was Vercnocke, not May, who was in control of MTG during the relevant time period. And there is no evidence in the record that Collins had any special relationship with Vercnocke or any involvement in MTG's business operations during Vernocke's tenure which would give rise to a fiduciary relationship between Comerica and MTG.

can be established, the lender may be placed in a fiduciary capacity."). However, the level of control required by Michigan cases is substantial. Only "where the lender exercises control over **all or substantially all aspects of the finances and operations** of the debtor" will a fiduciary relationship between a lender and borrower be found. *Auto Specialties*, 153 B.R. at 479 (emphasis added) (relying on *Bergquist v. First Nat'l Bank of St. Paul* (*In re Am. Lumber Co.*), 7 B.R. 519, 529 (Bankr. D. Minn. 1979)).

The *Auto Specialties* court distinguished between the type of control that a primary lender of a borrower naturally exerts on one hand, and the type of control that gives rise to a fiduciary duty on the part of a lender, on the other hand:

> **Actual or *de facto* control does not exist simply because bargaining power was greatly skewed in favor of the lender. This will invariably be true wherever a debtor's primary lender is on the verge of terminating the debtor's operations:**
>
>> Through its loan agreement, every lender effectively exercises "control" over its borrower to some degree. A lender [who is the primary lender and whose loan is in default] will usually possess "control" in the sense that it can foreclose or drastically reduce the debtor's financing. The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender.
>
> *Smith v. Associates Commercial Corp.* (*In re Clark Pipe & Supply Co., Inc.*), 893 F.2d 693, 701 (5th Cir.1990). *Clark Pipe* goes on to say that the mere possession by a lender of power over the borrower does not establish control; the lender must have used that control to direct the activities of the borrower. In *Zimmerman* [*v. Central Penn National Bank* (*In re Ludwig Honold Manufacturing Co., Inc.*, 46 B.R. 125, 128 (E.D. Pa. 1985)], the court stated that **the control must be so overwhelming that there must be, "to some extent, a**

172

merger of identity." [*Anaconda-Ericsson, Inc. v. Hessen* (*In re*) *Teltronics* [*Services, Inc.*)], 29 B.R. [139,] 170 [(Bankr. E.D.N.Y. 1983)], describes the conduct required as "a domination of [the debtor's] will." In yet other words, **the facts which the Trustee must produce must raise a genuine question whether the Bank controlled the day-to-day activities of AUSCO in the same manner that a director or officer would.**

  . . . .

**It is only when the lender effectively steps into the shoes of current management that it is subjected to a fiduciary duty[.]**

*Auto Specialties,* 153 B.R. at 480–81 (emphasis added).

In *Auto Specialties*, the court gave an example of the kind of control that a lender would have to exert over the borrower for a fiduciary relationship to arise:

> In [*Bergquist v. First Nat'l Bank of St. Paul (In re*] *American Lumber* [*Co.*, 7 B.R. 519 (Bankr. D. Minn. 1979), *aff'd*, 5 B.R. 420 (D. Minn. 1980)], the lender was intimately involved with and controlled the debtor's payment of payables and wages, collection and use of accounts receivable and contract rights, purchase and use of supplies and materials, inventory sales, salaries of the principals, the employment of employees, and receipt of payments for sales and accounts receivable. Under those conditions a special relationship existed which imposed upon the lender the responsibilities of a fiduciary.

*Auto Specialties*, 153 B.R. at 479.

There is no genuine dispute that Comerica did not exercise the degree of control required under Michigan law to find that it owed MTG a fiduciary duty. Vercnocke has repeatedly testified that the Becker Group and its employees, not Comerica, had taken control of MTG and were running the day to day activities of MTG during the relevant time period.[321]  Vercnocke also testified that he was taking direction from B. Becker, not Comerica, regarding taking the over-

---

[321]  *See supra* Part IV.A.9.a of this Opinion.

formula advances.[322]  Vercnocke testified in his deposition:

> Well, in my opinion, [B.] Becker had taken control and was
> running the company and they were totally committed, and I --
> you know, as far as I was concerned, I was taking direction
> from them on what to do with regards to cash management,
> hiring and firing employees, and a variety of other things.
> . . . .
>
> I'm not denying that [my employment agreement with the
> Becker Group specifically states that my employment with the
> Becker Group "division will commence on the closing date as
> defined in the [A]sset [P]urchase [A]greement]. What I'm
> saying is that as a practical matter, and as far as how the events
> unfolded, [the Becker Group] had taken practical ownership
> and control, and I felt that I was their employee.[323]

In addition, in the July 24, 1995 letter Vernocke wrote to B. Becker, Vercnocke indicated that he

had followed the instructions of the Becker Group, and had relied on the Becker Group's "specific

representation that $500,000 would be deposited immediately to cover the over-formula

[advances]" when he requested the over-formula advances from Comerica, and that he was

waiting for the Becker Group to "provide direction . . . as to how to address Comerica's concerns"

and Comerica's "demand that [MTG] cover the over-formula immediately."[324]  Both Vercnocke's

deposition testimony and the July 24, 1995 letter show that Vercnocke was alleging that the

Becker Group, not Comerica, was in control of MTG.

Given this evidence, Vining cannot establish a fiduciary duty on the part of Comerica to

MTG.

---

[322]  *See supra* notes 125-129 and accompanying text.

[323]  Vercnocke Dep. Tr. (Docket # 584-45) at 70-71.

[324]  Letter to B. Becker from Vercnocke dated July 24, 1995 (Docket # 645-9).

174

Because there is no basis under Michigan law to find that Comerica had a fiduciary duty to MTG, and because of the Michigan statute of frauds discussed above, the Court must grant summary judgment in favor of the Comerica Defendants on Vining's breach of fiduciary duty claim.

### G. Vining's claim against the Comerica Defendants for tortious interference with contractual relations and business expectancies (Count XX)

In Count XX of his complaint, Vining asserts a claim against the Comerica Defendants for tortious interference with contractual relations and business expectancies. For the reasons stated in Parts V.B.3.c, V.C, V.D, and V.E of this Opinion, this claim is barred by Michigan's statute of frauds. But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

> In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy. The elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, . . . (3) an unjustified instigation of the breach by the defendant[, and (4)] damage. . . . The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848–49 (Mich. Ct. App. 2005) (citations omitted).

> [O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business

175

> relationship of another.  A wrongful act per se is an act that is
> inherently wrongful or an act that can never be justified under any
> circumstances. If the defendant's conduct was not wrongful per se,
> the plaintiff must demonstrate specific, affirmative acts that
> corroborate the unlawful purpose of the interference.

*Badiee v. Brighton Area Sch*s., 695 N.W.2d 521, 539 (Mich. Ct. App. 2005) (internal quotation

marks and citations omitted); *see also Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 696

(Mich. Ct. App. 2010) (internal quotation marks and citation omitted).  ("To establish that a

defendant's conduct lacked justification and showed malice, the plaintiff must demonstrate, with

specificity, affirmative acts by the defendant that corroborate the improper motive of the

interference.")  "Where the defendant's actions were motivated by legitimate business reasons, its

actions would not constitute improper motive or interference."  *Dalley* 788 N.W.2d at 696

(internal quotation marks and citation omitted); *see also Formall, Inc. v. Cmty. Nat'l  Bank of

Pontiac,* 421 N.W.2d 289, 293 (Mich. Ct. App. 1988) (citation omitted) ("[D]efendants motivated

by legitimate personal and business reasons are shielded from liability against [a claim for

interference with a business relationship].").

The actions by the "Bank and its Officers, Mr. Lyons and Mr. Collins," that are the basis

for both Vining's tortious interference with contractual relations claim and his tortious

interference with business expectancies claim, are (1) "wrongfully declar[ing] the Debtor in

default," and (2) taking "collection action under the Loan Documents."[325]  The Court has already

determined that Comerica's declaration of default and its collection efforts were permitted under

the Loan Documents.[326]  Vining has not alleged that Comerica's actions were per se wrongful, and

---

[325]  *See* Compl. at 52 ¶ 385.

[326]  *See supra* Part V.B.3.b of the Opinion.

has not specified any actions that Comerica took that would tend to show that Comerica acted "with malice and [was] unjustified in law for the purpose of invading the contractual rights or business relationship of [MTG]." *See Badiee*, 695 N.W.2d at 539; *Formall*, 421 N.W.2d at 293. There is no genuine dispute that Comerica's efforts to collect a debt owed to it from MTG, which was in default under the terms of the Loan Documents, was motivated by a legitimate business purpose. The Comerica Defendants thus are shielded as a matter of law from claims for tortious interference of business contracts or business relations, and are entitled to summary judgment on such claims.

The facts here are similar to the facts in *Formall*. In that case, a bank made two loans to Formall, Inc. ("Formall") for which Formall signed promissory notes, and the bank also granted Formall a revolving line of credit for which Formall signed a promissory note that was "due on June 30, 1981 or upon demand." 421 N.W.2d at 290-91.

On June 11, 1981, David Forshee ("Forshee"), the owner of Formall, executed an agreement under which he sold all of his stock in Formall to Form Plastics, Inc. ("Plastics"), a corporation wholly owed by Charles Jones ("Jones"). However, Plastics did not pay for the stock at the time of execution of the agreement. *Id.* at 291.

On June 30, 1981, the note on the revolving line of credit came due but Formall defaulted. After the default, Formall made interest payments on the note but did not make any payments on the principal. After attempts by the bank and Formall to come up with a payment solution failed, on October 23, 1981, the bank declared Formall in default on the revolving credit line. The bank also declared a default on the two promissory notes based on cross-default provisions in the notes. *Id.* The bank "then applied funds from accounts [Formall] maintained with [the bank] to the

177

unpaid notes . . . [and] also advised [Formall's] debtors to make payments directly to [the bank].

*Id.*

On October 28,1981, Formall merged with Plastics, with Plastics being the surviving company. Plastics changed its name to Formall. Jones and Forshee filed a 6-count complaint against the bank which included a count for tortious interference with contractual relations. In this claim, the plaintiffs alleged

> that [the] defendant bank, through its acts and omissions, tortiously interfered with their rights under their June 11, 1981, agreement by causing the contract to fail due to Jones' inability to pay Forshee for the stock. They assert that defendant deprived Formall of the necessary funds from which Forshee was to be paid. Specifically, plaintiffs state that defendant's acceptance of interest payments after the revolving credit note came due, its failure to make formal demand for payment, and its implicit encouragement of negotiations between Formall, Jones, and a third party for sale of Formall led them to believe that strict compliance with the terms of the note were not required. Therefore, plaintiffs posit, defendant's conduct operated as a waiver of strict compliance and imposed a duty on it to notify Formall that timely payment would be insisted upon prior to declaring a default.

*Id.*

The court held that the plaintiffs had "failed to state a cause of action." The court reasoned:

> In this case, defendant's actions in securing Formall's payment on a loan which was past due is not "per se wrongful." This Court recently held that defendants motivated by legitimate personal and business reasons are shielded from liability against this cause of action.

*Id.* at 293.

Finally, there is a further basis for granting summary judgment against Vining on his claims of tortious interference with contractual relations and tortious interference with business

178

expectancies. The Court concludes that Vining has not adequately pled such claims in his complaint or supported such claims at this summary judgment stage. In the complaint, Vining does not specify any contract that Comerica allegedly caused anyone to breach. A breach of a contract is a necessary element of a tortious interference with contractual relations claim. In addition, Vining does not specify what business relationship Comerica interfered with and thereby caused a termination of that relationship. The complaint pleads only in generalities.

Plaintiff's Summary Judgment Motion does not add any details to the allegations in the Complaint supporting these claims. Although Vining states that he is seeking judgment on all counts of the complaint, he does not mention these two claims in his Summary Judgment Motion. Vining's response to the Comerica Defendants' Summary Judgment Motion is likewise lacking in necessary detail regarding the contracts that were breached or relationships that were terminated, and does not even attempt to answer or develop an argument in opposition to the arguments of the Comerica Defendants regarding these claims. Vining's response states in its entirety:

> Count XX of the Complaint states a tortious interference claim based on Comerica's wrongfully declaring Debtor in default and taking impermissible collection actions. Comerica contends that the Trustee's tortious interference claim must be dismissed because its "actions were motivated by legitimate business interests" and constituted a proper "exercise of express rights under the loan documents." The Trustee's Contempt Briefs demonstrate otherwise. See AD 507, 529, and 545.[327]

For all the foregoing reasons, the Comerica Defendants are entitled to summary judgment in Vining's Count XX.

**H. Vining's claim against the Comerica Defendants for business defamation (Count XXI)**

---

[327] Docket # 639 at 43.

In Count XXI of the complaint, Vining asserts a claim against the Comerica Defendants for business defamation.[328]  For the reasons stated in Parts V.B.3.c, V.C, V.D, and V.E of this Opinion, this claim is barred by Michigan's statute of frauds.  But even assuming that this claim is not barred by the statute of frauds, the Comerica Defendants still are entitled to summary judgment on this claim.

Vining's allegations regarding this claim are lacking any specificity.  They do not state which of the Comerica Defendants made a defamatory statement; what allegedly defamatory statements were made; or to whom such allegedly defamatory statements were made.  In addition, although Vining states in Plaintiff's Summary Judgment Motion that he is seeking judgment on all counts of the complaint, he does not mention his claim for business defamation.  Vining's response to the Comerica Defendants' Summary Judgment Motion regarding his business defamation claim provides a little more information.  It states:

> Count [X]XI of the Complaint states a business defamation claim, based on, among other things, Comerica's 8/4/95 notification of Debtor's account debtors that (1) Debtor was in default of its loan obligations, and (2) account debtors must forward account payments directly to Comerica. See AD 1, ¶¶ 78, 345(F), 380(F), and 394-399. Such notification was false and defamatory, Comerica knew it was false, and it is actionable.[329]

Given the fact that the first statement was true; namely that the Debtor was in default as of August 4, 1995; and the second statement truthfully represented a right that Comerica could exercise in the event of a default by the Debtor, the Comerica Defendants are entitled to a

---

[328]  *See* Compl. at 53 ¶¶ 394-99

[329]  Docket # 639 at 40.

180

judgment as a matter of law on this claim.  Under Michigan law,

> [i]n order to establish liability for defamation, a plaintiff must
> prove: (1) a **false** and defamatory statement concerning the plaintiff,
> (2) an unprivileged publication to a third party, (3) fault amounting
> to at least negligence on the part of the publisher, and (4) either
> actionability of the statement irrespective of special harm or the
> existence of special harm caused by the publication.  *Rouch v.
> Enquirer & News of Battle Creek*, 427 Mich. 157, 173-174, 398
> N.W.2d 245 (1986).

*Michigan Microtech, Inc. v. Federated Publ'ns, Inc.*, 466 N.W.2d 717, 720 (Mich. Ct. App. 1991)

(emphasis added).  Because neither of the statements on which Vining bases his business

defamation claim was false, the Comerica Defendants are entitled to summary judgment on this

claim.

## I. Damages

The Comerica Defendants argue that damages are an element of each of the Pre-Petition

Claims, and that Vining has failed to present evidence of any damages that MTG suffered as a

result of Comerica's failure to advance further funds in late July 1995, or as a result of Comerica's

efforts to collect the debt MTG owed to it.[330]  The Comerica Defendants argue that although

Vining presented Michelle Gallagher ("Gallagher") as a damage expert, Gallagher's report and

testimony regarding the alleged damages MTG suffered must be disregarded.  This is so,

according to the Comerica Defendants, because Gallagher alleged that the measure of MTG's

damages for each of it Pre-Petition claims should be the value of MTG that Comerica destroyed.

The problem is that Gallagher estimated the value of MTG as of May 31, 1995, rather than as of

late July 1995 when Comerica took the complained of actions.  The Comerica Defendants point

---

[330] *See* Comerica Defs.' Br. (Docket # 584) at 21-22; Comerica Defs.' Reply in Supp. of Summ.
J. Mot. (Docket # 645) at 6.

out that Gallagher admitted that one cannot compare the financial condition or the net equity of

MTG on May 31, 1995 to the financial condition or the net equity of MTG in late July 1995.[331]

The Comerica Defendants allege that as of July 1995, the Becker Group and MTG agreed that the

net equity of MTG was worth *zero*.  According to the Comerica Defendants, this is evidenced by

fact that under the Asset Purchase Agreement, the only consideration from the Becker Group for

the purchase of the assets of MTG was the assumption of certain liabilities of MTG.[332]  There is

also evidence in the record that as early as May 1995, Vercnocke believed that MTG could not

survive in business.  In a letter to the Michigan Department of the Treasury dated July 26, 1996,

Vernocke stated: "I owned 15% of [MTG], 85% of [MTG] was owned by a person who quit the

company in **May of 1995 when it became apparent that [MTG], could not survive in**

**business."**[333] The Comerica Defendants argue that because it was known as early as May 1995

that MTG "could not survive in business," and because MTG was "worthless . . . at the end of

July 1995 . . . it has no damages and the case should be dismissed" for this additional reason.[334]

The Comerica Defendants argue further that the evidence in the record establishes that

even if MTG suffered damages as a result of having to file for relief under Chapter 11,

Comerica's actions were not the cause of MTG's bankruptcy filing, nor the cause of any damages

---

[331]  *See* Tr. of March 20, 2009 Dep. of Michelle K. Gallagher ("Gallagher Dep. Tr.") (Docket # 584-40) at 31-33, 96 ("I think it was completely apples and oranges between the date that I valued the company and the date that Becker terminated their agreement."); 132 ("What I know is the entity as a whole was completely different from May to the end of July or ultimately when bankruptcy was filed.").

[332]  *See* Asset Purchase Agreement (Docket # 598-3) at ¶¶ 1.1 through 1.5.

[333]  Docket # 584-12 (emphasis added); *see also* Vercnocke Dep. Tr. (Docket # 584-45) at 139-40.

[334]  *See* Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 27-28.

182

suffered as a result of the filing. During the summary judgment hearing, Vining's attorney Halbert asserted: "Comerica Bank accelerated the debt under the line of credit facility and the equipment facility notes, mortgage note, and a couple of related demand notes on equipment obligations. This forced the [D]ebtor into Chapter 11."[335] The Comerica Defendants argue that evidence in this case shows that this is not so. The Comerica Defendants rely on statements Vercnocke made in an affidavit and at his deposition. Vercnocke stated in an affidavit: "27. Injectronics' failure to timely pay its Debt to the Debtor in accordance with the terms of the parties' agreements and its theft of the Stolen Tooling were a proximate cause of the Debtor's Chapter 11 filing."[336] Later, when asked at his deposition about whether he had ever blamed Injectronics for the bankruptcy filing, Vercnocke testified:

> **A. Well, I might have said that -- I think there's really -- you know, there's a combination of events. They really intertwine. I don't know if any one event -- I can't say that any one event necessarily alone or as a standalone thing caused it, or I could say is directly related to the cause; but it was kind of a combination of, yeah, the Injectronics thing was a big problem. The fact that [the] Becker [Group] decided not to fund was a big problem, and that obviously created in the way that the [B]ank chose to handle their participation in that was a big problem. So I had a bunch of big problems going on.[337]**

With regard to the Pre-Petition Claims, it is not necessary for the Court to determine whether or not MTG suffered any damages as a result of Comerica's complained of actions,

---

[335]  Tr. of H'rg on Summ. J. Mots. (Docket # 679) at 42.

[336]  "Affidavit of Kirk Vercnocke in Support of Objection to Motion for Preliminary Injunction" (Docket # 584-31) at pdf. p. 7 ¶ 27.

[337]  Vercnocke Dep. Tr. (Docket # 584-45) at 113-14.

183

because the Court has already determined that summary judgment is required against each of the Pre-Petition Claims for other reasons.

## VI. Conclusion regarding the Pre-Petition Claims

The Comerica Defendants are entitled to summary judgment on all of the Pre-Petition Claims (Counts XV through XXI of Vining's Complaint). The Court will enter an order granting such summary judgment.

## VII. Summary judgment motions regarding the Post-Petition Claims

### A. Discussion of Vining's Post-Petition Claims

In part I.B of this Opinion, the Court summarized Vining's Post-Petition Claims. The Court now will discuss those claims in more detail, one by one, in discussing the summary judgment motion arguments concerning those claims.

#### 1. Vining's fraud on the court claim (Count I)

In Count I of the Complaint, Vining alleges a fraud on the court claim against the Taunt Defendants, Taunt's attorney, Plunkett & Cooney, Comerica and its attorneys, and certain of Comerica's officers and/or directors.[338] Vining alleges, in relevant part, that "[t]he Debtor's estate was damaged by repeated frauds on the court" and that these Defendants should be held "jointly and severally liable for such damages."[339] According to Vining, the actual damage amount is "the fair market value of [MTG's] assets as of the date of the [Comerica] Fee Agreement."[340] In

---

[338] Compl. at ¶¶ 211-23.

[339] *Id.* at ¶¶ 220-21.

[340] Trustee's Br. (Docket # 657) at 23; *see also id.* at 30.

addition to actual damages, Vining seeks punitive damages, attorney fees, and costs.[341]

In addition to monetary damages, Vining also seeks equitable relief based on his fraud on the court claim. Vining requests an order (1) vacating the orders that were obtained by fraud on the Court that benefitted Comerica; (2) disallowing Comerica's secured claim; and (3) requiring Comerica to "disgorge all monies received on such claim in this bankruptcy case" and all "profits earned on misappropriate[d] funds through the date the judgment is satisfied."[342]

Vining alleges that Taunt and his attorneys are liable for fraud on the court because (1) they were officers of the Court; (2) they had a duty to disclose to the Court the Comerica Fee Agreement and their conflict of interest based on that agreement, but failed to do so; (3) their conduct was "directed to the 'judicial machinery' itself;" (4) their conduct was intentional; and (5) their conduct deceived the Court into believing that Taunt and his attorneys were disinterested and impartial. And but for this belief, Vining alleges, the Court would not have entered the Comerica Settlement Order, the Comerica Claim Allowance Order, and the Comerica Relief From Stay Order, all of which benefitted Comerica at the expense of the estate.[343]

Vining alleges that Comerica and its attorneys, and certain of Comerica's officers and/or

---

[341] *See Id.* at 22, 24-26.

[342] Compl. at ¶¶ 217, 222; *see also* Trustee's Br. (Docket # 657) at 27, 30-32, 34.

[343] *See* Trustee's Br. (Docket # 657) at 25 (stating that "[i]n the Sixth Circuit, the elements of fraud on the court are conduct: (1) on the part of an officer of the court; (2) that is directed to the 'judicial machinery' itself; (3) that is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth; (4) that is a positive averment or is concealment when one is under a duty to disclose; (5) that deceives the court), 28 (arguing that "[t]here is overwhelming evidence of Defendants' actual fraudulent intent in committing fraud on the court"), 28-29 (arguing that "Taunt and counsel, officers of the court, committed fraud on the court in obtaining Orders for the benefit of Comerica"; and that "'Taunt and his attorneys did deceive the bankruptcy court, when they obtained the three orders in question without disclosing the [Comerica F]ee [A]greement, because each of the orders benefitted Comerica").

185

directors (the Comerica Defendants) are liable for the damages caused by Taunt's and his attorneys' fraud on the court, based on three theories. First, according to Vining, the Comerica Defendants are liable for Taunt's and his attorneys' fraud on the court "[b]y virtue of their control of [Taunt] and the administration of the Debtor's estate," which control gave rise to "duties of honesty and loyalty to the [C]ourt."[344] Second, Vining argues that the Comerica Defendants are liable for Taunt's and his attorneys' fraud on the court because they colluded with, conspired with, and/or aided and abetted Taunt and his attorneys in furtherance their common purpose of committing fraud on the Court.[345] Third, Vining argues that Taunt was the agent of Comerica and therefore, Comerica is liable for all of its agent Taunt's acts and omissions, including his failure to disclose the Comerica Fee Agreement.[346]

Vining argues that Plunkett & Cooney is liable for Taunt's fraud on the court based on the Court's Fraud on the Court Opinion. This is so because as the Court found in that opinion, Taunt had joined the law firm of Plunkett & Cooney as a shareholder before June 26, 1996, when Taunt and his new firm, Plunkett & Cooney, filed a new "Verified Statement of Disinterest for Trustee to Employ Counsel" stating that Plunkett & Cooney was disinterested, without disclosing the Comerica Fee Agreement. Based on this representation, on August 21, 1996, the Court approved the substitution of Plunkett & Cooney for Charles J. Taunt & Associates, P.C. as attorneys for Taunt. Then, on August 29, 1996, Taunt, while being represented by Plunkett & Cooney,

---

[344] Compl. at ¶¶ 214, 226-27; *see also* Trustee's Br. (Docket # 657) at 30 (stating, in relevant part, that "Defendants gained control of and converted virtually all estate assets").

[345] *See* Trustee's Br. (Docket # 657) at 25 & nn.7-8.

[346] *See* Compl. at ¶¶ 213, 218.

186

obtained entry of the Comerica Settlement Order.[347]   Plunkett & Cooney also filed its first interim

fee application on December 18, 1996, in which it made a limited, but clearly insufficient,

disclosure regarding the Comerica Fee Agreement.[348]

### a. The Court's Fraud on the Court Opinion

As discussed in part I.C of this Opinion, the Court, in its Fraud on the Court Opinion,

granted some of the relief that Vining is seeking in his Complaint.  In that opinion, the Court held

that "Taunt and his attorneys did commit a fraud on the court" by failing to disclose the Comerica

Fee Agreement, which they had a duty to disclose, and "then obtaining several orders from the

Court that benefitted Comerica."[349]  But the Court could not find, based on the record then before

it, "that Taunt and his attorneys *intended* to deceive the Court or to commit a fraud on the

court."[350]  Rather, the Court found that Taunt's and his attorneys' failure to disclose the Comerica

Fee Agreement was, at the least, "in reckless disregard" of their disclosure duties."[351]  The Court

held that "reckless disregard" was a sufficient state of mind to satisfy the third element of

Vining's fraud on the court claim.[352]  Given that finding, the Court held that the appropriate

remedy was to vacate the orders that benefitted Comerica: the Comerica Settlement Order; the

---

[347] *M.T.G*, 366 B.R. at 738,

[348] *Id.* at 739.

[349] *Id.* at 732, 747, 749.

[350] *Id.* at 732 (italics in original).

[351] *Id.* at 750.

[352] *Id.* at 750.

187

Comerica Claim Allowance Order; and the Comerica Relief From Stay Order.[353]

The Court held, however, that "none of the additional relief [Vining was seeking could] or should be granted at [that] time."[354] Although the Court found some support in case law for denying a creditor all substantive relief where that party committed a fraud on the court, the Court concluded that neither Comerica, nor Comerica's officers and directors, nor even Comerica's attorneys, had committed a fraud on the Court. The Court noted that Comerica and its officers and directors were not officers of the Court. But even assuming that Comerica and its officers and directors could be liable for the conduct of their attorneys, who are officers of the court, the Court could not find that Comerica's attorneys had committed a fraud upon the court. This is so, the Court reasoned, because Comerica's attorneys did not owe a duty to the Court to disclose the Comerica Fee Agreement. Rather, that duty belonged to Taunt, as the Chapter 7 Trustee, and to his attorneys, because "[t]he conflict of interest found by the district court was a conflict that Taunt had, as trustee, not a conflict of interest on the part of Comerica or its counsel."[355] And the Court concluded that on the record then before it, the Court could not find that Comerica and its counsel engaged in a conspiracy to defraud the bankruptcy estate.[356] For these reasons, the Court denied Vining's request "to deny all relief to Comerica as a creditor, in this bankruptcy case, such as, . . . disallowing Comerica's secured claim and requiring Comerica to disgorge all sums that it

---

[353] *Id.* at 748.

[354] *Id.* at 756.

[355] *Id.* at 756-57.

[356] *Id*. at 752.

188

ha[d] received on its claim."[357]  The Court left open, for later determination in this adversary proceeding, Vining's conspiracy theory against the Comerica Defendants.[358]

The Court also left open, for later determination in this adversary proceeding, the possibility that Vining could be awarded punitive damages and attorney fees.  With regard to punitive damages, the Court explained that "[w]ithout a finding of intent to deceive or defraud, punitive damages are not appropriate."[359]  The Court held that "[o]n the present record, and at [that] summary judgment stage," it could not find that Taunt and his attorneys had an intent to deceive or defraud the Court when it committed a fraud on the Court.[360]

With regard to attorney fees, the Court explained that an important factor, in deciding whether to award attorney fees and the amount of any such fees, was "whether the very substantial amount of work that . . . [was] done over the years in pursuing [the] fraud on the court allegations, [would] in the end actually benefit the bankruptcy estate, and if so, to what extent."[361]  The Court noted that while "Halbert and Vining have succeeded in obtaining a finding of fraud on the court and the vacation of three orders . . . it is still far from clear whether any of this ultimately will result in a benefit to the bankruptcy estate and its creditors."[362]

The question whether Vining is entitled to any additional relief, based on his fraud on the

---

[357] *Id.* at 756.

[358] *Id.* at 757.

[359] *Id.*

[360] *Id.*

[361] *Id.*

[362] *Id.*

189

court claim, is now before the Court.

### b. The Taunt Defendants' position on an award of additional relief against them based on Vining's fraud on the court claim

The Taunt Defendants argue that Vining is not entitled to any additional relief based on the fraud on the court claim. The Taunt Defendants argue that Vining's fraud on the court claim is governed by what is now Fed. R. Civ. P. 60(d), and that under this rule, "[t]he only remedy available for fraud on the court, is relief from the judgment or order."[363] Because the Court has already set aside the three orders that it concluded were procured by fraud on the Court, the Taunt Defendants argue, Vining has already been awarded all of the relief to which he is entitled.

The Taunt Defendants do, however, acknowledge that the Court has the inherent power to sanction parties for any misconduct, which would include any misconduct that was the basis for the fraud on the court claim. The Taunt Defendants note that in the Court's Fraud on the Court Opinion, the Court found it was inappropriate to award punitive damages against the Taunt Defendants, based on their acts/omissions that gave rise to the fraud on the court claim, without a finding that the Taunt Defendants intended to deceive and/or defraud the Court.[364]

With regard to Vining's request for attorney fees as a sanction for the Taunt Defendants' fraud on the court, the Taunt Defendants argue that the Court has discretion under its inherent powers to make "an award of attorney's fees and costs only if there is bad faith."[365] According to the Taunt Defendants, "[b]ad faith requires something more egregious than mere recklessness or

---

[363] *See* Taunt Defs.' Substitute Br. in Supp. of Mot. for Summ. J. ("Taunt Defs.' Br.") (Docket # 658) at 27.

[364] *Id.* at 26; *see also* Taunt Defs.' Resp. to Tr.'s Mot. for Summ. J. Against Defs ("Taunt Defs.' Resp.") (Docket # 638) at 8.

[365] Taunt Defs.' Br. (Docket # 658) at 26 (citation omitted)

negligence. Bad Faith requires an act that is motivated by an improper purpose."[366]

The Taunt Defendants argue that Vining has presented no evidence that supports a finding that they intended to deceive or defraud the Court, that they acted in bad faith, or that they had an improper purpose in failing to disclose the Comerica Fee Agreement. The Taunt Defendants argue that "[t]he uncontroverted evidence shows that the relationship between Taunt and [Comerica] was adversarial and the [Comerica Fee A]greement was a compromise."[367] According to the Taunt Defendants, the following testimony in the record supports a finding that the Taunt Defendants did not intend to deceive or defraud the Court and did not act in bad faith: that, after conducting research, Taunt's attorney Kevin M. Ball ("Ball") concluded that it was not necessary to disclose the Comerica Fee Agreement; that Comerica's attorney, Hertzberg, did not care whether or not Taunt disclosed the agreement and said so; and that the Taunt Defendants partially disclosed the agreement in several pleadings.[368] Under these circumstances, the Taunt Defendants argue, "the only appropriate remedy is disgorgement which has already taken place in this matter, and no further remedy by way of punitive damages or sanctions (attorney fees and costs) . . . is warranted."[369]

### c. Plunkett & Cooney's position on an award of additional relief against them based on Vining's fraud on the court claim

Plunkett & Cooney argues that "the primary problem with [Vining's] request [for

---

[366] *Id.* (citations omitted).

[367] *Id.* (record citations omitted).

[368] *Id.* at 26-27.

[369] *Id.* at 30.

additional damages, including attorney fees and punitive damages based on his fraud on the court claim,] is that he hasn't expanded on the record that was before this Court when it denied attorney fees and punitive damages in 2007."[370]  Plunkett & Cooney argues that because "[n]othing has changed," since the Court issued its Fraud on the Court Opinion, the Court should decline to award any further relief to Vining based on its fraud on the court claim for all of the same reasons the Court declined to do so in it Fraud on the Court Opinion.[371]  Plunkett & Cooney argues that "[t]here is still no evidence of intentional misconduct" which would support a punitive damage award, and Vining's summary judgment motion "cites no evidence that Taunt or his attorneys intended to mislead the Court."[372]

Plunkett & Cooney argues further that there is no basis to award any relief against them for the Taunt Defendants' commission of any fraud on the court that occurred before June 1, 1996. This is because that time period was before Taunt joined Plunkett & Cooney.  According to Plunkett & Cooney, most of Taunt's actions that form the basis of Vining's claims occurred before June 1, 1996, including entering into the Comerica Fee Agreement in February 1996; filing a "motion for authority to sell property at auction" in March 1996; stipulating to the Comerica Claim Allowance Order in April 1996; and settling the claim against the Becker Group in May 1996.[373]  Plunkett & Cooney concedes that "to the extent that there was something inappropriate about ['settlement of the lender liability case that was done [o]n June 26th, 1996'] . . . Plunkett

---

[370] Def. Plunkett & Cooney's Br. in Opp'n to Trustee's Mot. for Default J. or in the alternative, for Summ. J. Against Defs. ("Plunkett & Cooney's Opp'n Br.") (Docket # 622) at 21.

[371] *Id.*

[372] *Id.*

[373] Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 114-15.

[&] Cooney would be responsible, but . . . the deal was already negotiated before Taunt came with the firm[.]"[374]  It also concedes that it would have liability if there was anything inappropriate about the settlement of the claim against Injectronics.[375]  But, Plunkett & Cooney argues, there was nothing inappropriate about settling the lender liability claims or the claim against Injectronics.

Plunkett & Cooney argues further that there is no claim against it based on a successor liability theory because Plunkett & Cooney did not merge with, and is not the successor company of, Charles J. Taunt & Associates, P.C.[376]  Plunkett & Cooney argues further that, even if it were found to be a successor of Charles J. Taunt and Associates, P.C.,  it is still not liable for the Taunt Defendants' fraud on the court which occurred before Taunt joined Plunkett & Cooney, because none of "Michigan's five exceptions to successor non-liability" apply.[377]

Finally, Plunkett & Cooney argues that Vining cannot show that the Taunt Defendants' fraud on the court "caused a present injury" to the bankruptcy estate.[378]  Plunkett & Cooney argues:

> The Trustee's claims [for breach of fiduciary duty, fraud, and legal malpractice], are based on the alleged impairment of actions against Comerica, Injectronics, Richard May, and the Becker Group. The estate can now pursue *all* of these claims. If it had a valid claim

---

[374]  *Id.* at 115.

[375]  *Id.*

[376]  Def. Plunkett & Cooney's Br. in Supp. of Mot. for Summ. J. ("Plunkett & Cooney's Br.") (Docket # 578) at 1-2, 16-17; Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 113-15.

[377]  Plunkett & Cooney's Br. (Docket # 578) at 2, 16-20; Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 114-15.

[378]  Plunkett & Cooney's Br. (Docket # 578) at 16-17.

193

before, it has a valid claim now. Consequently, the Trustee cannot establish that Plunkett & Cooney caused a present injury.[379]

According the Plunkett & Cooney, because a present injury is an element of Vining's fraud on the court claim, this claim fails and must be dismissed.

In addition to asserting a claim for additional relief against Plunkett & Cooney based on that firm's own actions, which Vining alleges were a fraud on the court, Vining argues that Plunkett & Cooney is liable for fraud on the court based on any actions taken by the other Defendants. This is so, according to Vining, because Plunkett & Cooney allegedly participated in a conspiracy with the other Defendants to commit a fraud on the court, and aided and abetted actions taken in furtherance of the conspiracy.[380]

Plunkett & Cooney argues that both of these secondary theories of liability fail. It argues that Vining's aiding and abetting theory fails, because Vining did not plead an aiding and abetting claim in his complaint, and the Court previously denied Vining's untimely motion to file an amended complaint to add that claim.[381] Plunkett & Cooney argues that Vining's conspiracy theory also fails, because in its Fraud on the Court Opinion, this Court was unable, on the record before it, to find a conspiracy between the Defendants, nor could the district court find a conspiracy when it affirmed the Fraud on the Court Opinion, and there is no new evidence to support Vining's conspiracy theory that would justify a different result.[382]

---

[379] *Id.* at 2; *see also id.* at 20-26.

[380] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 11.

[381] *Id*. at 2, 11-15.

[382] *Id.* at 16-17.

194

Plunkett & Cooney argues that "[t]he record in this case actually shows that there was *no* conspiracy."[383]  It points out that Vining "relies heavily" on the testimony of Hertzberg, Comerica's attorney during the negotiations that led up to the execution of the Comerica Fee Agreement.  As Plunkett & Cooney notes, Hertzberg testified that those negotiations were "'adversarial,'" and that he had no intent to enter into any conspiracy "'with anybody, for anything.'"[384]  Plunkett & Cooney argues that because Vining has offered no evidence contrary to Hertzberg's testimony, there is no evidence in the record now to support Vining's conspiracy theory, just as there was no evidence to support such a theory when the Court issued its Fraud on the Court Opinion.

### d.  The Comerica Defendants' position on an award of relief against them based on Vining's fraud on the court claim

The Comerica Defendants first note that in its Fraud on the Court Opinion, the Court did not find that Comerica, or its officers, or its attorneys committed a fraud on the court.  Rather, the Court only found that the Taunt Defendants committed a fraud on the court.  The Comerica Defendants argue that they cannot be liable for the fraud on the court committed by the Taunt Defendants, either directly, or indirectly under Vining's theory that the Comerica Defendants conspired with, and/or aided and abetted Taunt and his attorneys in concealing the existence of the Comerica Fee Agreement from the Court.[385]

The Comerica Defendants argue that "[t]he objective facts show that Comerica did not

---

[383]  *Id.* at 17 (italics in original).

[384]  *Id.* at 18.

[385]  Comerica Defs.' Br. (Docket # 584) at 25-27.

control Taunt's administration of the Chapter 7 estate."[386]  Nor, they argue, can Vining show that Comerica "'controlled the day-to-day operations of the [D]ebtor.'"[387]  Relying on *Boyd v. Sachs* (*In re Auto Specialties Mfg. Co.*), 153 B.R. 457, 479 (Bankr. W.D. Mich. 1993), *opinion adopted*, 153 B.R. 503 (W.D. Mich. 1993), Comerica argues that "Comerica would have had to exercise control over substantially all aspects of the finances and operations of the [D]ebtor to have a fiduciary duty to MTG."[388]  Comerica notes that Vercnocke "testified that it wasn't Comerica that was in control over the [D]ebtor, it was [the] Becker [Group].  He even sent a letter to Bruce Becker on July 24[, 1995] saying that he relied on [the] Becker [Group] as their employee and not Comerica with respect to the over[-]formula advances."[389]

The Comerica Defendants allege that Taunt and Ball, not Comerica, controlled the administration of the bankruptcy estate.  One example of this that the Comerica Defendants point to is Taunt's and Ball's negotiations with the Becker Group's counsel over MTG's potential claims against the Becker Group.  Taunt's ultimate settlement of MTG's claims against the Becker Group was contrary to the wishes of Comerica.[390]  The Comerica Defendants also point out that "Taunt's first two fee applications show over 158 hours of time dedicated to matters not covered by the [Comerica Fee A]greement."[391]  Comerica also points to Ball's rejection of

---

[386]  *Id.* at 29

[387]  *Id.* at 30.

[388]  Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 25.

[389]  *Id*. at 26.

[390]  Comerica Defs.' Br. (Docket # 584) at 30.

[391]  *Id.*

196

Comerica's first offer of settlement, and Ball's refusal to allow Taunt to sign a settlement agreement with release language that Ball did not approve of, as evidence that Comerica did not control Taunt's administration of the estate.[392]

Another example Comerica points to is Ball's investigation of potential lender liability claims against Comerica. According to Comerica, this investigation "included interviewing Halbert and Vercnocke, ["numerous conversations with . . . the attorneys for the individual guarantors";] deposing Comerica's Michael Collins, researching the claims and reviewing documents."[393] Comerica argues that the reason Taunt decided to settle those claims was not because Comerica controlled Taunt, but because "Ball concluded from his analysis that 'the claims against Comerica were and are a sham.'"[394]

With regard to Vining's claim that the Comerica Defendants aided and abetted Taunt's breaches of fiduciary duty, the Comerica Defendants argue that Taunt did not plead an aiding and abetting claim, and was denied leave to amend his complaint to add such a claim, so the Court should not consider this claim.[395] The Comerica Defendants argue further that, even assuming the Court could consider an aiding and abetting claim, Vining has not established all of the elements of this claim. The Comerica Defendants argue that Comerica had no knowledge of any breach of fiduciary duty by Taunt, because Comerica's attorney, Hetzberg, did not believe that Taunt had a duty to disclose the Comerica Fee Agreement. The Comerica Defendants argue further that they

---

[392] *Id.*

[393] *Id.*; *see also* Docket # 584-23 at 2-4.

[394] Comerica Defs.' Br. (Docket # 584) at 30; Docket # 584-23 at 2-4.

[395] *See, e.g.*, Comerica Defs.' Resp. to Vining's Mot. for Summ. J. (Docket # 634, "Comerica's Resp. Br.") at 29-31.

did not provide substantial assistance to Taunt's breach of his duty to disclose. Rather, Hertzberg told Taunt that the question whether there was a duty to disclose the agreement was Taunt's "'problem to figure out and, if necessary, comply with.'"[396] According to the Comerica Defendants, Comerica was only pursuing its interests as "a first priority security creditor, with an interest in liquidating the collateral to recover on its loans."[397] The Comerica Defendants argue that Comerica's interests were aligned with Taunt's legitimate and proper interest, as Trustee, in liquidating Comerica's collateral in a way that would maximize proceeds for the estate. And the Comerica Defendants argue that "[t]here is no evidence that Taunt liquidated any asset for unreasonably low value" nor would that have been in Comerica's interest to assist in him doing so.[398]

With regard to Vining's conspiracy theory of liability, the Comerica Defendants argue that, as a matter of law, they cannot be liable indirectly, as co-conspirators, for any tort that they cannot commit directly. The Comerica Defendants argue that because none of them was an officer of the Court, they could not be directly liable for fraud on the court. The Comerica Defendants argue that "Sixth Circuit cases limit liability for fraud on the court to counsel, and do not even provide for liability of a party who is complicit in the fraud."[399]

The Comerica Defendants argue further that although their attorneys were officers of the

---

[396] *Id.* at 31; *see also id.* at 25 (record citations omitted) (arguing: "In Hertzberg's mind, disclosure was '[Taunt's] problem to figure out ... [I]t wasn't [Comerica's] issue ... Disinterestedness, notice, whatever, I'm not [T]rustee's counsel. That's not my issue.' Hertzberg was confident that Comerica had absolutely no obligation to disclose."), 26 (same).

[397] *Id.* at 38.

[398] *Id.*

[399] *Id.* at 23 (citing *Okros v. Angelo Iafrate Const. Co.*, 298 F. App'x 419, 427 (6th Cir. 2008)).

198

Court, those attorneys did not have a duty to disclose the Comerica Fee Agreement to the Court, and they could not be directly liable for a fraud on the court claim. In addition, the Comerica Defendants argue that their attorneys did not have a fiduciary duty to MTG or the bankruptcy estate, but rather had a duty only to their client Comerica, so Comerica's attorneys did not have any conflict of interest.[400] According to the Comerica Defendants, it follows that because they were not legally capable of directly committing the underlying legal wrong (fraud on the court) on which the conspiracy claim is based, Vining's conspiracy claim fails, as a matter of law.[401] For this argument, the Comerica Defendants rely on *CNH Capital America LLC v. Hunt Tractor, Inc.*, 568 F. App'x 461, 472-73 (6th Cir. 2014) and *Applied Equipment Corporation v. Litton Saudi Arabia Limited*, 869 P.2d 454, 457 (Cal. 1994).

But even if a conspiracy to commit fraud on the court was a possible viable claim against Comerica's attorneys, the Comerica Defendants argue, there is no evidence to support such a claim against them. Comerica points out that "four judges and the [United States] Trustee" examined Taunt's state of mind when he failed to disclose the Comerica Fee Agreement and "[n]one concluded that Taunt intended to deceive the Court, let alone that he conspired with Comerica to do so."[402] According to the Comerica Defendants, there is also no evidence that Hertzberg, the attorney for Comerica who negotiated with Taunt and Ball over the terms of the Comerica Fee Agreement, had an intent to conspire with Taunt to hide the Comerica Fee Agreement from the Court. Hertzberg denies conspiring with Taunt, and testified that he left it

---

[400] *Id.* at 22-25, 27-28.

[401] Tr. of Hr'g on Summ. J. Mots. (Docket # 733) at 62-63.

[402] *Id.*

entirely up to Taunt to decide whether Taunt disclosed the Comerica Fee Agreement to the Court. Hertzberg testified that he told Taunt that whether to disclose the Comerica Fee Agreement was Taunt's "problem to figure out," not his problem.[403]  The Comerica Defendants note that both Hertzberg and Ball testified that they negotiated the terms of the Comerica Fee Agreement as adversaries, not co-conspirators, and that Ball testified that reaching that agreement was difficult.[404]

Finally, the Comerica Defendants argue that Vining has already received all of the relief he is entitled for his fraud on the court claim.  That, they say, is because the appropriate remedy for fraud on the court is vacating the order(s) obtained by the fraud, not monetary damages, and all of the orders procured by the fraud on the Court have been vacated.[405]  The Comerica Defendants argue further that "the Court has already imposed sufficient penalties in this case" for Taunt's non-disclosure of the Comerica Fee Agreement.[406]  They note that "[t]he district court, on appeal, characterized the penalties imposed previously [(vacation of the three orders the Court had found were procured by fraud on the Court)] as 'harsh' but 'necessary.'"[407]  And the Comerica Defendants note that Taunt was ordered to disgorge all fees,  which is "a significant sanction for non-disclosure."[408]  In summary, the Comerica Defendants argue that there is no legal basis for

---

[403] Comerica's Resp. Br. (Docket # 634) at 29-31.

[404] *See id.* at 24.

[405] *Id.* at 28.

[406] *Id.*

[407] *Id.* (citing *Taunt v. Vining* (*In re MTG, Inc.*), 400 B.R. 558, 569 (E.D. Mich. 2009)).

[408] *Id.*

200

awarding any other remedy than what has already been ordered.

### e. Explanation of the Court's ruling

#### 1. Taunt and his attorneys committed fraud on the court.

To date, this Court has found that Taunt and his law firms, Charles J. Taunt and Associates, P.C. and Plunkett & Cooney (Taunt's attorneys while he was Trustee) committed fraud on this Court. The Court so found in its 2007 Fraud on the Court Opinion, and that was affirmed on appeal by the district court. The Court now reiterates, and incorporates by reference, its previous finding, and the facts and reasoning supporting that finding. As to Plunkett & Cooney, these include the Court's findings that there was fraud on the court, both before *and* after the June 1, 1996 date when Taunt and Ball joined Plunkett & Cooney. These include the continued failures to properly and fully disclose the Comerica Fee Agreement, and in moving for and obtaining the Comerica Settlement Order, on July 3, 1996 and August 29, 1996, respectively.

#### 2. The Comerica Defendants are not liable for fraud on the court.

The Court concludes that none of the Comerica Defendants committed fraud on the Court, or can be held liable based on fraud on the Court. This is so for the following reasons.

**First**, neither Comerica nor the other Comerica Defendants (who were bank officers, namely, Ronald Marcinelli; Steve Lyons; Paul Dufault; and Michael Collins) can be found to have committed fraud on the Court *directly*. Any *direct* theory of fraud on the Court against the Comerica Defendants fails because fraud on the court can only be committed by an officer of the court, which in this case means the Trustee Taunt and one or more of the attorneys in this case. None of the Comerica Defendants was such an officer of the Court. The Court reiterates the point it made about this in its Fraud on the Court Opinion:

> [H]ere, the fraud on the court was committed by Taunt and his counsel, not by Comerica or Comerica's counsel. Comerica itself was not an "officer of the court," the first element necessary for fraud on the court. Comerica's attorneys in the bankruptcy case were officers of the court. But even if one assumes that Comerica could be deemed to commit a fraud on the court because of fraudulent conduct by its attorneys, the present record does not permit the Court to find, based on the summary judgment motion filed by Halbert and Vining, that any of Comerica's attorneys committed a fraud upon the court. The duty to disclose the Comerica Fee Agreement was a duty owed by Taunt, as the Chapter 7 trustee, and by his appointed counsel. The conflict of interest found by the district court was a conflict that Taunt had, as trustee, not a conflict of interest on the part of Comerica or its counsel.[409]

None of Comerica's attorneys are Defendants in this case. And even if they were Defendants, Comerica's attorneys did not commit any acts or omissions that would satisfy the required elements for finding fraud on the court. Fraud on the court is limited, among other ways, to conduct by "an officer of the court" that is directed to the court itself, and "[t]hat is a positive averment or is concealment when one is under a duty to disclose."[410] The Comerica attorneys

---

[409]  *M.T.G.,* 366 B.R. at 756-57.

[410]  As the Court stated in its Fraud on the Court Opinion,

> The elements of fraud on the court are: conduct:
>
> > (1) On the part of an officer of the court;
> >
> > (2) That is directed to the "judicial machinery" itself;
> >
> > (3) That is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth;
> >
> > (4) That is a positive averment or is concealment when one is under a duty to disclose;
> >
> > (5) That deceives the court.
>
> *Workman v. Bell*, 245 F.3d 849, 852 (6th Cir. 2001)(citing *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993)).

202

were not in the same position as Taunt and his attorneys; it was Taunt and his attorneys, not Comerica's attorneys, who obtained the various orders at issue from this Court without complying with their duty to disclose the Comerica Fee Agreement. And the Court reiterates its previous point, that "[t]he duty to disclose the Comerica Fee Agreement was a duty owed by Taunt, as the Chapter 7 Trustee, and by his appointed counsel. The conflict of interest found by the district court was a conflict that Taunt had, as Trustee, not a conflict of interest on the part of Comerica or its counsel."[411] The district court agreed with these points in its 2009 opinion affirming this Court's Fraud on the Court Opinion.[412]

**Second**, neither Comerica nor the other Comerica Defendants can be found liable *indirectly* for fraud on the court. Vining's *indirect* liability theories — aiding and abetting and conspiracy — fail as a matter of law. Even if Vining's theory that the Comerica Defendants aided and abetted Taunt's fraud on the court could be viewed as a valid legal theory, it was not pled in Vining's complaint, as the Comerica Defendants point out. And this Court denied Vining leave to amend his complaint to add an aiding and abetting claim.[413] The Court stands by that decision.

The Court also agrees with the Comerica Defendants that they cannot be liable for the fraud on the court by Taunt and his attorneys based on a conspiracy theory, for the following reason. Because the Comerica Defendants were not legally capable of directly committing the

---

*M.T.G.,* 366 B.R. at 748.

[411] *Id.* at 757.

[412] *M.T.G.,* 400 B.R. at 569.

[413] *See* Docket # 162 at 2, ¶¶ 2.E, 4 (Vining motion seeking, among other things, leave to amend complaint); Docket # 184-1 (Vining's proposed amended complaint); Docket # 203 (Order denying leave to amend complaint, among other rulings).

fraud on the court in this case (because they were not officers of the court), they cannot be held liable for fraud on the court based on a conspiracy theory, as a matter of law. The Court agrees with this proposition, which is supported by the following cases cited by the Comerica Defendants. *CNH Capital America LLC v. Hunt Tractor, Inc.*, 568 F.App'x. 461, 472-73 (6th Cir. 2014) (holding that a party not directly liable for a fraudulent transfer under Kentucky law could not be liable indirectly, for conspiracy to commit fraudulent transfer, because a party "cannot be liable for conspiring to perform a tort he could not commit as a matter of law"); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal.1994) ("By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, *i.e.*, that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty.").

For these reasons, the Comerica Defendants are not liable, either directly on indirectly, for fraud on the court.

In addition, even if the Court could find any of the Comerica Defendants liable for fraud on the court, on any theory, the Court would exercise its discretion not to award any relief against any of the Comerica Defendants. This is so for the reasons explained in Part VII.A.1.e.4 below.

### 3. The issue of intent to deceive by Taunt and his attorneys

In its Fraud on the Court Opinion, this Court found that Taunt and his attorneys met the intent requirement to establish fraud on the court. That requirement is that the officer of the court's conduct "is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth." This Court found that the conduct by Taunt and his attorneys met at least the "reckless disregard" part of this element. The Court also found, however, that on the summary judgment

record then before it, the Court could not determine whether the conduct was "intentionally false" or whether Taunt and his attorneys intended to deceive the court.[414]

The same is true now, on the present summary judgment motions and the present record. Genuine issues of material fact prevent the Court from finding whether or not Taunt or his attorneys intended to deceive the court, or whether their conduct was "intentionally false." A trial would be necessary to enable the Court to make findings on these issues. For the reasons discussed below, however, a trial will not be necessary.

### 4. The remedies for fraud on the court in this case

### i. Remedies available generally

The federal courts have "inherent power" to order appropriate equitable relief to remedy fraud on the court. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248-51 (1944); *Demanjuk v. Petrovsky*, 10 F.3d 338, 352, 356 (6th Cir. 1993).

Bankruptcy courts have such inherent power. *See, e.g., Lavander v. Prober* (*In re Levander*), 180 F.3d 1114, 1119 (9th Cir. 1999). Bankruptcy courts also have statutory power to remedy a fraud on the court, under various sections of the Bankruptcy Code. They have this power generally under 11 U.S.C. § 105(a), which permits the bankruptcy court to "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and to take "any action . . . necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *See generally In re Gorges*, 590 B.R. 771, 791-94 (Bankr. E.D.

---

[414] *M.T.G.,* 366 B.R. at 750-52.

Mich. 2018).[415]  And bankruptcy courts have this power in specific situations, such as under 11

U.S.C. § 1144, which permits the bankruptcy court to revoke a confirmation order in a Chapter 11

case if it "was procured by fraud."  *See Tenn-Fla Partners v. First Union Nat'l Bank of Fla.* (*In re*

*Tenn-Fla Partners*), 226 F.3d 746, 751 (6th Cir. 2000) (affirming the revocation of a confirmation

order under § 1144 because of fraud on the court).

The power to remedy fraud on the court "is necessary to the integrity of the courts, for

'tampering with the administration of justice . . . involves far more than an injury to a single

litigant.  It is a wrong against the institutions set up to protect and safeguard the public.'"

*Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas Glass*, 322 U.S. at 246).  The courts are

"institutions in which fraud cannot complacently be tolerated consistently with the good order of

society."  *Hazel-Atlas Glass*, 322 U.S. at 246.

The Court has significant discretion in determining, in each case, what remedies should be

imposed for a fraud on the court.  *United States v. Schilling* (*In re Big Rivers Elec. Corp.*), 355

F.3d 415, 436 (6th Cir. 2004) (citation omitted) (a bankruptcy court "'is given a great deal of

latitude in fashioning an appropriate sanction'"); *see also Chambers*, 501 U.S. at 44-45 (courts

have "discretion . . . to fashion an appropriate sanction for conduct which abuses the judicial

process"); *Hazel-Atlas Glass*, 322 U.S. at 248 (courts have "flexibility" to "accord all the relief

necessary to correct the particular injustices involved").  But, as the cases have repeatedly held,

such discretion must be exercised "with restraint."  *See Chambers*, 501 U.S. at 44 (citation

---

[415]  "Federal courts, including bankruptcy courts, have the discretion to award attorney fees and expenses as a sanction for misconduct under their inherent authority" and "[t]he power granted in Section 105(a) carries with it the authority to 'award attorney fees as a sanction for misconduct.' *In re Mehlhose*, 469 B.R. 694, 711 (Bankr. E.D. Mich. 2012)."  *Gorges*, 590 B.R. at 791-94.

omitted) ("Because of their very potency, inherent powers must be exercised with restraint and discretion"); *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 12 (1st Cir. 1985) (citation omitted) (inherent powers "must be exercised with restraint and discretion"); *Levander*, 180 F.3d at 1119 (same).

Permissible remedies for fraud on the court include, but are not necessarily limited to, the following:

• vacating order(s) or judgment(s) obtained by fraud on the court. *E.g.*, *Chambers*, 501 U.S. at 44; *Hazel-Atlas Glass*, 322 U.S. at 247-48, 251; *Demanjuk*, 10 F.3d at 356; *Lavander*, 180 F.3d at 1118-1119 ("When a court vacates a judgment obtained by fraud, it not only rids itself of the defilement caused by the fraud, but also restores balance and fairness between the parties by removing the benefit gained by the party that committed the fraud.").

and

• requiring the offender to pay attorney fees incurred by an opposing party because of the fraud on the court. *See Chambers*, 501 U.S. at 46 (citations omitted) (explaining that "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party" and that such sanctions serve the "dual purpose of 'vindicat[ing] judicial authority . . . and mak[ing] the prevailing party whole for expenses caused by" his opponent); *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 1176, 1179 (1946); *Tenn-Fla Partners*, 226 F.3d at 751 (affirming bankruptcy court's award of attorney fees for fraud on the court).

And as noted earlier, two additional forms of relief that Vining seeks for the fraud on the court, among others, are compensatory damages and punitive damages.

There is some case law indicating that compensatory damages are not appropriate relief for fraud on the court. *See GAF Holdings, LLC v. Rinaldi* (*In re Farmland Indus., Inc.*), 639 F.3d 402, 405 (8th Cir. 2011) (citation omitted) ("[T]he remedy . . . [of] money damages . . . is at odds with a fraud on the court claim, for which the remedy is setting aside the fraudulently obtained court judgment."); *Morris Healthcare & Rehab. Ctr, LLC v. Berish* (*In re Morris Senior Living, LLC*), 526 B.R. 750, 760 (N.D. Ill. 2014 (same); *see also Interstate Fire & Cas. Co. v. 1218 Wisconsin, Inc.*, 136 F.3d 830, 836 (D.C. Cir. 1998) ("Because [an action for fraud on the court] does not sound in tort, the only remedy available . . . is vacatur of the [judgment allegedly procured by fraud on the court].").

As for punitive damages, there is a Sixth Circuit case from 2000 suggesting that the bankruptcy court has discretion to award punitive damages for fraud on the court. *See Tenn-Fla Partners*, 226 F.3d at 751 (citations omitted) (affirming the bankruptcy court's denial of punitive damages for fraud on the court, but noting that "such an award lies within the discretion of the trial court"). But in a later case not involving fraud on the court, decided in 2013, the Sixth Circuit held that unlike Article III courts, bankruptcy courts lack authority to award "serious noncompensatory punitive damages." *See Adell v. John Richards Homes Bldg. Co., L.L.C.* (*In re John Richards Homes Bldg. Co., L.L.C.*), 552 F. App'x. 401, 415 (6th Cir. 2013) (citation omitted). Rather, bankruptcy courts may impose, at most, only "mild noncompensatory punitive damages." *Id*. In the *Adell* case, the Sixth Circuit did not define what is a "mild" punitive damages award as opposed to a "serious" one, except to hold that "a $5,000 sanction is not considered a serious punitive sanction," and that a $2.8 million punitive damages award is a "serious" one, and thus is forbidden. *See id.* at 415, 416.

Given the foregoing, there is some question about whether this Court has authority to award either compensatory damages (other than attorney fees) or punitive damages, as remedies for fraud on the court. But it is not necessary for the Court to decide the extent of its authority to impose such remedies. For other reasons stated below, the Court will not be awarding either form of damages in this case for fraud on the court.

## ii. Remedies already imposed in this case, or considered and rejected

In this case, the following remedies already have been either ordered, or, in one instance, considered and rejected, for the fraud on the court by Taunt and his attorneys, and for their conflicts of interest, related to the Comerica Fee Agreement:

1. Taunt was disqualified and removed as the Chapter 7 Trustee in the *MTG* bankruptcy case;[416]

2. Taunt's attorneys were disqualified from representing the Chapter 7 Trustee;

3. With certain exceptions discussed below, the Taunt Defendants and Plunkett & Cooney were ordered to disgorge all fees that they had been paid by the bankruptcy estate,[417] and they did so, by

---

[416] This was ordered by the district court, as part of its decision in the first appeal to the district court. Copies of the district court's two orders from that first appeal, which include the disqualification/removal of Taunt, are at Docket ## 721 and 762 in Case No. 95-48268. The district court's decision in the first appeal is described in detail in this Court's Fraud on the Court Opinion, 366 B.R. at 743-45.

[417] The impetus for this disgorgement requirement was the district court's decision in the first appeal, in which the district court "den[ied] 100% of the attorney fees" to Taunt and his counsel. (*See* Docket ## 721, 762 in Case No. 95-48268; Fraud on the Court Opinion, 366 B.R. at 743-44). The disgorgement requirement was imposed by Bankruptcy Judge Jeffrey R. Hughes, who was assigned the *MTG* case before the undersigned judge was appointed. In an opinion and an amended order, each filed July 29, 2004 (Docket ## 1252, 1253 in Case No. 95-48268), Judge Hughes interpreted the district court's order to require disgorgement of all fees that had been paid by the bankruptcy estate. Judge Hughes ordered Taunt and Plunkett & Cooney "to each return to the MTG bankruptcy estate whatever payments [they] received from property of the estate as fees for their representation of the bankruptcy estate as its trustee and its attorneys respectively." (Am. Order, Docket # 1252 in Case No. 95-48268, at 1). But Judge Hughes also ordered that "neither Mr. Taunt nor Plunkett & Cooney are required to turnover to the bankruptcy estate any payments received by either from Comerica Bank (whether

repaying to the bankruptcy estate a total of $42,058.50 in fees;[418]

4.  Taunt and his attorneys were precluded from receiving any fees from the bankruptcy estate for their work in the *MTG* bankruptcy case;

5.  This Court considered, but did not grant, a motion filed by Halbert to remove Taunt from serving as a Chapter 7 bankruptcy trustee in any other bankruptcy case in this district;[419]

6.  The district court vacated this Court's allowance of a super-priority claim in favor of

---

received directly from Comerica Bank or indirectly through a deduction against proceeds from the liquidation of its collateral) on account of their agreement to liquidate Comerica Bank's collateral on its behalf." (*Id.*) As to the latter fees, Judge Hughes opined, the undersigned judge could determine, in later proceedings about fraud on the court issues, whether to order Taunt and his counsel to disgorge those fees. (*See* Op. (Docket # 1252 in Case No. 95-48268) at p. 7; *see also* Op. filed October 14, 2004 (Docket # 1312 in Case No. 95-48268) at p. 6).

The foregoing amended order, filed July 29, 2004 (Docket # 1252), amended an order that Judge Hughes had entered on December 27, 2001, which appears at Docket # 1251 in Case No. 95-48268. That order had been entered after Judge Hughes issued an oral bench opinion on the subject of disgorgement, on November 30, 2001. A transcript of that oral bench opinion is at Docket # 921 in Case No. 95-48268 (the bench opinion is at pp. 49-63 of that transcript).

[418]  The undersigned judge quantified the fees that had to be repaid under Judge Hughes's Orders, described in the preceding footnote of this Opinion. This was done in the Court's order entered on April 16, 2010, which required Plunkett & Cooney to pay back to the estate fees totaling $29,888.00, and required Charles J. Taunt & Associates to pay back to the estate fees of $12,170.50. (Order Granting in Part, and Denying in Part, Trustee's Motion for Disgorgement of Fees, etc. (Docket # 1571 in Case No. 95-48268) at pp. 1-2.) These amounts were repaid to the estate on May 18 and 20, 2010. (*See* Trustee Vining's Interim Report for the Period Ending 3-31-11 (Docket # 1607 in Case No. 95-48268) at 1-2, Form 2 at pdf p. 10).

[419]  The decision to deny that relief was made by Bankruptcy Judge Jeffrey R. Hughes, during the time before the undersigned judge was appointed and received assignment of the *MTG* bankruptcy case. After the remand from the first district court appeal, Judge Hughes considered and denied a motion by Halbert seeking an order under 11 U.S.C. § 324(b), removing Taunt as a trustee in all other cases in this district. The motion by Halbert, and the order by Judge Hughes, are at Docket ## 753 and 890, respectively, in Case No. 95-48268. Judge Hughes stated his reasons for denying the motion in an oral bench opinion. A transcript of that bench opinion is at Docket # 891 in Case No. 95-48268 (the bench opinion is at pages 7-17 of that transcript).

Comerica, under 11 U.S.C. § 507(b), that Taunt and his attorneys had obtained;[420]

7.  This Court vacated the three orders that benefitted Comerica and that the Court found were obtained by fraud on the court, namely, the Comerica Settlement Order; the Comerica Claim Allowance Order; and the Comerica Relief from Stay Order.[421]  This allowed Vining to litigate the merits of all of his Pre-Petition Claims, which are discussed in Parts IV-VI of this Opinion.

In addition to the foregoing remedies, of course, Taunt and his attorneys suffered the embarrassment and damage to their reputations from being publicly found by two federal courts to have committed fraud on the court, as stated in detail in this Court's published Fraud on the Court Opinion, and in the district court's published opinion that affirmed this Court's order based on the Fraud on the Court Opinion.

### iii.  What additional relief, if any, should be imposed

The Defendants continue to dispute that Taunt and his attorneys committed a fraud on the court, but they also argue that all of the remedies already imposed, described above, are enough to fully remedy any such fraud on the court.

Vining disagrees, and seeks additional relief.  Vining's catalogue of relief is described in Part VII.A.1 of this Opinion, and will be discussed now.

### a.  Compensatory damages (other than attorney fees)

First, Vining seeks compensatory damages for injury suffered by the bankruptcy estate due

---

[420]  The district court vacated the § 507(b) order as part of its decision on the first appeal to the district court.  A copy of the district court's order is at Docket # 762 in Case No. 95-48268.  Comerica's § 507(b) super-priority claim, and the district court's orders vacating the bankruptcy court's order allowing that claim, are described in this Court's Fraud on the Court Opinion, 366 B.R. at 740-43, 740 n. 53.

[421]  "Amended Order Regarding 'Fraud on the Court' Issues and Pending Summary Judgment Motions" (Docket # 1354 in Case No. 95-48268) at 2, ¶¶ 6-8.

to the fraud on the court (in addition to attorney fees, which are discussed separately below).  No

such damages can be awarded, however, because the bankruptcy estate was not damaged by any

fraud on the court.  It is now clear that the estate suffered no injury because of anything Taunt or

his attorneys did or failed to do during the nearly five years that Taunt was the Chapter 7 Trustee

in the *MTG* case.[422]  After this Court vacated the Comerica Settlement Order, Vining was free to

pursue against Comerica and the other Comerica Defendants all the Pre-Petition Claims Vining

wanted to pursue.  And Vining has done so.  But all those claims have failed, for reasons

unrelated to the fraud on the court.  The Court now has ruled that all such Pre-Petition claims are

without merit as a matter of law, and is granting summary judgment against Vining on all such

claims.  *See* Parts IV and V of this Opinion, especially Parts V.B through V.H.  So those claims

have ended up being worth nothing.

       As a result, it is now clear that in obtaining this Court's approval of his settlement with

Comerica, in the Comerica Settlement Order, Taunt actually benefitted the bankruptcy estate, by

obtaining $10,000.00 from Comerica in the settlement, in exchange for giving up claims worth

nothing.

       It is also now clear that in obtaining the two other orders that this Court vacated, due to

fraud on the court — *i.e.*, the Comerica Claim Allowance Order; and the Comerica Relief from

Stay Order — and in settling claims against parties other than Comerica on behalf of the

bankruptcy estate, Taunt did no damage to the estate.  In later sections of this Opinion, the Court

---

[422]  Taunt was the Chapter 7 Trustee in the *MTG* case for just over 4 years and 8 months, from
the date the case was converted from Chapter 11 to Chapter 7, on February 8, 1996, to the date on which
Taunt was replaced by the successor trustee, Douglas Ellmann, on October 27, 2000.  (*See* "Appointment
of Interim Trustee [etc.]" (Docket # 317 in Case No. 95-48268); "Certificate of Appointment of
Successor Trustee" (Docket # 715 in Case No. 95-48268)).

discusses Vining's various Post-Petition Claims, including those relating to Taunt's settlement and/or disposition of the estate's purported claims against Comerica for alleged conversion of the so called "DIP Funds," and claims against the Becker Group, Richard May, Richard Schneider, and Injectronics. As that discussion will show, those claims were of little to no value to the *MTG* bankruptcy estate, and Taunt did no damage to the estate in the way he disposed of them. *See, e.g.*, Parts VII.A.8, VII.A.9, and VII.A.11 of this Opinion, below.

With respect to Taunt's disposition of other causes of action belonging to the bankruptcy estate — including Taunt's collection of accounts receivable, prosecution of preference claims, and settlement of other claims of the estate[423] — Vining has not alleged, or presented any evidence, that Taunt's prosecution and settlement of such claims resulted in a return to the estate of less than the reasonable value of such causes of action.

And with respect to the disposition of other assets of the bankruptcy estate,[424] Vining has not alleged, or presented any evidence, that any such assets were sold for less than their reasonable value.

For these reasons, the Court cannot, and in the exercise of its discretion, the Court will not, award any compensatory damages against any of the Defendants in this case.

---

[423] While he was Chapter 7 Trustee, Taunt collected a total of at least $90,604.26 in preference recoveries, which were paid into the bankruptcy estate. (*See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), p. 7; Ex. B (Form 1), p. 2). Taunt also collected $40,150.00 in trade receivables, (*id.* at Ex. B (Form 1), p. 1), and a total of $217,663.03 in other funds collected that were owing to the bankruptcy estate. (*See id.* at Ex. B (Form 1), pp. 1-2). These sums are in addition to the $10,000.00 Taunt collected from the Comerica settlement and the $235,000.00 Taunt collected from the settlement with the Becker Group, which is discussed later in this Opinion. (*See id.*)

[424] Other estate assets liquidated by Taunt included office equipment and machinery, sold at auction sales that brought a total of $1,851,301.79 paid into the bankruptcy estate. (*See id.* at Ex. B (Form 1), p. 1).

### b. Punitive damages

The Court will not award any punitive damages against Taunt or his attorneys, or against any Defendant, including the Comerica Defendants. This would be the Court's decision even if the Court could find one or more of the Comerica Defendants liable for fraud on the Court (which it cannot, for reasons explained above). And this would be the Court's decision even if the Court could find, on the present summary judgment record, that Taunt and his attorneys had an actual intent to deceive or defraud the Court (which the Court cannot, as explained above). The Court finds, in the exercise of its discretion, that the relief already imposed for fraud on the court, coupled with the additional relief the Court now will impose (discussed below), is sufficient and appropriate to fully remedy the fraud on the court that occurred in this case, and to deter others from committing a similar fraud on the court in other cases.

This is especially so in a case such as this, where the fraud on the court did no financial damage to the bankruptcy estate.

### c. Disallowance of Comerica's claim

As one of the remedies he seeks, Vining asks this Court to disallow Comerica's claim in the *MTG* bankruptcy case entirely, and as a result of that disallowance, order Comerica to repay to the bankruptcy estate all sums it has been paid to date on its claim. But the Court will not impose that remedy, for the reasons that follow.

### 1. Comerica's claim in the *MTG* bankruptcy case

The Court first will give the following background information about Comerica's claim. From the beginning of the *MTG* bankruptcy case through the present, Comerica always has been a secured creditor with liens in virtually all of the assets of the bankruptcy estate, and Comerica's

214

claim always far exceeded the value of those estate assets.

As listed in Part I of this Opinion, Comerica filed several proofs of claim in the *MTG* case. The two primary claims are Claim No. 105 in the Court's claims registry, filed December 26, 1995, and Claim No. 223, filed June 25, 1997.

Claim No. 105 is a secured claim in the amount of $5,314,660.14,[425] based on "Money loaned," in which Comerica claimed to have a security interest in "All assets of Debtor."[426] And as noted in more detail in Parts IV.A.1.a, IV.A.1.c, and especially Part VII.A.11.c.2.a of this Opinion, Comerica's collateral included MTG's accounts receivable, chattel paper, inventory, machinery and equipment. As described in the Fraud on the Court Opinion, the Comerica Claim Allowance Order, filed April 19, 1996,

> stated that Comerica "shall have an allowed claim. . . in the amount of $5,304,563.63," and that Comerica "has a valid and properly perfected security interest in and lien on all property of Debtor's estate determined pursuant to Section 541 of the Bankruptcy Code, except for causes of action arising exclusively under Chapter 5 of the Bankruptcy Code. . ., which liens and security interests secure the Allowed Claim."[427]

Of course, this Court later vacated that Order, as having been obtained by fraud on the court. And Vining contests Comerica's claim, on several grounds discussed in this Opinion. But for reasons stated in this section below and elsewhere in this Opinion, the Court today is rejecting all of Vining's stated grounds for contesting the validity and amount of Comerica's claim, and its

---

[425] Claim No. 105 appears to be an amendment of Comerica's Claim No. 24, which was a secured claim in the amount of $5,303,175.33, filed August 31, 1995.

[426] Claim No. 105, Boxes 1, 4.

[427] *M.T.G.*, 366 B.R. at 737-38 (footnote omitted).

secured status. Apart from Vining's rejected grounds, there is no basis for disputing the amount of Comerica's claim or its secured status.

Claim No. 223, filed June 25, 1997, is Comerica's super-priority claim based on Bankruptcy Code § 507(b), and is in the stated amount of "in excess of $500,000." As described in this Court's Fraud on the Court Opinion, Bankruptcy Judge Graves determined, in his February 4, 1999 opinion, that Comerica was entitled to an allowed § 507(b) claim, in the amount of $444,475.17. That claim is based on the fact that during the Chapter 11 phase of this case, the Debtor was required to provide adequate protection for its use of Comerica's cash collateral, as permitted by several cash collateral orders that were entered, but the adequate protection was insufficient to prevent a diminution in the value of Comerica's collateral consisting of accounts receivable.

The 1999 decision by Judge Graves to allow Comerica's § 507(b) claim was vacated by the district court on appeal, because of Taunt's conflict of interest, but otherwise not based on the merits of the claim.[428]

The important points about this now, however, are (1) as Judge Graves found, the facts and evidence supporting Comerica's § 507(b) claim and its amount were "unrebutted" and undisputed;[429] (2) the "unrebutted" evidence consists of an affidavit of Defendant Paul G. Dufault dated January 15, 1998, which presented a detailed calculation of Comerica's § 507(b) claim, in the amount of $444,475.17, and which for various reasons that DuFault explained, was a

---

[428] *See M.T.G.*, 366 B.R. at 740-43, 740 n. 53.

[429] *See id.* at 742, 742 n. 63.

conservative and minimum amount of the claim;[430] (3) Vining does not dispute such evidence or DuFault's calculations, although Vining does make several other arguments against Comerica having an allowed claim in any amount (all of which this Court rejects in today's Opinion).

The unrebutted 1998 DuFault Affidavit also shows that Comerica had, at that time, an unpaid balance of over $1.3 million still owing on its claim (*i.e.*, deficiency balance on its secured claim):

> The Bank is currently owed $1,654,130.45 from the estate and all or substantially all of the assets have been liquidated. Even if the estate is given full credit for payments received from third party guarantors of such debt, all such payments are applied to principal, and such third party guarantors have no rights of subrogation or reimbursement against the Debtor, the Bank is still owed $1,359,130.45, . . .[431]

The unpaid amount of Comerica's claim in this case has not declined at all since the time of DuFault's 1998 affidavit. Taunt made no distributions to Comerica after the date of the 1998 DuFault Affidavit, and on November 6, 2000, Taunt turned over the entire $83,784.20 in funds remaining in the bankruptcy estate to his successor Trustee, Douglas Ellmann.[432] Ellmann made no distributions to Comerica while he was the Chapter 7 Trustee, but rather turned over all the estate funds ($83,784.20 plus interest earned) to his successor Trustee, Vining, on February 14,

---

[430] *Id.* This affidavit by DuFault (the "1998 DuFault Affidavit") and its attached Exhibit 1 were filed by Comerica in Case No. 95-48268 on January 20, 1998 (Docket # 615, Ex. A). *See also MTG*, 366 B.R. at 742 n.63. The 1998 DuFault Affidavit also appears in the record in this adversary proceeding, *e.g.*, as the Taunt Defendants' Exhibit 82 (Docket # 598-36).

[431] 1998 DuFault Aff. at 2-3, ¶ 4.

[432] *See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), p. 7; "Final Report by Successor Trustee Douglas S. Ellmann" (Docket # 935 in Case No. 95-48268) at Ex. A (Form 2), p. 1.

217

2002.[433]  Not surprisingly, Vining has made no distributions to Comerica.[434]

Based on these numbers, Comerica's secured claim turned out to be under-secured by more than $1.3 million.  And Comerica likely has a valid super-priority administrative claim under § 507(b) of at least $444,475.17.  That § 507(b) claim will have priority over all allowed Chapter 11 administrative expenses in this case, and over all allowed nonpriority unsecured claims, but it will be subordinate to all allowed Chapter 7 administrative expenses.  *See* 11 U.S.C. §§ 507(b); 507(a)(2); 503(b); 726(a)(1); 726(b).[435]  As Bankruptcy Judge Hughes described it in his 2002 opinion, which this Court quoted in its Fraud on the Court Opinion,

> Section 507(b) of the Bankruptcy Code provides that a creditor who has been granted adequate protection in connection with its collateral shall have a priority claim over all other administrative claims for any loss resulting from the debtor's use of the collateral which was not compensated by the grant of adequate protection.  **In the context of a converted Chapter 11 proceeding, such a "super-priority" claim is prior in right to all other Chapter 11 administrative expenses but subordinate to all Chapter 7 administrative expenses.**  The court calculated the amount of Comerica's Section 507(b) claim in conjunction with Mr. Halbert's objection to Mr. Taunt's proposed distribution.  It determined that Comerica was entitled to a Section 507(b) claim in the amount of $444,475.17.[436]

The above facts and law about Comerica's claim are important for several reasons, some

---

[433]  *See id.* at pp. 1, 3; "First Report by (Second) Successor Trustee Guy C. Vining for Period Ending 3-31-02" (Docket # 987 in Case No. 95-48268) at Form 1, Form 2.

[434]  *See* "Report by (Second) Successor Trustee, Guy C. Vining, for Period Ending 9-30-21" (Docket # 1640 in Case No. 95-48268) at Form 1.

[435]  Prior to the 2005 amendments to the Bankruptcy Code, the relevant section numbers included § 507(a)(1), rather than § 507(a)(2), and § 507(b) was referred to in § 507(a)(1).  In substance, however, the law on this point has not changed since 1995.

[436]  *M.T.G.*, 366 B.R. at 740 n. 53 (emphasis added) (citation to Judge Hughes 2002 opinion omitted).

of which are discussed in later sections of this Opinion.  They also have a bearing on the question of what relief the Court should grant for the fraud on the court by Taunt and his attorneys.

## 2. Vining's request that Comerica's claim be disallowed

Now the Court will discuss Vining's request that Comerica's claim be disallowed and Comerica be ordered to repay all amounts it has been paid on that claim.  Vining seeks that relief for fraud on the court.  In support of such requested relief, Vining relies in part on the 1944 Supreme Court case of *Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra.*  But that case is quite different from this case.

*Hazel-Atlas Glass* was a patent infringement case.  Hartford-Empire Co. ("Hartford") had applied to the U.S. Patent Office for a patent in 1926 "on a machine which utilized a method of pouring glass into molds known as 'gob feeding.'"  *Hazel-Atlas Glass*, 322 U.S. at 240.  To overcome "apparently insurmountable Patent Office opposition" to the patent application, Hartford secretly arranged for the publication of a trade journal article "signed by an ostensibly disinterested expert" that described the "'gob feeding' device as a remarkable advance in the art of fashioning glass by machine."  *Id.*  But the trade journal article secretly had been authored by a lawyer for Hartford.  *Id.* at 240-42.  Hartford submitted this "spurious" article to the Patent Office, in support of the patent application.  In 1928, the Patent Office granted the application.

Hartford then sued Hazel-Atlas Glass Co. ("Hazel") in federal court for allegedly infringing on Hartford's "gob feeding" patent.  After a trial, the district court held that no infringment had been proved, and dismissed the case.  Hartford appealed, and among other things, cited to the court of appeals the "spurious" trade journal article.  *Id.* at 241.  As the Supreme Court put it, the article "was not without effect" in the court of appeals.  *Id.*  That court quoted

219

"copiously from the article," and in 1932 "held the patent valid and infringed, reversed the [d]istrict [c]ourt's judgment, and directed that court to enter a decree accordingly." *Id.*

After this, Hazel investigated information it had received that the purported author of the trade journal article had admitted that the Hartford lawyer was the true author of the article. But that investigation came up empty, because the purported author secretly had been persuaded, and later bribed, by Hartford not to cooperate with the Hazel investigator. *See id.* at 241-43. Having lost in the court of appeals, Hazel then agreed to a settlement under which it paid Hartford $1 million and entered into several licensing agreements. *Id.* at 243.

"Indisputable proof" of the above facts, showing Hartford's fraud, came to light in 1941. Hazel then filed a petition in the court of appeals, seeking to set aside that court's 1932 decision in favor of Hartford. *See id.* at 239, 243. For several reasons, however, the court of appeals refused to grant the relief sought by Hazel. *Id.* at 243-44.

The United States Supreme Court reversed. It found that Hartford had engaged in "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but [also] the [court of appeals]." *Id.* at 245. The Supreme Court held that such fraud "demands the exercise of the historic power of equity to set aside fraudulently begotten judgments." *Id.* The Court held that "[t]he total effect of all this fraud, practiced both on the Patent Office and the courts, calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced." *Id.* at 250.

The Supreme Court also held that because Hartford's patent had been "obtained by fraud," that patent "must be vacated." *Id.* at 251. But the Court did not purport to order such relief itself, because it had held in a prior case that such a remedy "is not available in infringement

220

proceedings, but can only be accomplished in a direct proceeding brought by the government."
*Id.* (citation omitted).[437]

The Supreme Court directed the court of appeals "to set aside [its 1932 judgment], recall [its] 1932 mandate, dismiss Hartford's appeal, and issue [a] mandate to the [d]istrict [c]ourt directing it to . . . reinstate its original judgment denying relief to Hartford, and to take such additional action as may be necessary and appropriate." *Id.* at 251.

Citing *Hazel-Atlas Glass*, Vining argues that Comerica should be denied all relief — that is, that Comerica's claim in the *MTG* case should be disallowed, and Comerica should be required to pay back all distributions it received on its claim in the case.

But this case is quite different from that in the *Hazel-Atlas Glass* case. In the latter case, Hartford was denied all relief on its patent infringement claim because Hartford defrauded both the court *and* the Patent Office. Hartford had obtained the patent on which it based its infringement claim by defrauding the Patent Office. It then had obtained a favorable judgment on appeal by committing fraud on the court of appeals. Thus, the very basis of Hartford's claim — the patent — *and* Hartford's success in court on its claim — the court of appeals decision — had *both* been obtained by fraud. Once the court of appeals decision, which had been obtained by a fraud upon that court, was vacated, what was left was only (1) the district court's judgment after trial that the patent was not infringed; and more importantly, (2) a patent that was invalid because it had been obtained by fraud practiced against the Patent Office.

In this case, by contrast, Comerica's claim is based on money it loaned pre-petition to the

---

[437] The dissent pointed out that the government, which had filed an amicus brief in the Supreme Court, "has elected not to proceed for cancellation of the patent." *Id.* at 252 (Roberts, J. dissenting) (footnote omitted).

Debtor MTG.  No such lending by Comerica was fraudulent.  Comerica's claim was not obtained by Comerica fraudulently, and is not infected by any fraud, or by any fraud on the court.[438]  The only form of fraud in this case — *i.e.*, the fraud on the court —  occurred only post-petition, after MTG's case was converted to Chapter 7.

There is no fair or logical basis in this case for depriving Comerica of its $5.3 million-plus claim, or any part of that claim, as a remedy for the fraud on the court by Taunt and his attorneys. This is particularly so given the fact that, as the Court concludes in this Opinion, the fraud on the court did no damage to the bankruptcy estate that is not fully and appropriately remedied by the relief previously granted and the limited additional relief being granted today.[439]

As held by decisions of the Supreme Court (*Chambers*; *Hazel-Atlas Glass*) and the Sixth Circuit (*Levander*; *Big Rivers Elec. Corp.*) cited in Part VII.A.1.e.4.i of this Opinion, this Court has significant discretion to determine what remedies to order for fraud on the court, but such discretion must be exercised "with restraint."  The Court has discretion to deny such a drastic remedy as disallowing Comerica's claim, and the Court will deny such relief.

---

[438]  As discussed in earlier sections of this Opinion, Vining contends that the some of the loan advances that Comerica made to the Debtor MTG were actually loans to the Becker Group, not MTG. These loan advances are described in detail in Parts IV.A.5 and IV.A.6 of this Opinion.  They are the loan advances Comerica made after the June 21, 1995 Renaissance Club meeting, totaling $1,225,798.64, and the $316,292.26 loan advance Comerica made to enable MTG to purchase the FPT milling machine in June 1995.  But as discussed in great detail in Part V.B.3.a of this Opinion, the Court has ruled that none of these loan advances were made to the Becker Group.  Rather, all were made to MTG under Comerica's existing loan documents with MTG, and MTG was liable to repay all such loan advances. Moreover, there is no basis for finding that any part of MTG's debt to Comerica for these loan advances was incurred because of any fraud by Comerica.

[439]  The Court's ruling on this remedy issue would be the same, even if (a) the Court could find that Taunt and his attorneys intended to deceive the Court (which the Court cannot find on the present summary judgment record); and (b) the Court could hold one or more of the Comerica Defendants liable for fraud on the court (which the Court cannot do, as explained above).

### d. Disgorgement of the other fees and expenses paid to Taunt and his attorneys from the proceeds of Comerica's collateral

As part of the relief for fraud on the court, Vining also seeks an order requiring Taunt and his attorneys to disgorge, and pay to the bankruptcy estate, all fees and expense reimbursements that they received but have not yet been ordered to disgorge, namely certain fees and expenses paid by Comerica under the Comerica Fee Agreement. These are fees and expense amounts that are not included in the $42,058.50 in fees that the Taunt attorneys already disgorged, discussed above. All of these additional amounts are itemized in a motion filed by Vining on December 2, 2008,[440] and in Taunt's "Second Amended Final Report to Successor Trustee" filed May 24, 2001.[441] These additional amounts are:

(1) $1,330.00 in fees paid by the estate to Charles J. Taunt & Associates on May 29, 1996;[442]

(2) $11,988.00 in fees paid directly by Comerica to Charles J. Taunt & Associates on May 3, 1996, in payment of that firm's invoice to Comerica dated April 26, 1996;[443]

(3) $7,222.50 in fees and $4.12 in expense reimbursement paid directly by Comerica to Charles J. Taunt & Associates on May 23, 1996, in payment of that firm's invoice to Comerica dated May

---

[440] *See* "Trustee's Motion for Entry of Order Enforcing Amended Order re Consolidated Motion [etc.]" (Docket # 1506 in Case No. 95-48268) at 1-2, ¶¶ 3-4.

[441] Docket # 775 in Case No. 95-48268.

[442] *See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), p. 2.

[443] *See id.*; Suppl. to Trustee's and Todd M. Halbert's Mot. for Entry of Default J. (Docket # 94), Ex. E (check copies); Trustee's and Todd M. Halbert's Mot. for Entry of Default J. (Docket # 90), Ex. 15 (copy of April 26, 1996 invoice to Comerica).

223

14, 1996;[444]

(4) $2,282.50 in fees paid by the estate to Plunkett & Cooney on January 29, 1997;[445]

(5) $1,738.56 in expense reimbursement paid by the estate to Charles J. Taunt & Associates, P.C. on January 27, 1997;[446]

(6) $505.07 and $682.28 in expense reimbursement paid by the estate to Plunkett & Cooney on January 27, 1997 and August 18, 1998, respectively.[447]

The foregoing amounts total $20,540.50 in fees paid to Charles J. Taunt & Associates; $1,742.68 in expenses paid to Charles J. Taunt & Associates; $2,282.50 in fees paid to Plunkett & Cooney; and $1,187.95 in expenses paid to Plunkett & Cooney.

The Court concludes, in its discretion, that it is appropriate to require that the fee portions of these amounts, but not the expense reimbursement amounts, be disgorged by the recipients, as part of the remedy for the fraud on the Court committed by Taunt and his attorneys. These were fees paid by Comerica to the two law firms employed by Taunt and his attorneys, either directly or from the proceeds of Comerica's collateral, based on the Comerica Fee Agreement.

Functionally, these fee payments stand on the same footing as the $42,058,50 in fees that these firms already were required to disgorge, as described in Part VII.A.1.e.4.ii, above. Because

---

[444] *See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), p. 2; Suppl. to Trustee's and Todd M. Halbert's Mot. for Entry of Default J. (Docket # 94), Ex. E (check copies); Trustee's and Todd M. Halbert's Mot. for Entry of Default J. (Docket # 90), Ex. 16 (copy of May 14, 1996 invoice to Comerica).

[445] *See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), p. 3.

[446] *See id.*

[447] *See id.* at pp. 3-4.

of their fraud on the court, these firms should not be allowed to retain the financial benefit of these fee payments for the work they did in this case. Instead, they will be required to pay these fee payments over to the bankruptcy estate.[448] This is appropriate and necessary, in the Court's view, to achieve the objective of "removing the benefit gained by the party that committed the fraud [on the court]." *In re Levander*, 180 F.3d at 1119.

### e. Attorney fees incurred because of the fraud on the court

As noted in Part VII.A.1.e.4.i above, one of the discretionary remedies available for a fraud on the court is to require the offender to pay attorney fees incurred by an opposing party because of the fraud on the court. Vining seeks such attorney fees as one of the remedies here.

As noted in Part VII.A.1.a above, in the Court's Fraud on the Court Opinion, the Court held that an important factor in deciding whether to award attorney fees, and the amount of any such fees, is "whether the very substantial amount of work that . . . [was] done over the years in pursuing [the] fraud on the court allegations, [would] in the end actually benefit the bankruptcy estate, and if so, to what extent. . . . Halbert and Vining have succeeded in obtaining a finding of fraud on the court and the vacation of three orders. But it is still far from clear whether any of this ultimately will result in a benefit to the bankruptcy estate and its creditors."[449]

As it now has turned out, all this work by Halbert and Vining has resulted in relatively little benefit to the bankruptcy estate, and no benefit at all to the non-priority unsecured creditors.

---

[448] There is nothing inappropriate or unfair about requiring these firms to pay the fees into the bankruptcy estate, rather than repaying the fees to Comerica. This is so because Comerica knowingly and voluntarily paid these fees to these firms, for work done by these firms in the *MTG* bankruptcy case. And Comerica has not expressed any interest in receiving any of these fees back.

[449] *MTG*, 366 B.R. at 757 (citations and footnote omitted).

225

The financial benefit to the estate is limited to (1) the total of $64,881.50 in fees that have been and will be disgorged and paid to the estate by Taunt's attorneys;[450] plus (2) the sum of $175,000.00 that was paid by the Miller Canfield law firm, as part of Vining's 2008 settlement with that firm.[451]  All of this total amount of $239,881.50 will be consumed by Chapter 7 and Chapter 11 administrative expenses, and non-priority unsecured creditors will see no benefit whatsoever from it.  Ultimately, this limited nature of the benefit to the estate is primarily due to (1) the fact that Taunt and his attorneys did no financial damage to the bankruptcy estate; and (2) thet fact that all of Vining's claims against the Defendants, other than fraud on the court, have now failed, and therefore have proven to be worth nothing.

But there is another consideration, one that is non-financial in nature, but one that is important.  That is the inherent value in exposing a fraud on the court, and obtaining appropriate relief to cleanse the court of such fraud, thereby restoring the integrity of the court.  The value of this is expressed by several of the cases cited in Part VII.A.1.e.4.i above, and it bears repeating:

- Remedying fraud on the court "is necessary to the integrity of the courts, for 'tampering with the administration of justice . . . involves far more than an injury to a single litigant.  It is a wrong against the institutions set up to protect and safeguard the

---

[450]  This total is the sum of the $42,058.50 in fees previously disgorged, plus the total of $22,823.00 in fees that the Court will now order to be disgorged.

[451]  Miller Canfield originally was a defendant in this adversary proceeding.  Vining alleged that Miller Canfield advised and represented Comerica "at all relevant times . . . during the Chapter 11 and Chapter 7 proceedings" in the *MTG* bankruptcy case.  (Compl. at ¶ 17).  On April 25, 2008, the Court approved a settlement, under which Miller Canfield paid Vining $175,000.00.  (*See* "Order Granting Trustee's Application for Authority to Compromise Claims Against Miller, Canfield, Paddock and Stone, P.L.C." (Docket # 1443 in Case No. 95-48268)).  Miller Canfield was dismissed as a defendant on May 27, 2008.  (*See* "Order Dismissing Claims Against Miller, Canfield, Paddock & Stone, P.L.C. Without Prejudice and Without Costs or Attorney Fees" (Docket # 189).)

public.'" *Chambers*, 501 U.S. at 44 (quoting *Hazel-Atlas Glass*, 322 U.S. at 246).

- The courts are "institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel-Atlas Glass*, 322 U.S. at 246.

- "[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party" and **such sanctions serve the** "dual **purpose of 'vindicat[ing] judicial authority** . . . and mak[ing] the prevailing party whole for expenses caused by" his opponent. *See Chambers*, 501 U.S. at 46 (citations omitted) (emphasis added).

On the one hand, the fact that there has been only a small financial benefit to the bankruptcy estate from Vining's pursuit of his fraud on the court claim, and no financial benefit to non-priority unsecured creditors, cuts against the Court awarding any attorney fees as a supplement to the other remedies imposed to remedy the fraud on the court. On the other hand, the non-financial consideration described above cuts in favor of awarding at least some attorney fees, as one of the group of remedies the Court is imposing for the fraud on the court, in order to "vindicate judicial authority."

Given the above financial and non-financial considerations, and under all the circumstances, the Court concludes, in its discretion, that it is appropriate to make a limited award of attorney fees against each of the Taunt Defendants (*i.e.*, former Trustee Charles J. Taunt; Charles J. Taunt & Associates, P.C.) and Plunkett & Cooney, jointly and severally. The fees will be awarded and must be paid to Vining, as Trustee of the *MTG* bankruptcy estate.

The fees to be awarded will be less than the full amount of fees for all of the work done by Vining, Halbert and Vining's other attorneys, and will not include any fees for work done by

Halbert before Vining was elected Chapter 7 Trustee. Under all the circumstances, fees for all such work would be far too much. Rather, the fees will be in the amount of the reasonable attorney fees incurred by Vining on behalf of the bankruptcy estate after his election as Chapter 7 Trustee on January 10, 2002, in successfully obtaining, in litigation in this Court and in the district court, the following relief: (1) the opinions and orders by Judge Hughes regarding disgorgement of attorney fees based on the district court's first appeal decision;[452] (2) this Court's April 16, 2007 Order vacating the Comerica Settlement Order; the Comerica Claim Allowance Order; and the Comerica Relief from Stay Order, and the affirmation of that Order in the district court;[453] and (3) the undersigned judge's April 16, 2010 Order, quantifying the attorney fees to be disgorged,[454] based on the district court's first appeal decision and the opinions and orders on that subject by Judge Hughes referred to in item (1) above.[455]

---

[452] *See supra* footnote 417.

[453] Docket # 1354 in Case No. 95-48268 ("Amended Order Regarding 'Fraud on the Court' Issues and Pending Summary Judgment Motions," filed April 16, 2007) at 2, ¶¶ 6-8; *see also In re M.T.G., Inc.*, 366 B.R. 730 (Bankr. E.D. Mich. 2007); *aff'd.*, 400 B.R. 558 (E.D. Mich. 2009).

[454] *See supra* footnote 418.

[455] All of these fees to be awarded based on work done by Halbert after January 10, 2002 will be for work done by Halbert after he was retained as special counsel for Vining, in Vining's capacity as Chapter 7 Trustee in the *MTG* case. Based on orders entered in the *MTG* case, the Court deems Halbert to have been employed as special counsel for Vining at all times effective from January 10, 2002 through the present.

As with so much else in this case, Halbert's employment as special counsel for Vining was much disputed. Halbert was first retained as special counsel by Vining, "effective as of January 10, 2002," based on an Order entered by Judge Hughes on February 22, 2002 (Docket # 934 in Case No. 95-48268, the "February 22, 2002 Order"). Judge Hughes later vacated that order, however, in an order filed July 16, 2002 (Docket # 995 in Case No. 95-48268). But the latter order by Judge Hughes was reversed by the district court, and the matter remanded, in a Memorandum and Opinion filed on September 11, 2003, a copy of which is filed at Docket # 1075 in Case No. 95-48268. The district court's opinion also was published. *See Vining v. Taunt* (*In re M.T.G., Inc.*), 298 B.R. 310 (E.D. Mich. 2003), *appeal dismissed*, 403 F.3d 410 (6th Cir. 2005). This Court, through the undersigned judge, then entered an order on

228

No attorney fees or expenses will be awarded against any of the Defendants for any of the other work done by Vining and his attorneys, including the other work prosecuting this adversary proceeding, and including the work done by Halbert before he was retained as special counsel for Vining.

As far as it goes, this award of attorney fees is limited, but likely will not be *de minimis*. The amount of such fees to be awarded will be determined after Vining files appropriate fee itemizations for his attorneys. The Court's Order based on this Opinion will establish the procedure for the filing of such itemizations and an opportunity for the Taunt Defendants and Plunkett & Cooney to respond to the itemizations. The procedure will be patterned after L.B.R. 7054-1 (E.D. Mich.).

The Court concludes, in its discretion, that this additional but limited relief now being awarded for the fraud on the court by Taunt and his attorneys, combined with the relief previously ordered, all as described above, is the full relief that should be awarded. Nothing more is necessary, appropriate, or proper to remedy the fraud on the court.

### 2. Vining's breach of fiduciary duty claim (Count II)

In Count II of the Complaint, Vining alleges a breach of fiduciary duty claim against the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants.[456] Vining alleges that the Taunt Defendants, Ball, and Plunkett & Cooney, owed fiduciary duties to the estate because they

---

October 14, 2005, reinstating the February 22, 2002 Order, with certain modifications. *See* "Order Granting 'Amended Motion for Entry of Order Vacating Disqualification Order'" (Docket # 1343 in Case No. 95-48268). As a result of all of the foregoing, the Court deems Halbert to have been employed as special counsel for Vining at all times effective from January 10, 2002 through the present.

[456] Compl. at ¶¶ 224-33.

were bankruptcy professionals appointed by the Court to represent the estate.[457]  Vining alleges

that the Comerica Defendants owed fiduciary duties to the estate because they exercised control

over the estate.[458]  In the Complaint, Vining lists seventeen ways that the Taunt Defendants,

Taunt's attorney, Ball, Plunkett & Cooney, and the Comerica Defendants allegedly breached their

fiduciary duties to the estate by acting in their own self interests which conflicted with the

interests of the estate:

> (A)  Entering into the [Comerica] Fee Agreement;
>
> (B)  Representing [Comerica] during the administration of the Debtor's case;
>
> (C)  Creating and holding conflicts of interest;
>
> (D)  Stipulating to entry of the [Comerica Settlement Order];
>
> (E)  Stipulating to the entry of the [Comerica Relief from Stay Order];
>
> (F)  Filing false accounts with the Court;
>
> (G)  Collusively selling and assigning the May Chapter 5 Claims to the Bank;
>
> (H)  Collusively settling and selling the [l]ender [l]iability [c]laims to [Comerica];
>
> (I)  Failing to pursue and maximize recoveries on the [claims against Comerica, the Becker Group, Injectronics and May] in the best interests of and for the benefit of the estate;
>
> (J)  Moving for and obtaining the entry of the [settlement orders regarding the claims against the Becker Group, Comerica, and Injectronics];

---

[457]  *Id.* at ¶ 225.

[458]  *Id.* at ¶ 226-27.

230

(K)  Failing to honor disclosure obligations concerning conflicts of interest;

(L)  Fraudulently destroying and withholding documents;

(M)  Violating the automatic stay under Section 362(a) of the [Bankruptcy] Code;

(N)  Making transfers to themselves and [Comerica] which may be avoided under Section 549 of the [Bankruptcy] Code;

(O)  Employing professionals holding known conflicts of interest;

(P)  Soliciting [Comerica] for business; and

(Q)  Moving for the allowance of [Comerica's] alleged superpriority claim and the distribution of all proceeds of the Debtor's estate to  [Comerica].[459]

Vining alleges that the estate was damaged by these breaches of fiduciary duty.  He seeks an order holding these Defendants "jointly and severally liable for all such damages."[460]  He also seeks any "profits" Comerica made from misappropriating funds from the estate.[461]

### a.  The Taunt Defendants' position on Vining's breach of fiduciary duty claim

The Taunt Defendants argue that an element of each of Vining's claims, including the breach of fiduciary duty claim, is "damage to the estate," and that Vining cannot satisfy this element with regard to any of the claims.[462]  The Taunt Defendants argue, in relevant part, that

> [w]ith the possible exception of the [prepetition claims against the Becker Group] (which has tellingly never been pursued directly by Halbert) and aspects of the [Chapter 5 claims against May, both of

---

[459]  *Id.* at ¶¶ 228(A)-(Q), 229, 231.

[460]  *Id.* at ¶ 233.

[461]  *See* Ex. A to Docket # 583 (Proposed Default J. Against Defs.) at pdf p. 4 ¶ E.

[462]  Taunt Defs.' Br. (Docket # 658) at 1-2.

231

> which were covered by Comerica's liens against all of the assets of MTG and therefore would only benefit Comerica,] all of the trustee's claims against [the Taunt Defendants] hinge entirely on the lender liability claims against Comerica. . . .  If these are not meritorious, then there can be no basis for depriving Comerica of the proceeds from what was left of its collateral after Chapter 11, aside from the amounts it agreed to reimburse the estate pursuant to the [Comerica Fee A]greement.  In other words, the lender liability "case within the case" must be proved for the Trustee to prevail against Taunt.[463]

The Taunt Defendants argue further that the lender liability claims are without merit,[464] an argument that this Court now has agreed with.  And the Taunt Defendants argue that Taunt and his attorney, Ball, investigated whether MTG had "any type of lender liability or breach of contract claim against Comerica. . . and they saw that there was not a valid claim."[465]  The Taunt Defendants state that other individuals who investigated whether MTG had any type of lender liability or breach of contract claim against Comerica came to the same conclusion:

> That is the same finding that Professor White out at the University of Michigan found. That is the same finding that trustee Ellman who followed Mr. Taunt in this case found. Same finding that the U.S. Trustee found. There was no real meritorious claim against Comerica Bank under any lender liability scenario.[466]

The Taunt Defendants argue that

> there is no reasonable dispute that the Becker claim, lender liability claim, Injectronics claim and May claim were meritless and/or were subject to Comerica's security interest and/or were subject to setoff by Comerica and/or Richard May and/or were subject to Comerica's

---

[463] *Id*. at 2 (citation omitted).

[464] *Id.* at 20.

[465] Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 63.

[466] *Id.* at 63-64.

superpriority claim, and, therefore, the resulting settlements and orders procured by the Taunt [D]efendants were reasonable under the standard articulated by the Court and no damage was done to the MTG bankruptcy estate by their resolution; and (b) other aspects of the fraud on the court claim have been and will continue to be addressed in the main bankruptcy case.[467]

Therefore, the Taunt Defendants argue, any of the alleged acts or omissions that Vining claims was a breach of their fiduciary duties resulted in no damage to the estate.

### b. Plunkett & Cooney's position on Vining's breach of fiduciary duty claim

Plunkett & Cooney's position on Vining's breach of fiduciary duty claim is basically the same as its position on the fraud on the court claim. Plunkett & Cooney argues: "[T]he Trustee's breach-of-fiduciary-duty argument is based on two mistaken assumptions—that the Trustee pleaded an aiding-and-abetting claim (he didn't) and that there's no causation element in a breach-of-fiduciary-duty claim (there is). And once these errors are corrected, the Trustee is unable to establish a viable breach-of-fiduciary-duty claim."[468]

Plunkett & Cooney notes that Vining does not have an aiding and abetting claim in his Complaint and the Court denied Vining leave to file an amended complaint to add an aiding and abetting claim. Therefore, according to Plunkett & Cooney,Vining cannot rely on the aiding and abetting theory of liability against Plunkett & Cooney to establish his breach of fiduciary duty claim, just as Vining could not rely on this theory as a basis for the Court to award additional damages against Plunkett & Cooney for Vining's fraud on the court claim.[469]

---

[467] Taunt Defs.' Br. (Docket # 658) at 47-48 (record citations omitted).

[468] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 22; *see also id.* at 11.

[469] *Id.* at 22-23.

233

Plunkett & Cooney argues further that Vining's "[c]laims alleging breach of fiduciary duty, legal malpractice, and fraudulent misrepresentation sound in tort" and as such, under Michigan law, each require proof of a "'present injury.'"[470] According to Plunkett & Cooney, all of these claims also require Vining to establish proximate causation, and that this element requires Vining to establish that but for Plunkett & Cooney's breach of its duty, the estate would not have suffered the injury.[471]

Plunkett & Cooney argues that Vining cannot establish either a present injury or proximate causation. The injury alleged by Vining is that he was prevented from pursuing his lender liability claims against Comerica, because of the Taunt Defendants and Plunkett & Cooney obtaining the entry of orders that resolved all claims against Comerica: the Comerica Relief From Stay Order; the Comerica Claim Allowance Order, and the Comerica Settlement Order. But according to Plunkett & Cooney, because all three of these orders were vacated by the Court's Fraud on the Court Opinion, and Vining is now pursuing the lender liability claims against Comerica in this adversary proceeding, there is no longer any present injury. If Vining ultimately does not prevail on his lender liability claims, Plunkett & Cooney says, its actions or omissions will not be the cause of that.[472]

Plunkett & Cooney argues further that the same rationale applies to any potential claims Vining says the bankruptcy estate had against May, Injectronics, and the Becker Group. With regard to May, Plunkett & Cooney argues that Vining "had an opportunity to evaluate its claims

---

[470] Plunkett & Cooney's Br. (Docket # 578) at 2, 20-21.

[471] *Id.* at 21-23, *see also* Plunkett & Cooney's Opp'n Br. (Docket # 622) at 23-24.

[472] Plunkett & Cooney's Br. (Docket # 578) at 23-24.

against May independently, did so," and decided to settle the estate's claims against May.[473] Therefore, any damage caused is due to Vining's own decision to settle.

With regard to the estate's alleged claims against the Becker Group, Plunkett & Cooney notes that "this Court directed [Vining] to file a proper motion to vacate the May 1996 order settling those claims" but "[Vining] hasn't done so."[474] For this reason, according to Plunkett & Cooney, "[it is] the current Trustee's [(Vining's)] inaction, not the former Trustee's [(Taunt's)] actions, that are the proximate cause of any damages relating to [the alleged claim against the Becker Group]."[475]

With regard to both the estate's alleged claims against the Becker Group and the estate's alleged claims against Injectronics, Plunkett & Cooney argues that Vining

> is presently able to pursue any claims the estate alleges it has against Injectronics and the Becker Group—and he may pursue those claims not only against Injectronics and the Becker Group but also against Comerica. As a result, the Trustee cannot establish that Plunkett & Cooney's actions or inactions caused a present injury, as

---

[473] *Id.* at 24; *see also* Plunkett & Cooney's Opp'n Br. (Docket # 622) at 25 (noting that Vining compromised the estate's alleged claim against May "with the Court's approval" (citing the Court's "Order Granting Trustee's Motion for Authority to Compromise Claims Against Richard May (Docket # 1557 in Case No. 95-48268))).

[474] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 25 (citing the Court's Fraud on the Court Opinion, *M.T.G.*, 366 B.R. at 748 n.92)). In the cited part of the Court's Fraud on the Court Opinion, the Court stated:

> In their joint summary judgment motion, Halbert and Vining also appear to argue that the May 28, 1996 Becker Group settlement order (Docket # 446), described in Part I(F) of this opinion, also should be vacated for fraud on the court. The court cannot take such action at this point. To date, neither Halbert nor Vining has filed and served on Becker Group, Inc. a motion to vacate the Becker Group settlement order, and Becker Group, Inc. has not participated in the proceedings to date regarding the fraud on the court issues.

[475] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 25.

235

required to sustain his breach-of-fiduciary-duty, fraudulent misrepresentation, and legal-malpractice claims.[476]

Plunkett & Cooney states, in summary, that Vining is "unable to establish causation because the harm he complains about has been rectified."[477]  Nor, according to Plunkett & Cooney, does the law of the case doctrine help Vining establish the causation element of his breach of fiduciary duty claim.  This is so, Plunkett & Cooney says, because the district court did not decide whether the conflict of interest, which was the basis for its finding that there was a breach of fiduciary duty, "actually caused harm to the estate."[478]

Plunkett & Cooney also argues that Taunt's actions cannot be attributed to Plunkett & Cooney under a successor liability theory, for all of the same reasons Vining could not use this theory in seeking additional damages against Plunkett & Cooney on his fraud on the court claim.[479]

### c.  The Comerica Defendants' position on Vining's breach of fiduciary duty claim

The Comerica Defendants argue that under Michigan law, the general rule is that the lender-borrower relationship does not give rise to a fiduciary relationship.  *See Farm Credit Servs. of Michigan's Heartland, P.C.A. v. Weldon*, 591 N.W.2d 438, 447 (Mich. Ct. App. 1998).  The Comerica Defendants acknowledge an exception to the general rule — namely, that a fiduciary duty can arise on the part of a lender when the lender exercises such overwhelming control over

---

[476] Plunkett & Cooney's Br. (Docket # 578) at 26.

[477] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 25.

[478] *Id.* at 27-28.

[479] *Id.* at 26-27; *see supra* part VII.A.1.c of this Opinion.

236

the borrower's day-to-day operations that there is, in essence, a usurpation by the lender of the role of management, and a merger of identities between the borrow and lender. But the Comerica Defendants argue that they did not exercise that type of control over MTG or the bankruptcy estate, for all of the same reasons stated by the Comerica Defendants in response to Vining's control argument in its fraud on the court claim.[480] Also, according to the Comerica Defendants, because they owed no fiduciary duty to MTG or the bankruptcy estate, as a matter of law, they cannot be liable for conspiracy to breach a fiduciary duty, for all of the same reasons they could not be liable for conspiracy to commit fraud on the court.[481]

The Comerica Defendants argue further that, even if Comerica owed a fiduciary duty to MTG or to the bankruptcy estate, it could not have breached that duty by pursuing its own interests, because its interests were aligned with those of MTG. Comerica argues that because it was unsecured by more than $1 million, it, like MTG, had an interest in maximizing the value received from the liquidation of MTG's assets. Therefore, according to Comerica, to show any breach of a fiduciary duty or any damage to the estate from a breach of that duty, Vining would have had to show that but for a breach of fiduciary duty by Taunt, he would have been able to bring over $1 million *more* into the bankruptcy estate; otherwise, there could not have been any harm to the estate's unsecured creditors. Because there is no evidence of this, the Comerica Defendants argue, they are entitled to a judgment in their favor on Vining's breach of fiduciary duty claim.

---

[480] Comerica Defs.' Br. (Docket # 584) at 28-30; *see also* part VII.A.1.d of this Opinion.

[481] *See* part VII.A.1.d of this Opinion (arguing that, to be viable, a civil conspiracy claim must be based on an underlying tort that the defendant is legally capable of committing).

237

### d. The Court's ruling

The parties agree that an essential element for Vining's breach of fiduciary duty claim is damages. Vining acknowledges this, stating that "[t]he elements of a breach of fiduciary duty claim are (1) the existence of a fiduciary duty, (2) the breach of that duty, and (3) damages."[482] The case law holds that a valid claim for breach of fiduciary duty requires, among other things, that the alleged breach of fiduciary duty proximately caused damage. *See, e.g.*, *Monroe Bank & Trust v. Rosati* (*In re Tr. of Rosati*), 441 N.W.2d 30, 32-33 (Mich. Ct. App. 1989); *see also Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 689 (Mich. 2005) (footnote omitted) ("[A]n individual is entitled to relief under a tort theory only when he has suffered a present injury."); *Borock v. Comerica Bank-Detroit*, 938 F. Supp. 428, 430 (E.D. Mich. 1996) (a claim for breach of fiduciary duty is a common law tort claim under Michigan law)*; see generally Bezanson v. Thomas* (*In re R & R Assoc's. of Hampton*), 402 F.3d 257, 270-71 (1st Cir. 2005) (applying New Hampshire law to a Chapter 7 Trustee's claim that the bankruptcy debtor's Chapter 11 counsel breached their fiduciary duties; counsel's breach must have "proximately caused damages to the estate — namely, that it led to an unrecoverable deficit, which in turn would result in a diminished dividend to unsecured creditors").

In discussing Vining's claim for compensatory damages for fraud on the court, in Part VII.A.1.e.4.iii.a of this Opinion, this Court has held and explained that "[i]t is now clear that the [bankruptcy] estate suffered no injury because of anything Taunt or his attorneys did or failed to do during the nearly five years that Taunt was the Chapter 7 Trustee in the *MTG* case." This holding applies to Vining's claim for breach of fiduciary duty — *i.e.*, nothing that Vining alleges

---

[482] Trustee's Br. (Docket # 657) at 31.

238

was a breach of fiduciary duty caused any damage to the bankruptcy estate. As a result, Vining's breach of fiduciary duty claim fails as a matter of law, and Defendants are entitled to summary judgment on that claim.[483]

### 3. Vining's inducing breach of fiduciary duty claim (Count III)

In Count III of the Complaint, Vining alleges a claim against the Comerica Defendants for inducing a breach of fiduciary duty. Vining alleges, in relevant part, that Comerica, through its officers and attorneys, knowingly induced the Taunt Defendants, Plunkett [&] Cooney, and Ball to breach their fiduciary duties to the Debtor's estate.[484] Vining alleges further that "[a]s a direct and proximate result of such inducement, the Debtor's estate has been damaged."[485] Vining seeks to hold the Comerica Defendants "jointly and severally liable for all such damages."[486]

#### a. The Comerica Defendants' position on Vining's breach of fiduciary duty claim

The Comerica Defendants argue that under Michigan law, there is no cause of action for inducing a breach of fiduciary duty.[487]

The Comerica Defendants admit that Michigan law recognizes a cause of action for aiding and abetting a breach of fiduciary duty, and they also concede that under that cause of action, a third party who participates in someone else's breach of his or her fiduciary duty can be held

---

[483] Given this, it is not necessary for the Court to reach the other arguments made by the Defendants in seeking summary judgment on this claim.

[484] Compl. ¶ 235.

[485] *Id.* at ¶ 236.

[486] *Id.* at ¶ 238.

[487] Comerica Defs.' Br. (Docket # 584) at 31.

239

jointly and severally liable with that person for any damages proximately caused by the breach. But the Comerica Defendants note that Vining did not plead an aiding and abetting claim against any of the Defendants in his complaint, and "this Court denied Vining's motion to amend the complaint to add this claim."[488]  Therefore, the Comerica Defendants argue, the Court should not consider any aiding and abetting claim, including any claim that the Comerica Defendants aided and abetted Taunt in breaching his fiduciary duty.[489]

The Comerica Defendants argue further that even if Vining had pled such a claim against them, he cannot satisfy the elements of such a claim.  They state that the elements of an aiding and abetting breach of fiduciary claim are: "(1) a breach of a fiduciary duty; (2) actual knowledge of wrongful conduct by the aider/abettor; and (3) substantial assistance of the wrongful conduct by the aider/abettor that proximately caused a loss."[490]  To the extent that Vining's aiding and abetting theory is based on Taunt's breach of his duty to disclose the Comerica Fee Agreement to the Court, the Comerica Defendants argue that they did not aid and abet that breach.  This is so, they say, first, because "Comerica had no actual knowledge of a breach."[491]  The Comerica Defendants note that Comerica's attorney, Hertzberg, testified that he did not know whether Taunt had a duty to disclose the Comerica Fee Agreement to the Court, but he did not believe that Taunt did.  Therefore, according to the Comerica Defendants, Hertzberg did not have actual knowledge that Taunt breached his fiduciary duty by failing to disclose the Comerica Fee Agreement.

---

[488] Comerica's Resp. Br. (Docket # 634) at 21, 29.

[489] *Id.* at 30.

[490] *Id.* at 31 (citation omitted).

[491] *Id.*

240

Second, according to the Comerica Defendants, they did not provide any assistance to Taunt in his breach of his disclosure duty. Rather, according to the Comerica Defendants, Herzberg testified that he told Taunt that whether he had a duty to disclose the Comerica Fee Agreement was his "'problem to figure out and, if necessary, [to] comply with.'"[492]

The Comerica Defendants argue further that, to the extent Vining is basing his aiding and abetting theory on some other alleged breaches of fiduciary duty by Taunt, Vining has not identified those other breaches. The Comerica Defendants argue that the acts Taunt took in administering the assets of the bankruptcy estate, even if he had a conflict of interest, were not breaches of his fiduciary duty, as long as those acts were, in Taunt's business judgment, in furtherance of his duty to maximize the assets of the bankruptcy estate for creditors. The Comerica Defendants argue that Taunt's agreement to the allowance of Comerica's secured claim, which was valid beyond reasonable dispute; his settlement of claims, such as the lender liability claims, which had little or no value; and his actions "'to protect Comerica's interests,'" whose interests as a secured creditor Taunt was duty-bound to protect; all were proper and in the best interests of creditors of the estate. Therefore, according to the Comerica Defendants, such actions were not breaches of the fiduciary duty Taunt owed to the estate.

The Comerica Defendants argue further, that even if Vining could establish that Taunt breached some fiduciary duty, they still could not be liable for aiding and abetting Taunt in that breach because Vining has not demonstrated that Comerica had actual knowledge of such breach. The Comerica Defendants point out that no witness ever testified that they knew that Taunt was

---

[492] *Id.*

breaching any fiduciary duty.[493]  Nor, they argue, did Vining establish that Comerica substantially assisted Taunt in any breach of fiduciary duty.  The Comerica Defendants argue that Taunt's interest in maximizing the value of the bankruptcy estate, for the benefit of all creditors, was aligned with Comerica's interest in maximizing the value of the estate, so that Comerica could obtain the highest possible payment on its secured claim.  Therefore, the fact that Taunt's acts benefitted Comerica does not mean that Comerica provided substantial assistance to Taunt in breaching any fiduciary duty.

Finally, the Comerica Defendants argue that damages are an essential element of a claim of aiding and abetting a breach of fiduciary duty, but there are no such damages here.  According to the Comerica Defendants, Vining has failed to establish that there was any damage to the estate by any of Taunt's actions.[494]  The Comerica Defendants argue that "Vining cannot identify any asset liquidated by Taunt for unreasonably low value" or any act by Comerica that "diminished the other creditors' recovery."[495]  And they point out that Taunt liquidated assets "at auction, . . . with Court approval and without relevant objection."[496]  Therefore, according to the Comerica Defendants, Vining has failed to satisfy the element that any aiding and abetting of a breach of fiduciary duty proximately caused any damage to the estate.

**b.  The Court's ruling**

The Comerica Defendants are entitled to summary judgment on Count III of Vining's

---

[493] *Id.* at 37-38.

[494] *Id*. at 31-37.

[495] *Id.* at 39.

[496] *Id.* (footnote omitted).

complaint, for the following reasons.

First, the Comerica Defendants are correct in their argument that Michigan law does not recognize a claim for inducing a breach of fiduciary duty. *See Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 850 (E.D. Mich. 2003) ("Michigan does not recognize [a] claim for inducement to breach fiduciary duties.")*; Grand Valley Health Corp. v. Ethospartners Healthcare Mgmt. Grp., Inc.*, No. 292446, 2011 WL 255344, at *2 (Mich. Ct. App. Jan. 27, 2011) (holding that "tortious inducement of breach of fiduciary duty claim is not a recognized cause of action in Michigan").

Second, while Michigan law does recognize a cause of action for aiding and abetting a breach of fiduciary duty, the Comerica Defendants correctly note that Vining did not plead such a claim.

Third, because Vining's claim of breach of fiduciary duty (Count II) fails, for the reasons described above, Vining's claim for aiding and abetting a breach of fiduciary duty fails as well. *See id.* at *3 (holding that "claims for conspiracy and aiding and abetting cannot survive separately from an independent, actionable tort").

Fourth and finally, just as with Vining's breach of fiduciary duty claim, damages is an essential element of a claim for aiding and abetting a breach of fiduciary duty. *See El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 897 (W.D. Mich. 2010), *aff'd.*, 712 F.3d 917 (6th Cir. 2013) (Under Michigan law, the elements of a claim for "aiding and abetting tortious conduct" include "proximately causing" injury to the plaintiff.). And there are no such damages in this case, as discussed above.

243

For these reasons,[497] the Comerica Defendants are entitled to summary judgment in their favor on Count III of Vining's complaint.

## 4. Vining's fraudulent misrepresentations claim (Count IV)

In Count IV of the Complaint, Vining alleges a claim against the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants for fraudulent misrepresentations. Vining bases this claim on the same alleged misrepresentations and omissions of material fact that form the basis of Vining's fraud on the court claim against these Defendants. Those misrepresentations/omissions were the failure of these Defendants to inform the Court of the Comerica Fee Agreement, although they had a duty to do so, and the misrepresentations of disinterestedness made by the Taunt Defendants. According to Vining, these Defendants knew that they had a duty to disclose the Comerica Fee Agreement and that the misrepresentations of disinterestedness were false when they made them. Vining alleges further that these Defendants intended for the Court, the Debtor, creditors, and parties in interest to rely on these misrepresentations, and the Court, the Debtor, creditors, and parties in interest did rely on these misrepresentations because the Court entered orders which benefitted Comerica without the Debtor or other parties in interest objecting, and this would not have been done if it had been known that these Defendants had egregious conflicts of interest. Vining alleges that the reliance by the Court, the Debtor, and parties in interest was reasonable, given that these Defendants were bankruptcy professionals, officers of the Court, and owed fiduciary duties to the Court. Vining alleges that the estate suffered unspecified damages as a result of these

---

[497] Given the Court's ruling, it is not necessary to reach the other arguments made by the Comerica Defendants in seeking summary judgment on this claim.

misrepresentations/omissions and he seeks an order holding these Defendants jointly and severally liable for the damages.[498]

### a. The Taunt Defendants' position on Vining's fraudulent misrepresentations claim

The Taunt Defendants argue that "Taunt did not make any fraudulent misrepresentations to the [P]laintiff."[499]  And they argue that Vining has not pled his fraudulent misrepresentations claim with particularity as is required by Fed. R. Civ. P. 9(b).[500]  The Taunt Defendants argue that Vining has failed to identify which Defendant made the allegedly false misrepresentations and what such Defendant gained from it.  The Taunt Defendants state that Vining "concedes that the alleged statements were made to the [C]ourt" by various Defendants but "he does not explain how they were made 'with the intention that [they] should be acted upon by plaintiff.'"[501]  The Taunt Defendants argue that Vining does not explain how his fraudulent misrepresentation is distinct from his fraud on the court claim.  But even if Vining has pled with sufficient specificity to satisfy Rule 9(b), the Taunt Defendants argue that Vining's fraudulent misrepresentations claim still fails, because Vining cannot satisfy the damage element of this claim.  They say that this is so for all of the same reasons described in part VII.A.1.b of this Opinion.

### b. The Comerica Defendants' position on Vining's fraudulent misrepresentations claim

The Comerica Defendants also argue that Vining has not pled the fraudulent

---

[498]  *See* Compl. at ¶¶ 240-48.

[499]  Taunt Defs.' Br. (Docket # 658) at 30.

[500]  *Id.*

[501]  *Id.*

misrepresentations claim against them with particularity as is required by Fed. R. Civ. P. 9(b). The Comerica Defendants argue that Vining has not specified any affirmative misrepresentation made by the Comerica Defendants as a basis for its fraudulent misrepresentation, nor can he. The Comerica Defendants argue further that to the extent that Vining's claim is based on silent fraud, it is without merit because the Comerica Defendants had "no legal duty to disclose anything . . . ."[502]

### c. Plunkett & Cooney's position on Vining's fraudulent misrepresentations claims

Plunkett & Cooney's argument regarding Vining's fraudulent misrepresentation claim is the same as its argument regarding Vining's breach of fiduciary duty claim.[503] In short, Plunkett & Cooney argues that Vining cannot establish the present injury or proximate causation elements of this claim.

### d. The Court's ruling

Damages are an essential element of Vining's fraudulent misrepresentations claim. *See Lenchner v. Korn* (*In re Korn*), 567 B.R. 280, 307 (Bankr. E.D. Mich. 2017) (stating elements of a claim for fraudulent misrepresentation under Michigan law, which include "injury" to the plaintiff); *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 780 (Bankr. E.D. Mich. 2011) (same); *see also Rosenblatt v. John F. Ivory Storage Co.*, 247 N.W. 733, 734 (Mich. 1933) (determining whether defendant's fraudulent misrepresentation was "the proximate cause of the [plaintiff's] loss"); *Henry v. Dow Chem. Co.*, 701 N.W.2d at 689 ("[A]n individual is entitled to relief under a

---

[502] Comerica Defs.' Br. (Docket # 584) at 32.

[503] *See* Part VII.A.2.b of this Opinion.

tort theory only when he has suffered a present injury.").

As with Vining's breach of fiduciary duty claim, the bankruptcy estate suffered no damages because of any of the alleged fraudulent misrepresentations. For this reason, the Court must grant summary judgment for the Defendants on Count IV of Vining's complaint.[504]

### 5. Vining's equitable subordination claim (Count V)

Count V of Vining's complaint is a claim against Comerica for equitable subordination. In support of this claim, Vining alleges that the bankruptcy estate has been substantially damaged by the Bank's misconduct."[505] Vining alleges that

> [u]nder the principles of equitable subordination and pursuant to Section 510(c) of the Code, the Debtor is entitled to the entry of judgment in its favor and against the Bank (a) subordinating all Bank Claims to the allowed claims of creditors and interests of shareholders of the Debtor, and (b) transferring the Bank Liens to the Debtor.[506]

### a. Comerica's position on Vining's equitable subordination claim

Comerica alleges that it "was not an insider of MTG" and therefore Vining "must prove with particularity, that Comerica is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'"[507] Comerica argues that "Vining cannot satisfy this burden."[508] Comerica notes that University of Michigan law professor James J. White, who

---

[504] Given the Court's ruling, it is not necessary to reach the Defendants' other arguments in seeking summary judgment on this claim.

[505] Compl. at ¶ 250.

[506] *Id*. at ¶ 251.

[507] Comerica Defs.' Br.(Docket # 584) at 34 (quoting *First Nat'l Bank of Barnseville v. Raforth* (*In re Baker & Getty Fin. Servs., Inc*.), 974 F.2d 712, 718 (6th Cir. 1992)).

[508] *Id.* (footnote omitted).

former Trustee Douglas Ellman hired to opine on whether Comerica's claims could be subordinated to the claims of unsecured creditors, concluded that it was "doubtful."[509]  Professor White concluded that the facts did not support a finding that "Comerica became an insider" nor did they suggest that Comerica exercised the degree of control necessary for a non-insider's claim to be be equitably subordinated.[510]

### b.  The Court's ruling

Vining's equitable subordination claim is based on 11 U.S.C. § 510(c), which states:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

The Court reiterates what it held in a prior case, about equitable subordination:

> The Sixth Circuit Court of Appeals has held that courts must "use great caution in applying the remedy" of equitable subordination, and that "equitable subordination is an unusual remedy which should be applied in limited circumstances." *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 745 (6th Cir. 2001)(citations omitted).  The Sixth Circuit further held that the following requirements must be met before the bankruptcy court may equitably subordinate one claim to another claim under § 510(c)(1):
>
> > This court has adopted a three-part standard for establishing equitable subordination: (1) the claimant

---

[509]  *Id.* at 34 n.25.

[510]  *Id.*

must have engaged in some type of inequitable conduct; (2) **the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant**; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *See In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d 712, 717–18 (6th Cir.1992) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 699–700 (5th Cir.1977)). Satisfaction of this three-part standard does not mean that a court is *required* to equitably subordinate a claim, but rather that the court is *permitted* to take such action. *See In re Octagon Roofing*, 157 B.R. 852, 857 (N.D.Ill.1993).

   *Id.* at 744 (bold emphasis added; italics in original).

*In re Energy Conversion Devices, Inc.*, 528 B.R. 697, 706 (Bankr. E.D. Mich. 2015), *aff'd. sub nom. Murphy v Madden*, 532 B.R. 286 (E.D. Mich. 2015), *aff'd.*, No. 15-1734 (6th Cir. February 19, 2016).

   On the present record, and at this summary judgment stage, the Court cannot find that Comerica or any of the Comerica Defendants engaged in "inequitable conduct" of the type required for equitable subordination. But even if the Court could make such a finding, an essential element required for equitable subordination is missing. That is the requirement that "the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Id.* None of the misconduct alleged by Vining caused any injury to other creditors in the *MTG* bankruptcy case. Nor did it confer an unfair advantage on Comerica. Equitable subordination therefore cannot be imposed.

   As a result, Vining's equitable subordination claim against Comerica fails as a matter of law, and the Court must grant summary judgment against Vining on Count V of the complaint.

   **6. Vining's claim of collusive sales under 11 U.S.C. § 363(n) (Count VI)**

249

Count VI of the Complaint alleges collusive sales under 11 U.S.C. § 363(n) against the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants. Vining argues that Taunt's settlement of claims against Comerica, the Becker Group, and Injectronics, and Taunt's alleged assignment of the Chapter 5 claim against May "constituted sales of Claims under [11 U.S.C. § 363(n)]."[511] Vining argues further that these Defendants colluded with each other "to eliminate potential bidders for Claims and to chill bidding for Claims" in willful disregard and in violation of § 363(n), and should be jointly and severally liable for all damages.[512] Vining argues that as a result of the collusion between these Defendants, the estate's claims against Comerica, the Becker Group, Injectronics, and May, "were sold for substantially less than fair value."[513] Vining argues that he "may either avoid the sale of these Claims or recover treble the estate's loss resulting from the colluded sales."[514]

### a. The Taunt Defendant's position on Vining's collusive sales claim under 11 U.S.C. § 363(n)

The Taunt Defendants argue that 11 U.S.C. § 363(n) does not apply because (1) Taunt did not sell or assign any of the bankruptcy estate's claims against Comerica, the Becker Group, Injectronics, or May — rather, at most, Taunt settled those claims; (2) the Taunt Defendants and the Comerica Defendants were not "bidders;" and (3) there were no damages to the estate because all of these claims were without merit or settled for their fair value. The Taunt Defendants argue

---

[511] Compl. at ¶ 253.

[512] *Id.* at ¶ 254-56, 260.

[513] *Id.* at ¶ 257.

[514] *Id.* at ¶ 261.

further that even if these claims were worth more than they were settled for, there still was no damage to the estate because these claims were "subject to Comerica's security interest, Comerica's and May's setoff rights, and/or Comerica's superpriority claim."[515]

### b. Plunkett & Cooney's position on Vining's collusive sales claim under 11 U.S.C. § 363(n)

Unlike the Taunt Defendants, Plunkett & Cooney says that, "in theory," it is "possible to obtain relief under § 363(n) based on a collusive settlement." But Plunkett & Cooney argues that under the facts of this case, Vining cannot establish that "Plunkett & Cooney was involved in a collusive agreement within the meaning of [11 U.S.C.] § 363(n)."[516]

First, according to Plunkett & Cooney, Vining cannot establish that there was an agreement "*among bidders,*" which is a necessary element of a claim under § 363(n).[517] This is so because even if the Comerica Fee Agreement was an agreement between Taunt and his agents, on the one hand, and Comerica and its agents, on the other hand, it was not "*among bidders.*" According to Plunkett & Cooney, Taunt was not a bidder. Comerica was the only bidder.[518]

Second, Plunkett & Cooney argues that Vining's complaint does not allege, nor can Vining establish, that the Comerica Fee Agreement "controlled the price" for which Taunt settled the claims against Comerica, the Becker Group, Injectronics, and May.[519] Plunkett & Cooney argues that the allegations in the complaint that Taunt and his agents and Comerica and its agents

---

[515] Taunt Defs.' Br. (Docket # 658) at 48 ¶ 4.

[516] Plunkett & Cooney's Br. (Docket # 578) at 27-28.

[517] *Id. at* 29 *(*italics in original).

[518] *Id.*

[519] *Id.*

251

colluded to "'eliminate potential bidders and 'chill bidding,'" at best, are allegations that these Defendants entered into an agreement that *affected* the sale price, which falls short of the standard required to state a claim under § 363(n).

Finally, Plunkett & Cooney argues that the Comerica Fee Agreement "does not explicitly or implicitly suggest an agreement to fix settlement values."[520] And, according to Plunkett & Cooney, after years of discovery, Vining has not found any other agreement between these Defendants which fixes settlement values. For all of these reasons, Plunkett & Cooney argues that this claim fails as a matter of law.

### c. The Comerica Defendants' position on Vining's collusive sales claim under 11 U.S.C. § 363(n)

The Comerica Defendants argue that none of claims that were settled give rise to a meritorious claim under 11 U.S.C. § 363(n). The Comerica Defendants argue that Vining's collusive sales claim under 11 U.S.C. § 363(n) is moot with regard to the lender liability claims, because the Court vacated the Comerica Settlement Order.

With regard to the settlement of the claim against the Becker Group, the Comerica Defendants argue that there is no evidence of collusion between the Taunt Defendants and Comerica. Rather, the Comerica Defendants opposed settlement of this claim. The Comerica Defendants also note that the Court authorized the settlement of this claim, without objection.

With regard to the estate's claim against Injectronics, the Comerica Defendants argue that this claim was "heavily disputed" in two adversary proceedings (Adversary Nos. 95-4762 and 95-

---

[520] *Id.*

252

4706), and that "[t]he settlement fairly reflected the weaknesses of the case."[521]  The Comerica

Defendants argue further that because they had a lien on this claim, they would not have "thrown

away a valuable claim."[522]  Finally, the Comerica Defendants argue that this claim fails because

the settlement with Injectronics was approved by the Court.

With regard to Vining's claim based on the purported assignment of claims against May,

relating to a tax refund of $400,000, the Comerica Defendants argue that "[t]here was no

'assignment' of the estates's interest, if any, in the May tax refund" and therefore, there is "no

factual basis" for this claim.[523]  The Comerica Defendants state that Taunt did not sign any

document that assigned or waived any claim against May.[524]

### d.  The Court's ruling

### 1.  Taunt's disposition of the bankruptcy estate's potential claims against Richard May

Before discussing § 363(n), the Court will clarify how the bankruptcy estate's potential

claims against May were disposed of by Taunt, and later by Vining.  Taunt did not assign or

otherwise transfer the estate's claims against May to anyone.  Rather, as part of Taunt's settlement

with Comerica that culminated in the entry of the Comerica Settlement Order, Taunt settled a

potential dispute with Comerica over whether Comerica's all-assets lien covered the claims

against May.  In the motion for approval of his settlement with Comerica, filed July 3, 1996,

---

[521] Comerica Defs.' Br. (Docket # 584) at 35-36.

[522] *Id.*

[523] *Id.* at 36.

[524] *Id.* at 36-37.

Taunt acknowledged that "[u]pon further review of the Order Lifting Stay that was entered in this case, the Trustee has determined that any claims of the estate against Richard May fall within the scope of Comerica's all-assets lien, and the property upon which Comerica has obtained relief from the automatic stay."[525] So among other things, Taunt's settlement with Comerica, which was approved by the Comerica Settlement Order,[526] settled, in favor of Comerica. the question of who had the right to the proceeds of any claims the estate had against May.

Meanwhile, after Taunt filed the motion to approve the settlement with Comerica, but before the Court entered the Comerica Settlement Order, Comerica entered into a settlement agreement with May and his wife, dated August 13, 1996.[527] That agreement included a settlement of the estate's claims against May (which by then Comerica and Taunt had agreed were part of Comerica's collateral), along with other claims Comerica had against May. The other claims included Comerica's claim against May as a guarantor of MTG's debt.

Much later, in 2009, well after this Court vacated the Comerica Settlement Order and the Comerica Relief from Stay Order in 2007, Vining sought and obtained this Court's approval of a settlement with May, which settled all of the estate's claims against May.[528]

For simplicity, in this Opinion, the Court will sometimes refer to Taunt's disposition of the

---

[525] "Trustee's Application to Compromise Causes of Action Against Comerica Bank," filed July 3, 1996 (Docket # 451 in Case No. 95-48268) at 3, ¶ 6(E).

[526] Docket # 488 in Case No. 95-48268, filed August 29, 1996.

[527] "Settlement Agreement" (Docket # 598-37).

[528] *See* "Trustee's Application for Authority to Compromise Claims Against Richard May," filed September 16, 2009 (Docket # 1540 in Case No. 95-48268); "Order Granting Trustee's Motion for Authority to Compromise Claims Against Richard May," filed November 18, 2009 (Docket # 1557 in Case No. 95-48268).

estate's potential claims against May as a settlement of the claims against May.

### 2. Discussion and ruling regarding § 363(n)

Bankruptcy Code § 363(b)(1) states, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, . . . ." 11 U.S.C. § 363(b). Section 363(n) applies to a "sale" under § 363(b), and states:

> **The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale**, **or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated**, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n) (emphasis added).

Initially, there is some appeal to the Taunt Defendants' first argument, that Taunt's settlements at issue were not "sales" within the meaning of § 363(n). The argument is that a *settlement* of a cause of action is different from a *sale* of the cause of action, and that Taunt did not sell the estate's causes of action, but rather only settled them. With a settlement, the cause of action normally is released, and thereby extinguished. Ownership of the cause of action is not transferred to a purchaser. With a sale, by contrast, the cause of action is not released or extinguished, but rather ownership of the cause of action is transferred to a purchaser, who then may prosecute or settle the cause of action.

This distinction has superficial appeal, at least. But the Taunt Defendants cite no authority that adopts this distinction under § 363(n) or under any other part of § 363 that uses the word

255

"sale."  Nor do they cite any case law in support of their argument that a settlement of a cause of action is not a "sale" of that asset for purposes of § 363(n).

As noted above, Plunkett & Cooney takes a different view.  It seems to concede that a settlement of a cause of action by a bankruptcy trustee is a "sale" of that asset, within the meaning of § 363(n).  In support of that view, it cites *In re Dow Corning Corp.*, 198 B.R. 214, 245-46 (Bankr. E.D. Mich. 1996).  In that case, the court held that the settlement of a bankruptcy estate's cause of action, which included releases, was a "sale" of that cause of action, at least for purposes of 11 U.S.C. § 363(f).  Section 363(f) is the provision that, under certain circumstances, authorizes the sale of estate property "free and clear of any interest in such property of an entity other than the estate."

In *Dow Corning*, the debtor had been "sued by thousands of individuals for personal injuries allegedly caused by the breast implants it manufactured and the materials it supplied to other breast implant manufacturers."  198 B.R. at 218.  The debtor and "about a hundred" of its insurers had been in litigation in state court in coverage disputes.  *Id.*  Then the debtor filed a Chapter 11 bankruptcy case, and soon thereafter, the debtor asked the bankruptcy court to approve a settlement of the debtor's claims against thirteen of its insurers.  *Id.* at 218-19.  As part of some of the settlements, the insurer was to be released from the claims of the debtor, *and* released from the claims of all tort claimants.  *Id.* at 219.

Over objections, and subject to certain conditions, the *Dow Corning* court approved the settlements.  *See id.* at 251.  The court rejected the argument that it "lack[ed] the power to impose a release of the tort claimants' rights to sue the settling insurers."  *Id.* at 221.  As one basis of its authority to approve the releases, the court cited § 363(f), which authorizes the sale of estate

256

property "free and clear" of any third party interests. The court reasoned that the settlement of the insurance claims by the debtor was the "equivalent" of the sale of those claims, so that § 363(f) applied, and permitted the disputed releases. *See id.* at 245.

The *Dow Corning* court supported its holding with a lengthy and interesting discussion, *see id.* at 245-47, which the Court need not repeat here. But it included the following:

> Equating compromises/settlements of lawsuits to sales of a debtor's property is appropriate because there is so little to distinguish them. . . . [W]hen a compromise/settlement involves the exchange of property, the line between it and a sale begins to blur.

*Id.* at 245 (citation omitted). In support of this point, the court cited *In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 n.7 (Bankr. N.D. Ill. 1994), for that case's statement that:

> The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim. There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with an adverse party.

*Telesphere* made this point in the course of holding that the settlement of a claim owned by the bankruptcy estate was a "use or sale of estate assets out of the ordinary course," subject to the notice and hearing requirements of 11 U.S.C. § 363(b). *Telesphere*, 179 B.R. at 552 (footnote omitted).

In this case, none of the parties have cited a case that applied § 363(n) to the *settlement* of a bankruptcy estate's cause of action. The Court finds it unnecessary to decide whether any of the settlements at issue can be deemed a "sale" within the meaning of § 363(n). Rather, the Court concludes that § 363(n) does not apply for other reasons.

By its terms, § 363(n) applies only when there was "an agreement among potential bidders

257

at [a] sale" of the bankruptcy estate's asset(s), and that agreement "controlled" the sale price. There was no such agreement in this case, with respect to any settlement Taunt made while he was the Chapter 7 Trustee, even if one assumes that a settlement can be deemed a "sale."

The theory of Vining's § 363(n) claim is that Taunt and his attorneys, on the one hand, colluded with Comerica and the Comerica Defendants, on the other hand, in a way that depressed the price the bankruptcy estate received for the settlements at issue. This theory, and Vining's § 363(n) claim, fail for the following reasons.

First, there is no evidence that there was any "agreement among" two or more "potential bidders" with respect to any of the settlements at issue. (For § 363(n) to apply, there has to have been more than one "potential bidder.") With respect to each of the settlements at issue, there were, in substance, two parties. On the one hand, there was Taunt, Trustee, on behalf of the bankruptcy estate (the seller), which was the owner of the claim to be settled. As the seller, Taunt, Trustee was seeking to part with the claim to be settled, in exchange for money. On the other hand, there was the other party to the settlement, which was the target of the claim to be settled (the target party). Assuming that the target party can be viewed as a "potential bidder," there was no *other* "potential bidder" involved. As the seller, Taunt and his attorneys were not "potential bidders;" they were not trying to buy the claim to be settled; rather, they were trying to sell it. In the context of the sale of an asset, a "potential bidder" is a potential *buyer*.

The Comerica Settlement Agreement illustrates this point. Taunt, in his capacity as Trustee of the bankruptcy estate, in effect, already owned the estate's causes of action against Comerica. He was not a potential buyer of those causes of action. Comerica was a potential buyer ("potential bidder"). So even if Taunt and Comerica colluded, it was not collusion between

258

"potential bidders," and § 363(n) does not apply.

The same is true of the other settlements at issue — Taunt and his attorneys were not "potential bidders" with respect to the settlement with the Becker Group, or Injectronics, or May. As a result, § 363(n) does not apply. *Cf. Tri-Cran, Inc. v. Fallon* (*In re Tri-Can, Inc.*), 98 B.R. 609, 618 (Bankr. D. Mass. 1989) (holding that § 363(n) did not apply to a collusive sale in which the collusion was between "the sole bidder and the Debtor in Possession, not among bidders").

There is a second reason why Vining's § 363(n) claim fails, at least with respect to Taunt's settlements other than the Comerica Settlement Agreement. Vining's complaint does not allege, and Vining has presented no evidence, that any collusion between the alleged potential bidders "controlled the sale price" — *i.e.*, the settlement price, for any of those settlements, as required by § 363(n). Rather, Vining alleges only that Taunt and his attorneys, on the one hand, and the Comerica Defendants on the other hand, colluded with each other "to eliminate potential bidders for the Claims and to chill bidding for the Claims" and that because of this, the estate's claims against Comerica, the Becker Group, Injectronics, and May, "were sold for substantially less than fair value."[529]

This is not sufficient under § 363(n). Rather, § 363(n) "addresses only an agreement among potential bidders at a § 363 sale that *controls* the sale price, not an agreement that merely *affects* the sale price." *Off. Unsecured Creditor's Comm. of LWD, Inc. v. K & B Cap.*, LLC (*In re LWD, Inc.*), 332 B.R. 543, 551 (Bankr. W.D. Ky. 2005) (italics in original) (footnote omitted) (citation omitted), *aff'd.*, 340 B.R. 363 (W.D. Ky. 2006).

For these reasons, Vining's claim under § 363(n) fails as a matter of law, and the Court

---

[529] Compl. at ¶¶ 254, 257.

must grant summary judgment against Vining on Count VI of the complaint.[530]

### 7. Vining's claim of avoidable post-petition transfers (Count VII)

Count VII of Vining's complaint seeks avoidance under 11 U.S.C. § 549(a) of certain post-petition transfers, and recovery under 11 U.S.C. § 550(a) of the value of such transfers. Vining argues that Taunt's "sale" of the claims against the Comerica Defendants, the Becker Group, Injectronics, and May, as described in Count VI of the Complaint, were "transfers" of property of the estate within the meaning of 11 U.S.C. §§ 101(54) and 549, and can be avoided and recovered from Comerica, as the initial transferee of those transfers, and from the Taunt Defendants, Plunkett & Cooney, and May "as transferees of certain [t]ransfers."[531] The complaint does not specify which transfers were made to the Taunt Defendants, Plunkett & Cooney, and May. Vining's brief in support of his motion for summary judgment also does not provide this information. The brief states only that the Comerica Fee Agreement and the orders obtained by the fraud on the court "transferred control and possession of virtually all estate assets to Comerica in violation of the [Bankruptcy] Code and without authorization by valid Court Orders," and that the liability of the Taunt Defendants and Plunkett & Cooney is based on the fact that they all "conspired to accomplish the unlawful transfers in violation of Section 549."[532] According to Vining, because of this conspiracy, all of these Defendants are "jointly and severally liable on this claim."[533] According to Vining, the transfers can be avoided because they occurred post-petition

---

[530] Given the Court's ruling, it is not necessary to reach the Defendants' other arguments in seeking summary judgment on this claim.

[531] Compl. at ¶¶ 262-66.

[532] *See* Trustee's Br. (Docket # 657) at 42.

[533] *Id.*

260

and were not "properly" authorized by the Court, by "valid" orders, or by the Bankruptcy Code.[534]

Vining argues further that this claim is free from the pre-petition security interest of Comerica.[535]

### a. The Taunt Defendants' position on Vining's claim of avoidable post-petition transfers

The Taunt Defendants argue that Plaintiff's Summary Judgment Motion should be denied because of "[p]leading deficiencies alone."[536] They argue that Vining has failed to allege what "property of the estate" was transferred; to which Defendant the property of the estate was transferred; and the value of the property transferred. The Taunt Defendants state that Plaintiff's Summary Judgment Motion "appears to assert entitlement to recovery from all Defendants, collectively, of an unspecified value of the property transferred, without any mention of what was allegedly transferred to each Defendant or how Vining intends on computing the value in light of Comerica's substantial liens."[537]

The Taunt Defendants further argue that Vining has failed "to establish that the alleged transfers involved 'property of the estate'" as defined under § 541(a)(1) and as required under § 549(a).[538] They argue that "[p]laced in the context of avoidance actions, 'property of the estate' includes only the debtor's equity in the property after consideration of all liens and encumbrances."[539] The Taunt Defendants argue that because Comerica has valid liens "on all of

---

[534] Compl. at ¶ 264; *see also* Trustee's Br. (Docket # 657) at 42.

[535] Trustee's Br. (Docket # 657) at 41.

[536] Taunt Defs.' Resp. (Docket # 638) at 31.

[537] *Id.*

[538] *Id.* at 31-32.

[539] *Id.* at 32 (citations omitted).

MTG's assets" and because "these liens far exceeded any value, if any, in the MTG estate" on the date MTG filed its Chapter 11 petition, there was no "property of the estate" to transfer.[540] And the Taunt Defendants argue further that due to Comerica's all-assets lien, the avoidance of any post-petition transfer would not bring any additional value into the estate:

> [I]f Vining succeeds in any avoidance action under § 549, § 502(h) places Comerica in the same legal position as a secured creditor as of the MTG petition date. Therefore, MTG's estate would still owe Comerica any proceeds recovered by Vining under § 550, achieving the same result as the allegedly unauthorized pre-petition transfer. The only party that stands to gain from such a fruitless undertaking is the trustee, who would ultimately recover fees and administrative expenses without any identifiable benefit to the overall estate or its creditors.[541]

The Taunt Defendants argue that because pursuing avoidance and recovery of any purported unauthorized post-petition transfer would not benefit the estate or its creditors, such pursuit is punitive in nature and is "in direct contravention" of the Trustee's duties under 11 U.S.C. § 704(1).[542] The Taunt Defendants argue that "[i]f the Debtor lacks equity in the property sought to be recovered, and there is otherwise no identifiable benefit to the estate, the Trustee's entitlement to recovery under § 550 must be denied."[543] They argue further that because "Vining has never made any showing that the avoidance would benefit the estate," pursuing avoidance and recovery of such purported transfers would be fruitless, a "'gross abuse of [Vining's] discretion,'" and a violation of the Vining's fiduciary duty to expeditiously liquidate the assets of

---

[540] *Id.* at 33-34.

[541] *Id.* at 34.

[542] *Id.*

[543] *Id.* at 32.

262

the estate for the benefit of the estates's creditors.[544]  Among other cases, the Taunt Defendants

rely on *McCord v. Agard* (*In re Bean*), 252 F.3d 113 (2d Cir. 2001); *McCord v. Agard* (*In re*

*Bean*), 251 B.R. 196 (E.D.N.Y. 2000); *In re C. Keffas & Son Florist, Inc.*, 240 B.R. 466 (Bankr.

E.D.N.Y. 1999); and *Dave Noake, Inc. v. Harold's Garage, Inc.* (*In re Dave Noake, Inc.*), 45 B.R.

555 (Bankr. D. Vt. 1984).

In support of their motion for summary judgment, the Taunt Defendants discuss Vining's

claims of collusive sales under § 363(n) and of avoidable post-petition transfers under § 549(a)

together, [545] and argue that the Court should dismiss both claims for the same reasons.

### b. Plunkett & Cooney's position on Vining's claim of avoidable post-petition transfers

Plunkett & Cooney argues that Vining has not sufficiently pled his claim for avoidance

and recovery of post-petition transfers under §§ 549 and 550.  It argues that Vining has not

specified which assets of the estate were transferred, or when the purported avoidable transfers

occurred.  Rather, according to Plunkett & Cooney, Vining states only that the Comerica Fee

Agreement and invalid orders of this Court transferred possession and control over all assets of

the estate to Comerica.[546]

Plunkett & Cooney argues that regardless of "the merits of [Vining's] avoidance claim

[under § 549] against Comerica, it has no application to Plunkett & Cooney."[547]  This is so,

---

[544]  *Id.* at 32-34 (citation omitted).

[545]  Taunt Defs.' Br. (Docket # 658) at 48 ¶ 4; *see also* part VII.A.6.a of this Opinion.

[546]  Plunkett & Cooney's Opp'n Br. (Docket # 622) at 30.

[547]  *Id.* at 31.

according to Plunkett & Cooney, because under § 550, a trustee who avoids a transfer under § 549 can only recover from "the initial transferee of such transfer or the entity for whose benefit such transfer was made" or "any immediate or mediate transferee of the initial transferee," and Vining does not "allege that Plunkett & Cooney is a transferee of any kind."[548]  Plunkett & Cooney argues further that Vining does not have any factual support for his claim that Plunkett & Cooney conspired with Taunt in transferring property of the estate, and Vining does not cite any authority for the proposition that under § 550, a trustee can recover from a party who is not a transferee but was involved in a conspiracy to transfer property.[549]

Plunkett & Cooney argues further that there is "no precedential authority," and Vining has not cited any authority, that would support recovery on any other basis under § 550 from anyone other than one of the parties specified in that provision.[550]

Although Plunkett & Cooney does not expressly say so, it implicitly argues that it cannot be held liable under § 550 as "the entity for whose benefit such transfer was made."  This is implied in Plunkett & Cooney's argument that it is not one of the parties from whom § 550 allows recovery.

### c.  The Comerica Defendants' position on Vining's claim of avoidable post-petition transfers

The Comerica Defendants argue that Vining is not entitled to avoid and recover under §§ 549 and 550 any transfers of property of the estate that were authorized by orders of this Court,

---

[548]  *Id.* at 30-31.

[549]  *Id.* at 32.

[550]  *Id.*

264

even though those orders were later vacated.  The Comerica Defendants argue that "§ 549 allows a trustee to avoid certain **debtor-initiated** *unauthorized* transfers of property that are not otherwise prohibited under the [Bankruptcy] Code."[551]  The Comerica Defendants argue that because "[o]nly debtor-initiated transfers are subject to section 549" and "Vining does not assert that [MTG] made transfers to Comerica[,] . . . his claims under section 549 fail as a matter of law."[552]

The Comerica Defendants argue further that even if transfers not initiated by the Debtor are avoidable under § 549, to the extent Vining is basing his § 549 claim on a purported automatic stay violation allegedly caused by the Court vacating the Comerica Relief From Stay Order, Vining's claim still fails.  This is so, according to the Comerica Defendants, for two reasons.  First, the Comerica Relief From Stay Order was not vacated retroactively, so the order vacating did not later convert actions authorized under the Comerica Relief From Stay Order into unauthorized actions.  Second, "'§ 549 applies only to post petition transfers that are neither authorized nor expressly prohibited.  It does not apply to a transfer in violation of the automatic stay because such a transfer is expressly prohibited.'"[553]

In addition to the Comerica Defendants' substantive arguments regarding why the Court should deny Vining's § 549 claim, they argue that the Court should deny this claim on the procedural ground that it is premature.  The Comerica Defendants note that when the Court vacated certain orders in its Fraud on the Court Opinion, including the Comerica Relief From Stay

---

[551] Comerica's Resp. Br. (Docket # 634) at 41 (italics and bold added) (citation omitted).

[552] *Id.* at 42.

[553] *Id.* (quoting *Smith v. London* (*In re Smith*), 224 B.R. 44, 47 (Bankr. E.D. Mich. 1998)).

Order, it contemplated again revisiting the subjects of those orders after "the conclusion of this adversary proceeding."[554]

In the brief in support of their motion for summary judgment, the Comerica Defendants, like the Taunt Defendants, discuss Vining's claims of collusive sales under § 363(n) and of avoidable post-petition transfers under § 549 together, and argue that the Court should dismiss both claims for the same reasons.[555]

### d. The Court's ruling

Section 549(a) states:

> Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
>
> (1) that occurs after the commencement of the case; and
>
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
>
> (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). In this case, none of the post-petition transfers at issue were "authorized only under section 303(f) or 542(c)" of the Bankruptcy Code, so § 549(a)(2)(A) is not applicable. The issue is whether any of the alleged transfers were "not authorized under" the Bankruptcy Code "or by the court," within the meaning of § 549(a)(2)(B).

The Court concludes that based on undisputed facts, none of the alleged post-petition transfers were unauthorized. Rather, they all were "authorized" under the Code or by orders of this Court. The result is that none of the alleged transfers are avoidable under § 549(a).

---

[554] *Id.* at 42 (citing *M.T.G.,* 366 B.R. at 757).

[555] Comerica Defs.' Br. (Docket # 584) at 34-37.

266

First, the Court notes that Vining's complaint does not actually allege that any of the post-petition transfers at issue were unauthorized. Rather, the complaint alleges only that the transfers "were not **properly** authorized under the Code or by this Court."[556] But the word "properly" does not appear in § 549(a). A post-petition transfer does not need to be "properly authorized" to be immunized from avoidance under § 549(a)(2)(B); rather, it only needs to have been "authorized" by the Court or under the Code. Whether the authorization was "proper" or not is immaterial.

A recent court of appeals case supports this distinction, by analogy under a different section of the Bankruptcy Code. *Reynolds v. Servisfirst Bank* (*In re Stanford*), 17 F.4th 116 (11th Cir. 2021) was a Chapter 11 case in which the debtors obtained an order from the bankruptcy court under § 363(b), authorizing the sale of real property by means of a credit bid by a secured creditor. Later, the debtors sought to modify the sale order, to remove the provision authorizing a credit bid, arguing that certain post-petition events had eliminated the creditor's lien in their real estate. After the bankruptcy court denied that relief, the debtors appealed. The debtors failed to obtain a stay of the sale order pending appeal, and the sale closed. The district court and the court of appeals dismissed the debtors' appeals, as moot, based on 11 U.S.C. § 363(m). That section provides:

> The reversal or modification on appeal **of an authorization under subsection (b) or (c) of this section of a sale** or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added).

---

[556] Compl. at ¶ 264(B) (emphasis added).

The *Stanford* debtors argued that § 363(m) did not apply to the sale at issue because the bankruptcy court's order authorizing the sale was "not authorized by the [Bankruptcy] Code because [the creditor's] credit bid was invalid." 17 F.4th at 122. In rejecting that argument, the court of appeals held that § 363(m) applied to the sale, regardless of whether the bankruptcy court's authorization of the sale under § 363(b) was proper. It was enough that the sale was authorized. *See id.* at 122-23. The court held that:

> *Section 363(m) Moots Appeals from Any Sale Authorized by the Bankruptcy Court, Not Just Those Properly Authorized by the Code*[.]
> . . .
>
> [T]he plain language of Section 363(m)'s text . . . unambiguously supports [the creditor's] position. . . . Section 363(m) moots an appeal from "an *authorization under* subsection (b) or (c) of this section." This language makes it clear that *all* "authorizations" are covered, not just those that may be *proper* under the Code.

*Id.* (italics in original) (citations omitted).

So it is with § 549(a)(2)(B). If a transfer was "authorized" by an order of the Court, it does not matter whether that authorization was "proper" or valid.

In this case, it is undisputed that every alleged post-petition transfer that Vining seeks to avoid under § 549(a) was authorized by an order of this Court. These orders include the Comerica Settlement Order;[557] the order approving the Becker Settlement;[558] and the order approving the Injectronics settlement.[559] With the exception of the Comerica Settlement Order, all of these

---

[557] Docket # 488 in Case No. 95-48268, filed August 29, 1996.

[558] Docket # 466 in Case No. 95-48268, filed May 28, 1996.

[559] Docket # 566 in Case No. 95-48268, filed March 10, 1997.

268

orders remain in full force and effect, and they are not being vacated or modified as a result of any of Vining's claims in this adversary proceeding.

As noted earlier in this Opinion, the Comerica Settlement Order was vacated in April 2007, several years after it was issued, because of fraud on the court. But there is nothing in the Court's Fraud on the Court Opinion, or in the order that vacated the Comerica Settlement Order, stating or implying that the Comerica Settlement Order was being vacated on some sort of retroactive basis, or *nunc pro tunc*, or that it was void *ab initio*.

On the contrary, the Comerica Settlement Order was not void. In discussing when a judgment is "void" under Fed. R. Civ. P. 60(b)(4), for example, the United States Supreme Court has held that "'[a] judgment is not void' . . . simply 'because it is or may have been erroneous.'" *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 270 (2010) (citations omitted). Rather, a judgment is void "only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *Id.* at 271 (citations omitted). And only a narrow class of jurisdictional defect can make a judgment or order void:

> Federal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the court that rendered judgment lacked even an "arguable basis" for jurisdiction. *Nemaizer v. Baker*, 793 F.2d 58, 65 (C.A.2 1986); see, *e.g.*, *Boch Oldsmobile, supra*, at 661–662 ("[T]otal want of jurisdiction must be distinguished from an error in the exercise of jurisdiction, and ... only rare instances of a clear usurpation of power will render a judgment void" (brackets and internal quotation marks omitted)).

*Id.*

The Comerica Settlement Order was not void, even though this Court ultimately vacated

that order, due to fraud on the court.  This Court did not lack jurisdiction when it entered the Comerica Settlement Order, and there was no due process violation in the entry of the order.

A further reason why the Comerica Settlement Order cannot be deemed void *ab initio* is that this Court's decision to vacate that Order, due to fraud on the Court, was a discretionary matter.  A federal court is not compelled to vacate an order that was obtained by a fraud on the court.  Rather, as discussed in Part VII.A.1.e.4.i of this Opinion, the Court has significant discretion in determining, in each case, what remedy or remedies should be imposed for a fraud on the court.  And while this Court exercised its discretion to vacate the Comerica Settlement Order, the Court did not hold or imply that the order was void *ab initio*.  It was not.

The undisputed historical facts are that Taunt's settlement with Comerica was authorized by an order of this Court, so that at the time Taunt made the alleged "transfer(s)" of the bankruptcy estate's claims against Comerica, Taunt in fact was authorized to do so.  Nothing has changed or will change these historical facts.

Thus, all of the alleged post-petition transfers at issue were "authorized" by the Court, within the meaning of § 549(a)(2)(B), and therefore cannot be avoided under § 549(a).[560]  The Court will grant summary judgment in favor of the Defendants on Count VI of Vining's complaint.

### 8.  Vining's claim of automatic stay violations (Count VIII)

Count VIII of Vining's Complaint is a claim against the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants for violations of the automatic stay under 11 U.S.C.

---

[560]  Given the Court's ruling, it is not necessary to reach the Defendants' other arguments in seeking summary judgment on this claim.

270

§§ 363(a)(3), 363(a)(4) and 363(a)(6), by "exercising control over the property and administration of the Debtor's estate for [Comerica's] benefit."[561]  According to Vining, these Defendants obtained possession of, exercised control over, and transferred estate assets under the Comerica Fee Agreement.  Vining argues that the Defendants' actions in furtherance of the Comerica Fee Agreement were "without authorization."[562]  According to Vining, the Defendants also "acted with malice, fraudulent intent, and in arrogant defiance of the law."[563]  Vining alleges that the estate was damaged by the Defendants' violation of the automatic stay and therefore, under 11 U.S.C. §§ 362(h) and 105(a), they should be held jointly and severally liable for "the estate's actual damages, interest, attorney fees, costs, and punitive damages in an appropriate amount."[564]  That appropriate amount of damages, according to Vining, should be calculated as follows:

> (a) compensatory damages based on the fair market value of the estate assets controlled and subsequently transferred to Defendants . . . including attorneys' fees and costs, (b) profits earned by Comerica on converted funds wrongfully withheld from this estate for over 19 years, (c) punitive damages in an amount no less than three times compensatory damages, and (d) costs, including attorney fees.[565]

Vining's Exhibit DM is entitled "Summaries of Damages and other Monetary Relief Sought by Trustee" and contains a "Summary of Fair Market Values of Estate Assets."[566]  The

---

[561] Compl. at ¶ 271.

[562] Trustee's Br. (Docket # 657) at 46.

[563] *Id.*

[564] Compl. at ¶ 274; *see also* Trustee's Br. (Docket # 657) at 46.

[565] Trustee's Br. (Docket # 657) at 46 (record citations omitted).

[566] Docket # 589-53 (bold and underlining deleted).

271

summary includes an itemized list of "Case Transfers/Receivables," which according to Vining, totals $3,437,272.22; a list of "Machinery and Equipment," which according to Vining, totals $2,371,045.00; and a list of "Real Property," which according to Vining, totals $700,000.00, for a grand total of $6,508,317.22.[567]

With regard to the "profits earned" component of damages, Vining alleges that "[u]nder case law and equitable principles, Comerica must disgorge profits it has earned based on the funds misappropriated from Debtor's estate."[568] In a document entitled "Profit Disgorgement Summaries," Vining estimates that such profits total $3,677,991.97.[569]

Vining also argues that Comerica's violated the automatic stay in March 1996, when it transferred $81,842.45 from the Debtor-in-Possession accounts ("DIP Accounts") to an escrow account at Comerica, and paid utility bills from that account, both before the Court entered the Comerica Stay Relief Order.

### a. The Taunt Defendants' position on Vining's claim of automatic stay violations

The Taunt Defendants first argue that it is difficult, if not impossible, to respond to Plaintiff's Summary Judgment Motion regarding Vining's claim in Count VIII, because Vining has failed to specify what conduct on their part violated the automatic stay, and Vining has failed to cite to the record to support his factual allegations. The Taunt Defendants argue:

> [Vining's] analysis violates one of the basic tenets of a dispositive motion practice under Fed.R.Civ.Pro. 56, requiring that factual disputes be supported by citations to "particular parts of materials in the record." (Fed.R.Civ.P. 56(c))." Vining simply makes the broad,

---

[567] *Id.* (bold and underlining deleted).

[568] Ex. PD (Docket # 589-74) at 1.

[569] *Id.*

272

conclusory allegation that "Defendants violated the automatic stay," coupled with an unsubstantiated assertion that Defendants unlawfully controlled, possessed and transferred estate property. These statements lack factual support that would otherwise enable the Taunt Defendant[s] to decipher what particular conduct Vining relies upon to support his conclusion.[570]

The Taunt Defendants next argue that they did not violate the automatic stay. This is so, they say, because there has never been any finding by the Court that they acted with fraudulent intent or the intent to deceive or defraud the Court,[571] and all of the relevant transactions which form the basis for Vining's automatic stay violation claim "were approved by the [C]ourt and, to the extent that the orders [approving their actions] were set aside, the [C]ourt would now grant relief from the stay and approve them[.]"[572]

The Taunt Defendants argue further that because they were not pre-petition creditors of MTG, and because their actions which underlie Vining's claim of a stay violation were not an effort to collect on pre-petition debts, § 362 does not apply to them.[573] In addition, the Taunt Defendants argue that Vining is not entitled to seek relief under § 362(k)(1). This is so, they argue, because § 362(k)(1) permits relief only for "an individual," and a trustee is not an individual within the meaning of § 362(k)(1). Therefore, under § 362(k)(1), "Vining is not 'an individual' entitled to damages for violation of the stay."[574] And, according to the Taunt Defendants, the sole remedy available to individuals injured by alleged stay violations is to seek

---

[570] Taunt Defs.' Resp. (Docket # 638) at 36.

[571] *Id.* at 35-36.

[572] Taunt Defs.' Br. (Docket # 658) at 48-49 ¶ 5.

[573] Taunt Defs.' Resp. (Docket # 638) at 36-37.

[574] *Id.* at 37-38.

redress under § 362(k), relief which Vining acknowledges he is not entitled to."[575]  The Taunt Defendants argue that a court may not award damages for a stay violation under § 105(a).[576]

### b.  Plunkett & Cooney's position on Vining's claim of automatic stay violations

Plunkett & Cooney argues that Vining has failed to sufficiently plead his claim against Plunkett & Cooney for an automatic stay violation.  Plunkett & Cooney says that the pleading deficiencies include Vining's failure to specify which subsection of § 362 he claims Plunkett & Cooney violated; his failure to describe what action Plunkett & Cooney allegedly took which violated the automatic stay; and his failure to cite to portions of the record that support the factual allegations of his claim.  In light of these deficiencies, Plunkett & Cooney says, it is forced to guess the basis for Vining's automatic stay violation claim.[577]

Plunkett & Cooney surmises that Vining claims that it violated the automatic stay by operating under the allegedly illegal Comerica Fee Agreement; unlawfully controlling, possessing, and transferring property of the estate; and pursuing collection and recovery of Comerica's secured claim against property of the estate.  Plunkett & Cooney notes that "[t]he most relevant subsection of [§] 362 would seem to be [§] 362(a)(3), which prohibits 'any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .'"[578]  Plunkett & Cooney argues that Vining's claim under § 362(a)(3) fails as a matter of law.

---

[575]  *Id.* at 40.

[576]  *Id.* at 38-41.

[577]  Plunkett & Cooney's Opp'n Br. (Docket # 622) at 32-33.

[578]  *Id.* at 33 (footnote omitted).

274

Plunkett & Cooney argues that Taunt and his attorneys, as Trustee and Trustee's counsel, were authorized to take all of the actions that form the basis for Vining's stay-violation claim, *at the time that they took the actions*.  According to Plunkett & Cooney, it does not matter that the Comerica Fee Agreement created a conflict of interest which led to Taunt and his attorneys *later* being disqualified from acting on behalf of the estate, and that the Court *later* vacated orders which authorized the actions complained of.  These facts do not convert Plunkett & Cooney's authorized actions into unauthorized actions.[579]

Plunkett & Cooney argues that there can be no willful violation of the automatic stay under § 362(k) where the actions complained of were "*authorized by this Court*."[580]  It argues that the only estate property that Vining lists as a basis for his stay-violation claims is the following: "'[t]he Lender Liability, Becker, Injectronics, Bank Preference, and May Chapter 5 Claims[.]'"[581] Plunkett & Cooney notes that the Court approved settlements regarding potential claims against Comerica, the Becker Group and Injectronics, and Vining "settled claims against May after averring that they had no real value."[582]

Plunkett & Cooney argues that the fact that this Court later vacated the Comerica Relief From Stay Order and other orders does not rewrite the history of the bankruptcy case.  Plunkett & Cooney relies on *Javens v. City of Hazel Park* (*In re Javens*), 107 F.3d 359, 371 (6th Cir. 1997) (stating, in relevant part that "[e]ven if the bankruptcy court were wrong, and the cities should not

---

[579]  *Id.*

[580]  Plunkett & Cooney's Br. (Docket # 578) at 31 (italics in original).

[581]  *Id.* at 30 (citing Compl. at ¶ 268).

[582]  *Id.* at 30-31 (citation to record omitted).

275

have enjoyed exceptions to the automatic stays, it could scarcely be said that the cities willfully violated stays that court orders declared did not exist").  Plunkett & Cooney argues that the rationale in *Javens* applies to Vining's claim of automatic stay violations: "Even if the Bankruptcy Court should not have approved orders settling claims with Comerica, Injectronics, the Becker Group, and May those actions were nevertheless approved by the Bankruptcy Court and cannot be considered 'willful' violations" under 11 U.S.C. § 362(k).[583]

### c.  The Comerica Defendants' position on Vining's claim of automatic stay violations

The Comerica Defendants first argue that under 11 U.S.C. § 362(h), which was in effect in 1996 when the alleged stay violations occurred, and later became 11 U.S.C. § 362(k), "Vining cannot recover for any alleged violations of the automatic stay."[584]  This is so, according to the Comerica Defendants, because under § 362(k)(1), only an "individual" can recover for a willful violation of the stay, and a Chapter 7 trustee is not an "individual" within the meaning of the statute.[585]

Second, the Comerica Defendants argue that they did not violate the automatic stay, because they "did not 'control' the resolutions of the estate's claims against Comerica or third parties."[586]

Third, the Comerica Defendants argue that Comerica's March 1996 transfer of $81,842.45 from the DIP Accounts to an escrow account at Comerica, before the Court entered the Comerica

---

[583]  *Id.* at 32 & n.127.

[584]  Comerica Defs.' Br. (Docket # 584) at 39.

[585]  *Id.* at 39-40.

[586]  *Id*. at 37.

Relief From Stay Order, was not a violation of the stay.[587]  Relying on *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 19-21 (1995), the Comerica Defendants argue that "[c]reditors with setoff rights are allowed to place administrative holds on bank accounts or similar action to preclude the debtor from accessing accounts pending a motion to lift an automatic stay."[588]  The Comerica Defendants argue that Comerica's holding of funds, which were subject to its right of setoff, pending the Court's ruling on its motion for relief from stay, which Comerica filed the day before, is not a violation of the stay under *Strumpf*.[589]

Fourth, the Comerica Defendants argue that Vining has not satisfied two of the elements of his § 362(k) claim, namely, that the bankruptcy estate was injured by a willful violation of the automatic stay by Comerica; and that the bankruptcy estate suffered actual damages.[590]

According to the Comerica Defendants, after MTG converted to Chapter 7, neither MTG nor the Chapter 7 Trustee had any right to use the funds that Comerica put in an escrow account, because the funds were Comerica's cash collateral.  Therefore, according to the Comerica Defendants, MTG was not injured by Comerica's actions, and neither was the bankruptcy estate.

According to the Comerica Defendants, Comerica's violation of the stay was not "willful" because Comerica's actions cannot be characterized as the type of "'egregious, intentional misconduct'" that courts typically require a debtor to show to find a stay violation "willful."[591]

---

[587]  *Id.* at 40-41.

[588]  *Id.* at 40.

[589]  *Id.* at 41.

[590]  *Id.*

[591]  *Id.*

According to the Comerica Defendants, no payments went directly to Comerica. Rather, Comerica paid utility bills from the escrow account to preserve the estate. And, they argue, because those payments were made within a few weeks before the Court entered the Comerica Relief From Stay Order, such payments were, at most, mere technical violations of the automatic stay, and as such, were not willful.

The Comerica Defendants also argue that "Vining cannot establish actual damages."[592] The Comerica Defendants rely on the Tenth Circuit Court of Appeals case of *Jubber v. Bank of Utah* (*In re C.W. Mining Co.*)*,* 749 F.3d 895, 899 (10th Cir. 2014), which according to the Comerica Defendants, "joined the First Circuit [Court of Appeals case of *Fleet Nat'l Bank v. Gray* (*In re Bankvest Capital Corp.*), 375 F.3d 51, 57 (1st Cir. 2004),] in holding that a Chapter 7 trustee cannot recover a secured creditor's post-petition transfer in violation of the automatic stay without establishing actual damages."[593]

The Comerica Defendants argue further that Vining is not entitled to any punitive damages under § 362(k)(1). The Comerica Defendants argue that "[p]unitive damages for violation of the automatic stay are available only for 'egregious, vindictive, or intentionally malicious' conduct," and for deterrent purposes, and are "not meant to compensate or enrich individual victims."[594] The Comerica Defendants argue further that Comerica's payment of "$8,000 of **MTG utility bills from funds subject to Comerica's security interest – funds that MTG had no right to use**" does not

---

[592] *Id.* at 42.

[593] *Id.* (footnote omitted).

[594] *Id.* at 42-43 (citing *In re Baer*, No. 11-8062, 2012 WL 2368698, at *10 (B.A.P. 6th Cir. 2012)).

meet this criteria, and therefore the Court cannot award punitive damages under § 362(k).[595]

Nor, according to the Comerica Defendants, does the Court have inherent authority under § 105(a) "to impose substantial noncompensatory punitive sanctions."[596] The Comerica Defendants argue that although § 105(a) grants the Court "broad discretion to craft appropriate remedial orders . . . that discretion permits a bankruptcy court only to award 'mild noncompensatory punitive damages.'"[597] The Comerica Defendants note that in *Adell v. John Richards Homes Bldg. Co.* (*In re John Richards Home Bldg. Co.*), 552 F. App'x. 401 (6th Cir. 2013), the court found that an award of $2.8 million in sanctions was "'serious under any definition' and thus beyond the authority of a bankruptcy court.'"[598] Therefore, the Comerica Defendants argue, "MTG's request for $50 million in punitive damages against Comerica is clearly beyond the authority of this Court."[599]

### d. The Court's ruling

The Court concludes that with one minor and harmless exception by Comerica, none of the Defendants violated the automatic stay. The Court further concludes that, even if any of the Defendants' acts could be construed as a stay violation, none of the complained of acts resulted in any injury to the bankruptcy estate. Therefore, Vining has failed to satisfy necessary elements of

---

[595] *Id.* at 50 (emphasis in original). As discussed below in Part VII.A.8.d.3 of this Opinion, the evidence in the record indicates that Comerica paid $6,225.52 in utility bills, not $8,000.00.

[596] *Id.* at 43-44 (bold in original).

[597] *Id*. at 43 (quoting *Adell v. John Richards Homes Bldg. Co.* (*In re John Richards Home Bldg. Co.*), 552 F. App'x. 401, 414 (6th Cir. 2013)).

[598] *Id.* at 44 (quoting *Adell v. John Richards Homes Bldg. Co.* (*In re John Richards Home Bldg. Co.*), 552 F. App'x. 401, 416 (6th Cir. 2013)).

[599] *Id.*

279

his stay violation claim, and is not entitled to an award of any damages on this claim.

**1.  The Taunt Defendants and Plunkett & Cooney did not violate the automatic stay.**

**i.  Some automatic stay principles relevant to this case**

Section 362(a) states, in relevant part:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, . . . operates as a stay, **applicable to all entities**, of –
> . . .
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
> . . .
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;
> . . . .

11 U.S.C. § 362(a) (emphasis added).  "Subsection 362(a) provides for an automatic stay, **applicable to all entities**, . . . [of] virtually all acts to collect prepetition claims and all actions that would affect property of the estate[.]"  3 Collier on Bankruptcy ¶ 362.03 (Richard Levin & Henry J. Sommer eds., 16th ed. 2022) (emphasis added).

The Bankruptcy Code defines "entity" broadly.  It states: "The term 'entity' includes person, estate, trust, governmental unit, and United States trustee."  11 U.S.C. § 101(15).  "The term 'person' includes individual, partnership, and corporation[.]"  11 U.S.C. § 101(41).

Courts are split on whether a chapter 7 trustee, in his capacity as a representative of the

280

bankruptcy estate,[600] a chapter 11 debtor-in-possession,[601] and a bankruptcy estate in its own

bankruptcy case, are "entities" within the meaning of § 101(15), and thus are subject to the

automatic stay provisions of § 362(a).  *See*, *e.g.*, *In re Mid-City Parking, Inc.*, 332 B.R. 798, 809-

20 (Bankr. N.D. Ill. 2005) (discussing cases, and holding that a case trustee and a debtor-in-

possession were "entities" within the meaning of § 362(a), but they could, without leave of the

bankruptcy court, "waive the protections afforded by § 362(a) when the actions that would

otherwise violate the stay are in furtherance of [their] statutory duties of administering the

bankruptcy estate, including appealing judgments against the debtor's estate in nonbankruptcy

forums").

But regardless of whether a Chapter 7 trustee is restrained by § 362(a), the Bankruptcy

Code expressly authorizes a chapter 7 trustee to take all of the actions listed in § 704(a), many of

which would be a violation of the automatic stay if taken by any other entity.  Section 704(a),

---

[600] Section 323 of the Bankruptcy Code, entitled "Role and Capacity of trustee," provides

> (a) The trustee in a case under this title is the representative of the estate.

> (b) The trustee in a case under this title has capacity to sue and be sued.

11 U.S.C. § 323.

[601] Subject to certain exceptions, § 1107(a) of the Bankruptcy Code gives a Chapter 11 debtor-in-possession all the rights, powers and duties of a trustee.  It states:

> (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a).

which in 1996 was codified as Section 704, states, in relevant part:

> (a) The trustee shall–
>
>> (1) **collect and reduce to money the property of the estate for which such trustee serves**, and close such estate as expeditiously as is compatible with the best interests of parties in interest;
>>
>> (2) be accountable for all property received;
>> . . .
>>
>> (4) investigate the financial affairs of the debtor;
>>
>> (5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;
>>
>> (6) if advisable, oppose the discharge of the debtor;
>>
>> (7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;
>> . . .
>>
>> (9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee;
>> . . .

11 U.S.C. § 704(a) (emphasis added).

Not only are the actions listed in § 704(a) permissible, but also it is a chapter 7 trustee's *duty* to take such actions.

Vining does not argue otherwise. And Vining does not dispute that, under normal circumstances, the actions taken by Taunt and his attorneys would be considered to be authorized under § 704 at the time Taunt and his attorneys took those actions. Vining does not contend that, under normal circumstances, the actions taken would be a violation of the automatic stay. They

282

would not.

Vining alleges that the bankruptcy estate was injured by Taunt's and his attorneys' violation of the automatic stay. Vining argues that he is therefore entitled to damages under current Bankruptcy Code § 362(k)(1), which in 1996 was § 362(h), or alternatively, under Bankruptcy Code § 105(a).[602]

Section 362(h), which was in effect at the time of the actions complained of, stated that "[a]n individual injured by any willful violation of a stay provided by [section 362(a)] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." This language now appears in § 362(k)(1).[603] There is a conflict of authority on whether a bankruptcy trustee is "an individual" within the meaning of § 362(h)/ 362(k)(1). *See*, *e.g.*, *Havelock v. Taxel* (*In re Pace*), 67 F.3d 187, 192-93 (9th Cir. 1995) (citing conflicting cases, and following the cases holding that a chapter 7 trustee is not "an individual" within the meaning of § 362(h)).

This Court holds, as it previously held in this case and in other cases, that a Chapter 7 Trustee is not an "individual" under this section. (*See* "Supplement to Opinion Regarding Plaintiff's Motions For Turnover of Estate Documents, Enforcement of the Automatic Stay, and for Sanctions";[604] *see also* "Opinion Regarding Plaintiff's Motions For Turnover of Estate

---

[602] Vining cites to both § 362(h) and §362(k)(1), which replaced § 362(h). (*See. e.g.*, Compl. at ¶ 274 (citing § 362(h); Trustee's Br. (Docket # 657 at 31 (§ 362(k), 46 (§§ 362(h) and 363(k)(1)).

[603] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA") amended § 362 such that former § 363(h) is now § 362(k)(l).

[604] Docket # 492 at 64-65 (attaching and relying on Tr. of July 30, 2009 Bench Op. in Adv. No. 09-4639 (*Lewis v. Negri Bossi USA, Inc.* (*In re Mathson Indus., Inc.*)). In the bench opinion just cited, the Court stated:

Documents, Enforcement of the Automatic Stay, and for Sanctions";[605] Tr. of Nov. 16, 2005 Mot.

---

> As I have held in prior cases, individual as used in that section means a human being and not a non-human person or not a non–human entity. Now the trustee of course is a human being, but the trustee is not bringing this adversary proceeding and seeking damages and claiming a violation of the stay in her individual capacity, that is in her capacity as a human being, a person, but rather as – on behalf of the bankruptcy estate which is not a human being.
>
> That – and in my view then essentially it's the estate, the bankruptcy estate that is seeking damages for violation of the automatic stay [and] since that estate is not an individual under Section 362(k)(1), that section does not apply to authorize damages or monetary relief of any kind in favor of the estate against [the corporate defendant] here for violation of the automatic stay.

*Id.* (agreeing with, and following, *Spookyworld, Inc. v. Town of Berlin* (*Spookyworld, Inc.*), 345 F.3d 1, 7-8  (1st Cir. 2003), which followed the majority line of cases holding that a corporation is not an individual within the meaning of § 362(h), now § 362(k)(1)).

[605] Docket # 489 at 8.  In that opinion the Court stated:

> [T]his Court has no authority to grant any relief to the Trustee that is based on § 362(k)(1) of the Bankruptcy Code. . . . [Section 362(k)] does not apply here, because the Chapter 7 Trustee is not "an individual" within the meaning of § 362(k)(1). While the Trustee is a human being, in his capacity as Trustee he represents the Chapter 7 bankruptcy estate, which is not a human being, and therefore not an "individual." This Court has so ruled in prior cases, and incorporates those prior rulings here by reference. [Footnote 8  *See also In re Sayeh*, [445 B.R. 19, 26-27 (Bankr. D. Mass. 2011)](citing *Havelock v. Taxel* (*In re Pace*), 67 F.3d 187, 192 (9th Cir.1995) and 3 Collier on Bankruptcy, ¶ 362.12[3] (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2010))(noting a split of authority "on the question of whether a bankruptcy trustee, acting as a representative of a bankruptcy estate, is an 'individual' within the meaning of § 362(k)(1)" and concluding that "the better view . . . is that 'individual' does not include a trustee as representative of a bankruptcy estate . . . [and that t]he Trustee therefore may not have recourse to § 362(k)(1)."); *cf. Spookyworld, Inc. v. Town of Berlin* (*In re Spookyworld, Inc.*), 346 F.3d 1, 7-8 (1st Cir. 2003)(Chapter 11 debtor corporation is not "an individual" within the meaning of former section 362(h), now found at section 362(k)(1)).
>
> [Footnote 8  *See, e.g.*, this Court's bench opinion of July 30, 2009 in *Lewis v. Negri Bossi* (*In re Mathson Industries, Inc.*), Adv. No. 09-4639 (Transcript, on file at Docket # 102, at pp. 64-65)(holding that Chapter 7

284

Hr'g in *Deluxe Pattern Corp. v. Winget* (*In re Deluxe Pattern Corp.*).)[606]  This Court also holds,

as it has previously held,

> that when the entity injured by a violation of the automatic stay is
> not "an individual," but rather is a Chapter 7 Trustee or a Chapter
> 11 debtor in possession, that entity may be awarded appropriate
> relief based on 11 U.S.C. § 105(a), which permits the bankruptcy
> court to "issue any order, process or judgment that is necessary or
> appropriate to carry out the provisions of" the Bankruptcy Code. 11
> U.S.C. § 105(a).[607]

This Court also holds, as it has held previously, that although an award of actual damages under

§ 362 is mandatory, if a willful stay violation is found, "such relief under § 105(a) is

*discretionary.*"[608]  This Court previously cited the following cases with approval:

> *See Sensenich v. Ledyard Nat'l Ban*k (*In re Campbell*), 398 B.R.
> 799, 814 (Bankr. D. Vt. 2008) (quoting *Havelock v. Taxel* (*In re
> Pace*), 67 F.3d 187, 193 (9th Cir. 1995)) ("'[A]n award of damages
> under section 362(h) [now § 362(k)(1)] is mandatory, [but] an
> award of damages [for willful violations of the automatic stay]

---

Trustee is not "an individual" within the meaning of Section 362(k)(1)).
A copy of the relevant excerpts from this bench opinion are being filed
in this case today, as a supplement to this opinion.  *Id.*

[606]  Docket # 58 in Adv. No. 04-4578 at 63-64.

[607]  "Opinion Regarding Plaintiff's Motions For Turnover of Estate Documents, Enforcement of
the Automatic Stay, and for Sanctions" (Docket # 489) at 9; *see also* "Supplement to Opinion Regarding
Plaintiff's Motions For Turnover of Estate Documents, Enforcement of the Automatic Stay, and for
Sanctions" (Docket # 492) at 65 (citation omitted) ("After enactment of section 362(h), corporations (and
other non-'individual[s]') remain free to petition bankruptcy courts to award damages for automatic stay
violations pursuant to their section 105(a) power."); Tr. of Nov. 16, 2005 Mot. Hr'g in *Deluxe Pattern
Corp. v. Winget* (*In re Deluxe Pattern Corp.*) (Docket # 58 in Adv. No. 04-4578) at 64-65; Tr. of Feb. 3,
2006 Bench Op. in *Deluxe Pattern Corp. v. Winget* (*In re Deluxe Pattern Corp.*) (Docket # 59 in Adv.
No. 04-4578) at 17-20 ("Bankruptcy Courts may grant remedies for violations of the automatic stay that
[are] based on Section 105 that are not expressly found in Section 365(h) or anywhere expressly provided
in the Bankruptcy Code.")).

[608]  "Opinion Regarding Plaintiff's Motions For Turnover of Estate Documents, Enforcement of
the Automatic Stay, and for Sanctions" (Docket # 489) at 9; *see also* Tr. of Feb. 3, 2006 Bench Op. in
*Deluxe Pattern Corp. v. Winget* (*In re Deluxe Pattern Corp.*) (Docket # 59 in Adv. No. 04-4578) at 24.

under section 105(a) is discretionary.'"); *see also Spookyworld, Inc. v. Town of Berlin* (*In re Spookyworld, Inc.*), 346 F.3d 1, 8 (1st Cir. 2003) (characterizing bankruptcy courts' power under 11 U.S.C. § 105(a) "to award damages [to "corporations (and other non-'individual[s')"] for automatic stay violations" as "[a] discretionary remedy"); *Honigman, Miller, Schwartz & Cohn, L.L.P. v. Adell* (*In re John Richards Homes Bldg. Co., L.L.C.*), 405 B.R. 192, 231 (E.D. Mich. 2009) ("Orders under § 105(a) may include sanctions, but the bankruptcy court is not required to do so as § 105(a) is, on its face, a discretionary tool for the courts.").[609]

Whether Vining seeks relief under § 362(h)/362(k)(1) or § 105(a), Vining must prove that damages "were actually suffered." *In re Pawlowicz*, 337 B.R. 640, 645-46 (Bankr. N.D. Ohio 2005) (footnote omitted) (discussing § 362(h)). Thus,

> [i]n an action brought under § 362(h), this requires showing that, (1) a legally recognized injury was suffered, (2) that the injury relates to the damages sought, and (3) that the amount of the damages can be computed with reasonable certainty; a damage award cannot be based on mere speculation, guess or conjecture.

*Id.* at 646.

With respect to punitive damages, "Section 362(h) [also] authorizes an award of [punitive] damages 'in appropriate circumstances.' The term 'appropriate circumstances' is not defined but has generally been held to require egregious misconduct on the creditor's part such as that which is taken in arrogant defiance of federal law." *Id.* at 647 (citations omitted).

This Court holds, as it previously held in another case, that where § 105(a) applies, rather than § 362(h)/§ 362(k)(1), bankruptcy courts have discretion to award punitive damages for a violation of the automatic stay only if two requirements are met.

---

[609] "Opinion Regarding Plaintiff's Motions For Turnover of Estate Documents, Enforcement of the Automatic Stay, and for Sanctions" (Docket # 489) at 9-10 (citing these cases).

First, "there has to be a willful violation of the automatic stay."[610] "Willful," within the meaning of § 362(a), means that "the creditor knew of the bankruptcy case or knew of the stay" and "violated the stay by some intentional conduct."[611] "There is no requirement for a willful stay violation that the actor knew that the act would violate the automatic stay or had a specific intent to violate the automatic stay."[612]

Second, "the Court must find that punitive damages, and in fact a specific amount of any punitive damages awarded[,] is necessary to deter and thereby prevent the . . . the defendant from continuing to violate the automatic stay in the future, or from violating . . . the automatic stay again in the future."[613]

> In other words, that the other remedies available under Section 105(a) for a stay violation are insufficient without a remedy of punitive damages to deter and thereby prevent future or continuing violations of the automatic stay. Those other remedies available to the Court in its discretion to remedy a violation of the automatic stay under Section 105(a) include an award of compensatory damages. That is damages that compensate the debtor in the case of a debtor injured by a stay violation for its actual damages and loss including reasonable attorney fees incurred because of the stay violation.
>
> And of course there is the prospect when an actor is considering whether to take certain conduct that would violate the automatic stay, [he or she will consider] the prospect that if the Court does determine that the action is a violation of the stay, that the actor will be subject to being held liable for such compensatory damages for

---

[610]   Tr. of Feb. 3, 2006 Bench Op. in *Deluxe Pattern Corp. v. Winget* (*In re Deluxe Pattern Corp.*) (Docket # 59 in Adv. No. 04-4578) at 27.

[611]   *Id.* at 28.

[612]   *Id.* (citing *TranSouth Fin. Corp. v. Sharon* (*In re Sharon*), 234 B.R. 676, 687–88 (B.A.P. 6th Cir. 1999); *In re Johnson*, 253 B.R. 857, 861 (Bankr. S.D. Ohio 2000)).

[613]   *Id.* at 28-29.

287

that violation.

Other relief available to the Bankruptcy Court under Section 105(a) to remedy an automatic stay violation or to otherwise enforce the automatic stay, is of course injunctive relief as recognized by the [Sixth] Circuit in [*Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.* (*In re Nat'l Century Fin. Enters.*, *Inc.*), 423 F.3d 567 (6th Cir. 2005)]. And so . . . it is only when the Court concludes that those other remedies, either . . . alone or together in combination would not suffice to . . . deter and thereby prevent any further stay violations by the respondent or the defendant at issue, does the Court have discretion under Section 105(a) to award punitive damages for . . . an automatic stay violation . . . as a remedy that is necessary or appropriate to carry out the provisions of this title. And that . . . of course means necessary or appropriate to enforce the automatic stay and to prevent future violations of the automatic stay by the person in question.

This generally . . . requires a case by case inquiry of the facts and circumstances of each case. And given this standard[,] . . . it is not necessary to impose other requirements that would have to be met before punitive damages are . . . in the Court's discretion[, awarded,] such as a requirement of malice, or egregious conduct, or specific intent to violate the automatic stay. Those factors . . . the party can argue are relevant to the larger question [of deterrence.][614]

ii. **Vining's theories of stay violations by Taunt and his attorneys fail as a matter of law.**

Vining argues that under the circumstances of this case, Taunt and his attorneys violated the automatic stay, because they took actions with regard to property of the bankruptcy estate "without authorization."[615] Vining advances two theories for this conclusion.

First, Vining argues that all of Taunt's actions and his attorneys' actions with regard to property of the estate were "without authorization," because such actions were taken at a time when Taunt and his attorneys had a conflict of interest, due to the Comerica Fee Agreement.

---

[614] *Id.* at 29-30.

[615] Trustee's Br. (Docket # 657) at 46.

288

According to Vining, because Taunt was not a "disinterested person," he was not qualified to serve as a Chapter 7 Trustee, and his attorneys likewise were not qualified to represent the bankruptcy estate. Therefore, according to Vining, any exercise of control over, or any administration of, property of the estate by Taunt and his attorneys was a violation of the automatic stay.

Second, Vining argues that even though the actions by Taunt and his attorneys were authorized by the Comerica Settlement Order; the Comerica Relief From Stay Order; and the Comerica Claim Allowance Order, such actions were "without authorization," and violated the automatic stay, because all of those orders were later vacated by the Court.

The Court rejects Vining's novel theory that when a chapter 7 trustee is disqualified from serving as a representative of the bankruptcy estate due to a conflict of interest, all of the previous acts he took while serving as a chapter 7 trustee, though authorized at the time he took them, retroactively become unauthorized, and thus somehow become a violation of the automatic stay. Vining has cited no authority that supports his theory, and the Court is not aware of any such authority. The Court holds that because all of the actions that Taunt and his attorneys took regarding property of the estate, when they were serving as representatives of the bankruptcy estate, *were authorized at the time*, by § 704(a) or by orders of this Court, or both, they were not violations of the automatic stay.

The Court's ruling is supported by a Sixth Circuit case cited by the Defendants, *Javens v. City of Hazel Park* (*In re Javens*), 107 F.3d 359 (6th Cir. 1997). In *Javens*, the debtors filed a joint bankruptcy petition after the cities of Hazel Park and Royal Oak obtained orders in pre-petition state court litigation allowing them to immediately demolish buildings that the debtors

289

owned. The cities alleged that such buildings were "a public nuisance and a danger to the public health, safety, and welfare" due to "numerous building and fire code violations." 107 F.3d at 361. "Hazel Park and Royal Oak obtained orders from the bankruptcy court declaring that there was no [automatic ] stay [under 11 U.S.C. § 362(a)] in force to prevent the enforcement of their building and fire codes," by demolishing the debtors' buildings under the state court demolition orders, and by continuing the state court litigation regarding other buildings that the debtors owned. *Id.* at 371. The bankruptcy court held

> that "[t]he automatic stay does not prevent [the] government from the exercise of police or regulatory power.... Hazel Park's effort to require adherence to building codes or demolish property that may pose a threat to the safety and health of the community is clearly within the police or regulatory power of government. The exercise of this power is not barred by the operation of 11 U.S.C. Section 362."

*Javens*, 107 F.3d at 363–64.

After obtaining stay-relief orders from the bankruptcy court, the cities demolished some of the buildings owned by the debtors and continued litigation regarding other buildings owned by the debtors. The debtors appealed the bankruptcy court's stay-relief orders, apparently "[w]ith [an] eye . . . on obtaining § 362(h) damages" for the demolition. *Id.* at 364. The district court affirmed the bankruptcy court's decision that no stay applied to the cities' actions, and the debtors appealed to the Sixth Circuit Court of Appeals. *Id.*

The Sixth Circuit affirmed the judgment of the district court. *Id.* at 371. In doing so, the court explained that even had it found that the cities' actions violated the automatic stay, "the cities would still have been mostly immune from damages for their actions." *Id.* The court reasoned:

290

Section 362(h) allows "an individual injured by any willful violation of a stay provided by this section [to] recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, [to] recover punitive damages." Hazel Park and Royal Oak obtained orders from the bankruptcy court declaring that there was no stay in force to prevent the enforcement of their building and fire codes. **Even if the bankruptcy court were wrong, and the cities should not have enjoyed exceptions to the automatic stays, it could scarcely be said that the cities willfully violated stays that court orders declared did not exist.**

*Id.* (emphasis added) (footnote omitted).

*Javens* supports the Court's conclusion in this case, that even if the Court were wrong in concluding that Taunt and his attorneys were "disinterested" and therefore qualified to act in the capacity of representatives of the bankruptcy estate, Taunt and his attorneys cannot be found after the fact to have willfully violated the stay. Taunt was the duly appointed Chapter 7 Trustee at the time of the complained of actions, and as such, he had not only the authority to take such actions but the duty to take such actions.

The Court also rejects Vining's position, that because the actions Taunt took under the authority of the orders of this Court that were later vacated (*i.e.*, the Comerica Relief From Stay Order; the Comerica Settlement Order; and the Comerica Claim Allowance Order), Taunt's actions were without authorization, and violated the automatic stay. Under *Javens*, even if the Court would not have entered those orders had it known about the conflict of interest, Taunt and his attorneys cannot be said to have willfully violated the automatic stay. This is because their complained of actions were authorized by the Court's orders *at the time they took such actions*. The actions of Taunt and his attorneys did not retroactively become stay violations when the Court vacated these orders many years later.

This conclusion is further supported by the reasons and authorities cited elsewhere in this

Opinion, in the Court's ruling on Vining's claim of avoidable post-petition transfers[616] and on Vining's common law and statutory conversion claims.[617]

Because all of the actions regarding property of the estate by Taunt and his attorneys were authorized by § 704(a) or orders of this Court, or both, such actions did not violate the automatic stay. The Court will grant summary judgment in favor of the Taunt Defendants and Plunkett & Cooney on Vining's automatic-stay-violation claim.

### 2. With the minor and harmless exception of paying some MTG utility bills, the Comerica Defendants did not violate the automatic stay.

Vining alleges two ways in which the Comerica Defendants violated the automatic stay. First, Vining alleges that the Comerica Defendants obtained possession of, exercised control over, and transferred estate assets as a result of entering into the Comerica Fee Agreement. Second, Vining alleges that a day after Comerica filed a motion to lift the automatic stay regarding the estate's DIP Accounts, and without waiting for a ruling from the Court on that motion, the Comerica Defendants took possession of and used that property of the estate, by closing the DIP Accounts, transferring the $81,842.45 remaining balance in those accounts to an escrow account at Comerica to which Taunt did not have access, and paying a $2,362.15 gas bill for real estate belonging to MTG.

The Court concludes that with the minor exception of Comerica's payment of the gas bill and some other utility bills, none of these acts by the Comerica Defendants violated the automatic stay. And Comerica's payment of the gas bill and other utility bills did not damage the bankruptcy estate.

---

[616] *See supra* Part VII.A.7.d of this Opinion.

[617] *See infra* Part VII.A.9.d of this Opinion.

First, although the Comerica Fee Agreement exceeded the scope of a surcharge agreement and in doing so created a conflict of interest for Taunt, there is nothing in the agreement or about the agreement that itself constituted a violation of the automatic stay by Comerica. The actions disposing of and transferring assets of the bankruptcy estate were taken by Taunt, in his capacity as Trustee, and under the authority of § 704 and orders of this Court. As explained above, those actions were not automatic stay violations.

Second, with only the minor exception of paying some utility bills, discussed below, Comerica's actions with regard to the DIP Accounts were akin to a bank merely placing a temporary administrative hold on a bank account, an act that the United States Supreme Court has held does not violate the automatic stay.

In *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995), the issue before the Court was "whether the creditor of a debtor in bankruptcy may, in order to protect its setoff rights, temporarily withhold payment of a debt that it owes to the debtor in bankruptcy without violating the automatic stay imposed by 11 U.S.C. § 362(a)." 516 U.S. at 17. The issue arose because a bank "placed what it termed an 'administrative hold' on so much of [a Chapter 13 debtor's bank] account as it claimed was subject to setoff—that is, the bank refused to pay withdrawals from the account that would reduce the balance below the sum that it claimed was due on [the Chapter 13 debtor's] loan." *Id.* at 17-18. Five days after the bank placed the administrative hold on the Chapter 13 debtor's bank account, the bank moved the bankruptcy court for relief from the automatic stay and for setoff. The debtor then filed a motion to hold the bank in contempt, arguing that the bank's administrative hold on its bank account violated the automatic stay under § 362(a). *Id.* at 18.

293

The Supreme Court held that the bank's "temporary refusal to pay was neither a taking of possession of [the debtor's] property nor an exercising of control over it," and thus the bank did not violate § 362(a)(3) or § 362(a)(6). *Id.* at 21. The Court also held that because the bank, in placing an administrative hold on the debtor's bank account, did not intend "permanently to settle accounts[,]" the bank's "action was not a setoff within the meaning of § 362(a)(7)," which automatically stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor[.]" *Id.* at 19; 11 U.S.C. § 362(a)(7). The Court reasoned that the bank "refused to pay its debt, not permanently and absolutely, but only while it sought relief under § 362(d) from the automatic stay." *Id.* The Court explained that

> [a] requirement of such an intent [to "permanently . . . reduce [the debtor's account balance by the amount of the defaulted loan"] is implicit in the rule followed by a majority of jurisdictions addressing the question, that a setoff has not occurred until three steps have been taken: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff. *See, e.g., Baker v. National City Bank of Cleveland*, 511 F.2d 1016, 1018 (C.A.6 1975) (Ohio law); *Normand Josef Enterprises, Inc. v. Connecticut Nat. Bank*, 230 Conn. 486, 504–505, 646 A.2d 1289, 1299 (1994).

*Id.*

Here, as in *Strumpf*, Comerica did not exercise its setoff right when it took the actions complained of, nor did it intend to permanently and absolutely settle its accounts with the Debtor. There is no evidence that Comerica made the decision to effectuate a setoff; accomplished a setoff; or recorded a setoff in its records. Rather, like the bank in *Strumpf*, Comerica sought to protect its setoff rights by placing the DIP account funds in an escrow account, which was, in effect, the equivalent of placing an administrative hold on the DIP Accounts, while Comerica

294

awaited the Court's order on its motion for relief from the automatic stay. Comerica did not use any of the money in the escrow account to pay its own expenses, or to reduce the debt MTG owed to it. Rather, Comerica's only use of the funds was for the benefit of the bankruptcy estate – it used some of the funds to preserve property of the estate by paying utility bills for property that MTG owned. That payment of utility bills may have been a stay violation, but if so, it caused no damage to the bankruptcy estate, as discussed below. Otherwise, Comerica's mere retention of the DIP funds in the escrow account was not a violation of the automatic stay. *See also City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585, 589, 591 (2021) (Chapter 13 case) (citing *Strumpf,* and holding "that mere retention of property does not violate § 362(a)(3).").

### 3. The bankruptcy estate suffered no injury as a result of the Comerica Defendants' actions regarding the DIP Accounts.

As noted above, the day after filing its motion for relief from stay on March 13, 1996,[618] the Comerica Defendants closed the DIP Accounts, and transferred the funds in those accounts to a commercial escrow account at Comerica in the name of MTG. And as noted above, this was in substance the placing of an administrative hold on the DIP account funds, until Comerica could get relief from stay. Comerica got that relief from stay on April 30, 1996, when the Comerica Relief From Stay Order was entered.

Before Comerica actually obtained the relief from stay, it used some of the funds that had been in the DIP Accounts to pay some MTG utility bills. Specifically, Comerica paid a total of $6,225.52 in utility bills before the Comerica Relief from Stay Order was entered. This consisted of a payment of a gas bill for $2,362.15 on March 18, 1996, plus the payment of other utility bills

---

[618] Docket # 346 in Case No. 95-48268.

totaling $3,863.37 on April 18, 1996.[619]

Comerica's placing of the temporary hold on the funds that were in the DIP Accounts did not injure the bankruptcy estate in any way. Neither Taunt nor anyone else, other than Comerica, had any right to use the funds that were in the DIP Accounts, because they were part of Comerica's cash collateral. Any use of such cash collateral required either the consent of Comerica or an order authorizing the use of cash collateral. *See* 11 U.S.C. § 363(c)(2). There was neither such consent nor such an order, after the conversion of MTG's Chapter 11 case to Chapter 7 on February 8, 1996. Neither the Debtor nor the Chapter 7 Trustee could use the cash collateral funds in the DIP Accounts, under the terms of the cash collateral orders that were entered while the case was in Chapter 11.[620] And no cash collateral order was entered after conversion.

Taunt's inability to access the funds in the escrow account had no negative impact on his administration of the bankruptcy estate, because had the funds remained in the DIP Accounts, he would not have had the ability to use those funds. And the Comerica Defendants' payment of the utility bills out of the escrow account actually benefitted the estate, because Taunt could not have used the funds in the DIP Accounts to pay those administrative expenses. And within a little over a month after Comerica filed its motion for relief from the automatic stay, the Court entered the

---

[619] *See* Docket # 584-34 at 5.

[620] An order was filed on August 31, 1995, authorizing the Debtor to use cash collateral until November 30, 1995. (Docket # 25 in Case No. 95-48268 at 2, ¶ 1). The authority to use cash collateral was extended by later orders, including duplicate orders filed on November 7 and 16, 1995 (Docket ## 123, 138 in Case No. 95-48268), and an order filed on December 14, 1995 (Docket # 190 in Case No. 95-48268). Under the terms of these cash collateral orders, the Debtor's authorization to use cash collateral terminated, at the latest, upon conversion of the case to Chapter 7, which occurred on February 8, 1996. (*E.g.*, Docket # 25 at 5-6, ¶ 10(B); Docket # 190 at 4, ¶ 8(B), each in Case No. 95-48268). The last of the cash collateral orders was entered on January 11, 1996 (Docket # 285 in Case No. 95-48268). Under that last order, the Debtor was authorized to use cash collateral only until January 31, 1996. (*Id.* at 2, ¶ B).

Comerica Relief From Stay Order, granting stay relief, based on a stipulation between Comerica, Taunt, and the Debtor MTG, through its attorney Halbert. The Comerica Relief From Stay Order gave Comerica relief from the stay to use and apply the DIP funds in the escrow account. And for the reasons stated above, and in Parts VII.A.7.d and VII.A.9.d of this Opinion, the fact that the Comerica Relief From Stay Order was vacated, several years later, did not convert the Comerica Defendants' actions into stay violations after the fact. And finally, as explained in Part VII.A.1.e.4.iii.c.1 of this Opinion, even after applying all payments that Comerica received in this case, Comerica's secured claim has turned out to be under-secured by more than $1.3 million. And Comerica likely has a valid super-priority administrative claim under § 507(b) of at least $444,475.17.

For all of these reasons, the bankruptcy estate suffered no actual damage from any of Comerica's actions regarding the estate's funds in the DIP Accounts. Even if any of Comerica's acts were a stay violation, the Court would not grant any relief for such violation(s). As discussed above, any monetary relief in favor of Vining, as the current Chapter 7 Trustee, for an automatic stay violation, must be based on Bankruptcy Code § 105(a), rather than § 362(h)/362(k)(1). And that means that granting such relief for a stay violation is discretionary, not mandatory. And because the bankruptcy estate suffered no damage whatsoever for the alleged stay violations, the Court would exercise its discretion to award no monetary relief to the Trustee whatsoever — no actual damages; no punitive damages; no attorney fees — even if the Court could find that a stay violation occurred.

The Court's ruling on this point is supported by a case cited by the Defendants, *Jubber v. Bank of Utah* (*In re C.W. Mining Co.*), 749 F.3d 895 (10th Cir. 2014).

In *Jubber*, the Bankruptcy Appellate Panel for the Tenth Circuit (the "Tenth Circuit BAP")
agreed with the bankruptcy court that it was "pointless" to avoid, as an unauthorized post-petition
transfer under § 549, a bank's exercise of its setoff right against a debtor's Certificate of Deposit
("COD"), which setoff was a clear willful violation of the automatic stay, because "the
post-petition transfer did not alter the Estate's financial condition in any way," and thus avoidance
of the transfer would provide no benefit to the estate. 749 F.3d at 897-98. This was so, according
to the Tenth Circuit BAP, because the bank was a secured creditor, with a lien in the proceeds of
the COD. The result of the bank exercising its setoff right was that "the [b]ank's fully secured
claim was reduced dollar-for-dollar by the post-petition transfer." *Id*. at 898. If such transfer were
avoided, the Tenth Circuit BAP reasoned, "the Bank's lien in the proceeds of the [COD] would
necessarily be revived." *Id.* at 897.

For similar reasons, the Tenth Circuit BAP held that the Chapter 7 Trustee was entitled to
no relief for the bank's violation of the automatic stay. *Id.* at 898.

On appeal from the BAP's decision, the Tenth Circuit Court of Appeals agreed that there
was no benefit to the estate of avoiding and recovering the post-petition transfer, because the
Estate would still be required to pay the secured creditor's claim in full, which claim would be
increased by the dollar amount recovered as an unauthorized post-petition transfer. *Id.* at 899.
And for the same reasons, the court of appeals held that the Chapter 7 trustee was entitled to no
relief for the bank's violation of the automatic stay. *Id.*

The reasoning in *Jubber* applies in this case. Comerica, like the bank in *Jubber*, is a
secured creditor that had a lien on the funds in the Debtor's DIP Accounts. The funds in the DIP
Accounts were Comerica's cash collateral, which could be used only in accordance with the terms

of the cash collateral orders entered when MTG's bankruptcy case was in Chapter 11.  Because of this, Comerica's actions toward the funds in the DIP Accounts "did not alter the Estate's financial condition in any way."  If the DIP funds were returned the bankruptcy estate, Comerica's lien in those funds would be revived and its claim would be increased by the amount of the funds.  There would be no benefit to the estate in ordering Comerica to pay the DIP funds back to the bankruptcy estate, even if some valid legal basis existed for doing so.

Because Vining has failed to establish that the Comerica Defendants violated the automatic stay in any way, except in the harmless action of paying $6,225.52 of the estate's utility bills, and because that action did not injure the bankruptcy estate, and the bankruptcy estate suffered no actual damages, the Comerica Defendants are entitled to summary judgment on Vining's automatic-stay-violation claim.  The Court will enter an order granting the Comerica Defendants summary judgment on this claim.

### 9.  Vining's common law and statutory conversion claims (Count IX)

Count IX of Vining's Complaint is a claim against the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants for common law and statutory conversion.  Vining alleges that these Defendants and/or agents of these Defendants converted: "(A) The Lender Liability Claims; (B) The Becker [Group] Claims; (C) The May chapter 5 Claim; (D) the Injectronics Claim; and (E) Certain accounts receivable, equipment, general intangibles, real property and other property (the 'Other Assets')," by unlawfully taking control of this property and the proceeds of this property for Comerica's benefit.[621]

Vining alleges that these Defendants are liable for common law conversion "as co-

---

[621] Compl. at ¶¶ 276, 279.

conspirators, and as "aiders-and-abetters."[622]  He argues that once the Taunt Defendants and Comerica entered into the Comerica Fee Agreement, the Taunt Defendants were disqualified from representing the bankruptcy estate, and therefore, any dominion or control they exercised over property of the estate was wrongful and constituted conversion.  According to Vining, any transfer of any estate property or any payments made to Comerica under orders of the Court "constituted continuing acts of conversion" because those orders were not valid, due to the Taunt Defendants' conflict of interest.[623]  Vining alleges that the Comerica Defendants and Plunkett & Cooney knew that the Taunt Defendants did not have the authority to enter the Comerica Fee Agreement; knew of the unlawful purpose of that agreement; provided substantial assistance to the Taunt Defendants in the conversion scheme, and actively participated in it.[624]  They therefore are liable for common law conversion, to the same extent as the Taunt Defendants.

Vining alleges that the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants also are liable for statutory conversion under the Michigan conversion statute, Mich. Comp. Laws Ann. § 600.2919a, because they were all part of the conspiracy to convert property of the estate.  According to Vining, all of these Defendants "concealed the fact that the assets had in fact been converted."[625]  Vining argues that "[a]s co-conspirators, all Defendants are jointly and severally liable for statutory conversion, regardless of who was the 'converter.'"[626]

---

[622]  Trustee's Br. (Docket # 657) at 38.

[623]  *Id.*

[624]  *Id*. at 38-39.

[625]  *Id.* at 39.

[626]  *Id.*

300

Vining alleges that "[a]s a direct and proximate result of such conversion, the Debtor's estate has been damaged."[627]  He argues that '[t]he measure of damages for conversion is the actual or fair market value of property converted at the time of conversion."[628]  Vining argues further that profits derived from the converted property, exemplary damages, and attorney fees also are available remedies for common law conversion to compensate the plaintiff, "where the defendant engages in willful and malicious misconduct."[629]  Finally, Vining argues that because these Defendants also are liable for statutory conversion, he is entitled to an award of treble damages, attorney fees, and costs against them.

### a. The Taunt Defendants' position on Vining's common law and statutory conversion claims

The Taunt Defendants argue that it was impossible for them to have converted any property of the estate, because under the Bankruptcy Code, Taunt was the Chapter 7 Trustee, and as such, he had the authority to exercise dominion and control over property of the estate, and in fact, was the only person who could do so.  The Taunt Defendants argue that "as to Taunt acting as the Trustee, the estate property was not 'another's' property which Taunt could convert. Vining may complain that Taunt exercised poor judgment in administering the property, but that is not conversion; that claim would be for a breach of fiduciary duty, which is addressed elsewhere."[630]

The Taunt Defendants dispute Vining's theory underlying his conversion claim, which is

---

[627]  Compl. at ¶ 283.

[628]  Trustee's Br. (Docket # 657) at 36.

[629]  *Id*. at 37.

[630]  Taunt Defs.' Resp. (Docket # 638) at 26.

301

that once Taunt entered into the Comerica Fee Agreement, he lost his right to act as a Chapter 7 Trustee, and to exercise dominion and control over estate property. The Taunt Defendants argue that Vining's conversion theory is not supported by any case law. Rather, they say, case law supports the conclusion that even if a chapter 7 trustee is later found to have been unqualified to act as trustee at the time he took certain actions, such actions nevertheless are valid.[631]

The Taunt Defendants also argue that the Court's Fraud on the Court Opinion, which vacated the Comerica Settlement Order, the Comerica Claim Allowance Order, and the Comerica Relief From Stay Order, does not support Vining's conversion theory, because the Court "did not find [any of its prior orders authorizing certain actions on the part of Taunt with regard to property of the estate] void *ab initio*."[632] The Taunt Defendants also note that the Court's Fraud on the Court Opinion also did not vacate the order settling the estate's claims against the Becker Group. And they point out that this Court based its holding that Taunt committed a fraud on the court on the fact that "'*as the Chapter 7 [T]rustee in this case*, Taunt was an officer of the court.'"[633] The Taunt Defendants argue that this holding meant that "Taunt was the [T]rustee, remained the [T]rustee until removed in 2000, and could rightfully exercise dominion over the assets [of the bankruptcy estate]."[634]

As to Vining's statutory conversion claim under Mich. Comp. Laws § 600.2919a, relying

---

[631] *Id.* (citing *Granderson v. Carpenter* (*In re Granderson*), 252 B.R. 1 (B.A.P. 1st Cir. 2000)).

[632] *Id.* (record citation omitted) (italics in original).

[633] *Id.* (emphasis added) (citing Docket # 1353 in Case No. 95-48268) at 17; *In re M.T.G., Inc.*, 366 B.R. 730, 749 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich. 2009)).

[634] *Id.* (relying on the Court's Fraud on the Court Opinion (Docket # 1353 in Case No. 95-48268) at 17; *In re M.T.G., Inc.*, 366 B.R. 730, 749 (Bankr. E.D. Mich. 2007), *aff'd*, 400 B.R. 558 (E.D. Mich. 2009)).

on *Hovanesian v. Nam*, 539 N.W.2d 557 (Mich. Ct. App. 1995), the Taunt Defendants argue that a mistake as to title of property is a defense against a statutory conversion claim, even though it is not a defense to a common law conversion claim. The Taunt Defendants argue that in order to prevail on his statutory conversion claim, Vining would have to prove that Taunt was not the trustee at the time he exercised dominion and control over estate assets, and that he knew he had no right to exercise dominion control over property of the estate. Because Taunt did not know this, according to the Taunt Defendants, even if the Court had later removed him from the position of Trustee *ab initio*, he still would not be liable for statutory conversion because he lacked the requisite knowledge. Finally, the Taunt Defendants note that in its Fraud on the Court Opinion, the Court could not find, on the record before it, that the Taunt Defendants had an intent to deceive. Because Vining has presented no new evidence to the Court that bears on the intent of the Taunt Defendants, they say, the Court's ruling on no fraudulent intent must stand.[635]

As to Vining's request for exemplary damages, the Taunt Defendants argue that "[e]ven if Vining proved conversion, he has provided no evidence whatsoever that the Taunt [D]efendants acted maliciously," which is a required showing for exemplary damages to be awarded.[636] The Taunt Defendants rely on the fact that in the Fraud on the Court Opinion, the Court did not award punitive damages, because it could not find that the Taunt Defendants intended to deceive or defraud the Court. The Taunt Defendants argue that the same reasoning applies to Vining's exemplary damages claim. They also argue that exemplary damages can only be granted to a corporation for damages that cannot be readily calculated "'in monetary terms'" such as damages

---

[635] *Id*. at 27.

[636] *Id.*

to reputation or to good will.[637]  They argue that because MTG had already "shut it doors" and was liquidating, "its reputation and good will had already dissipated" by the time Taunt became the Chapter 7 Trustee.  Therefore, according to the Taunt Defendants, there is no basis to award exemplary damages.[638]

As to specific assets, the Taunt Defendants argue that causes of action are intangible assets that cannot be converted.  However, according to the Taunt Defendants, even if causes of action could be converted, because federal law vests a bankruptcy trustee with broad discretion on whether to prosecute a cause of action, or abandon it, to subject a trustee to a state law-based conversion claim based on such a decision would violate the Supremacy Clause of the United States Constitution.  And even if the causes of action had value, could be converted, and Taunt allowed Comerica to assert dominion and control over them, because they were subject to Comerica's lien, the estate would not have been damaged, because any recovery on those causes of action would benefit only Comerica.[639]

As to the DIP Accounts, the Taunt Defendants argue that Comerica did not convert these accounts and Taunt did not assist Comerica in converting these accounts.  This is because "although [these accounts] were combined, [they] remained titled in MTG's name" and when MTG's Chapter 11 case converted to Chapter 7, the Court's prior cash collateral orders prohibited MTG from accessing these accounts.[640]  According to the Taunt Defendants, "Comerica did not

---

[637]  *Id.* at 28 (citation omitted).

[638]  *Id.*

[639]  *Id.* at 29.

[640]  *Id.* at 29-30.

act wrongfully by combining the three DIP Accounts into one account, and Taunt had no reason to challenge that act."[641]  This is so, according to the Taunt Defendants, because "[u]nder Michigan law, the bank-depositor relationship is one of debtor-creditor."[642]  According to the Taunt Defendants, Comerica did not dispute that it owed the $81,842.45 in the three combined accounts to the MTG estate, subject to Comerica's right of offset.  The Taunt Defendants argue that after MTG's case was converted from Chapter 11 to Chapter 7, MTG was no longer operating its business, so two of the three accounts (one for payroll, and one for tax accounts) "no longer had any function."[643]  For this reason, according to the Taunt Defendants, it was irrelevant whether Comerica held the funds in "escrow" for the estate in one account, rather than in three accounts.[644]  The Taunt Defendants argue further that although only the names of officers of Comerica were on the signature cards for the "escrow" account, that did not govern ownership of the account.  Because Comerica had no intent, before it obtained stay relief, to vest title of the funds in the escrow account in itself, and had no intent to convert the funds, the Taunt Defendants argue that Comerica cannot be liable for conversion.  The Taunt Defendants rely on the fact that Comerica called the DIP account an "escrow" account to further support their position.

### b.  Plunkett & Cooney's position on Vining's common law and statutory conversion claims

Plunkett & Cooney argues that Vining once again attempts to use an aiding and abetting theory to hold Plunkett & Cooney liable for Taunt's actions.  But, according to Plunkett &

---

[641]  Taunt Defs.' Br. (Docket # 658) at 46 ¶ 8.

[642]  *Id.* (citations omitted).

[643]  *Id.*

[644]  *Id.*

Cooney, because "aiding-and-abetting tortious conduct is 'a distinct and independent cause of action in Michigan,'" and Vining did not plead this cause of action in the Complaint, Vining cannot use this theory against Plunkett & Cooney.[645] According to Plunkett & Cooney, Vining's common law and statutory conversion claims therefore must be based on Plunkett & Cooney's own wrongful exercise of dominion and control over property of the estate.[646] Plunkett & Cooney argues that any exercise by it of dominion and control over property of the estate was not "wrongful" because such exercise was authorized by Court orders.[647] And, it argues, the fact that some of those orders were later vacated does not change the fact that at the time Plunkett & Cooney exercised dominion and control over property of the estate, it had authority to do so.[648]

### c. The Comerica Defendants' position on Vining's common law and statutory conversion claims

The Comerica Defendants complain that Vining does not specify what property of the estate the Comerica Defendants allegedly converted nor does he "cite the factual record or apply law to fact."[649] For these reasons, the Comerica Defendants argue that Vining has failed to support his conversion claims.

The Comerica Defendants argue further that they cannot be liable for conversion of estate property because the Bankruptcy Code is a comprehensive system of laws that are meant to govern *all* of the rights, duties, and remedies between debtors and creditors in a bankruptcy case,

---

[645] Plunkett & Cooney's Opp'n Br. (Docket # 622) at 28-29 (citation omitted).

[646] *Id.*

[647] *Id.* at 29.

[648] *Id.* at 29-30.

[649] Comerica's Resp. Br. (Docket # 634) at 39.

and therefore the Bankruptcy Code preempts state law claims and remedies, including Vining's conversion claims. According to the Comerica Defendants, the remedy for Comerica's alleged improper dominion and control over property of the estate is to seek damages for violation of the automatic stay provision of § 362(a)(3). According to the Comerica Defendants, allowing a party to bring a state law conversion claim for actions that constitute a violation of the automatic stay "would allow parties to evade the willfulness requirement of the statute, and obtain different remedies than the [Bankruptcy] Code provides."[650]

Even assuming that Vining's conversion claims are not preempted by the Bankruptcy Code, the Comerica Defendants argue, they did not "convert" estate assets.[651] With regard to the $81,842.45 balance in MTG's debtor-in-possession accounts at the time MTG's case was converted from Chapter 7 to Chapter 11, the Comerica Defendants argue that Comerica, as a secured creditor with set-off rights, had a right to take the action it took to protect its interest in its collateral. The Comerica Defendants argue that Comerica's combining of the three debtor-in-possession accounts into a single account, and including the names of only officers of Comerica as signatories on those accounts, was akin to a bank placing an administrative hold on a debtor's bank account pending a motion for relief from the automatic stay, which was found not to be a violation of the stay in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 19-21 (1995). The Comerica Defendants argue that "[w]here the creditor does not 'purport permanently to reduce [debtor's] account balance,' but rather holds funds subject to setoff pending a motion, no violation

---

[650] *Id.*

[651] *Id.* at 40.

307

[of the automatic stay] occurs."[652]

The Comerica Defendants next dispute what they describe as "a retroactive conversion theory" by Vining, to retroactively treat as *unauthorized* all of the actions that Taunt took with respect to property of the estate before he was removed as the Trustee, and before the Court vacated the Comerica Relief From Stay Order, the Comerica Settlement Order, and the Comerica Claim Allowance Order.[653]  Under Vining's theory, it does not matter that at the times he acted, Taunt, as the Chapter 7 Trustee, had authority under § 704(a) to exercise control over property of the estate, and it does not matter that the Court had entered orders authorizing Taunt to make certain transfers and other dispositions of property of the estate.  These things do not matter, Vining says, because Taunt *later* was found to have had a disqualifying conflict of interest at the time of his actions with respect to property of the estate.  Because of that, Vining argues, Taunt' exercise of dominion and control over property of the estate constituted conversion.

The Comerica Defendants argue that Vining has not cited any authority in support of his retroactive conversion theory, and courts, such as the court in *In re Weisser Eyecare, Inc.*, 245 B.R. 844, 848 (N.D. Ill. 2000), have rejected the argument that a trustee who fails to fully comply with one of his duties in administering estate assets is acting "outside the scope of his authority as trustee, i.e. *ultra vires*." [654]  The Comerica Defendants argue that although Taunt did not fully comply with the disclosure requirements of the Bankruptcy Code, by failing to fully disclose the Comerica Fee Agreement, such failure did not "make his otherwise permissible actions *ultra*

---

[652]  *Id.* (quoting *Strumpf*, 516 U.S. at 19).

[653]  *Id.*

[654]  *Id.* at 41.

308

*vires.*"[655]  Nor did the Court's vacating of the Comerica Relief From Stay Order, the Comerica Settlement Order, and the Comerica Claim Allowance Order have such effect, according to the Comerica Defendants, because the Court did not vacate those orders *nunc pro tunc;* nor did the Court rule " that *all* of Taunt's actions – including actions not taken under the vacated orders – were void and of no effect."[656]

### d. The Court's ruling

The Michigan conversion statute, Mich. Comp. Laws § 600.2919a, was amended in 2005. In both its pre-2005 and post-2005 versions, the statute uses forms of the word "conversion," but does not define conversion or state its elements.[657]  Those are supplied by Michigan common law.

---

[655]  *Id.*

[656]  *Id*. (italics in original).

[657]  Before the 2005 amendment, the statute stated:

> A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

*Marshall Lasser, PC v. George*, 651 N.W.2d 158, 162 (Mich. Ct. App. 2002) (quoting former Mich. Comp. Laws § 600.2919a).

After the 2005 amendment, the statute has stated:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding

309

*See McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 787-88 (Bankr. E.D. Mich. 2012); *Victory Estates, L.L.C. v. NPB Mortg., L.L.C.*, No. 307457, 2012 WL 6913826, at *2 (Mich. Ct. App., Nov. 20, 2012). As this Court stated in a previous case,

> The Michigan Supreme Court has defined conversion as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Dep't of Agriculture v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 244 (Mich. 2010)(footnote and citations omitted); *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992)(footnote and citations omitted). "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Appletree Mktg., L.L.C.*, 779 N.W.2d at 244-45 (footnote and citations omitted).

*McCallum v. Pixley*, 456 B.R. at 788. "[T]here are three elements to a common-law conversion claim: (1) a distinct act of dominion; (2) wrongfully exerted; and (3) over another's personal property. The act is wrongful when it is inconsistent with the ownership rights of another." *Victory Estates,* 2012 WL 6913826, at *2 (citations omitted).

It is not necessary to decide whether, as Comerica contends, the Bankruptcy Code preempts Vining's state law-based conversion claim. The conversion claim fails as a matter of law for the following other reasons.

As the Court explained above in ruling on Vining's claims of § 549(a) avoidable post-

---

in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

(2) The remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise.

Mich. Comp. Laws § 600.2919a.

310

petition transfers and § 362 automatic stay violations, Parts VII.A.7.d and VII.A.8.d of this Opinion, all of Taunt's actions at issue, taken while he was serving as the Chapter 7 Trustee in the *MTG* case, were fully authorized at the time he took them. Taunt's actions in settling, selling, or otherwise liquidating the bankruptcy estate's causes of action and other assets, and in distributing the proceeds, were authorized by provisions of the Bankruptcy Code, including §§ 704(a)(1) and 363, and by orders of this Court. These actions cannot be deemed, after the fact, to have been a wrongful exercise of dominion over the bankruptcy estate's property. Thus, they cannot be deemed a conversion of any estate property.

During Taunt's 4 years and 8 months of service as the Chapter 7 Trustee, he was the one, and basically the only one, who had the right to exercise dominion and control over the property of the MTG bankruptcy estate. *See, e.g., Lowe v. Sanflippo* (*In re Schmidt*), 362 B.R. 318, 325 (Bankr. W.D. Tex. 2007) ("[T]he chapter 7 trustee alone has exclusive dominion and control" over property of the bankruptcy estate.). This is shown by, among other things, (1) the Bankruptcy Code provision giving the trustee the duty to "collect and reduce to money the property of the estate," 11 U.S.C. § 704(a)(1); (2) the Bankruptcy Code provisions requiring the debtor and others to turn over the property of the estate to the trustee, 11 U.S.C. §§ 521(a)(4), 542(a)(1), 542(a)(2), 543(b)(1); (3) the rule authorizing the trustee to commence, prosecute, and defend any action by or against the bankruptcy estate, "before any tribunal," Fed. R. Bankr. P. 6009; (4) the rule authorizing the trustee to make settlements concerning property of the bankruptcy estate, after motion, notice and hearing, Fed. R. Bankr. P. 9019(a); and (5) the Code provision authorizing the trustee to "use, sell, or lease" property of the bankruptcy estate, 11 U.S.C. §§ 363(b)(1), 363(c)(1).

Vining does not contend that under normal circumstances, a Chapter 7 trustee commits conversion of bankruptcy estate property when he takes control of, and performs his statutory duty to liquidate, property of the estate. Nor does Vining contend that under normal circumstances, a Chapter 7 trustee commits conversion by settling an estate's cause of action after obtaining an order approving settlement under Fed. R Bankr. P. 9019, or by selling estate assets under Bankruptcy Code § 363.

Rather, Vining's conversion theory is based on the premise that Taunt's actions and the orders authorizing them were invalid, because (1) at the time of Taunt's actions he had what was found, much later, to be a disqualifying conflict of interest; (2) three orders — the Comerica Settlement Order, the Comerica Relief From Stay Order, and the Comerica Claim Allowance Order — were vacated several years after the fact, in 2007; and (3) Taunt was disqualified and stopped serving as the Trustee in 2002, also years after the fact, due to a conflict of interest.

Vining's conversion theory fails, however, for essentially the same reasons that Vining's § 549(a) avoidance claim and § 363 stay violation claim fail. As discussed above, none of the orders that authorized Taunt's actions were vacated with retroactive effect, or were ruled to be void *ab initio*, or in fact were void. The later events on which Vining relies did not retroactively change Taunt's contemporaneously-authorized actions into conversion. Vining cites no authority suggesting otherwise.

The Court's ruling is supported, by analogy, by cases addressing the situation where an appointed or elected bankruptcy trustee is later determined not to have "qualified" to be trustee under 11 U.S.C. § 322(a), because he or she failed to timely post a bond as required by that statute. Courts have nonetheless refused to invalidate actions taken by the non-qualified trustee,

under the "*de facto* trustee doctrine." Under that doctrine,

> a trustee who has not qualified statutorily will be treated as a *de facto* trustee if such person has, since being appointed trustee, "acted as trustee, . . . held [him/herself] out to be trustee, and . . . [has] been treated as trustee by the Court, creditors and employees of the estate, and all other interested parties."

*Granderson v. Carpenter* (*In re Granderson*), 252 B.R. 1, 5 (B.A.P. 1st Cir. 2000) (citations omitted). When the *de facto* trustee doctrine applies, "[t]he right of the trustee to act as such and to officially perform his duties can only be ended by a judicial declaration of vacancy." *In re Martinez*, 355 F. Supp. 650, 654 (D.P.R. 1972), *aff'd.*, 502 F.2d 1158 (1st Cir. 1973).

Because Taunt committed no conversion, neither he nor any of the other Defendants who allegedly aided and abetted, or conspired to commit, the alleged conversion, can be held liable for conversion. For these reasons, the Court will grant summary judgment in favor of the Defendants on Count IX of Vining's complaint.[658]

### 10. Vining's conspiracy claim (Count X)

In Count X of his complaint, Vining alleges that the Taunt Defendants, Plunkett & Cooney, the Comerica Defendants, Richard May,[659] and others "illegally conspired to accomplish . . . illegal purposes," and that "[a]s a direct and proximate result of the conspiracy, the Debtor's estate was damaged."[660] Vining alleges that

---

[658] Given the Court's ruling, it is not necessary to reach the Defendants' other arguments in seeking summary judgment on this claim.

[659] Richard May originally was a defendant in this case, and Count X was directed at May, among other defendants. But all claims against May were dismissed after the Court approved a settlement between Vining and May. (*See* "Order Dismissing Claims Against Defendant Richard May Without Prejudice and Without Costs or Attorney Fees" (Docket # 394)).

[660] Compl. at ¶¶ 294, 298.

> [t]he Debtor's damages include damages from the loss of valuable
> causes of action, the allowance of [Comerica's] disputed claim, the
> Court's entry of [the Comerica] Settlement Order which benefitted
> third parties and not the Debtor's estate, and the Court's entry of
> other Orders because of [these D]efendants' fraud on the court."[661]

Vining alleges further that because all of these Defendants participated in the conspiracy, they are jointly and severally liable for such damages."[662]

The complaint alleges that the parties to the alleged conspiracy had separate interests that they sought to advance through their participation in the conspiracy, and that the pursuit of those interests was an illegal purpose. The complaint states, in relevant part:

> 287. The Bank had an interest in avoiding liability for its misconduct as previously described.
>
> 288. The Bank had an interest in obtaining the allowance of its disputed secured claim and collecting over $3 million of proceeds of collateral.
>
> 289. The Bank also had an interest in protecting its relationship, or resuming its relationship with Becker Group, Inc.
>
> 290. The Bank had an interest in maximizing recovery on its guaranty claim against Mr. May.
>
> 291. [The Taunt Defendants], and Plunkett [&] Cooney each had an interest in maximizing recovery of trustee and attorney fees paid by the Bank and the Debtor's estate, even at the expense of the Debtor's estate.
>
> 292. [The Taunt Defendants] and Plunkett [&] Cooney each had an interest in soliciting and securing the Bank's national bankruptcy and foreclosure business, which was worth millions of dollars.
>
> 293. Richard May had an interest in avoiding liability on the

---

[661] *Id.* at ¶ 299.

[662] *Id.* at ¶ 300.

314

May Chapter 5 Claim and the Injectronics Claim.

> 294. The Bank, [the Taunt Defendants] Plunkett [&] Cooney, . . . the Bank Officers, Kevin M. Ball, Steven A. Roach, and Mr. May illegally conspired to accomplish these and other illegal purposes.

> 295. [The attorneys for Taunt and the Bank] knowingly assisted [Taunt] and the Bank in this illegal conspiracy by providing legal services to accomplish its illegal purposes.[663]

In the civil conspiracy section in one of Vining's briefs, Vining sets forth the elements of a conspiracy claim and argues that he has satisfied all of those elements. Vining states, in relevant part, that

> [u]nder Michigan law, "[a] civil conspiracy is the 'combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means.'" *Wrobbel v. Int'l Bro. of Elec. Workers*, 638 F.Supp.2d 780, 794 (E.D. Mich. 2009). . . . Thus, the elements of a civil conspiracy under Michigan law are (1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose or a lawful purpose by unlawful means, (4) causing damage to the plaintiff. *Fenestra Inc. v. Gulf American Land Corp.*, 377 Mich. 565, 593-4 (1966); *Chancellor v City of Detroit*, 454 F.Supp.2d 645, 663 (E.D. Mich 2006). Under federal law, the elements are essentially the same.[664]

Vining argues that

> [t]here is no genuine issue of material fact as to any of the elements of civil conspiracy. First, Defendants engaged in concerted action pursuant to the [Comerica] Fee Agreement and its unlawful objectives. Second, Defendants constitute a combination of two or more persons. Third, Defendants agreed expressly and implicitly to accomplish numerous unlawful purposes and (to the extent arguable) lawful purposes by unlawful means, including:

---

[663] Compl. at ¶¶ 287-95.

[664] Trustee's Br. (Docket # 657) at 19-20 (footnote omitted).

315

- Secretly allowing Comerica, a creditor holding a disputed secured claim and the probable target of estate lender liability claims, to secretly control the administration and liquidation of Debtor's estate;

- Obtaining an Order allowing Comerica's disputed secured claim on an expedited basis without any investigation by Taunt and counsel of Debtor's defenses and counterclaims as a necessary first step to obtaining an Order lifting the automatic stay as to Comerica;

- Secretly agreeing to Taunt's turnover . . . of all proceeds of prepetition assets to Comerica to prevent the accumulation of a "war chest" for potential lender liability litigation against Comerica;

- Obtaining an Order lifting the automatic stay to permit Comerica to control and receive the proceeds from the liquidation of estate assets;

- Performance of services by Taunt and counsel for the exclusive benefit of Comerica and without any conceivable benefit to the Debtor's estate;

- Comerica's payment of Taunt and counsel's fees for services which exclusively benefitted Comerica and not in any manner the Debtor's estate;

- Comerica's payment of Taunt and counsel's fees for non-surchargeable services and payment of Taunt's trustee fees on an hourly basis;

- Depriving the estate of the honest services of disinterested, conflict-free professionals representing exclusively the interests of the estate and its creditors;

- Converting the DIP Accounts to fund the payment of fees and concealing such conversion and payments;

- Concealing from the Court and creditors (1) the [Comerica] Fee Agreement, its terms, and its unlawful objectives; (2) Taunt and counsel's disqualifying conflicts of interest and breaches of duty; (3) the existence of the DIP Accounts and Defendants' conversion of same; (4) Comerica's payments to Taunt and

316

counsel from proceeds of the converted DIP Accounts; and (5) facts required to be disclosed to obtain the various Orders granting relief to Comerica;

- Settling the estate's claims against Comerica for no consideration to prevent the abandonment of such claims for use by Debtor's shareholders in guaranty litigation initiated by Comerica;

- Taunt and counsel's filing of false Verified Statements of Disinterestedness to avoid disclosure of known conflicts of interest and disqualification of Taunt and counsel;

- Procuring Orders allowing Comerica's disputed secured claim, lifting the automatic stay, settling and releasing the estate's claims against Comerica, authorizing payments to Comerica, and granting other relief to Comerica through fraud on the court;

- Effecting numerous transfers of estate assets to Comerica and Taunt and counsel without valid Court authorization;

- Violating numerous Bankruptcy Code provisions, Bankruptcy Rules, [Model Rules of Professional Conduct] provisions, and arguably criminal statutes in pursuit of Defendants' unlawful objectives[;]

- Breaching numerous duties owed to the estate and its creditors in pursuit of Defendant's unlawful objectives;

- Destroying and concealing estate records and Comerica records critical to the pursuit of claims against Defendants; and

- Committing massive discovery fraud in this case.[665]

Vining states in his brief that under Michigan law, "civil conspiracy and civil aiding and abetting are secondary theories of liability, meaning that the defendant, if liable, will be responsible for the unlawful conduct of another even though the defendant did not act in an unlawful manner" and that "[c]ivil conspiracy must be based on an underlying theory of liability,

---

[665] *Id.* at 22-23.

i.e., an independent actionable wrong."[666]  The independent actionable wrongs Vining bases his

conspiracy claim on in his brief are: (1) Taunt's and his attorneys' breaches of their fiduciary

duties; (2) Taunt's and his attorneys' fraud on the court; (3) the alleged conversion of the Debtor's

assets; and (4) an alleged violation of the automatic stay.[667]  Though Vining doesn't say so in his

brief, these wrongs appear to relate to the following counts in Vining's Complaint: Count I (fraud

of the court); Count II (breach of fiduciary duty); Count III (inducing breach of fiduciary duty);

Count VII (avoidable post-petition transfers); Count VIII (violation of the automatic stay); and

Count IX (common law and statutory conversion).

### a.  The Taunt Defendants' position on Vining's conspiracy claim

The Taunt Defendants argue that "Vining's first problem is that he has not developed any

further facts to support his [conspiracy] argument in this proceeding" since the Court issued its

Fraud on the Court Opinion.[668]  The Taunt Defendants argue that because the Court was unable to

find a conspiracy between Comerica and its counsel and Taunt and his counsel "to defraud the

bankruptcy estate" and to violate "numerous criminal statutes" on the record before it when it

issued the Fraud on the Court Opinion, it cannot now find such a conspiracy on what is basically

the same evidence.[669]

The Taunt Defendants next argue that Vining's conspiracy claim fails because he is unable

to satisfy the elements of any of the underlying claims of actionable wrongs on which he is basing

---

[666]  *Id.* at 19-20.

[667]  *Id*. at 8, 21.

[668]  Taunt Defs.' Resp. (Docket # 638) at 17.

[669]  *Id.* at 17-18 (citing *M.T.G.*, 366 B.R. at 757).

his conspiracy claim. The Taunt Defendants have moved for summary judgment on all those underlying claims, and, if summary judgment is granted against those underlying claims, then summary judgment against the conspiracy claim also must be granted.[670]

Finally, the Taunt Defendants argue that there is no support in the record for Vining's allegation that the Comerica Fee Agreement embodied the alleged conspiracy between Taunt and his attorneys, on the one hand, and Comerica and its attorneys, on the other hand. The Taunt Defendants argue that the deposition testimony of Ball, Taunt, and Hertzberg demonstrates that the Comerica Fee Agreement was not the result of a common plan to commit any wrongful acts, which is the type of plan necessary to show a conspiracy.

Rather, according to the Taunt Defendants, the Comerica Fee Agreement was the result of hard bargaining between adverse parties to achieve the respective legitimate goals of each party. Taunt's interest in entering into the Comerica Fee Agreement was to try to maximize the assets remaining in the estate for a potential enhanced distribution to general unsecured creditors.[671] Taunt hoped to achieve this by having Comerica pay the costs of Taunt administering Comerica's collateral. Comerica's interest in entering into the agreement was to avoid a repetition of a "painful experience" that had occurred in another case where it was forced to consent, after the fact, to a $70,000-$90,000 surcharge of its collateral for attorney fees.[672] Comerica hoped to avoid a similar scenario in this case by entering into "an agreement at the outset with very well-defined

---

[670] *Id.* at 18.

[671] *Id.* at 11, 19 (relying on the deposition testimony of Taunt ("Taunt 10/28/2008 Dep. Tr.") (Docket # 600-5) at 138).

[672] *Id.* at 10-11 (relying on Hertzberg 10/23/2008 Dep. Tr.) (Docket # 600-2) at 152:11-156:22).

319

limits on the extent of the surcharge [on its collateral]."[673]

The Taunt Defendants rely, in part, on the testimony of Ball, who negotiated the Comerica Fee Agreement on behalf of Taunt. The Taunt Defendants note that "Ball described negotiations with Comerica leading up to the Comerica Fee Agreement as 'contentious,' 'adverse' and 'difficult,' not conspiratorial."[674] The Taunt Defendants also point out that Ball testified that his intent in entering into the Comerica Fee Agreement was to obtain the type of surcharge agreement permitted under 11 U.S.C. § 506(c); Ball did not think the Comerica Fee Agreement would implicate the disinterestedness requirement; and he believed that the Comerica Fee Agreement was in the "'best interest of the estate,'" because it would leave more money in the estate for possible distribution to general unsecured creditors.[675] The Taunt Defendants also note that Ball further testified that, as explicitly permitted by the Comerica Fee Agreement, he diligently investigated possible lender liability claims against Comerica, and he had every intention of pursuing such claims if he believed that they had any merit.[676]

The Taunt Defendants argue that Taunt's deposition testimony also shows that there was no conspiracy between Taunt and his attorneys, on the one hand, and Comerica and its attorneys,

---

[673] Id. (relying on the deposition testimony of Hertzberg ("Hertzberg 10/23/2008 Dep. Tr.") (Docket # 600-2) at 152:11-156:22).

[674] Id. at 18 (relying on the deposition testimony of Ball ("Ball 10/7/2008 Dep. Tr.") (Docket # 599-13) at 46:6; 60:12-19).

[675] Id. at 18-19 (relying on the Ball 10/7/2008 Dep. Tr. (Docket # 599-13) at 18:24-25; 36:18-37:8, 38:13-19; 65:3-12; 89:12-14; 122:12-17).

[676] Id. at 19 (relying on the Ball 10/7/2008 Dep. Tr. (Docket # 599-13) at 52:1-7; 83:13-19 (testifying that "at no time did any of the [Comerica Fee Agreement] influence my investigation of the lender liability claim against Comerica" and "I was perfectly willing . . . to pursue that claim if it had panned out and I thought it was a valid claim").

on the other hand, to enter into a wrongful or secret fee agreement. They rely on Taunt's testimony that Halbert told him that he needed to enter into a surcharge agreement with Comerica.[677] Taunt testified that his first involvement with the case was a telephone conference with Halbert and Ball, in which "Halbert said you better get a surcharge agreement with Comerica for anything that benefits their collateral because I've got fees owed to me in this case and if you try and take those fees out of the estate, I'm going to object."[678] The Taunt Defendants argue that with all of the assets in the estate being subject to Comerica's all-asset lien, all parties knew that a surcharge agreement was necessary in order to have funds to administer the estate.[679]

The Taunt Defendants also rely on Taunt's deposition testimony to demonstrate that Taunt had no intent to enter into an agreement that would in any way violate the Bankruptcy Code or any of his duties. Rather, according to the Taunt Defendants, Taunt had a good faith belief that the Comerica Fee Agreement was a legitimate surcharge agreement of the type that Bankruptcy Judge Steven Rhodes had discussed at a meeting he had with the panel trustees.[680] Taunt testified:

> I can tell you that Judge Rhodes, who's currently the Chief Judge of the Bankruptcy Court, in addressing a meeting of the panel of trustees prior to this case, in response to a question indicated that he had no problem, no objection to or was fine with, I can't remember the exact path of words at this point, trustees administering collateral subject to a security interest. His admonition to the trustees was just get your surcharge agreement defined and buttoned up and get your deal firmed up so that we weren't coming back in

---

[677] *Id.* at 18 (relying on Taunt 10/28/2008 Dep. Tr. (Docket # 600-5) at 10:23-11:6; 43:24-44:2).

[678] Taunt 10/28/2008 Dep. Tr. (Docket # 600-5) at 10:23-11:6; *see also id.* at 43:24-44:2 ("As I previously testified, we were advised by Mr. Halbert that we should be seeking a surcharge agreement with Comerica in connection with this case.").

[679] *See* Taunt Defs.' Resp. (Docket # 638) at 10.

[680] *Id.* at 19 (relying on Taunt 10/28/2008 Dep. Tr. (Docket # 600-5) at 127:20-128:11).

front of him fighting with the secured creditor so that he had to resolve the issue with a secured creditor as to amounts and rates and extent of thing[s] of that nature.[681]

According to the Taunt Defendants, because Taunt believed that the Comerica Fee Agreement was the type of surcharge agreement discussed at the meeting with Judge Rhodes, and because Halbert stated that he should enter into such an agreement, Taunt did not believe that entering into it would create a conflict of interest. The Taunt Defendants argue that the Comerica Fee Agreement did not prevent Taunt from pursuing any possible lender liability claims against Comerica, nor did that Agreement provide any incentive for Taunt to forego pursuing such claims. According to the Taunt Defendants, "[t]he [Comerica Fee A]greement specifically acknowledged that Taunt would investigate MTG's alleged lender liability claim and pursue it if he thought it was in the interests of the estate."[682] And according to the Taunt Defendants, Taunt had good reason to pursue any lender liability claims he thought were valid: "if the lender liability claims were worth even a fraction of what Vining suggests, Taunt would stand to make a whole lot more than $25,000," which he was to receive under the Comerica Fee Agreement for his administration of Comerica's collateral.[683]

The Taunt Defendants bolster these points with the expert report of Lawrence Friedman, which stated, in relevant part:

> b. Plaintiff's value of the purported causes of action [is] in the millions of dollars range.
>
> c. The [T]rustee's fee on a recovery such as is alleged in this case

---

[681] Taunt 10/28/2008 Dep. Tr. (Docket # 600-5) at 127:23-128:11.

[682] Taunt Defs.' Resp. (Docket # 638) at 14.

[683] *Id.* at 15.

322

should have been up in the hundreds of thousands of dollars.

    d.   Counsel's fee for prosecution of these causes of actions would have added at least $150,000 in expense to the estate.

    e.   Thus in examining the loyalties of the trustee which ***actually*** existed, the plaintiff[']s claim is that the trustee threw away hundreds of thousands of dollars in fees for him and his firm in return for a budget of $25,000 in hand.

    f.   Even under the Comerica [Fee] Agreement, the [T]rustee could have been paid the $25,000 and still pursued the lender liability cause of action or any of the other alleged causes of action.

    g.   I am confident that there is no panel trustee in the United States who would have felt compromised about pursuing millions in claims simply because the potential defendant had agreed to advance to the estate $25,000 to clean up matters that would likely not have occurred if no funds were advanced.

The Comerica [Fee] Agreement simply did not provide any incentive to compromise the [T]rustee's duty of loyalty to the estate and no creditor was harmed by virtue of the [T]rustee entering into this agreement.[684]

The Taunt Defendants argue that Hertzberg's deposition testimony further supports their position that there was no concerted action between Taunt and his attorneys, on the one hand, and Comerica and its attorneys, on the other hand. The Taunt Defendants note that "[a]t no time were the[] negotiations [leading to execution of the Comerica Fee Agreement] 'secret negotiations.'"[685] Hertzberg agreed that these negotiations were "adversarial" and "hard-nosed."[686] The Taunt

---

[684] Docket # 638-18 (Expert Report of Lawrence A. Friedman) at 9-10 (footnotes omitted) (bold, italics, and underlining in original).

[685] Taunt Defs.' Resp. (Docket # 638) at 11 (relying on Hertzberg 10/23/2008 Dep. Tr. (Docket # 600-2) at 143).

[686] Taunt Defs.' Resp. (Docket # 638) at 11 (relying on Hertzberg 10/23/2008 Dep. Tr. (Docket # 600-2) at 184, 187).

Defendants also point to Hertzberg's testimony that it was not his intent nor his understanding at the time he was negotiating over the terms of the Comerica Fee Agreement that he "was conspiring with anybody for anything."[687]  The Taunt Defendants also rely on testimony from Hertzberg that Taunt was not representing the interests of Comerica and was free to pursue the lender liability claims.[688]

In his deposition testimony, Hertzberg characterized any potential lender liability claim as "garbage" and stated that because Comerica and its attorneys had a "high degree of confidence" that there was no merit to any lender liability claims against Comerica, they were not worried about any investigation by Taunt and his attorneys of any potential lender liability claims, and allowing such an investigation by Taunt "wasn't a big sticking point" in Comerica's negotiations with Taunt leading up to the Comerica Fee Agreement.[689]

To the extent the Comerica Fee Agreement required Comerica "to pay out of the proceeds of its collateral for administrative tasks of the Trustee that it might not have been compelled to pay pursuant to [11 U.S.C. §] 506(c)," the Taunt Defendants argue that Taunt believed there was also nothing improper about that.[690]  That is so, according to the Taunt Defendants, because that

---

[687]  *Id.* (relying on Hertzberg 10/23/2008 Dep. Tr. (Docket # 600-2) at 186).

[688]  *Id.* (relying on Hertzberg 10/23/2008 Dep. Tr. (Docket # 600-2) at 164, 180).

[689]  Hertzberg 10/23/2008 Dep. Tr. (Docket # 600-2) at 166-67 (testifying that he saw no reason why an order allowing Comerica's claim would not be entered regardless of who presented that order to the Court because he had "done the legwork" and "believed the [B]ank's claim was what we asserted it to be, and if you understand the UCC and liens and so on and so forth, to me it was a no-brainer"),176 ("[Comerica] felt the lender liability claim was garbage."), 180 (testifying that he had no problem with Comerica investigating any potential lender liability claim).

[690]  Taunt Defs.' Resp. (Docket # 638) at 12-13 (relying on Ball 10/7/2008 Dep. Tr.  (Docket # 599-13) at 61:15-63:16).

part of the agreement was "essentially in the nature of a 'carve-out,' a practical bankruptcy concept that is not defined in the [Bankruptcy] Code and is usually associated with Chapter 11."[691]

Ball testified that the Comerica Fee Agreement

> functions in much the same way as a carve-out does; that in a carve-out situation, a bank has a lien on collateral, it agrees to leave a certain portion of funds upon which it has a lien in the case in order to pay professional fees and other expenses incurred with the administration of the case. That's essentially what we were achieving here in this agreement. We got Comerica to agree to leave some money in to the case, so that the case could be administered, particularly the liquidation of its collateral.[692]

The Taunt Defendants argue that the expert report of Barbara Rom regarding the use of carve-outs in bankruptcy cases supports their position that the Comerica Fee Agreement did not raise conflict of interest concerns.[693] Barbara Rom's report stated:

> r) [Taunt and] Associates did not have a carve out or promise of payment from any secured party to conduct this investigation unlike typical creditors' committees in cases that obtain a carve out and are paid by the secured creditor to investigate the same secured creditor. I have never observed anyone objecting to a creditors' committee investigating a secured creditor even while being paid by that same creditor. In the case at bar, [Taunt and] Associates was not even paid by the secured creditor to conduct an investigation of the secured creditor, Comerica Bank.[694]

### b. Plunkett & Cooney's position on Vining's conspiracy claim

Plunkett & Cooney's position on Vining's conspiracy claim is discussed in part VII.A.1.c

---

[691] *Id.*

[692] Ball 10/7/2008 Dep. Tr. (Docket # 599-13) at 63:3-13 (bold omitted).

[693] Taunt Defs.' Resp. (Docket # 638) at 13.

[694] Report Regarding Expert Testimony of Barbara Rom on Behalf of Defendant Pursuant to Fed. R. Bankr. 7026, Fed. R. Civ. P. 26(a)(2)(B) (Docket # 638-16) ("Rom Expert Report") at 6.

of this Opinion, above, in the discussion of Vining's fraud on the court claim.

### c. The Comerica Defendants' position on Vining's conspiracy claim

The Comerica Defendants' position on Vining's conspiracy claim is discussed in Part VII.A.1.d of this Opinion, above, in the discussion of Vining's fraud on the court claim.

### d. The Court's ruling

Vining correctly states that under Michigan law and "[u]nder federal law" the elements of a civil conspiracy claim include the requirement that the civil conspiracy "caus[ed] damage to the plaintiff."[695] And Vining also acknowledges that "[c]ivil conspiracy must be based on an underlying theory of liability, i.e., an independent actionable wrong."[696]

The Court repeats what it said in Part VII.A.2.d of this Opinion, in ruling on Vining's claim for breach of fiduciary duty:

> In discussing Vining's claim for compensatory damages for fraud on the court, in Part VII.A.1.e.4.iii.a of this Opinion, this Court has held and explained that "[i]t is now clear that the [bankruptcy] estate suffered no injury because of anything Taunt or his attorneys did or failed to do during the nearly five years that Taunt was the Chapter 7 Trustee in the *MTG* case."

This holding applies to Vining's civil conspiracy claim — *i.e.*, nothing that Vining alleges was an actionable wrong in his civil conspiracy claim caused any damage to the bankruptcy estate. This is fatal to Vining's civil conspiracy claim. As the Michigan Supreme Court has held:

> **[A]t the core of an actionable civil conspiracy is a question of damages**. . . . "The law is well established that in a civil action for damages resulting from wrongful acts alleged to have been

---

[695] *See* Trustee's Br. (Docket # 657) at 19-20 & 20 n.3 (citing, among other cases, *Fenestra Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593-94, 141 N.W.2d 36, 48-49 (1966) and *Collyer v. Darling*, 98 F.3d 211, 229 (6th Cir. 1996)).

[696] *See id.* at 20 & 20 n.4 (citing cases).

committed in pursuance of a conspiracy, the gist or gravamen of the action is not the conspiracy but is the wrongful acts causing the damages. **The conspiracy standing alone without the commission of acts causing damage would not be actionable**. The cause of action does not result from the conspiracy but from the acts done." . . . **[T]he foundation of the action is the damage** and not the conspiracy.

*Fenestra Inc. v. Gulf Am. Land Corp*., 141 N.W.2d 36, 48-49 (Mich. 1966) (emphasis added) (citations omitted).

As a result, Vining's civil conspiracy claim fails as a matter of law, and the Defendants are entitled to summary judgment on that claim.[697]

### 11. Vining's legal malpractice claim (Count XI)

In Count XI of Vining's complaint, he alleges a legal malpractice claim against the Taunt Defendants and Plunkett & Cooney. In this count, Vining alleges that, by engaging in "misconduct," these Defendants violated the duties they had to the MTG estate: (1) "to exercise th[e] knowledge, skill, ability, and care ordinarily possessed and exercised by attorneys who practice in the U.S. Bankruptcy Courts;" (2) "to act in good faith and in the best interest of Debtor's estate;" and (3) "to comply with the Michigan Rules of Professional Conduct."[698] The complaint alleges further that due to these Defendants' misconduct, Vining is now barred from suing on the Pre-Petition Claims against the Becker Group "because of the wrongful entry of the Becker settlement order and the expiration of applicable statutes of limitation;" Vining *may* be barred from suing on its Pre-Petition Claims against Comerica, "because of the Comerica Settlement Order and the expiration of the applicable statutes of limitation;" and Vining *"may* be

---

[697] Given this, it is not necessary for the Court to reach the other arguments made by the Defendants in seeking summary judgment on this claim.

[698] Compl. at ¶¶ 302-06.

327

barred from suing "Injectronics, Richard May, and Richard Schneider . . . because of the wrongful entry of" the Injectronics Settlement Order or the expiration of the applicable statutes of limitations.[699]

The Trustee's brief in support of summary judgment against the Defendants does not mention, let alone discuss, his legal malpractice claims against the Taunt Defendants and Plunkett & Cooney.[700]

### a. The Taunt Defendants' position on Vining's legal malpractice claim

The Taunt Defendants argue that the Court should dismiss Vining's legal malpractice claims "because Michigan law requires a plaintiff alleging malpractice to 'show that but for the attorney's alleged malpractice, he would have been successful in the underlying suit,'"[701] and Vining cannot meet this requirement. This is so, according to the Taunt Defendants, because "the estate would not have prevailed or obtained better settlements on the alleged underlying claims, because the claims were (a) meritless and/or (b) subject to Comerica's security interest, Comerica's and May's setoff rights, and/or Comerica's superpriority claim."[702] And according to the Taunt Defendants, all of the potential claims belonging to the estate were properly investigated, evaluated, and administered by them.

### 1. The possible lender liability claims against Comerica

The Taunt Defendants argue that they would have been unsuccessful on any lender

---

[699] *Id.* at ¶¶ 307-09 (italics added).

[700] *See* Trustee's Br. (Docket # 657).

[701] Taunt Defs.' Br. (Docket # 658) at 49 ¶ 8 (quoting *Coleman v. Gurwin*, 503 N.W.2d 435, 437 (Mich. 1993)).       .

[702] *Id.*

liability claims against Comerica because such claims were without merit.[703]  The Taunt

Defendants further argue that because Note 26 was a demand note and there is no writing

modifying the terms of that note, as is required by the statute of frauds, "Comerica could and did

rightfully declare a default under [N]ote 26."[704]  For this reason, according to the Taunt

Defendants, "Vining's [C]ount XV [of the Complaint for breach of contact against Comerica] will

fail and Taunt would have failed" if he had filed a lender liability claim.[705]  The Taunt Defendants

further argue that because Taunt's settlement of a the estate's lender liability claim against

Comerica for $10,000.00 was vacated, and Vining is pursuing lender liability claims against

Comerica himself, Vining cannot satisfy the damages element of his malpractice claim.[706]

## 2.  Possible claims against the Becker Group

The Taunt Defendants concluded that they would not be successful on any pre-petition

claims against the Becker Group arising out of the Asset Purchase Agreement, because the Becker

Group did not breach that agreement.  Rather, according to the Taunt Defendants, the Becker

Group properly terminated that agreement due to a failure of conditions precedent to its duty to

perform under it.  The Taunt Defendants note that Vercnocke "admitted he had no recollection of

performing . . . [numerous] conditions precedent required by the [Asset Purchase Agreement]."[707]

The Taunt Defendants also note that Ball investigated potential pre-petition claims against the

---

[703]  *Id.* at 20.

[704]  *Id.* at 21.

[705]  *Id.*

[706]  *Id.* at 20.

[707]  *Id*. at 22-24 (listing numerous conditions precedent in the Asset Purchase Agreement which were not satisfied).

Becker Group, and concluded in a memo that "such litigation would 'be a waste of the Estate's unencumbered funds to . . . pursue an action against the Becker Group.'"[708]

In the memo, Ball stated that during his investigation of a potential breach of contract action against the Becker Group, he reviewed documents provided to him by Vercnocke. In the memo, Ball concluded that numerous conditions precedent in the Asset Purchase Agreement had not been satisfied, and he listed them. Ball also stated in the memo that he had investigated potential claims against the Becker Group based on Vercnocke's "allegations that the Becker Group improperly took control of [MTG] during the due diligence period, that [the Becker Group's] controller was actually running MTG's financial affairs, and that MTG was forced to take actions contrary to its best interests at [the Becker Group's] direction."[709] Ball concluded, "after reviewing [Vercnocke's] allegations carefully," that Vercnocke's actions during the due diligence period, not the actions of the Becker Group, were wrongful, and that Vercnocke had breached his fiduciary duties to MTG.[710] Ball concluded that "the Becker Group had a solid basis for terminating the [Asset Purchase Agreement]," and that "[t]he likelihood of prevailing on a suit [against the Becker Group] with respect to the peripheral issues is remote, at best."[711]

The Taunt Defendants note that although Taunt did not pursue any pre-petition claims against the Becker Group, he did pursue claims against the Becker Group that arose post-petition. The Taunt Defendants argue that Taunt's settlement of those claims for $235,000.00 was

---

[708] *Id.* at 22 (citing Docket # 590-11).

[709] Docket # 590-11 at 2.

[710] *Id.*

[711] *Id.*

proper.[712]  The Taunt Defendants argue that "Ball performed more than rudimentary due diligence in evaluating" post-petition claims against the Becker Group, and concluded that "it was prudent not to expend or waste significant amounts of estate monies to pursue such a complex (and weak) case against a company that had the financial wherewithal to defend such a claim."[713]

The Taunt Defendants also note that Taunt, as a Chapter 7 Trustee, had authority, under 11 U.S.C. § 704, to settle claims, and that his proposed settlement with the Becker Group was approved by the Court under Fed. R. Bankr. P. 9019.  The Taunt Defendants note that, as stated in the Court's Fraud on the Court Opinion, the Court's order approving the estate's settlement of its post-petition claim against the Becker Group has not been vacated, and neither Halbert nor Vining filed and served a motion to vacate that order on the Becker Group.[714]  For all of these reasons, the Taunt Defendants argue that Taunt's actions with regard to any post-petition claim against the Becker Group are protected by the "'safe harbor'" provided by the business judgment rule, and that there is therefore no basis for Vining's legal malpractice claim based on a possible post-petition claim against the Becker Group.

### 3.  Possible  pre-petition claims against May

The Taunt Defendants argue that Vining cannot establish a legal malpractice claim based on Taunt's failure to file an action to avoid, as a fraudulent transfer, and recover for the benefit of the estate, a $329,000 tax refund May received.  This refund was a result of Vercnocke having overestimated the 1994 income tax liability of MTG that flowed through to May and Vercnocke,

---

[712]  Taunt Defs.' Br. (Docket # 658) at 24.

[713]  *Id.* at 25.

[714]  *Id.* at 24 & n.10 (citing *M.T.G.*, 366 B.R. at 748).

as shareholders of MTG, and having caused MTG to pay such over-estimated tax liability on behalf of May and Vercnocke.[715]  In 1996, May paid Comerica $285,000 in exchange for the release of the estate's possible fraudulent transfer claim, the estate's possible conversion claim based on Injectronics receiving possession of the tooling, and Comerica's release of May's personal guaranty.[716]

The Taunt Defendants argue that Taunt would not have been successful on a fraudulent transfer claim against May, because the tax payments that MTG made on behalf of May and Vercnocke "did not leave MTG with unreasonably small capital, according to Vining's [own] expert," Michelle F. Gallagher, C.P.A., and "Vining's complaint specifically relies on the "unreasonably small capital provisions" of the fraudulent transfer statutes."[717]  But even if such transfer had been avoidable as fraudulent, the estate would not have benefitted from Taunt pursuing such a claim, according to the Taunt Defendants, because (1) Comerica had a security interest in such a claim, so that all proceeds recovered would be paid to Comerica, not the estate;[718] (2) May had $780,827.20 in set-off rights, which far exceeded the $329,000 tax refund

---

[715] *Id.* at 32-33.  The Taunt Defendants note that although Vining alleges that it was malpractice not to seek avoidance and recovery of the tax refund to May, Vining does not allege that it was malpractice for Taunt not to seek avoidance and recovery of the $55,100 tax refund to Vercnocke. Vining does not explain why Taunt's failure to prosecute a claim against May allegedly was malpractice, while Taunt's failure to pursue a claim against Vercnocke was not malpractice.

[716] *See* Compl. at ¶ 172.

[717] Taunt Defs.' Br. (Docket # 658) at 33-34 (relying on paragraph 39 of Vining's Complaint ("At the time the Debtor made the Estimated Tax Overpayments, the Debtor was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the conveyance was an unreasonably small capital."); and the March 20, 2009 deposition testimony of Vining's expert Michelle F. Gallagher, C.P.A. (Docket # 599-19) at 137:14-19 (stating that the transfers to May and Vercnocke for taxes would not have left MTG with unreasonably small capital)).

[718] *Id.* at 34-37.

May received, that May could have asserted defensively, had Taunt brought a fraudulent transfer action against him;[719] and (3) even if Comerica did not have a security interest in the proceeds from a fraudulent transfer action against May, Comerica "would have had first rights to the proceeds [of any recovery based on a fraudulent transfer claim] because of its [$440,156] superpriority claim under 11 [U.S.C.] § 507(b)," which was "more than the $329,000 alleged fraudulent transfer to May."[720] Therefore, according to the Taunt's Defendants, Taunt's failure to pursue a fraudulent transfer claim against May did not result in any loss to the estate, so Vining cannot satisfy the damage element of his malpractice claim.

### 4. Taunt's settlement of the estate's conversion claim against Injectronics, May, and Schneider

Vining's complaint states that "in October 1996, [Comerica's] counsel settled" the estate's claims against Injectronics for $117,000.[721] Taunt filed a motion to approve that settlement, and the Court granted that motion and entered on order approving that settlement.[722]

The Taunt Defendants argue that Taunt would not have been able to establish that MTG suffered any actual damages if he had filed a conversion claim against Injectronics, May, and Schneider, based on Injectronics's possession of tooling between July 27, 1995 and August 14, 1995 for testing, and based on Injectronic's continued possession of the tooling after it rejected it. This is so, according to the Taunt Defendants, because Injectronics did not damage the tooling,

---

[719] *Id.* at 38-39.

[720] *Id.* at 39-40.

[721] *See* Compl. at ¶ 174.

[722] *See id.* at ¶ 175; Docket # 566 in Case No. 95-48268 ("Order Granting Application to Settle Controversy With Injectronics").

333

and offered to return the tooling after it had tested and rejected it, but MTG "outright refused to receive [it] back."[723] The Taunt Defendants argue that any alleged damage to MTG was not the fault of Injectronics, but rather was the result of MTG refusing Injectronics's tender of the tooling to MTG after testing and rejecting it.

The Taunt Defendants' damages argument is only relevant if the Court finds that Injectronics's possession of the tooling for testing, and its continued possession of the tooling after rejection, were wrongful, and thus a conversion. The Taunt Defendants argue that "[n]o conversion took place before August 14, 1995[,] because Injectronics had a contractual right to possess the molds[,]" and that [n]o conversion occurred after August 14, 1995, because Injectronics found the molds to be non-conforming and appropriately chose its remedies."[724] For these reasons, the Taunt Defendants argue that "Taunt had no cause of action [for conversion] to pursue" and therefore, the estate's conversion claims "were properly settled."[725]

Next, the Taunt Defendants argue that "[e]ven if conversion took place, no liability was incurred for treble damages" based on statutory conversion. The Taunt Defendants argue that "[a] party may recover on a tort claim only if it is 'separate or distinct' from contractual obligations."[726] According to the Taunt Defendants, since Injectronics allegedly converted the tooling because it took possession of it without paying the contractual price for them, any damages suffered by MTG arose out of a breach of contract by Injectronics, and not from a breach

---

[723]  Taunt Defs.' Br. (Docket # 658) at 43.

[724]  *Id.* at 40, 43.

[725]  *Id.* at 40, 42.

[726]  *Id.* at 44 (citing *Fultz v. Union-Commerce Assocs.*, 683 N.W.2d 587, 592 (Mich. 2004)).

of any legal duty separate and distinct from Injectronic's contractual obligation to MTG.[727]

The Taunt Defendants argue further that under the version of Mich. Comp. Laws § 600.2919a in effect in 1995, treble damages were not available against Injectronics, May, or Schneider based on Vining's allegations.[728] The Taunt Defendants note that in 1995, Mich. Comp. Laws § 600.2919a did not provide for treble damages or any other relief against a person who actually converted property. Rather, the statute provided for treble damages only against a person who buys, receives, or aids in the concealment of any stolen, embezzled, or converted property.[729]

The Taunt Defendants point out that according to Vining's allegations, Schneider, who allegedly drove the tooling to Multi Form for testing, and Injectronics, which took possession of the tooling, were the alleged converters of the tooling, and the 1995 version of Mich. Comp. Laws § 600.2919a did not provide a remedy against the actual converter(s) of the property. And according to the Taunt Defendants, May "did not buy, receive or conceal any of the property" because "May never possessed or exercised dominion over the molds."[730]

---

[727] *Id.*

[728] *Id.* at 44-45.

[729] In 1995, Mich. Comp. Laws § 600.2919a stated:

> Sec. 2919a. A person damaged as a result of another person's buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property when the person buying, receiving, or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

[730] Taunt Defs.' Br. (Docket # 658) at 44.

And further, according to the Taunt Defendants, in order for treble damages to be awarded, Mich. Comp. Laws § 600.2919a required knowledge on the part of the person aiding in the concealment of converted property that his action with regard to the property converted is wrongful. The Taunt Defendants argue that because Injectronics, Schneider, and May "had a reasonable belief that" Injectronics had a right to possess the molds, the knowledge requirement for treble damages cannot be met.[731]

Finally, the Taunt Defendants argue that even if Injectronics, May, and Schneider were liable for treble damages, those damages would have gone to Comerica because under Article 9 of the Michigan UCC in effect in 1995, Comerica's security interest attached to such a cause of action, because it was a contract action rather than a tort action.[732]

For all of the foregoing reasons, the Taunt Defendants conclude that Taunt's settlement of the conversion claims against Injectronics, May, and Schneider is not a valid basis for any malpractice claim.

### b. Plunkett & Cooney's position on Vining's legal malpractice claim

Plunkett & Cooney addresses Vining's legal malpractice claim together with Vining's related state-law claims of breach of fiduciary duty and fraud on the Court. As stated in parts VII.A.1.c (regarding fraud on the court) and VII.A.2.b (regarding breach of fiduciary duty) of this Opinion, and for the reasons described in those parts of the Opinion, Plunkett & Cooney argues that Vining cannot establish an element of his legal malpractice claim – "that Plunkett & Cooney

---

[731] *Id*. at 45.

[732] *Id.*

336

caused a present injury" to the bankruptcy estate.[733]

### c. The Court's ruling

Under Michigan law,

> In order to establish a claim of legal malpractice, a plaintiff must prove (1) the existence of an attorney-client relationship, (2) negligence in the legal representation of the plaintiff, **(3) that the negligence was the proximate cause of an injury**, and **(4) the fact and extent of the injury alleged.** *Charles Reinhart Co. v. Winiemko*, 444 Mich. 579, 585–586, 513 N.W.2d 773 (1994). Further, **where the alleged malpractice results from the failure to diligently pursue or timely file a client's claim, a plaintiff seeking to establish the third and fourth elements of the claim, i.e., proximate cause and damages, must show that but for the attorney's alleged malpractice she would have been successful in the underlying suit.** *Id.* at 586, 513 N.W.2d 773; *Basic Food Industries v. Grant*, 107 Mich.App. 685, 691, 310 N.W.2d 26 (1981).

*Est. of Mitchell v. Dougherty*, 644 N.W.2d 391, 396 (Mich. Ct. App. 2002) (emphasis added).

Therefore, damages are an essential element of Vining's legal malpractice claim. Vining must establish that the actions or omissions constituting the alleged malpractice "was a proximate cause of an injury." *See Coleman v. Gurwin*, 503 N.W.2d 435, 436-37 (Mich. 1993) (footnote omitted); *Pontiac Sch. Dist. v. Miller, Canfield, Paddock & Stone*, 563 N.W.2d 693, 698 (Mich. Ct. App. 1997) (same). Such proximate cause includes the requirement that "'the defendant's action was a cause in fact of the claimed injury.'" *Pontiac Sch. Dist.*, 563 N.W. 2d at 698 (citation omitted).

For the reasons stated below, it is now clear that Vining cannot establish that the alleged

---

[733] Plunkett & Cooney's Br. (Docket # 578) at 2, 20-26; *see also* Plunkett & Cooney's Opp'n Br. (Docket # 622) at 22-25 ("**4.2 The Trustee forgot about causation.**") (bold added); *see also supra* Parts VII.A.1.c and VII.A.2.b of this Opinion.

malpractice caused any damage to the bankruptcy estate. For this reason, the Court must grant summary judgment for the Defendants on this claim.

### 1. The alleged possible loss of the claims against Comerica

As noted above, Vining alleges, as one of the three forms of damage due to legal malpractice, that Vining *"may"* be barred from suing Comerica, "because of the Comerica Settlement Order and the expiration of the applicable statutes of limitation."[734] This explicitly speculative allegation is now clearly refuted, by the following: (1) this Court vacated the Comerica Settlement Order based on fraud on the court, in 2007; and (2) today the Court is granting summary judgment against all of Vining's Pre-Petition Claims and Post-Petition Claims against Comerica, for the reasons explained in this Opinion. Vining has been able to prosecute all of his claims against Comerica, and all of the claims have failed on their merits, for reasons unrelated to any statute of limitations or to any passage of time. Thus, the alleged legal malpractice has caused no damage to the MTG bankruptcy estate's claims against Comerica.

### 2. The alleged loss of the pre-petition claims against the Becker Group

Vining alleges, as another one of the three forms of damage due to legal malpractice, that Vining "is barred from suing the Becker Group for the Becker Prepetition Claims because of the wrongful entry of the Becker settlement order and the expiration of applicable statutes of limitation."[735] But nothing that Taunt did or failed to do as Trustee regarding claims against the Becker Group caused damage to the bankruptcy estate.

In April 1996, Taunt settled all claims of the bankruptcy estate against the Becker Group,

---

[734] Compl. at ¶ 308.

[735] Compl. at ¶ 307.

including certain post-petition claims and any pre-petition claims. Taunt paid the proceeds of the $235,000 settlement to Comerica, because the claims against the Becker Group were part of the collateral securing Comerica's claim against MTG.[736] The estate's pre-petition claims against the Becker Group were described by Taunt in the motion he filed seeking authorization of the settlement as "claims arising out of the termination by Becker Group of a certain Asset Purchase Agreement between the Debtor and Becker Group."[737] As the Court stated in its 2007 Fraud on the Court Opinion,

> Taunt . . . [filed] a motion . . . on April 15, 1996, in which he sought authority to compromise the estate's claims against Becker Group, Inc. The application sought authority to compromise all disputes between the estate and Becker Group, Inc., including claims by the Debtor and Becker Group against each other under an agreement by which Debtor was to produce certain prototype molds and parts for Becker Group, and including "any claims arising out of the termination by Becker Group of a certain Asset Purchase Agreement between the Debtor and Becker Group." As to the latter claims, Taunt stated that he "ha[d] investigated the . . . transaction, and has determined that Becker Group's termination of the Asset Purchase Agreement was made in accordance with the terms of that agreement, and does not give rise to any claim by the estate against the [B]ecker Group." [Taunt's] settlement motion . . . [stated]:

>> The Trustee has determined that the proceeds of this proposed settlement agreement are subject to the security interest of Comerica Bank, and proposes that he be authorized to disburse said proceeds to Comerica Bank upon their receipt, after deduction for any outstanding expenses incurred by the Trustee in connection with the resolution of claims between the estate and Becker Group, including attorney fees, subject to surcharge pursuant to 11 [U.S.C. §] 506(c)

---

[736] Taunt received the $235,000.00 settlement payment from the Becker Group on June 18, 1996, and paid the proceeds over to Comerica on July 19, 1996. *See* "Second Amended Report to Successor Trustee" (Docket # 775 in Case No. 95-48268) at Ex. A (Form 2), pp. 3, 6.

[737] Docket # 411 in Case No. 95-48268 at ¶ 9.

> and the separate agreement of the Trustee and
> Comerica Bank.
>
> . . .
>
> No one objected to the . . . settlement motion, and on May 28, 1996,
> the Court entered an Order granting the motion.[738]

The Court's May 28, 1996 Order approving Taunt's settlement with the Becker Group, which also

authorized Taunt to pay the settlement proceeds to Comerica,[739] remains in effect. It was not

vacated as a result of the Court's 2007 Fraud on the Court Opinion.[740]

Taunt's decision not to pursue any pre-petition claim against the Becker Group, and his

release of such claim(s) as part of the $235,000.00 settlement, did no damage to the bankruptcy

estate, for two reasons. First, Taunt correctly concluded, after investigation, that the estate had no

viable pre-petition claims against the Becker Group. Second, even if Taunt could have succeeded

in realizing more in proceeds from pursuing pre-petition claims against the Becker Group, all of

those proceeds would have been paid to Comerica on its secured claim, and no other creditors

would have benefitted in any amount. The Court now will discuss these two points, in reverse

---

[738] *M.T.G.,* 366 B.R. at 736-37 (bolding and footnotes omitted).

[739] Docket # 446 in Case No. 95-48268.

[740] In its 2007 Fraud on the Court Opinion, this Court refused to vacate the Becker settlement
order:

> In their joint summary judgment motion, Halbert and Vining also appear
> to argue that the May 28, 1996 Becker Group settlement order . . . also
> should be vacated for fraud on the court. The court cannot take such
> action at this point. To date, neither Halbert nor Vining has filed and
> served on Becker Group, Inc. a motion to vacate the Becker Group
> settlement order, and Becker Group, Inc. has not participated in the
> proceedings to date regarding the fraud on the court issues.

*M.T.G.*, 366 B.R. at 748 n.92 (record citations omitted). To date, neither Vining nor Halbert has ever
filed and served on the Becker Group a motion to vacate the Becker settlement order.

order.

### a. Any additional proceeds realized from the pre-petition claims against the Becker Group would have been paid to Comerica on its secured claim.

Comerica's security interest in MTG's assets covered any pre-petition claims MTG may have had against the Becker Group. As described in Part IV.A.1 of this Opinion, MTG's debt to Comerica was secured by a security interest in all of MTG's assets. For example, in addition to "[a]ll equipment and fixtures,"[741] Comerica's security interest broadly covered all of the following types of MTG's property:

> All of the following property now owned or later acquired by Debtor, wherever located: **all accounts, general intangibles**, chattel paper, **contract rights**, deposit accounts, documents, instruments, **inventory**, returned or repossessed goods, records (including without limit computer software) pertaining to the foregoing property, **and all products and proceeds of any of the foregoing (whether cash or non-cash proceeds)**, including without limitation Insurance and condemnation proceeds.[742]

In 1995, Michigan UCC § 440.9102 stated, in relevant part, that "this article [UCC Article 9] applies: (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, *general intangibles*, chattel paper or accounts." Mich. Comp. Laws Ann. § 440.9102(a)(1) (italics added). In 1995, Michigan UCC § 440.9106 defined "General intangibles" to mean, in relevant part, "any personal property (*including things in action*) other than goods, accounts, chattel paper, documents, instruments, and money." Mich. Comp. Laws Ann. § 440.9106 (italics added). "Personal property" includes "'intangible as well as tangible personal property and must include

---

[741] E.g., Docket # 634-24 (Ex. 19-5).

[742] *E.g.*, Docket # 634-23 (Ex. 19-4) (emphasis added).

341

choses in action.'" *Fodale v. Waste Mgmt. of Mich., Inc.*, 718 N.W.2d 827, 833 (Mich. Ct. App. 2006) (quoting *Royal Oak Twp. v. City of Berkley*, 309 Mich. 572, 580, 16 N.W.2d 83 (1944)). A "chose in action," in turn, is a "proprietary right in personam, such as a debt owed by another person, . . . or a claim for damages in tort." Black's Law Dictionary (7th Ed. 1999) at 234. *See also* Garner, A Dictionary of Modern Legal Usage (2nd Ed. 1995) at 153 ("*choses in action* are rights that can be enforced by legal action (e.g., debts or causes of action in tort)") (italics in original).

In covering accounts, contract rights, and general intangibles (including choses in action), and their proceeds, Comerica's security interest broadly covered any pre-petition claims MTG may have had against the Becker Group, and the proceeds of such claims. If Taunt had recovered additional funds from pursuing any such claims against the Becker Group, they all would have been paid to Comerica, as proceeds of Comerica's collateral on its secured claim. Other creditors would have received nothing.

### b. The MTG bankruptcy estate had no valid pre-petition claim against the Becker Group.

The MTG bankruptcy estate had no viable pre-petition claim against the Becker Group arising out of the Becker Group's termination the Asset Purchase Agreement. Rather, the Becker Group validly terminated the Asset Purchase Agreement in writing, as permitted by the express terms of that agreement. The Becker Group did so by the Termination Letter dated July 27, 1995, more than one month before the contemplated Closing Date of that agreement of August 31, 1995.[743] The Termination Letter is quoted at greater length in Part IV.A.11 of this Opinion, but in

---

[743] *See* Termination Letter (Docket # 645-5); *see also* Part IV.A.7 of this Opinion (discussing the terms of the Asset Purchase Agreement; Part IV.A.11 of this Opinion (discussing the Termination Letter). Paragraph 6.1 of the Asset Purchase Agreement, entitled "Termination of Agreement," provided,

342

short, it terminated the Asset Purchase Agreement based on MTG's

> (i) failures in the proper execution and delivery of the [Asset
> Purchase] Agreement as required by its terms; (ii) [the] Becker
> Group's dissatisfaction with material issues revealed in the due
> diligence investigation; and (iii) the failure of certain conditions
> precedent to [the] Becker Group's obligations under the [Asset
> Purchase] Agreement.[744]

The Termination Letter specified some of the "numerous and material issues regarding the

financial conditions and operations of [MTG]" the Becker Group had uncovered as a result of "its

due diligence investigation,"[745] and also specified "certain conditions precedent to any obligation

[of the Becker Group] to close the transaction" that MTG had failed to satisfy and that were

"incapable of being satisfied or cured before the Closing Date."[746]

During due diligence, the Becker Group learned that several of the representations and

---

in relevant part: "This [Asset] Purchase Agreement may be terminated at any time prior to the Closing upon written notice delivered by Buyer or Seller to the other, in accordance with the following: . . . . (c) By Buyer, if any of the conditions set forth in Section 4.2 shall not have been fulfilled and shall not have been waived by the Buyer[.]"  Paragraph 1.8 of the Asset Purchase Agreement stated that "[t]he sale and purchase transactions contemplated by this Agreement shall be consummated at 10:00 a.m., on August 31, 1995 . . . or such other date and time . . . as may be agreed upon by Seller and Buyer (such date and time hereinafter referred to as the 'Closing' and 'Closing Date')."

[744]  *See* Part IV.A.11 of this Opinion (quoting the Termination Letter (Docket # 645-5)).

[745]  As discussed in more detail in the beginning of Part IV.A.10 of this Opinion, the Becker Group's Jensen testified in his deposition that when he was conducting due diligence, he and Crochett from the Becker Group discovered things which gave them serious concerns about the financial condition of MTG and the quality of the tooling.  For example, they found invoices that were in a drawer rather than in a job folder, and invoices on A/R Reports with no supporting documentation showing the customer-approval necessary to issue an invoice.  Although Jensen and Crochett asked for back-up documentation for the invoices, they never got it.  Jensen and Crochett both concluded that the invoices were not legitimate, should not have been included on the A/R Reports, and were included on the A/R Reports to give a false picture of the financial health of MTG.  Jensen's and Crochett's conclusions were supported by the deposition testimony of Schneider.  Schneider testified that MTG was prematurely invoicing customers to increase its borrowing base.  (Schneider Dep. Tr. (Docket # 584-43) at 29-32.) Jensen and Crochett also determined that there would be a lot of warranty work that would need to be performed due to the quality of the tooling.

[746]  *See* Termination Letter (Docket # 645-5) at 1-2; *see also* Part IV.A.11 of this Opinion (quoting the Termination Letter).

warranties that MTG and its shareholders had made in paragraph 2.1 of the Asset Purchase

Agreement were not true, including the following:

- "The May 3l, 1995 Balance Sheet and Income Statement . . . fairly presents the financial condition of [MTG] and the results of its operations for the period shown, and discloses all liabilities and obligations of [MTG] as of the date of the Balance Sheet as required by generally accepted accounting principles."[747]

- "All of [MTG]'s books and records, including the May 31, 1995 Balance Sheet and Income Statement, are true and accurate in all material respects and have been maintained in accordance with good business and generally accepted accounting principles."[748]

- With certain specified exceptions, "since May 31, 1995, there has not been (i) any material adverse change in the financial condition of [MTG] or any other event or condition of any character which has had or which may have a material adverse effect on [MTG]'s business, the Assets or the financial condition of [MTG] . . . (iv) any labor dispute or notice of dispute which would materially or adversely affect the business or financial condition of [MTG]; or (v) any notice of any material change in the purchase orders of or relationships with any of the customers of the [MTG]."[749]

- "Since May 31, 1995, [MTG] (i) has carried on its business in the same manner as such business was conducted prior to May 31, 1995, (ii)  has not taken or engaged in any action or transactions other than actions or transactions in the ordinary course of business; and (iii) there has been no material adverse change in the business, operations,  prospects, properties or financial condition of [MTG][.]"[750]

- "There are no service contracts or work in process which were not contracted for in the ordinary course of [MTG]'s business or which have been billed in advance, and there are no conditions or state of facts known to [MTG] which would result in any material loss to [MTG] in completing such service contracts or work in process. [MTG] has not rendered billings for or collected progress or other advance payments under any sales orders, contracts, or commitments providing for such payments in excess of amounts which could be reasonably billed or collected on the basis of work actually completed

---

[747] Asset Purchase Agreement (Docket # 598-3) at ¶ 2.1.3 ("Financial Statements: Liabilities").

[748] *Id.*

[749] *Id.* at ¶ 2.1.4 ("No Adverse Changes").

[750] *Id.* at ¶ 2.1.5 ("Transactions Since May 31, 1995").

thereunder."[751]

The fact that representations and warranties made by MTG were not true meant that the condition precedent in paragraph 4.2.4 was not satisfied. That condition required, in relevant part, that "[t]he representations and warranties made by [MTG] in this Agreement . . . shall be true and correct in all material respects when made and at and as of the Closing Date as though made at and as of the Closing Date."[752]

Although Vercnocke denied that the Becker Group had a right to terminate the Asset Purchase Agreement, and even alleged that there had been a Closing of the Asset Purchase Agreement, there is no evidence in the record to support these allegations. Rather, all of the evidence supports the Becker Group's position. And Vercnocke admitted that at least one of the conditions precedent to the Becker Group's obligation to close on the Asset Purchase Agreement had not been satisfied. The condition in paragraph 4.2.10 of the Asset Purchase Agreement, entitled "Restructuring of Comerica Loans," required a "[s]atisfactory agreement between [the Becker Group] and Comerica as to the restructuring of the Assumed Liabilities to Comerica."[753] During his deposition, when questioned about whether MTG's debt with Comerica had been restructured, as required by paragraph 4.2.10, Vercnocke responded: "I would say no, it wasn't restructured[,]"[754] and later in the deposition, when he was asked again about this condition

---

[751] *Id.* at ¶ 2.1.22 ("Service Contracts: Work in Process Payments").

[752] *Id.* at ¶ 4.2.4. *See also id.* at ¶ 4.2.1 ("On and as of the Closing Date, all of the representations and warranties set forth in Section 2.1 hereof shall be true and correct in all material respects . . . .")

[753] *Id.* at ¶ 4.2.10.

[754] Vercnocke Dep. Tr. (Docket # 584-45) at 84.

345

precedent, he responded: "I did not do that."[755]  And in any event, the Becker Group's

Termination Letter made clear that no agreement restructuring the Comerica debt had been made

or could be made that was "satisfactory" to the Becker Group.[756]  This dissatisfaction of the

Becker Group alone meant that the paragraph 4.2.10 condition was not satisfied.

Under paragraph 6.1(c) of the Asset Purchase Agreement, the failure of any of the

conditions precedent gave the Becker Group the right to terminate the agreement.  Thus, the

failure of the condition in paragraph 4.2.10 alone meant that Taunt could not have successfully

prosecuted any claim against the Becker Group, based on the Asset Purchase Agreement.  *See

Harbor Park Mkt., Inc. v. Gronda,* 743 N.W.2d 585, 588 (Mich. Ct. App. 2007) (footnote

omitted) (internal quotation marks and citations omitted) ("A condition precedent . . . is a fact or

event that the parties intend must take place before there is a right to performance.  If the

condition is not satisfied, there is no cause of action for a failure to perform the contract.").

There are other conditions precedent in the Asset Purchase Agreement that the Becker

Group alleged had not been satisfied, and as to which Vercnocke admitted during his deposition

that he could not recall performing.[757]

MTG also admitted "that it may have mistakenly billed Injectronics in the approximate

---

[755]  *Id*. at 206.

[756]  The Termination Letter stated that "pursuant to Section 4.2.10, a mutually satisfactory agreement as to the restructuring of the Comerica debt of MTG was not and cannot be reached (i.e., based upon the irregularities disclosed during the due diligence investigation, [the] Becker Group does not believe that a satisfactory agreement <u>can</u> be reached with Comerica)."  Termination Letter (Docket # 645-5) at 2 (underlining in original).

[757]  Vercnocke Dep. Tr. (Docket # 584-45) at 205-06.

amount of $50,000.00 on a purchase order for which services were in fact not performed[.]"[758]

This supports, in part, the Becker Group's allegation in the Termination Letter that during its due diligence, it discovered "the existence of invoices issued without purchase orders consisting of approximately $800,000.00 reflected as accounts receivable on recent accounts receivable agings" and that based on this, "the $50,000.00 threshold amount referenced in Section 4.2.11 of the [Asset Purchase] Agreement was exceeded[.]"[759]  This section of the Asset Purchase Agreement contained the condition precedent that the Becker Group be satisfied that all conditions in the Asset Purchase Agreement had been met, after the completion of its due diligence.  It required the following:

> 4.2.11 <u>Completion of Buyer's Due Diligence</u>.  **Satisfactory completion of Buyer's due diligence**; provided, however, that there shall be a presumption that the due diligence condition set forth in this Section 4.2.11 shall have been satisfied unless the aggregate amount of (a) reduction in book value of the Assets, plus (b) increase in the liabilities of [MTG], whether reflected on [MTG]'s Balance Sheet or otherwise, or whether accrued, absolute, contingent or otherwise, and excluding any unrecorded, contingent liability in connection with [MTG]'s Agreement with the International Association of Machinists and Aerospace Workers, Warren Local Lodge PM 2848, exceed Fifty Thousand and 00/100 ($50,000.00) Dollars, **in which event satisfactory completion of Buyer's due diligence shall be subject to Buyer's sole and absolute discretion.**[760]

Because MTG did not satisfy conditions precedent in the Asset Purchase Agreement, the Becker Group had no obligation to close on that agreement, and had a right to terminate the

---

[758]  Docket # 598-41 ("Debtor's Objection to Comerica Bank's Motion for Appointment of Trustee") at 2 ¶ 6.

[759]  Termination Letter (Docket # 645-5) at 1-2.

[760]  Asset Purchase Agreement (Docket # 598-3) at ¶ 4.2.11 (emphasis added).

347

agreement. MTG had no valid claim against the Becker Group.

Under paragraph 6.2 of the Asset Purchase Agreement, the Becker Group's termination of the Asset Purchase Agreement meant that the agreement "forthwith bec[a]me null and void," and there could be "no liability on the part of" the Becker Group or any of its "officers, directors, or affiliates."[761] Therefore, there was no basis for any claim against the Becker Group based on the Asset Purchase Agreement. Taunt would not have been successful if he had pursued any pre-petition claim against the Becker Group. Taunt's settlement of any pre-petition claims against the Becker Group, therefore, does not support a legal malpractice claim.

### 3. The alleged loss of the pre-petition claims against May

As discussed above, Vining and the Taunt Defendants have identified two possible pre-petition causes of action the bankruptcy estate had against May, which were released as part of May's settlement with Comerica, in which May paid $285,000 to Comerica. These are (1) a fraudulent conveyance claim against May based on the transfer to him of the $329,000 tax refund; and (2) a conversion claim against May, based on his alleged involvement with the removal of tooling from the Mold Shop. The Court's ruling about the conversion claim is discussed in Part VII.A.11.c.4 of this Opinion, below. The Court's ruling about the fraudulent conveyance claim against May is discussed here.

#### a. Vining failed to plead the loss of the fraudulent conveyance claim against May as a basis for his legal malpractice count.

The Court first notes that Vining did not plead Taunt's failure to pursue the alleged fraudulent conveyance claim against May as a basis for Vining's legal malpractice claim. Rather,

---

[761] *Id.* at ¶ 6.2.

as to May, Vining alleged in his malpractice count (Count XI) only that: "The Trustee may be barred from suing Injectronics, Richard May, and Richard Schneider for the Injectronics claims because of the wrongful entry of the Injectronics Settlement Order or the expiration of the applicable statutes of limitation."[762]  There is no allegation in the malpractice count of the complaint concerning the tax refund May received.  This pleading deficiency means that Taunt's failure to prosecute a claim against May for the tax refund is not part of Vining's legal malpractice claim.

> **b.  Vining has no valid legal malpractice claim relating to the potential fraudulent conveyance claim against May.**

In addition, the Court agrees with the Taunt Defendants that Vining cannot establish a legal malpractice claim against them, based on Taunt's failure to prosecute an action to avoid, as a fraudulent conveyance, and recover for the benefit of the estate, the $329,000 tax refund May received.  This is so for two reasons.  First, Taunt correctly concluded, after investigation, that the estate had no viable fraudulent conveyance claim against May.  Second, even if Taunt could have succeeded in realizing proceeds from pursuing a fraudulent conveyance claim against May, any such proceeds would have been paid to Comerica on its § 507(b) super-priority administrative claim, and no other creditors would have benefitted in any amount.  Therefore, Taunt's decision to settle and release such a claim against May, rather than to purse it, did not cause any damage to the bankruptcy estate.

> **c.  The bankruptcy estate had no viable fraudulent conveyance claim against May.**

>> **i.  Vining's allegations in the complaint regarding a fraudulent conveyance**

---

[762] *See* Compl. at ¶ 309.

claim against May

Vining alleges the following in the complaint about a possible fraudulent transfer claim against May:

> 37.  The Debtor overpaid its Subchapter S shareholders' actual income taxes relating to 1994 income.

> 38.  Before the Filing Date, Richard May, as a Subchapter S shareholder, received approximately $350,000 of federal and state tax refunds as a direct result of the Estimated Tax Overpayments made by the Debtor (the "Tax Refunds").

> **39.  At the time the Debtor made the Estimated Tax Overpayments, the Debtor was engaged or was about to engage in business or transaction[s] for which the property remaining in its hands after the conveyance was an unreasonably small capital.**

> 40.  The Debtor received less than fair consideration for the Estimated Tax Overpayments.
> . . . .

> 91.  As of the Filing Date, the Debtor had the following claims, among others:
> . . .

> **(D) A fraudulent conveyance claim against Richard May under Sections 544(b) and 548 of the Code and the Michigan Fraudulent Conveyance Act, [Mich. Comp. Laws Ann. §] 566.11 *et seq*. for the recovery of the Tax Refunds paid to Mr. May (the "May Chapter 5 Claim")[.]**
> . . .

> 93.  Before the Conversion Date, John D. Hertzberg, [Comerica's] counsel, forwarded a memorandum advising [Comerica] that (a) it had no security interest in the May Chapter 5 Claim . . . or its proceeds, and (b) it had no other right to recover the Tax Refunds made to Mr. May.
> . . .

> 98.  As of the Conversion Date, the Debtor's estate included the following assets:
> . . .

350

**(F) the May Chapter 5 Claim worth over $350,000[.]**

(Emphasis added).

### ii.  Applicable fraudulent conveyance law in 1995

In 1995, section 544(b) of the Bankruptcy Code stated, in relevant part:

> (b) The trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable **under applicable law** by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C.A. § 544(b) (emphasis added).  In 1995, Mich. Comp. Laws Ann. § 566.15, part of the

Michigan Uniform Fraudulent Conveyance Act (the "MUFCA") was the "applicable law."  It

stated:

> Every conveyance **made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital**, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.[763]

Mich. Comp. Laws Ann. § 566.15 (emphasis added).

---

[763]  Effective December 30, 1998, Michigan Public Act 434 repealed MUFCA.  *See* 1998 Mich. Pub. Acts 434 (enacting the Michigan Uniform Fraudulent Transfer Act (the "MUFTA")).  Effective April 10, 2017, the Legislature amended and replaced MUFTA with the Michigan Uniform Voidable Transactions Act (the "MUVTA").  *See* 2016 Mich. Pub. Acts 331, effective March 8, 2017 (amending sections 1, 4, and 9 of 1998 Mich. Pub. Acts 434 (Mich. Comp. Laws Ann. §§ 566.31, 566.34, and 566.39); 2016 Mich. Pub. Acts 552, effective April 10, 2017 (" 'repeal[ing] acts and parts of acts,' by amending the title and sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 (Mich. Comp. Laws §§ 566.31, 566.32, 566.33, 566.34, 566.35, 566.36, 566.37, 566.38, 566.39, 566.40, 566.41, 566.42, and 566.43) , sections 1, 4, and 9 as amended by 2016 PA 331 and section 8 as amended by 2000 Mich. Pub. Acts 362, and by adding sections 14 and 15.").  FRAUDULENT TRANSFERS—UNIFORM VOIDABLE TRANSACTIONS ACT, 2016 Mich. Legis. Serv. P.A. 552 (S.B. 982) (West).

Because the acts giving rise to this adversary proceeding occurred in 1995, the MUFCA, and not MUFTA or MUVTA, applies.

In 1995, Section 548(a)(2) of the Bankruptcy Code stated, in relevant part:

> (a) The trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> **(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or**
>
> (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C.A. § 548(a)(2) (emphasis added).

### iii. Discussion of the potential claim against May

As quoted above, Vining's complaint expressly relies on the "unreasonably small capital" provisions of Mich. Comp. Laws Ann. § 566.15 and 11 U.S.C. § 548(a)(2)(B)(ii).[764] But the evidence in the record does not support this element of a fraudulent conveyance claim. Rather, the evidence shows that Taunt could not have satisfied the "unreasonably small capital" element.

Vining's own expert, Michelle F. Gallagher, C.P.A., testified that, at the end of May 1995, the value of MTG's assets exceeded the amount of its liabilities and debts, and that the tax overpayments MTG made on behalf of May and Vercnocke did ***not*** leave MTG with unreasonably

---

[764] *See* Compl. at ¶¶ 39, 91(D).

small capital.  Gallagher testified:

> Q.  Based upon your calculation, you're saying that [at the end of May of 1995] M.T.G. had a salable value greater than that of its liabilities and debts?
>
> A.  Yes. That is correct.
>
> Q.  You talked about the 300 and some thousand to 400 and some thousand that was paid out in April in taxes.  Would that have left [MTG] with unreasonable small capital at that time, base upon your calculations?
>
> A.  No.[765]

Gallagher further testified that in May 1995, "[MTG] was strong" based on a credit quality report performed by Comerica Bank after an audit and dated May 22, 1995, which found "no serious problems" with MTG.[766]  Gallagher estimated that the working capital of MTG at that time was "in the range between [$]870[,000] and a million 92 . . . inclusive of the Injectronics job" but excluding the line of credit.[767]

Therefore, Vining's own expert's testimony shows that MTG's tax overpayments in April 1995 did not leave MTG with unreasonably small capital, and that MTG was not at or near the point of insolvency in April 1995 when the transfer was made.

Vining's own attorney admitted the same thing, in a hearing held on November 18, 2009 on Vining's motion to authorize a settlement with May.  As noted in footnote 659 of this Opinion, Richard May originally was a defendant in this case, but all claims against May were dismissed

---

[765]  Gallagher Dep. Tr. (Docket # 584-40) at 137.

[766]  *Id.* at 91-92.

[767]  *Id*. at 92-94.

after the Court approved a settlement between Vining and May.[768]  At the hearing held on Vining's settlement motion, Vining admitted, through his attorney Halbert, that Vining had no intention of proving at trial that the estate had a viable fraudulent transfer claim against May, because Vining's position is that when May received the tax refund in April 1995, MTG "had sufficient working capital to meet [its] obligations."[769]

The foregoing testimony of Vining's own expert, and the foregoing admission by Vining, show that Taunt could not have established the "unreasonably small capital" element of a fraudulent conveyance claim against May, and that therefore Taunt would not have been successful if he had filed a fraudulent converyance claim against May.  Taunt's failure to file and prosecute such a claim against May therefore cannot be the basis for a valid legal malpractice claim by Vining.

> **d.  Any additional proceeds of the bankruptcy estate's potential fraudulent conveyance claim against May would have been paid to Comerica on Comerica's § 507(b) super-priority claim.**

As the Court explained in detail in Part VII.A.1.e.4.iii.c.1 of this Opinion, above,

> . . . Comerica's secured claim turned out to be under-secured by more than $1.3 million.  Comerica likely has a valid super-priority administrative claim under § 507(b) of at least $444,475.17.  That § 507(b) claim will have priority over all allowed Chapter 11 administrative expenses in this case, and over all allowed nonpriority unsecured claims, but it will be subordinate to all allowed Chapter 7 administrative expenses.  *See* 11 U.S.C. §§ 507(b); 507(a)(2); 503(b); 726(a)(1); 726(b).

---

[768] *See* "Trustee's Application for Authority to Compromise Claims Against Richard May" (Docket # 1540 in Case No. 95-48268).   The Court entered an order approving the compromise of claims against May.  ("Order Granting Trustee's Motion for Authority to Compromise Claims Against Richard May" (Docket # 1557 in Case No. 95-48268).

[769]   *See* Tr. of Hr'g on Nov. 18, 2009 (Docket # 1564 in Case No. 95-48268) at 15-16.  Rather, Halbert indicated that MTG "had sufficient working capital to meet obligations" until later, after Comerica allegedly breached its loan agreement.  *See id.* at 16.

(footnote omitted).  As the Court explained above, this $444,475.17 amount is a conservative, minimum amount of Comerica's likely § 507(b) super-priority claim.  And this amount is much greater than the maximum amount Taunt could possibly have recovered if there had been a valid claim against May (the $329,000.00 amount of the tax refund).

Therefore, because of Comerica' super-priority claim, even if Taunt had successfully maintained a fraudulent conveyance claim against May based on the tax refund May received, Comerica would have received the proceeds, and unsecured creditors would have received none of the proceeds.

### 4.  The alleged loss of the estate's conversion claim against Injectronics, May, and Schneider

Vining's complaint alleges, as another form of damage due to legal malpractice, that Vining "may be barred from suing Injectronics, Richard May, and Richard Schneider for the Injectronics claims because of the wrongful entry of the Injectronics Settlement Order or the expiration of the applicable statutes of limitations."[770]

Taunt's obtaining the entry of the Injectronics Settlement Order did no damage to the *MTG* bankruptcy estate, for two reasons.  First, the estate never had any valid claim arising from the Injectronics matter.  Second, even if Taunt could have succeeded in realizing any proceeds from pursuing claims relating to Injectronics, all of those proceeds would have been paid to Comerica on its secured claim, and no other creditors would have benefitted in any amount.  The Court now will discuss these two points, in reverse order.

### a.  Any claim the bankruptcy estate may have had against Injectronics was part of Comerica's collateral.

---

[770]  Compl. at ¶ 309.

Comerica's security interests in the assets of MTG included a security interest in any claim(s) against Injectronics, and any claim(s) against Schneider or May arising from the Injectronics matter. Comerica therefore was entitled to payment from any proceeds that Taunt might have realized in pursuing any such claims on behalf of the bankruptcy estate. The other creditors of the bankruptcy estate therefore suffered no loss because of any alleged legal malpractice by the Taunt Defendants or Plunkett & Cooney.

As noted in Part VII.A.11.c.2.a of this Opinion, above, Comerica's security interest covered, among other things, all of MTG's "contract rights" and "general intangibles," and this included all of MTG's choses in action, including tort claims. Comerica's security interest therefore covered any claims for conversion, breach of contract, and any other pre-petition claims that MTG may have had against Injectronics, Schneider, or May arising from the Injectronics matter.

For these reasons, Taunt did no damage to the bankruptcy estate by obtaining this Court's approval of the settlement with Injectronics, with the settlement proceeds going to Comerica.

### b. The bankruptcy estate had no valid claim against Injectronics, or against Schneider or May.

The MTG bankruptcy estate never had a valid claim arising from the Injectronics matter, primarily because (1) between July 27, 1995, when the tooling[771] was delivered to Multi Form for testing, and August 14, 1995, when Injectronics rejected the tooling,[772] Injectronics had a

---

[771] The tooling is sometimes referred to as "molds" in some of the record excerpts quoted in this section of the Opinion. The type of tooling that MTG was making for Injectronics was injection molds. *See* Schneider Dep. Tr. (Docket # 584-43) at 17.

[772] *See, e.g.,* Letter dated August 14, 1995 from counsel for Injectronics to Halbert, counsel for MTG, informing Halbert of MTG's failure to "substantially perform" the terms of Purchase Order Nos. 26032 and 26189, and MTG's breach of such purchase orders (Docket # 599-10, the "August 14, 1995

356

contractual right to possess the tooling without first paying for it, to test it for conformity to the

specifications in its purchase orders; and (2) after August 14, 1995, Injectronics's continued

possession of the tooling was caused by MTG's own refusal of Injectronics's offer to return the

tooling to MTG.[773]

_____

Rejection Letter"). The August 14, 1995 Rejection Letter stated, among other things, that "Injectronics'[s] recent inspection reveals that the mold in question is non-conforming with specifications as identified in said purchase orders. Subject to further inspection, Injectronics'[s] review of the subject mold at this time reveals the defects set forth on the attachment to this letter[.]" Attached to the August 14, 1995 Rejection Letter was a document entitled "TOOLING INSPECTION REPORT," which listed 23 reasons why the tooling did not conform to the specifications in the purchase orders. *Id.* at pdf p. 3.

In another letter dated August 14, 1995, the Injectronics attorney informed Halbert of MTG's failure to comply with the terms of Purchase Order Nos. 26227, 26228, 26229, and 26230, and that MTG's failure was a breach of such purchase orders (Docket # 599-12, the "Second August 14, 1995 Rejection Letter" at 1-3). The Second August 14, 1995 Rejection Letter stated, in relevant part:

> As you are aware Injectronics has been in the process of inspecting molds VO7-9008-02 and VO7-9010-2. Based upon its inspection, these molds have substantial defects. Subject to further right of inspection, Injectronics is currently aware of the defects set forth in the attachments to this letter.
>
> **Based upon its inspection, Injectronics hereby rejects the molds as being substantially non-conforming with specifications set forth in the respective purchase orders. [MTG's] non-performance has caused a breach of the above referenced purchase orders**.

*Id.* at 1-2 (emphasis added). With regard to other tooling, counsel for Injectronics advised Halbert that it would be necessary to have the tooling built by another tool maker on an expedited basis. *Id.* at 2-3. The Second August 14, 1995 Rejection Letter stated, in relevant part: "**With respect to the molds, which are in the possession of Injectronics – Mold VO7-9008-02 and VO7-9010-02, please furnish Injectronics with instructions as to the disposition which is to be made of these items and furnish indemnity sufficient to cover the expense of complying with such instructions.**" *Id.* at 3 (emphasis added). The Second August 14, 1995 Rejection Letter also had attached to it documents entitled "TOOLING INSPECTION REPORT" which listed the reasons why the tooling was not in conformity with the specifications of the purchase orders. *Id.* at pdf pp. 4-5.

[773] *See, e.g.*, the letter dated September 14, 1995 from MTG's attorney Halbert to counsel for Injectronics, rejecting MTG's offer to return the non-conforming tooling that it had tested and rejected to MTG (Docket # 598-17). *See also* Docket # 598-48 (Letter dated July 12, 1995 to Schneider of MTG from Foley of Injectronics (the "July 12, 1995 Rejection Letter") informing Schneider of corrections that needed to be performed to certain tooling and the need for MTG to pick up the tooling so that he could

It is undisputed that, as of July 27, 1995, MTG had not completed the tooling at issue that was removed from the Mold Shop and delivered to Multi Form; the tooling had not been tested; and Injectronics had not approved of and accepted such tooling. As explained in Part IV.A.12 of this Opinion, under the terms of Injectronics's purchase orders, Injectronics had no obligation to pay MTG *until 30 days after* all of the following had occurred: (1) MTG completed the tooling; (2) MTG delivered the tooling to Injectronics; (3) Injectronics tested the tooling; and (4) Injectronics approved the tooling. Injectronics's purchase orders explicitly stated that the "TERMS" were "NET 30 AFTER ISIR APPROVAL."[774] Injectronics's purchase orders provided that MTG had to "design, build and condition mold[s] per Injectronics Injection Mold Specifications Guide Lines [sic], Rev B 10/20/94" and that "[p]roducts or material [would] be received **subject to** weight, count and **inspection**."[775]

---

have the corrections done). MTG never retrieved that tooling. (Tr. of March 16, 2009 Dep. of Dale Hadel ("Hadel Dep. Tr.") at 36-37.)

[774] *See, e.g.,* Purchase Order No. 26026 (Docket # 598-46) at 1 (capitalization in original). "ISIR," which stands for Initial Sample Inspection Report, was a report prepared by Injectronics *after* Injectronics had run the part at a testing facility. (*See* Schneider Dep. Tr. (Docket # 584-43) at 25-26.) For example, a purchase order which said that payment terms were "Net thirty after ISIR approval Clinton" meant that MTG would deliver the tool to the Clinton testing facility to be run and inspected by Injectronics, and if Injectronics approved the tool after testing it, Injectronics would be obligated to pay 30 days after issuing the Initial Sample Inspection Report. *Id.*

Leo Jensen testified at his deposition that the customers of MTG would have to give ISIR approval to a mold after testing it, before MTG could invoice the customer for the mold. *See* Jensen Dep. Tr. (Docket # 584-42) at 26.

[775] *See* Purchase Order No. 26026 (Docket # 598-46) at 1 (capitalization omitted), 2 ¶ 3 (emphasis added). A copy of Injectronics's document entitled "INJECTION MOLD SPECIFICATIONS GUIDELINES, REVISION LEVEL B UPDATED 10/20/94" ("Injection Mold Specifications Guidelines") is at Docket # 598-45 (capitalization in original). The evidence shows that a copy of Injectronics's Injection Mold Specifications Guidelines were sent by mail to MTG on October 27, 1994 and was acknowledged as received by the signature of Richard May on October 28, 1994. (Docket # 598-44 (Letter to Rich May, of MTG from Steven S. Foley, the Tooling Development Engineer of Injectronics)).

358

Injectronics's purchase orders further provided that there could be no modification of the terms of the purchase orders unless Injectronics agreed to the modification in writing,[776] and there is no evidence in the record that Injectronics ever agreed to modify these terms, in writing or otherwise. MTG could not change the terms of the purchase orders without the consent of Injectronics. *See Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003) (footnote omitted) (explaining that "one cannot unilaterally modify a contract because by definition, a unilateral modification lacks mutuality"); *Universal Leaseway Sys., Inc. v. Herrud & Co.* 115 N.W.2d 294, 297 (Mich. 1962) (holding that a lease agreement which set forth "[t]he basic agreement between the parties . . . could not be changed by either party without

---

[776] *See, e.g.,* Purchase Order No. 26026 (Docket # 598-46) at 2 ¶ 2 ("No variations in the quantity or other terms of this order will be accepted unless approved by Buyer in writing."). *See also id.* at 2 ¶ 12, which stated:

> No modifications of or additions to the provisions or conditions of this order whether included by the Seller upon the copy hereof provided for his acceptance or otherwise proposed to the Buyer will become a part of it unless and until accepted in writing by the Buyer. If Seller tenders delivery of any goods covered by this order before otherwise accepting it, such tender or delivery shall constitute an acceptance of this order as written.

*See also* Purchase Orders at Docket ## 598-50, 599-3, 599-5. Schneider also testified at his deposition that any changes in the terms and conditions of Injectronics's purchase orders had to be in writing:

> Q. As part of the terms and conditions of the purchase orders, if there was going to be any change in those terms and conditions, there had to be a writing?
> A. Yes.
> Q. That was your understanding as to the dealings that you had with Injectronics on behalf of M.T.G.?
> A. Yes.
> Q. So if there was to be any change in any of the terms and conditions, there had to be a corresponding writing altering those changes?
> A. Yes.

Schneider Dep. Tr. (Docket # 584-43) at 24.

the consent of the other" because "[a] meeting of the minds is required not only to make a contract but, also, to rescind or modify it after it has been made").

Therefore, MTG's attempt to require, during the period between July 27, 1995 and August 14, 1995, that Injectronics pay for the tooling *before* all of the above purchase order conditions had been satisfied and 30 days had elapsed, was a breach of the terms of Injectronics's purchase orders. And MTG's invoicing of Injectronics for the tooling, *before* all of these conditions were met and 30 days had elapsed, was premature and also was a breach of the terms of the purchase orders. Under the purchase orders, Injectronics had a contractual right to possess the tooling during the July 27, 1995 through August 14, 1995 time frame, even though it had not paid MTG for the tooling, because it had a right under its contract with MTG to inspect and test the tooling before approving of it and accepting it, *and* before paying for it.

Injectronics's Injection Mold Specifications Guidelines stated detailed requirements for tool sampling, and then provided that if the toolmaker (here, MTG) was unable to sample the tool, Intectronics could do so, and bill the toolmaker.[777]

It is undisputed that MTG could not sample the tools in the Injectronics purchase orders because (1) MTG was closing the Mold Shop, and (2) PMD, a company that had done tool tryouts for MTG, had refused to continue doing so because MTG owed PMD $130,000.[778] Therefore, Injectronics had a right to sample the tools itself under Part V, Paragraph 10, of its Injection Mold Specifications Guidelines.

Injectronics also had a right to inspect the goods, before paying for them, under

---

[777] Docket # 598-45 at 8 ¶ V (italics added).

[778] *See* Part IV.A.12.a of this Opinion, quoting Schneider's deposition.

360

Michigan's Uniform Commercial Code. *See* Mich. Comp. Laws Ann. §§ 440.2102 (making the Michigan UCC applicable to "transactions in goods"); 440.2513(1) (stating, in relevant part: "Unless otherwise agreed . . . , where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner").[779]

Agents of MTG, namely Schneider and Mood, under either actual authority from MTG, or at the very least, under apparent authority,[780] gave possession of the tooling to Multi Form and to Jo-Ad Industries, a prototype component tool manufacturer, "in care of Injectronics," for the purpose of fulfilling MTG's contractual obligation under the purchase orders to test them for Injectronics. Because MTG did not have the ability to test the tooling itself, Injectronics had the

---

[779] Other than in the heading for Mich. Comp. Laws Ann. § 440.2102, the language in Mich. Comp. Laws Ann. §§ 440.2102 and 440.2513(1) was identical in 1995 to what it is today. In 1995, the heading for Mich. Comp. Laws. Ann. § 440.2012 was "440.2102. Scope of application of article; security and other transactions excluded." The current heading for this section is "Scope; certain security and other transactions excluded."

[780] As stated in Part IV.A.12.a of this Opinion, Schneider testified in his deposition that at a July 27, 1995 meeting set up at the request of Injectronics, Vercnocke gave him authority to deliver the tools to Multi Form for testing. Vercnocke in an affidavit denied that he gave Schneider permission to deliver the tooling at issue to Multi Form. (*See* "Affidavit of Kirk Vercnocke in Support of Objection to Motion for Preliminary Injunction" (Docket # 584-31) at ¶ 18.) However, it is immaterial whether or not Schneider had actual authority to deliver possession of the tooling to Multi Form, because he clearly had apparent authority to do so. It is undisputed that Schneider, as a salesman of MTG, and Mood, who ran the operations of the MTG Mold Shop, were agents of MTG. And they had apparent authority to act on behalf of MTG with regard to the tooling. Because of this, Schneider and Mood had apparent authority on behalf of MTG to deliver tooling to Multi Form for testing. *See Central Wholesale Co. v. Sefa*, 87 N.W.2d 94, 98-99 (Mich. 1957) (explaining that persons dealing with an agent that has been clothed with apparent authority by his principal have a right to rely on that authority, and the principal is bound by the acts of that agent regardless of whether that agent had actual authority do what he has done).

But in any event, even if Schneider and Mood lacked actual or apparent authority to deliver the tooling to Multi Form for testing, Injectronics had a right under its purchase orders to test the tooling, and therefore a right to possess the tooling for that purpose. The exercise of that right was facilitated by Schneider and Mood, agents of MTG. Injectronics's possession of the tooling for testing purposes was not wrongful, and could not be the basis for a conversion claim against it.

361

right to have the tooling tested at Multi Form, or at any other reasonable location, and when Mutltiform could not perform such testing, Injectronics had the right to have the tooling tested at another reasonable location. Injectronics did not assert ownership of the tools, or a right to permanent possession of the tools. Rather, Injectronics merely took possession of the tools for the limited purpose of exercising its contractual right to inspect and test the tools.

Because Injectronics had a right under the contract to test the tooling and approve it before paying for it, Injectronics's possession of the tooling between July 27, 1995 and August 14, 1995 for the purpose of testing it was not wrongful, and was not in denial of or inconsistent with the property rights of MTG in the tooling. Therefore, Injectronics's possession of the tooling was not conversion under Michigan law. *See Aroma Wines & Equip, Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015) (footnote omitted) (citation omitted) ("Under the common law, conversion is "'any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'"); *Rohe Sci. Corp. v. Nat'l Bank of Detroit*, 350 N.W.2d 280, 282 (Mich. Ct. App. 1984), *on reh'g*, 355 N.W.2d 883 (1984) (citation omitted) ("Liability for conversion does not arise if the actor is privileged to dispossess another of the chattel. If defendant's right to possession was greater than that of plaintiff's, plaintiff could not maintain an action for conversion.").

And because MTG was the party to the purchase orders that committed the first substantial breach of its contract with Injectronics, MTG had no cause of action against Injectronics for any failure by Injectronics to perform under that contract. For example, in *Oak St. Funding, LLC v. Ingram*, 749 F. Supp. 2d 568, 574 (E.D. Mich. 2010), the court explained that under Michigan law,

362

> "[h]e who commits the first substantial breach of a contract cannot
> maintain an action against the other contracting party for failure to
> perform." *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742
> (6th Cir.1998) (quoting *Ehlinger v. Bodi Lake Lumber Co.*, 324 Mich. 77,
> 89, 36 N.W.2d 311 (1949)). The determining factor is whether a breach is
> substantial. *Id.* A "substantial breach" is one which effects a change in the
> essential operative elements of the contract, such as a failure of
> consideration, or something that makes further performance by the other
> party ineffective or impossible. *Id.*

MTG's failure to test the tooling, to assure that it was in conformity with the specifications of Injectronics's purchase orders, was a substantial breach of the purchase orders, as was MTG's requirement that Injectronics first pay for the tooling before the conditions precedent to Injectronics's duty to pay were met. Therefore, MTG committed the first substantial breach of the purchase orders, and its breach precluded it from maintaining any cause of action against Injectronics based on any alleged breach by Injectronics. For these reasons, Injectronics's possession of the tooling before August 14, 1995 did not give rise to any breach of contract claim or conversion claim in favor of MTG.

Nor was Injectronics's continued possession of the tooling, after August 14, 1995, a conversion under Michigan law. This is so because Injectronics found that the tooling did not conform to its specifications, rejected the tooling, and offered to return it to MTG, but MTG refused to take the tooling back. Injectronics purchase orders provided, in relevant part:

> All rejected goods will be held at Seller's risk and expense, subject to
> Seller's prompt advice as to disposition. Unless otherwise arranged, all
> rejected goods will be returned and charged back, including all
> transportation and handling costs.[781]

In rejecting the tooling and offering to return the tooling, Injectronics fully complied with its

---

[781] Purchase Order (Docket # 598-46) at 2 ¶ 3.

duties under its contract with MTG and the Michigan UCC.

In 1995, the provision of the Michigan UCC governing the "[r]ejection of goods" stated, in relevant part:

> Section 2602. . . .
>
> (2) Subject to the provisions of the 2 following sections on rejected goods (sections 2603 and 2604),
> . . .
>
> (b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest under the provisions of this article (subsection (3) of section 2711), he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but
>
> (c) the buyer has no further obligations with regard to goods rightfully rejected.
>
> (3) The seller's rights with respect to goods wrongfully rejected are governed by the provisions of this article on seller's remedies in general (section 2703).

Mich. Comp. Laws Ann. § 440.2602 (footnotes omitted).[782]

In 1995, the provision of the Michigan UCC which governed the buyer's options upon the buyer's rejection of goods stated, in relevant part, that

> if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in the preceding section. **Such action is not acceptance or conversion.**

---

[782] The only change in this provision from the 1995 UCC version to the present version is in the heading, which has been changed from "Rejection of goods" in the 1995 version to "Manner and effect of rightful rejection" in the current version.

Mich. Comp. Laws Ann. § 440.2604  (emphasis added).[783]

Therefore, Injectronics had a right to the continued possession of the tooling after it rejected them on August 14, 1995, and such possession was not acceptance or conversion.

There is another reason why the bankruptcy estate had no valid claim against Injectronics for either common law or statutory conversion, based on Injectronics's possession of the tooling at any time.  Vining's common law and statutory conversion theories against Injectronics are based on the fact that Injectronics took possession of the tooling without first paying MTG the contract price for the tooling.  Vining has not alleged any duty that Injectronics owed to MTG that was separate and distinct from Injectronics's alleged contract obligation to pay for the tooling before taking possession of it.  The bankruptcy estate's claim therefore would be, at best, no more than a breach of contract claim.  As such, it cannot be a conversion claim or any other tort claim.

> Conversion is a tort, not a contractual cause of action. . . . Michigan courts take precautions to avoid blurring the line between tort and contract principles.  *See Huron Tool & Eng'g Co. v. Precision Consulting Serv., Inc*., 209 Mich.App. 365, 374, 532 N.W.2d 541 (1995) (noting the Michigan Supreme Court's admonition "to avoid confusing contract and tort law"). . . .  Where a plaintiff claims only monetary losses stemming from a written contract, the plaintiff is limited to contractual remedies.

*Oak St. Funding, LLC v. Ingram*, 749 F. Supp. 2d at 578 (citation omitted).

Under Michigan law,

> the threshold question [in deciding whether the plaintiff has stated a tort claim based on a contract] is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.  If no independent duty exists, no tort action based on a contract will lie.

---

[783]  The only change in this provision from the 1995 UCC version to the present version is in the heading which has been changed from "Rejection of goods; buyer's options" in the 1995 version to "Buyer's options as to salvage of rightfully rejected goods" in the current version.

*Fultz v. Union-Com. Assocs.*, 683 N.W.2d 587, 592 (Mich. 2004) (footnote omitted). Because Vining has failed to allege that Injectronics owed any duty to MTG that was "separate and distinct from [Injectronics's] contractual obligations[,]" and claims only monetary losses resulting from Injectronics's failure to pay for the tooling before obtaining possession of it,[784] Vining has failed to satisfy the threshold requirement of stating a conversion claim against Injectronics.

For all the above reasons, MTG did not have a valid claim against Injectronics based on possession of the tooling at issue from July 27, 1995 forward. Nor did MTG have any valid claim against Schneider based on Injectronics's possession of the tooling during this period. Because Injectronics had a right under the contract to test the tooling and approve it before paying for it, Schneider's involvement in any transfer of possession of the tooling to Multi Form, and to Jo-Ad Industries, for the limited purpose of testing the tooling for Injectronics, was required by the purchase orders, and was not inconsistent with the property rights of MTG in the tooling. Because Injectronics's possession of the tooling was not wrongful, Schneider's actions which led to Injectronics's gaining possession of the tooling also were not wrongful.

It also is worth noting that Schneider had no apparent motive for removing the tooling from the Mold Shop for testing, other than to help MTG fulfill its contractual obligations. Schneider testified at his deposition that he was not promised, nor did he ever receive, any compensation or any other benefit, on account of the part he played in having the tooling removed from the MTG Mold Shop for testing.[785]

---

[784] Vining has not claimed, nor is there any evidence in the record, that MTG suffered any other alleged loss due to Injectronics's possession of the tooling, other than the failure to receive the contract price for the tooling.

[785] *See* Schneider Dep. Tr. (Docket # 584-43) at 201.

366

Vining also has alleged that the bankruptcy estate had some sort of potential claim against May based on Injectronics's possession of the tooling removed from the Mold Shop on July 27, 1995. But Vining does not cite any factual basis for this allegation, and there is no admissible evidence in the record that would support such a claim against May. May was formerly the President of MTG, but he was voted out as President in early March 1995, and at that time May ceased having active involvement in the management of MTG. And May resigned effective May 31, 1995, almost two months before the events involving Injectronics.[786]

According to Schneider's deposition testimony, May had nothing whatsoever to do with the decision to have the tooling removed from the Mold Shop so that it could be tested for Injectronics:

> Q. Did Richard May have any involvement whatsoever in regard to the delivery of the tooling in the end of July of 1995?
>
> A. No.
>
> Q. Did you ever talk to Mr. May about the delivering of this tooling in the end of July of 1995?
>
> A. No.[787]

There is no admissible evidence in the record that conflicts with this testimony or that would support a claim against May based on the delivery of tooling to Injectronics. Vercnocke's version of the events that occurred on July 27, 1995 and thereafter, as stated in his twenty-nine paragraph affidavit subscribed and sworn on August 17, 1995, quoted in Parts IV.A.12 and IV.A.13 of this Opinion, did not mention any involvement by May in the removal of the tooling

---

[786] *See* Tr. of Sept. 23, 1997 Dep. of Richard G. May (Docket # 600-8, "May Dep. Tr.") at 5, 7.

[787] Schneider Dep. Tr. (Docket # 584-43) at 83.

from the Mold Shop.

In his September 8, 2008 deposition, Vercnocke alleged, in substance, that May *may* have been involved in the removal of tooling from the Mold Shop, because of a phone call that May allegedly had with Schneider before the tooling was removed. But Vercnocke admitted that he did not have any personal knowledge of such a phone call, or that May was involved in any way in the removal of tooling from the Mold Shop. Vernocke never alleged that May was present at the Mold Shop when the tooling was removed; that May ever had possession of the tooling or exercised dominion or control over the tooling; or that May told Schneider to remove the tooling from the Mold Shop. Vercnocke testified at his deposition as follows:

> Q. Do you contend that Richard May also was involved in the theft of the tooling?
>
> A. Well, what Rich Schneider told me ultimately – Gene Gosnell and I got together with him a year or two later, and he said that he called up Rich May to say, what do I do? And Rich May basically – even though Rich May was still an owner but not involved with the company on a day-to-day basis – you've got to understand the history. Let me back up.
>
> Rick Schneider was Rich May's like right-hand man. So his loyalty was always to Rich May. When Rich May quit, Rick Schneider carried on an ongoing relationship with Rich May.
>
> When this event happened, Rick told us later that he had gotten in touch with Rich to say, What do I do? Injectronics – you know, I'm going to be in this industry a long time. Vercnocke is an accountant, he'll probably go on to do accounting.
>
> Rich May said to Rick, Well, I'm not going to tell you what to do, but if you feel like you need to get them their tools to further your career, you can; and that's what Rick was using as some premise.

> So do I believe that Rich May was involved in it? **I mean,
> to the extent that Rick Schneider says he was, I don't
> have any direct knowledge**.[788]

Vernocke's testimony regarding May's possible involvement not only is inadmissible hearsay, but also directly conflicts with Schneider's deposition testimony, which was that May had no involvement whatsoever in the delivery of tooling to Multi Form, and that Schneider did *not* talk to May about the delivery of tooling to Multi Form. And even if what Vercnocke alleged in his deposition about May's purported involvement in the delivery of the tooling to Multi Form were true — *i.e.*, that Schneider had a telephone conversation with May about delivery of the tooling to Multi Form in which May told Schneider that he would not tell him what to do — it would still not provide a basis for any claim against May. Vercnocke did not allege that May took possession of or asserted dominion and control over the tooling in the Mold Shop, or that May took any action that was inconsistent with the property interests of MTG in the tooling.

For all of the above reasons, MTG did not have a valid claim for conversion, or any other valid claim, against Injectronics, or against either Schneider or May, arising from the Injectronics tooling matter. Thus, Taunt's obtaining the entry of the Injectronics Settlement Order did no damage to the MTG bankruptcy estate.

For all the reasons stated above, the Taunt Defendants and Plunkett & Cooney are entitled to summary judgment on Vining's legal malpractice claim.[789]

### 12. Vining's claim for violations of the Racketeering and Corrupt Organizations Act (Count XII)

---

[788] Vercnocke Dep. Tr. (Docket # 584-45) at 120-21 (emphasis added).

[789] Given the Court's ruling, the Court does not address all of the Defendants' other arguments in seeking summary judgment on this claim. It is not necessary to do so.

369

In Count XII of the Vining's complaint, he alleges a violation of the Racketeering and Corrupt Organizations Act ("RICO") by the Taunt Defendants, Plunkett & Cooney, Miller Canfield, the Comerica Defendants, Steven Roach, Kevin Ball, and May.[790]  Vining alleges that the Defendants "conspired with one another to defraud the Bankruptcy Court, the Debtor's estate, the Debtor's creditors and shareholders, and others."[791]  According to Vining's complaint, the Comerica Defendants corrupted the Taunt Defendants, Plunkett & Cooney, and Kevin Ball, who then assisted the Comerica Defendants in defrauding "the Bankruptcy Court, the Debtor's estate, and others . . . to unlawfully divert the assets of the Debtor's estate to the benefit of the Defendants and others who had no lawful right to those assets."[792]  Vining alleges that the Defendants acted "knowingly and the with specific intent to deceive in order" to profit themselves by diverting assets of the estate to the "detriment of the integrity of the bankruptcy system, the Debtor's estate, and others.[793]  Vining alleges further that "[i]n carrying out the scheme to defraud the Debtor's estate, its creditors, its shareholders, the Court, and others, the Defendants engaged, among other things, in conduct in violation of federal and state laws, as set forth above."[794]

---

[790]  Compl. at ¶ 312.  Steven Roach and Kevin Ball were never Defendants in this case.  Richard May originally was a defendant in this case, and Count XII was directed at May, among other defendants. But all claims against May were dismissed after the Court approved a settlement between Vining and May.  (*See* "Order Dismissing Claims Against Defendant Richard May Without Prejudice and Without Costs or Attorney Fees" (Docket # 394)).  Miller Canfield originally was a defendant in this case, and Count XII was also directed at Miller Canfield, among other defendants.  Miller Canfield was dismissed from this lawsuit on May 27, 2008 (*See* "Order Dismissing Claims Against Miller, Canfield, Paddock & Stone, P.L.C. Without Prejudice and Without Costs or Attorney Fees" (Docket # 189).)

[791]  Compl. at ¶ 312.

[792]  *Id.* at ¶ 313.

[793]  *Id.* at ¶ 315.

[794]  *Id.* at ¶ 318.

370

Vining's complaint accuses the Defendants of mail fraud and wire fraud "as proscribed and prohibited by" 18 U.S.C. §§ 1341 and 1343, respectively.[795]  Vining alleges that "[t]he Defendants' association is an "enterprise," or "alternatively, [that] the Debtor's bankruptcy estate is an 'enterprise' within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)" which "was engaged in and the activities of which affected interstate commerce at all relevant times."[796]  Vining alleges further that these Defendants participated "directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(E) and 1961(5) and 1962(c)."[797]  Vining alleges that these Defendants acted "with malice, insult, intent and knowledge, and with a wanton and reckless disregard of the rights of the Debtor, its estate, its creditors, its shareholders, the Court, and others."[798]  Vining alleges that "[b]y reason of [these] Defendants' violation of 18 U.S.C. § 1962(c), the Debtor's estate was injured in an amount believed to be not less than $15,000,000, within the meaning of 18 U.S.C. [§] 1964(c)."[799]

Although Vining asserted a RICO claim against the Defendants in his complaint, he failed to mention his RICO claim or present any argument in support of his RICO claim in his motion seeking summary judgment against the Defendants.

### a. The Taunt Defendants' position on Vining's RICO claim`

---

[795] *Id.* at ¶¶ 321-22.

[796] *Id.* at ¶¶ 325-26.

[797] *Id.* at ¶ 327.

[798] *Id.* at ¶ 319-20.

[799] *Id.* at ¶ 328.

371

The Taunt Defendants argue that the Court should dismiss Vining's RICO claim because "Vining has agreed to it."[800] The Taunt Defendants rely on an email dated June 23, 2009, in which Halbert, on behalf of Vining, circulated a proposed attached "stipulation and order for dismissal of the RICO, Tortitious Interference, Business Defamation, and Accounting counts of the Complaint."[801] Halbert's email states, in relevant part: "The first three counts will be with prejudice as long as there are no res judicata effects, etc., and the Accounting count will be without prejudice because we will still seek an accounting as relief under the remaining counts. Let me know whether I can sign your names and file this."[802] No stipulation or order dismissing these counts was ever filed.

The Taunt Defendants also argue that the RICO claim, like all of the other claims in Vining's complaint, should be dismissed because Vining cannot prove that the bankruptcy estate suffered any damages from any of the actions of the Taunt Defendants. According to the Taunt Defendants, damages is a necessary element of all of the claims pled in the complaint, including Vining's RICO claim.[803]

Finally, Taunt relies on all of the arguments about RICO that are made in the briefs of Plunkett & Cooney and the Comerica Defendants.[804]

### b. Plunkett & Cooney's position on Vining's RICO claim

---

[800] Taunt Defs.' Br. (Docket # 658) at 49 ¶ 9 (relying on Docket # 601-45). In their brief, the Taunt Defendants erroneously cite to Ex. 449.

[801] *See* Docket # 601-45.

[802] *Id.*

[803] *See* Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 87.

[804] *Id.* at 87-88.

Plunkett & Cooney argues that the allegations in Vining's complaint regarding the elements of his RICO claim "fall far short of the governing standards for pleading under Federal Rule of Civil Procedure 9(b)."[805] Plunkett & Cooney argues further that "after years of discovery, [Vining] has produced no evidence to support his RICO claim."[806]

Plunkett & Cooney states that "[t]o establish a valid RICO claim under [18 U.S.C. § 1962], a plaintiff must prove, at a minimum, '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"[807]

Plunkett & Cooney argues, in detail, why it contends Vining has not shown "[t]he existence of a RICO 'enterprise[,]'" as that concept is defined by the case law.[808] Among other things, Plunkett & Cooney cites, in support of its argument, *Boyle v. United States*, 556 U.S. 938, 944-45 (2009); *Begala v. PNC Bank, Ohio*, 214 F.3d 776, 781 (6th Cir. 2000); and *Franklyn v. Federal National Mortgage Association*, No. 14–cv–10943, 2015 WL 74673, at *10 (E.D. Mich. Jan. 6, 2015).

Plunkett & Cooney argues further that Vining's description of the alleged activities of the purported enterprise is too vague.

Plunkett & Cooney also argues that Vining's allegations do not establish a "continuity" of criminal activity, which is necessary to establish "a 'pattern' of 'racketeering activity'" under

---

[805] Plunkett & Cooney's Br. (Docket # 578) at 35.

[806] *Id.*

[807] *Id.* at 36 (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

[808] *Id.* at 36-41.

373

§ 1962(c) of RICO.[809]  Plunkett & Cooney supports this argument with a detailed discussion of

applicable case law, including *H.J. Inc. v. Northwestern Bell Telephone Company*, 492 U.S. 229,

242 (1989); *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 409-10 (6th Cir.

2012); and *Moon v. Harrison Piping Supply*, 465 F.3d 719, 725-26 (6th Cir. 2006).

### c.  The Comerica Defendants' position on Vining's RICO claim

The Comerica Defendants agree with the Taunt Defendants' argument that Vining's RICO

claim was one of four claims that he agreed to dismiss.  The Comerica Defendants state:

> In 2009, Vining proposed and agreed that he would dismiss four
> counts from the complaint: two postpetition claims – counts XII
> (RICO), and XIV (Accounting); and two prepetition claims –
> counts XX (Tortious interference), and XXI (Business Defamation). In a
> writing to all counsel, Mr. Halbert stated:
>
>> Attached is a stipulation and order for dismissal of
>> the RICO, Tortious Interference, Business
>> Defamation, and Accounting counts of the
>> Complaint. The first three counts will be with
>> prejudice as long as there are no res judicata effects,
>> etc., and the Accounting count will be without
>> prejudice because we will still seek an accounting as
>> relief under the remaining counts. [Exhibit 34].
>
> All counsel agreed to the dismissal of these counts, but Halbert then
> refused to sign a stipulation. As even Halbert has recognized, these
> claims are meritless and should be dismissed.[810]

The Comerica Defendants further argue that "Vining cannot meet any of the elements of a

---

[809]  *Id.* at 38.  Section 1962(c) states: "(c) It shall be unlawful for any person employed by or
associated with any enterprise engaged in, or the activities of which affect, interstate or foreign
commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs
through **a pattern of racketeering activity** or collection of unlawful debt." 18 U.S.C. § 1962(c)
(emphasis added).

[810]  Comerica Defs.' Br. (Docket # 584) at 46.

RICO claim."[811]  The Comerica Defendants first argue that Vining has not pled the alleged "predicate acts" element of his RICO claims with particularity, because Vining has not alleged what false statement of fact the Comerica Defendants made, and has not alleged facts showing that the Plaintiff relied on false statements of the Comerica Defendants.[812]

Second, the Comerica Defendants argue that Vining cannot show that the Comerica Defendants participated in the management or the operation of the "bankruptcy estate," which Vining alleges was the "enterprise" for purposes of his RICO claim.  Without this showing, the Comerica Defendants argue that Vining cannot establish a RICO claim against them.  The Comerica Defendants rely on *Reves v. Ernst & Young*, 507 U.S. 170 (1993), in which the Supreme Court stated that "the legislative history confirms what we have already deduced from the language of [18 U.S.C.] § 1962(c)—that one is not liable under that provision unless one has participated in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 183.  The Comerica Defendants allege that "Comerica did not operate or manage the bankruptcy estate."[813]

Third, the Comerica Defendants argue that "Vining cannot prove a pattern of racketeering activity" under applicable case law.[814]  According to the Comerica Defendants, in order to establish a "pattern of racketeering activity," a plaintiff must prove both (1) that the defendant committed two or more related "'predicates acts;'" and (2) "'that [those predicate acts] amount to

---

[811]  *Id.*

[812]  *Id.*

[813]  *Id.* at 47.

[814]  *Id.*

or pose a threat of continued criminal activity.'"[815]  The Comerica Defendants argue that "Vining

cannot present proof of a 'pattern' of acts that amount to continued (or any) criminal activity."[816]

### d.  The Court's ruling

The Court will grant summary judgment in favor of the Defendants on Vining's RICO

claim.  An essential element of the claim is that the bankruptcy estate suffered injury because of

the Defendants' actions and omissions constituting the alleged RICO violation(s).  Based on the

discussion in the earlier sections of this Opinion, it is clear that Vining cannot meet his burden of

proving this element.

Section 1964(c) of Title 18 is the statute that provides a private civil right of action under

RICO.  But it applies only to a "person injured in his business or property by reason of a violation

of section 1962 of this chapter."  18 U.S.C. § 1964(c).  "[A] RICO claim contains three elements:

(1) a violation of 18 U.S.C. § 1962; (2) injury to plaintiff's business or property; and (3) causation

of the injury by the violation."  *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F.

Supp. 3d 207, 222  (E.D.N.Y. 2014).  "'A RICO plaintiff 'only has standing if, and can only

recover to the extent that, he has been injured in his business or property by the conduct

constituting the [RICO] violation."  *Id.* at 231 (citations omitted); *see also Anza v. Ideal Steel*

*Supply Corp.*, 547 U.S. 451, 453 (2006) (noting that "[RICO] prohibits certain conduct involving

a 'pattern of racketeering activity'" and RICO's "private right of action" is "available to '[a]ny

person injured in his business or property by reason of a violation' of the RICO's substantive

restrictions."); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985) (emphasis added) (noting

---

[815]  *Id.*

[816]  *Id.*

that "[i]f the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, **and the racketeering activities injure the plaintiff in his business or property**, the plaintiff has a claim under § 1964(c).").

Because Vining cannot demonstrate any injury to the bankruptcy estate, his RICO claim fails, and the Court must grant summary judgment for Defendants on this claim.[817]

### 13. Vining's claim on the American Casualty Bond (Count XIII)

Count XIII of Vining's complaint is against American Casualty on Bond No. 138041997, filed in the main bankruptcy case, "to indemnify the estate against any breach of fiduciary duty or other misconduct by [Taunt] (the 'Bond')."[818] "American Casualty . . . is the surety under the Bond."[819]

The Bond is entitled "Blanket Bond of Panel Trustees/Interim Trustees in Chapter 7 Cases," and a copy is attached to American Casualty's brief in support of its motion for partial summary judgment ("American Casualty's Brief") as Exhibit 6a.[820] The Bond covers Taunt as a named Principal, and provides that "[t]he liability of the Surety hereunder shall not exceed the amount stated in . . . Endorsement A for any one case as to each named principal . . . ."[821] The per case limit for Taunt in the endorsement is $1,000,000.[822]

---

[817] Given the Court's ruling, it is not necessary for the Court to reach the Defendants' other arguments in seeking summary judgment on this claim.

[818] Compl. at ¶ 332.

[819] *Id.* at ¶ 333.

[820] *See* Docket # 586 at pdf. pp. 24-27.

[821] *Id*. at pdf. p. 24.

[822] *Id.* at pdf. p. 26.

377

Vining alleges that the bankruptcy estate has suffered more than $1,000,000 in damages due to Taunt's failure to obey Court orders; "to faithfully and truly account for all the moneys, assets, and effects of the Debtor's estate;" and to "faithfully perform all of his official duties as [T]rustee, in accordance with the [Bankruptcy] Code."[823]  Vining argues that "[p]ursuant to the terms of the Bond, American Casualty is obligated to indemnify the Debtor's estate for [Taunt's] breaches of fiduciary duty and misconduct in an amount no less than $1,000,000."[824]  The prayer for relief in the Complaint states, in relevant part:

> WHEREFORE, the Trustee requests the Court to grant the following relief:
> . . .
>
> (M) As to Count XIII of the Complaint, entry of a judgment in favor of the Trustee and against American Casualty . . . in the amount of the Debtor's actual damages, plus interest, costs, and attorneys' fees equal to 50% of the foregoing recovery[.][825]

Vining and American Casualty each filed motions for summary judgment regarding the Bond.  Because the arguments raised by those motions evolved over the course of the briefing and the oral argument, the Court will describe the arguments in detail.

### a. Vining's motion for summary judgment

Vining filed a motion for summary judgment against American Casualty, in which he requested "the Court to enter summary judgment against American Casualty in the amount of $1,000,000, plus prejudgment interest, costs and attorney fees, and to grant such further relief as

---

[823]  Compl. at ¶¶ 335-38.

[824]  *Id.* at ¶ 339.

[825]  Compl. at 54, 56.

the Court deems appropriate and just."[826]  In his brief in support of his motion, Vining states that there is no dispute that "the Bond caps American Casualty's liability for damages arising from Taunt's failure to faithfully perform his duties at $1 million."[827]  Vining alleges that the Debtor's estate has suffered "substantial damages . . . exceeding the $1 million cap on the Bond."[828]  Vining argues that, despite the cap, if the Court finds Taunt personally liable for his failure to faithfully perform his duties to the bankruptcy estate, American Casualty is responsible for paying the full amount of  damages caused by Taunt's breach of his duties, even if those damages exceed the $1 million cap in the Bond.  Vining argues that a trustee can be held personally liable where he violated his duties willfully and deliberately.  Vining argues further, relying on *Walsh v. Northwestern National Insurance Company of Milwaukee, Wisconsin (In re Ferrante)*, 51 F.3d 1473 (9th Cir. 1995), that if the Court finds Taunt personally liable, "American Casualty is liable to the estate under its Bond's terms not only for damages attributable to Taunt's breaches of fiduciary duty, but also for all costs, including attorney fees, attributable to investigating and remedying Taunt's breach of duties."[829]  Vining alleges that "the cost to the estate of uncovering, investigating, and attempting to remedy Taunt's wrongdoing may very well exceed the $1 million cap on the Bond itself."[830]

**b.  American Casualty's motion for partial summary judgment**

---

[826]  Docket # 581 at 2.

[827]  *Id.*

[828]  *Id.* at 3.

[829]  *Id.* at 6.

[830]  *Id.*

American Casualty's motion for partial summary judgment ("American Casualty's Motion") seeks entry of "an Order determining that this Defendant's maximum liability under the Bond it issued naming Charles Taunt as Principal is $1,000,000."[831]  In its Motion, American Casualty also seeks an award of "costs, sanctions, attorney fees and any other relief that [the Court] deems just and appropriate."[832]

American Casualty denies that it owes any amount on account of the Bond, because "it is entitled to assert all [Taunt's] defenses[.]"[833]  But, according to American Casualty, "even if there were any liability against it, such liability cannot exceed $1,000,000" because "there is no legal basis whatsoever to impose liability on the part of American Casualty in excess of the $1,000,000 penal limit of the Bond."[834]

American Casualty relies on the plain language of the Bond, arguing that "[t]he Bond expressly states that the liability of American Casualty under the Bond 'shall not exceed' $1,000,000."[835]  American Casualty argues that "[u]nder both federal and state law, it is well settled that the liability of a surety under a bond cannot exceed the penal amount of the bond."[836]  It follows, according to American Casualty, that even assuming Vining can recover attorney fees, the Court cannot award attorney fees beyond the penal limit on the Bond.  American Casualty

---

[831]  American Casualty's Mot. (Docket # 586) at 3.

[832]  *Id.*

[833]  American Casualty's Br. (Docket # 586) at 3.

[834]  *Id.*

[835]  *Id*. at 5 (relying on Exhibit 6a to American Casualty's Brief).

[836]  *Id.*

380

cites six cases in support of its position, including two Michigan cases.[837]

### c. Vining's response to American Casualty's Motion

In response to American Casualty's Motion, Vining argues that "[t]he Trustee is entitled to recover not only the $1 million principal amount of the bond, but also prejudgment interest and reasonable attorney's fees."[838] This is so, according to Vining, "even if such recovery results . . . in a judgment exceeding the $1 million Bond amount."[839]

### 1. Vining's argument that prejudgment interest can and should be awarded beyond the $1,000,000 Bond amount, and should be calculated according to Michigan law

According to Vining, "[b]oth federal and Michigan courts uniformly hold that a surety is liable for prejudgment interest beyond the penal amount of its bond."[840] Vining argues further that "for every judgment on a bond issued pursuant to 11 U.S.C. § 322, 'there is a strong presumption in favor of awarding prejudgment interest'" and that bankruptcy courts have looked to state law to calculate the prejudgment interest amount.[841] Vining argues further that the Court should require American Casualty to pay prejudgment interest calculated from the date he notified American Casualty of Taunt's breach of his fiduciary duties (October 17, 2002), and that such prejudgment interest should be calculated as provided by Mich. Comp. Laws Ann. § 600.6013(8).[842]

---

[837] *Id.* at 5-7.

[838] Trustee's Resp. to American Casualty's Mot. (Docket # 631) at 1-2.

[839] *Id.* at 2.

[840] *Id.* at 3.

[841] *Id.* (quoting *United States ex rel. Lamesa Nat'l Bank v. Liberty Mut. Ins. Co.* (*In re Schooler*), 453 B.R 815, 818 (Bankr. N.D. Tex. 2011)).

[842] *Id.* at 3, 5.

381

### 2. Vining's argument that attorney fees can and should be awarded beyond the $1,000,000 Bond amount

Vining argues further that, in addition to prejudgment interest, he "is entitled to an award of reasonable attorney fees against American Casualty in addition to the penal sum of the Bond."[843]  This is so, according to Vining, because (1) there is no language in the Bond that restricts his right to seek attorney fees; (2) the attorney fees he seeks are not for compensation for Taunt's breaches of his fiduciary duties, but rather are for the failure of American Casualty to pay the amount due under the Bond when notified of Taunt's breach of his fiduciary duties, and therefore such fees are "not included in the equation that results in the 'aggregate liability' discussed in the [B]ond;" and (3) there are equitable reasons supporting an award of attorney fees in excess of the penal limit on the Bond.[844]  Those reasons are that the Bond clearly covered breaches of Taunt's fiduciary duties; American Casualty refused to pay on the Bond when notified of Taunt's breach of fiduciary duties; and American Casualty's failure to pay on the Bond caused Vining to incur attorney fees to obtain payment on the Bond, and jeopardized the prosecution of Vining's claims against other Defendants, because Vining had insufficient funds on hand for prosecution of those claims.

### d. American Casualty's reply

### 1. American Casualty's argument that the Court should exercise its discretion not to award prejudgment interest

In its reply in support of its motion, American Casualty concedes that, under appropriate circumstances, a court may award pre-judgment interest against a surety in an amount that exceeds

---

[843]  *Id.* at 6 (capitalization removed).

[844]  *Id.* at 6-7.

the penal sum of the bond. But American Casualty argues that under the facts of this case, it is not appropriate to do so.[845] American Casualty argues further that, in the event that the Court does award pre-judgment interest, the interest rate should not be calculated under Mich. Comp. Laws § 600.6013(8), because "suits on a bankruptcy trustee bond are governed by federal, and not state, law."[846] Rather, according to American Casualty, the Court should apply the federal statutory interest rate under 28 U.S.C. § 1961(a).[847]

American Casualty argues further that "any award of pre-judgment interest is discretionary," and that this Court should apply the 4-factor test it used to determine whether it "should exercise its discretion to award pre-judgment interest," in *Global Technovations, Inc*. v. *Onkyo U.S.A. Corp*. (*In re Global Technovations, Inc*.), 431 B.R. 739 (Bankr. E.D. Mich. 2010), *aff'd*, No. 10-12781, 2011 WL 1297356 (E.D. Mich. Mar. 31, 2011), *aff'd sub nom*. *Onkyo Europe Elec. GMBH v. Global Technovations, Inc.* (*In re Global Technovations Inc*.), 694 F.3d 705 (6th Cir. 2012).[848]

In *Global Technovations*, this Court stated:

> "[T]he factors influencing the exercise of [the court's] discretion to [award prejudgment interest] include: (1) the need for full compensation of an injured party; (2) considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court."

---

[845]  Docket # 649 at 1-2.

[846]  *Id.* at 2 (citing *Liberty Mut. Ins. Co. v. United States ex. rel. Lamesa Nat'l Bank* (*In Re Schooler*), 725 F.3d 498 (5th Cir. 2013) and *United States v. Hartford Cas. Ins. Co.* (*In re Armstrong*), 245 B.R. 123 (Bankr. D. Neb. 1999)).

[847]  *Id.* at 4.

[848]  *Id.*

383

431 B.R. at 775 (citation omitted). American Casualty argues that these factors weigh against the Court exercising its discretion to require it to pay prejudgment interest in this case. This is so, according to American Casualty, because Vining suffered no actual damages due to any breach by Taunt of any fiduciary duties. Because, according to American Casualty, Vining has no actual damages, any award of prejudgment interest would result in over-compensating Vining and would be "'punitive.'"[849] American Casualty notes that courts have held that "'prejudgment interest should not be awarded if the statutory obligation on which interest is sought is punitive in nature.'"[850]

American Casualty argues further that other equities in this case make it unfair to require it to pay prejudgment interest. Those include the facts that "there is a good faith dispute between the parties as to the existence of any liability;" Vining himself has been responsible for the length of time it took "just to place this case into the dispositive motion stage," having "requested and agreed to adjournments of various dates;" and "the parties have engaged in seemingly endless discovery disputes," while "American Casualty has timely responded to all discovery without complaint or objection from the Trustee or any other party" and "has done everything in its power to bring this litigation to a close."[851] Because American Casualty is not responsible for any delay in the resolution of the parties' litigation, American Casualty argues that it would be inequitable for it to be penalized for such delay by requiring it to pay prejudgment interest.

---

[849] *Id.* at 2.

[850] *Id.* (quoting *Wickham Contracting Co. v. Local Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992)).

[851] *Id.* at 3.

### 2. American Casualty's arguments that Vining is not entitled to any attorney fees from American Casualty, nor can an award of attorney fees increase American Casualty's liability to more than $1,000,000

In addition to disputing Vining's right to prejudgment interest, American Casualty disputes that Vining has a right to recover attorney fees from American Casualty, and that attorney fees "can increase American Casualty's potential liability beyond the penal amount of the Bond."[852] American Casualty argues that the Court should not award Vining attorney fees, because "there is no provision in either the Bond or [11 U.S.C. § 322] entitling [Vining] to attorney fees from American Casualty."[853] American Casualty relies on *United States ex. rel. Lamesa Nat'l Bank v. Liberty Mut. Ins. Co.* (*In Re Schooler*), 449 B.R. 502 (Bankr. N.D. Tex. 2010), *aff'd,* 725 F.3d 498 (5th Cir. 2013), to support its position. In that case, the court denied a request for attorney fees by a creditor, which had brought an action on the bankruptcy trustee's bond against the surety, because that creditor "had not cited to any authority that allows [the creditor] the recovery of its attorneys' fees against [the surety]." *Schooler*, 449 B.R. at 524.

American Casualty argues further that an award of attorney fees against Taunt based on his fraud on the court would only be appropriate to the extent there was a finding that Taunt acted in bad faith or that the many years of litigation ultimately provided a benefit to the estate. Because there has been no such finding, American Casualty argues that Vining is not entitled to attorney fees against Taunt.[854]

But even if there was an award of attorney fees against Taunt based on bad faith,

---

[852] *Id*. at 4.

[853] *Id.*

[854] *Id.* at 5 (relying on *M.T.G.*, 366 B.R. at 751).

385

American Casualty argues, it would not be responsible for paying such fees because "[t]he general rule is: . . . (A) surety is liable only for the payment of actual damages caused by the principal, and may not be held for exemplary or punitive damages, in the absence of any statutory provision imposing such liability."[855]  According to American Casualty, an attorney fee award is punitive in nature and cannot be assessed against a surety, where it is only the principal who has acted in bad faith and "[t]here has been no allegation of bad faith against American Casualty."[856]  American Casualty argues that it

> is simply allowing the judicial process to conclude in the face of a very strong defense on the part of Mr. Taunt and the other Defendants, and an acknowledgement in this Court's prior opinion that there has been no showing that Mr. Vining's efforts has brought any benefit to the Estate or Creditors. . . . Accordingly, because this Court has not determined that Mr. Vining has any right to recover damages from Mr. Taunt, there cannot be any finding of bad faith on the part of American Casualty in allowing this judicial proceeding to continue to determine whether there is any obligation whatsoever under its Bond.  To allow attorney fees under these circumstances would be unjust and contrary to the law in virtually every jurisdiction, which limits the surety's liability to the penal sum of the Bond.[857]

American Casualty again argues that even if the Court did require American Casualty to pay attorney fees, such an award cannot "increase [its] liability beyond the penal sum of the Bond."[858]  According to American Casualty, that legal principal has been adopted by "the overwhelming majority of courts that have addressed this issue[,]" and has been adopted by the

---

[855]  *Id.* (internal quotation marks and citation omitted) (quoting *Butler v. United Pac. Ins. Co.*, 509 P.2d 1184, 1185 (Or. 1973)).

[856]  *Id.*

[857]  *Id.* at 9 (citing *M.T.G.*, 366 B.R. at 751).

[858]  *Id.* at 6.

Court of Appeals of Michigan in the case of *Northline Excavating, Inc. v. Livingston Cty.*, 839 N.W.2d 693, 698 (Mich. Ct. App. 2013).[859] According to American Casualty, any attorney fees incurred by Vining would have been the result of investigating and discovering Taunt's breach of his fiduciary duties and therefore would be a part of the damages covered and limited by the penal amount of the Bond.[860]

American Casualty argues that the Court should disregard the three cases cited by Vining in support of his contrary position, because all of those cases are from another jurisdiction (Washington), two of the three cases do not even relate to a surety bond, and the one case that does relate to a surety bond (*Colorado Structures, Inc. v. Insurance Company of the West*, 167 P.3d 1125 (Wash. 2007)) "expanded the State of Washington's common law relating to insurance policies (imposing an enhanced fiduciary duty on an insurer) to include a performance bond surety" over a "vigorous dissent."[861] American Casualty says that the dissent in *Colorado Structures* "noted[, among other things,] that the insurance decisions were based on an 'enhanced duty' owed by an insurer to an insured, which is 'fundamentally inconsistent with the role of a surety, who stands in the shoes of its principal and may assert any defense that the principal has against the obligee … Imposing an "enhanced duty" on the surety toward the obligee is inconsistent with the surety's statutory and common law obligations to the principal.'"[862] American Casualty notes that outside of Washington, "the overwhelming majority of courts that

---

[859] *Id.* at 6, 8.

[860] *Id.* at 6.

[861] *Id.*

[862] *Id.* at 6-7 (citing *Colorado Structures*, 167 P.3d at 1154).

have addressed this issue have held that attorney fees do not increase a surety's liability beyond the penal limit of the bond."[863]  American Casualty argues that "[t]o hold otherwise would essentially create a limitless bond, contrary to the express wording of the bond statute and the bond itself."[864]  For all of these reasons, American Casualty argues that it is entitled to "an Order determining that [its] maximum liability under the Bond it issued naming Charles Taunt as Principal is $1,000,000."[865]

### e. American Casualty's oral argument

During oral argument American Casualty argued that *Ferrante*, the case Vining relied on for the proposition that the Court can award Vining damages even without proof that the estate incurred any damages, does not stand for that proposition.  Vining quoted from the *Ferrante* opinion, which in turn was quoting *Lopez-Stubbe v. Rodriguez-Estrada* (*In re San Juan Hotel Corp.*), 847 F.2d 931 (1st Cir. 1988).  But according to American Casualty, *Ferrante* and Vining omitted a vital part of the quotation from the *San Juan* opinion.  According to American Casualty, when the omitted part of the *San Juan* quotation is considered, *Ferrante* does not support Vining's position on its entitlement to an award of damages even without proof that the estate suffered any damages.[866]  The part of *Ferrante* opinion Vining quoted states:

> Here, as in *San Juan* and *Mosser* [*v. Darrow*, 341 U.S. 267 (1951)], a defense is being mounted in which it is argued on behalf of Duck (and his surety) that no loss has been suffered by the estate. But as the First Circuit, in discussing the Supreme Court's reaction to that

---

[863]  *Id.* at 8 (citing cases); *see also id.* at 7 (citing cases).

[864]  *Id.* at 8.

[865]  *Id.* at 9.

[866]  *See* Tr. of Hr'g (Docket # 720) at 52-54.

388

argument, said:

> To that, the Court responded by noting that
> determining the amount of damage the trustee
> caused, if any, was difficult; the Court then added:
> "But equity has sought to limit difficult and delicate
> fact-finding tasks concerning its own trustee by
> precluding such transactions for the reason that their
> effect is often difficult to trace, and the prohibition is
> not merely against injuring the estate—it is against
> profiting out of the position of trust." *Mosser*, 341
> U.S. at 273, 71 S.Ct. at 683. With this passage, we
> think, the Court clearly rejected the idea that a
> proven, quantifiable loss to the estate is a
> prerequisite to personal liability for trustees.

*Ferrante*, 51 F.3d at 1478 (quoting *San Juan,* 847 F.2d at 937).  American Casualty notes that the

remainder of the quotation states:

> At the same time, however, the degree of loss or harm has not been
> made irrelevant under *Mosser*.  As the Second Circuit has noted, the
> purpose of a *Mosser* surcharge is not to punish a trustee, it is to
> benefit creditors who have been injured by the trustee's acts. [*In re*]
> *Gorski*, 766 F.2d [723,] 727–28 [(2d Cir. 1985)](rejecting the use of
> a civil fine payable to the United States as a form of trustee
> surcharge).

> In order to insure that creditors are made whole without also having
> courts engage in open-ended punishment-by-surcharge, we think
> that some assessment of harm must be the guiding principle
> underlying *Mosser* liability. Where an exact amount of loss to the
> estate can be determined, that amount is the correct measure of
> damages. *See Matter of Combined Metals Reduction Co.*, 557 F.2d
> 179, 197 (9th Cir.1977) ("When a trustee has breached his trust, an
> equity court may hold him liable for any loss or depreciation in the
> value of the estate resulting from the wrongful act or omission.").
> **Where the fact of harm can be determined** but not the exact
> extent thereof, the estimated amount of harm to the estate should be
> surcharged. In *Mosser*, the Court essentially estimated damages by
> assuming that any profit made by the trustee's employees was to the
> estate's detriment. *See also Combined Metals*, 557 F.2d at 197 ("In
> addition, an unfaithful trustee may be held responsible for any lost
> profit which would have accrued to the estate but for the breach of

389

trust."). Other forms of estimates might be equally acceptable.

*San Juan*, 847 F.2d at 937–38 (emphasis added).

American Casualty argues that

> in order for the trustee to prevail in his motion for summary
> judgment against the surety and recover under the [B]ond, he's got
> to do two things. He's got to prove one, that Mr. Taunt is personally
> liable; and two, determine the actual damages or at a minimum
> some reasonable estimate of those damages.[867]

American Casualty argues that it is not liable on the Bond unless and until the Trustee is

found liable because American Casualty is allowed to assert any defense Taunt has.  According to

American Casualty, Taunt has valid defenses which Taunt, Plunkett & Cooney, and Comerica

have already asserted.[868]

American Casualty argues further that even if the Court determines that Taunt is liable,

Vining "still has other hurdles to overcome before he just gets a check for $1,000,000 from

the surety."[869]  First, according to American Casualty, under Sixth Circuit case law, Vining must

show that Taunt should be personally liable rather than liable in just his official capacity.

According to American Casualty, to hold Taunt personally liable for any breach of his duties, the

Court must find that Taunt acted willfully and intentionally.  American Casualty argues that,

because whether Taunt acted with such a state of mind is at issue in this case, summary judgment

is precluded on that basis alone.[870]

Second, in the event that the Court determines that attorney fees are recoverable, Vining

---

[867] *Id.* at 54.

[868] *Id.* at 54-55.

[869] *Id.* at 55.

[870] *Id.* at 55-58.

would have to show that those fees were to investigate and uncover wrongdoing by Taunt. This is so, according to American Casualty, because in the cases cited by Vining "only investigation fees, not litigation expenses were awarded."[871] But, American Casualty argues, "[t]here are no investigation costs to be recovered in this proceeding" because

> Mr. Halbert discovered the alleged defalcations by February 26th, 1998, prior to the time this lawsuit was even filed when he alleged the same issues in this lawsuit in his supplement to objections to trustee's motion for authority to disburse funds and motion for order disqualifying trustee, denying or adjourning hearing on trustee's disbursement motion[,] disallowing bank's alleged super priority claim[,] and for discovery in other matters which is docket number 619 in the original bankruptcy, prior to the time this litigation was ever filed.[872]

Third, according to American Casualty, Vining must show that the equities favor awarding pre-judgment interest. American Casualty argues that the equities do not favor such an award for all of the reasons stated in its brief.

Fourth, American Casualty again argues that Vining must show that the Debtor's bankruptcy estate was damaged by Taunt's failure to faithfully perform his duties. American Casualty argues that Vining cannot do this because the estate suffered no harm from Taunt's actions.

### f. The Court's ruling

### 1. American Casualty is liable on the Bond.

Under the Bankruptcy Code, Taunt was required to post a bond in order to serve as a Chapter 7 Trustee in MTG's bankruptcy case. Section 322(a) of the Bankruptcy Code states:

---

[871] *Id.* at 59.

[872] *Id.* at 60.

(a) Except as provided in subsection (b)(1), a person selected under section 701, 702, 703, 1104, 1163, 1183, 1202, or 1302 of this title to serve as trustee in a case under this title qualifies if before seven days after such selection, and before beginning official duties, such person has filed with the court a bond in favor of the United States **conditioned on the faithful performance of such official duties**.

11 U.S.C. § 322(a) (emphasis added).  Consistent with the "faithful performance" requirement of

§ 322, American Casualty provided the Bond for Taunt, which, stated, in relevant part:

> NOW, THEREFORE, if said Principals listed in Endorsement A attached or subsequently added thereto as Trustee as aforesaid shall obey orders as the United States Bankruptcy Court or any of the Judges of such court may make in relation to the trust undertaken by said Trustee, and shall faithfully and truly account for all the moneys, assets and effects of each estate created by the commencement of each case in which he has been appointed or will be appointed, and **shall in all respects faithfully perform all of his official duties as Trustee, in accordance with the underlying United States Bankruptcy Code,** then this obligation to be void; otherwise, to remain in full force and effect.[873]

In Vining's motion for summary judgment against American Casualty, Vining seeks to

hold American Casualty liable on the Bond for Taunt's unfaithful performance of his official

duties, and seeks compensatory and punitive damages "in the amount of $1,000,000, plus

prejudgment interest, costs, and reasonable attorney fees," against American Casualty.[874]  The

expenses and costs that Vining is seeking to recover on the Bond are those "to uncover,

investigate, and remedy the defalcations of the former Trustee Taunt[.]"[875]

American Casualty argues that Vining "is not entitled to relief on the Bond[,]" because he

---

[873] *See* Bond (Ex. 6a to Docket # 586) (emphasis added).

[874] *See* Trustee's Mot. For Summ. J. Against Def. American Casualty (Docket # 581) at 2.

[875] *See id.*; *see also* Trustee's Br. In Supp. of Trustee's Mot. For Summ. J. Against Def. American Casualty (Docket # 582) at 6 (cost and expenses include "attorney fees, attributable to investigating and remedying Taunt's breaches of fiduciary duties.").

cannot prove: (1) that Taunt is personally liable for the wrongful conduct the complaint alleges he committed; (2) that Taunt's misconduct "caused damages to the [bankruptcy e]state or its creditors;" and (3) the amount of damages to the bankruptcy estate and its creditors.[876]  American Casualty argues further that, even assuming that Vining could establish that it is liable on the Bond, "the maximum liability that can be imposed against American Casualty would be limited to $1,000,000."[877]  American Casualty has filed a motion for partial summary judgment seeking entry of an order determining that American Casualty's "maximum liability under the Bond it issued naming Charles Taunt as Principal is $1,000,000."[878]

Vining and American Casualty disagree on the level of culpability that must be shown on the part of Taunt to trigger American Casualty's liability on the Bond.  As noted above, American Casualty argues that Vining must prove the level of culpability that it says would make Taunt *personally* liable for his alleged breaches of fiduciary duty, misconduct, and/or fraud upon the court – namely, that Taunt's conduct was "willful" and "deliberate."[879]

Vining argues that "[n]othing in the Bond requires that Taunt's breach of Bond conditions be 'willful and deliberate' or that Taunt be 'personally liable' before liability can be imposed on

---

[876]  *See* American Casualty's Br. in Resp. to Trustee's Mot. for Summ. J. Against American Casualty (Docket # 616) at 1-2.

[877]  *See* American Casualty's Br. in Supp. of American Casu[al]ty's Mot. For Partial Summ. J. (Docket # 586) at pdf  pp. 17-18.

[878]  *See* American Casualty's Mot. for Partial Summ. J. (Docket # 586) at 3.

[879]  *See* American Casualty's Br. in Resp. to Trustee's Mot. for Summ. J. Against American Casualty (Docket # 616) at 1, 7 (relying on *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir. 1982) (italics added) (citations omitted) (holding that "[a] bankruptcy trustee is liable in his *official* capacity for acts of negligence" but that "[a] bankruptcy trustee is liable *personally* only for acts willfully and deliberately in violation of his fiduciary duties")).

393

American Casualty."[880]  Vining argues further that a mere negligent breach by Taunt of any of the

conditions of the Bond will render American Casualty liable on the Bond.  Vining argues further

that

> [t]his conclusion is supported by the text of 11 U.S.C. § 322, which
> requires a trustee to post a bond "conditioned on the faithful performance
> of [the trustee's] official duties." Section 322 does not limit the surety's
> liability to a breach that is [a] "willful or deliberate" breach or for which a
> trustee is personally liable. In fact, Section 322 distinguishes between the
> liability of the surety and the trustee by stating that "a trustee is not liable
> personally or on such trustee's bond in favor of the United States for any
> penalty or forfeiture incurred by the debtor." 11 U.S.C. § 322(c). Under
> Section 322, the surety's liability is primary and conditioned only on the
> breach of bond conditions; it is not derivative or predicated upon a trustee's
> "personal liability." The trustee bond insures a bankruptcy estate against a
> trustee's failure to faithfully perform any duty, including any negligent
> failure to perform a duty. That's why a bond is required. "The purpose of
> the bond is to assure faithful performance by the trustee and to indemnify
> the estate for any loss that might be sustained as a result of the misfeasance
> or malfeasance of the trustee." 1-322 Collier Bankruptcy Manual P
> 322.02.[881]

The Court agrees with Vining that American Casualty is liable on the Bond even if the

Court only finds that Taunt *negligently* performed any of his official duties as Chapter 7 Trustee.

*See United States by Cent. Sav. Bank. v. Lasich* (*In re Kinross Mfg. Corp.*), 174 B.R. 702, 706

(Bankr. W.D. Mich. 1994) (rejecting the argument "that the bond cannot be liable for mere

negligence of the trustee;" agreeing with the court in *Estate of Reich v. Burke* (*In re Reich*), 54

B.R. 995, 1008 (Bankr. E.D. Mich. 1985), that "the standard of a trustee's acting 'faithfully' as set

forth in the bond [is] equatable with the standard of negligence" and "that one who 'negligently'

performs an official duty does not 'faithfully' perform it"); *Estate of Reich v. Burke* (*In re Reich*),

---

[880]  Trustee's Reply to American Casualty's Resp. To the Trustee's Mot. For Summ. J. (Docket
# 648) at 2.

[881]  *Id.* at 3-4.

54 B.R. 995, 1008 (Bankr. E.D. Mich. 1985) (holding surety liable on a bond which assessed liability if the trustee did not "'faithfully perform all his official duties,'" because the trustee "'negligently'" performed his duties).

The *Lasich* and *Reich* cases just cited are consistent with the United States Supreme Court's decision in *United States ex rel. Willoughby v. Howard,* 302 U.S. 445 (1938). In that case, an individual serving as bankruptcy trustee in 114 separate cases had deposited all the estate funds in each case in a bank that later failed, resulting in losses to the bankruptcy estates. 302 U.S. at 447. After that trustee resigned in each case, the successor trustee filed suit against the former trustee and against the surety on the trustee's bond. The language of the bond in each case included the condition that the trustee "faithfully . . . perform his official duties as trustee." *Id.* The successor trustee's theory against the surety was that the former trustee had been negligent in depositing estate funds where he did. *Id.* at 448. The United States Supreme Court held that this was a valid theory for recovery on the bond. It held that "[a]s the exercise of ordinary care in making and maintaining deposits . . . was part of [the former trustee's] official duties, he and his surety are liable on the bonds if he failed in this respect." *Id.* at 454.

Thus, American Casualty is liable on the Bond if Taunt was negligent in performing his official duties. This means that, contrary to American Casualty's argument in its brief, American Casualty's liability on the Bond does not require the Court to find Taunt liable in his personal capacity, as opposed to his official capacity. This also means that it is not necessary for the Court to find that any breach of fiduciary duty, misconduct, or fraud on the court by Taunt was "willful" or "intentional."

American Casualty is liable on the Bond, because the Court held in its Fraud on the Court

Opinion, and reiterates in this Opinion, that Taunt's conduct that constituted a fraud upon the court and a breach of his fiduciary duties was "[a]t a minimum, . . . reckless" and "rose at least to the level of 'reckless disregard' of the truth and of his duties[,]"[882] a level of culpability which exceeds the negligence standard.

## 2. The amount of American Casualty's liability on the Bond

The Court must determine the amount of American Casualty's liability on the Bond. For the reasons stated below, the Court will enter an order granting Vining recovery on the Bond *only* in the following amounts: (1) the total of $22,823.00 in additional fees paid to Taunt's attorneys by Comerica and/or from Comerica's collateral, which the Court is requiring Taunt's attorneys to disgorge as part of today's decision;[883] plus (2) the limited amount of attorney fees, to be determined, for which the Court has held Taunt liable (jointly and severally with the other Taunt Defendants and Plunkett & Cooney), based on Taunt's fraud on the court.[884]

First, American Casualty is not liable for any compensatory damages, because the Court has held in this Opinion that Taunt's fraud on the court, and Taunt's alleged misconduct and alleged breach of fiduciary duty, did not cause any financial damage to the bankruptcy estate or to the creditors of the estate.[885] The Court has found that Vining presented no evidence that Taunt "sold assets for less than their reasonable value," nor did he present evidence that Taunt settled

---

[882] *M.T.G.*, 366 B.R. at 751-52 (footnotes omitted).

[883] This sum is the amount of fees yet to be disgorged by Charles J. Taunt & Associates ($20,540.50) and by Plunkett & Cooney ($2,282.50). *See* Part VII.A.1.e.4.iii.d of this Opinion.

[884] *See supra* Part VII.A.1.e.4.iii.e of this Opinion.

[885] *See, e.g., supra* part VII.A.1.e.4.iii.a of this Opinion (footnote omitted) ("It is now clear that the estate suffered no injury because of anything Taunt or his attorneys did or failed to do during the nearly five years that Taunt was the Chapter 7 Trustee in the MTG case.").

claims of the estate for less than they were worth.[886]  And the Court noted that "it is now clear that in obtaining this Court's approval of his settlement with Comerica, in the Comerica Settlement Order, Taunt actually *benefitted* the bankruptcy estate, by obtaining $10,000.00 from Comerica in the settlement, in exchange for giving up claims worth nothing."[887]

Second, Vining may not recover any punitive damages from American Casualty, because the Court has declined to exercise its discretion to award punitive damages against Taunt for his fraud on the court.  The Court determined that "that the relief already imposed for fraud on the court, coupled with the additional relief the Court now will impose [in this Opinion], is sufficient and appropriate to fully remedy the fraud on the court that occurred in this case, and to deter others from committing a similar fraud on the court in other cases," and that "[t]his is especially so in a case such as this, where the fraud on the court did no financial damage to the bankruptcy estate."[888]

Third, American Casualty is liable on the Bond only for the $22,823.00 in fees yet to be disgorged by Taunt's attorneys, plus the limited amount of attorney fees that the Court has held, in its discretion, Taunt is liable to pay (along with the other Taunt Defendants, and Plunkett & Cooney, jointly and severally), to fully remedy the fraud on the court.[889]  As to those fees, and as stated by the Court in this Opinion:

> [T]he fees will be in the amount of the reasonable attorney fees
> incurred by Vining on behalf of the bankruptcy estate after his

---

[886] *Id.*

[887] *Id.* (italics added).

[888] *See supra* part VII.A.1.e.4.iii.b of this Opinion.

[889] *See supra* part VII.A.1.e.4.iii.e of this Opinion.

397

election as Chapter 7 Trustee on January 10, 2002, in successfully obtaining, in litigation in this Court and in the district court, the following relief: (1) the opinions and orders by Judge Hughes regarding disgorgement of attorney fees based on the district court's first appeal decision; (2) this Court's April 16, 2007 Order vacating the Comerica Settlement Order; the Comerica Claim Allowance Order; and the Comerica Relief from Stay Order, and the affirmance of that Order in the district court; and (3) the undersigned judge's April 16, 2010 Order, quantifying the attorney fees to be disgorged, based on the district court's first appeal decision and the opinions and orders on that subject by Judge Hughes referred to in item (1) above.[890]

The amount of these fees will be determined after Vining submits an itemization of fees.

The Court rejects American Casualty's argument that if the Court finds, as it has done, that Taunt's wrongful conduct did not cause any damage to the estate or to its creditors, then the Court cannot find American Casualty liable on the Bond in any amount.[891] Under the circumstances of this case, and under the plain language of the Bond, Vining can recover on the Bond if the Court finds that Taunt did not "in all respects faithfully perform all of his official duties as Trustee, in accordance with the underlying United States Bankruptcy Code."[892] In containing this language, the Bond complied with the requirements of § 322(a) of the Bankruptcy Code. Section 322(a) of the Bankruptcy Code required that the Bond be "conditioned on the faithful performance of [Taunt's] official duties." 11 U.S.C. § 322(a). Therefore, neither the Bond nor § 322 require that Taunt's failure to faithfully perform his official duties caused financial damage to the bankruptcy estate or to creditors.

---

[890] *Id.* (footnotes omitted).

[891] *See* American Casualty's Br. in Resp. to Trustee's Mot. for Summ. J. Against American Casualty (Docket # 616) at 1.

[892] *See* Bond (Ex. 6a to Docket # 586).

Here, American Surety's liability on the Bond arises from the Court's holding that Taunt was not faithful in performing his duties because he committed fraud on the court, and from the Court's exercise of its discretion to remedy such fraud on the court by requiring the additional $22,823.00 disgorgement of attorney fees by Taunt's attorneys, and by assessing limited attorney fees against Taunt and others as a sanction for this misconduct. As stated by the Court, the $22,823.00 in additional fee disgorgement is being ordered as part of "'removing the benefit gained by the party that committed the fraud on the court.'"[893] And as stated by the Court, relying on *Chambers*, 501 U.S. at 46 (citations omitted), the limited attorney fees being assessed against Taunt and the others are in order to serve the purpose of "vindicat[ing] judicial authority."[894]

The total monetary relief to be awarded, including Taunt's liability for attorney fees, as described above, will certainly be much less than the $1,000,000 limit of the Bond. That makes American Casualty's motion for partial summary judgment entirely moot. For this reason, the Court will enter an order denying American Casualty's motion for partial summary judgment. The Court's award of only limited monetary relief also narrows the issues raised by Vining's summary judgment motion regarding the Bond, because it is not necessary to decide whether the surety can be liable for amounts in excess of the $1,000,000 limit of the Bond due to prejudgment interest and attorney fees.

3. **The Court will not award Vining any additional attorney fees, or prejudgment interest, or any costs/expenses of "investigation" against American Casualty on the Bond.**

Other than the attorney fees awarded above as a sanction based on the fraud on the court,

---

[893] *See supra* Part VII.A.1.e.4.iii.d of this Opinion (quoting *In re Levander*, 180 F.3d at 1119).

[894] *See supra* Part VII.A.1.e.4.iii.e of this Opinion.

the Court will not award any *additional* attorney fees against American Casualty on the Bond, nor will the Court award Vining any prejudgment interest or any costs/expenses of investigation, for the following reasons.

First, such additional attorney fees are not appropriate in this case, where the Court has chosen to award only limited monetary relief, and only limited attorney fees against Taunt, for the reasons stated above. Nor are such additional fees provided for in the Bond or under § 322 of the Bankruptcy Code, and therefore are not permitted. *See Schooler*, 449 B.R. at 524.

Second, and similarly, "costs of investigation" fees, to the extent they are fees or costs other than and in addition to the limited attorney fees for which Taunt is liable, are not provided for in the Bond or under § 322, and are not permitted. And even if the Court had discretion to award such additional fees against the surety on the Bond, the Court would exercise its discretion not to do so, for the same reasons the Court has chosen to award only limited monetary relief, and limited attorney fees against Taunt. And finally, the Court agrees with American Casualty's point that much of the investigation was done by Halbert, in his capacity as a Chapter 11 administrative expense creditor, before Vining was appointed as Chapter 7 Trustee:

> The cases cited by [Vining] hold that only those costs associated with investigating and discovering [Taunt's] defalcation are potentially recoverable. They do not reference any entitlement to litigation expenses. . . . In this case, Mr. Halbert (the current attorney for Mr. Vining) had certainly discovered the alleged defalcations no later than February 26, 1998, when filing his "Supplement to Objections to Trustee's Motion for Authority to Disburse Funds…" (See *In re: MTG, Inc.*, 366 BR 730, 740-741). In that filing, Mr. Halbert alleged the same issues as are alleged in this lawsuit, including conflict of interest and nondisclosure of the Comerica Fee Agreement.
>
> Mr. Halbert had already investigated and discovered the alleged actions and inactions of Mr. Taunt well before Mr. Vining was

400

appointed Successor Trustee or the current lawsuit was filed. Accordingly, prosecution of the current action cannot be attributed to the "discovery" of the alleged defalcations and would not be among the attorney fees allowable, even if attorney fees could be recovered from American Casualty. For that reason, the Trustee's request for attorney fees should be denied.[895]

Third, in the exercise of the Court's discretion, no prejudgment interest will be awarded. Prejudgment interest in this case is a matter of federal, not state law. *See Liberty Mut. Ins. Co. v. United States ex. rel. Lamesa Nat'l Bank* (*In re Schooler*), 725 F.3d 498, 508 (5th Cir. 2013) (citation omitted) ("[A]s with the bond required under the Miller Act, the rights and obligations associated with a Chapter 7 trustee's surety bond do not originate in state statutes, but rather derive from federal law and the bond issued in compliance therewith. *See* 11 U.S.C. § 322(a)[.]").

Under federal law, an award of prejudgment interest is discretionary. *Payne v. Brace* (*In re Brace*), 131 B.R. 612, 614 (Bankr. W.D. Mich. 1991) (citation omitted) ("In cases based upon federal law, . . . the Sixth Circuit has stated that "in the absence of a statutory provision to the contrary, the award of prejudgment interest is a matter addressed to the discretion of the court."); *see also Global Technovations*, 431 B.R. at 774 (citations omitted) ("It is well-settled that, unless prohibited by a statute, bankruptcy courts, as units of the district court under 28 U.S.C. § 151, have broad discretion in determining whether to award prejudgment interest based on the particular equities of a case.").

The Court has considered the four factors identified in *Global Technovations*, 431 B.R. at 775 (citation omitted), which are: "(1) the need for full compensation of an injured party; (2)

---

[895] American Casualty's Br. in Resp. to Trustee's Mot. for Summ. J. Against American Casualty (Docket # 616) at 9-10.

considerations of fairness and the relative equities of the award; (3) the remedial purpose of the statute involved, and/or (4) such other general principles as are deemed relevant by the court." The Court concludes that it should not award Vining prejudgment interest against American Casualty, because:

- in this case, the Court has found that Taunt did not damage the bankruptcy estate;

- in this case, Taunt's only monetary liability (limited attorney fees awarded as a sanction for fraud on the court), and the limited monetary liability of Taunt's attorneys for disgorgement, is discretionary, and the existence and amount of this liability could not have been known by American Casualty in advance of the Court's ruling today;

- in this case, the basis of the limited monetary liability in this case is not because of any damage Taunt caused, but rather, is only as part of removing the benefit gained by Taunt's attorneys, as parties that committed fraud on the court, and because of the "non-financial" purpose, to "vindicate the judicial authority" and the integrity of the Court. So the normal purpose of an award of prejudgment interest, which is "to make the estate whole, to bring back into the estate what was lost as a result of the trustee's conduct," is not implicated. *See Schooler*, 453 B.R. at 818.

### 4. Summary of ruling

For the foregoing reasons, the Court will grant partial summary judgment in favor of Vining and against American Casualty on the Bond (Count XIII of Vining's Complaint), limited to the amount of the $22,823.00 plus the limited attorney fees awarded against Taunt, in the amount to be determined. All other relief sought by Vining against American Casualty on the Bond will be denied, and American Casualty's motion for partial summary judgment will be denied as moot.

### 14. Vining's claim for an accounting (Count XIV)

In Count XIV of the Complaint, Vining seeks an accounting from Taunt and Comerica (which Vining refers to as the "Bank"), regarding the following:

(A) [Comerica's] liquidation of each of the Debtor's assets;

402

(B)  [Comerica's] receipt of proceeds from the liquidation of each of the Debtor's assets;

(C)  [Taunt's] payments to [Comerica]; and

(D)  [Comerica's] payments to [Taunt], [Charles J. Taunt &] Associates, and Plunkett [&] Cooney.[896]

### a.  The Taunt Defendants' position on Vining's claim for an accounting

The Taunt Defendants argue that the Court should dismiss this count of the Complaint because "Vining has agreed to it."[897]  The Taunt Defendants again are referring to the email from Halbert, discussed in Part VII.A.12.a of this Opinion.  In that email, Halbert proposed to dismiss "the RICO, Tortious Interference, Business Defamation, and Accounting counts in the Complaint," and attached a stipulation and order for dismissal for the signature of the Defendants.[898]  No such stipulation was ever filed, however, and no such order was ever entered by the Court.

### b.  Plunkett & Cooney's position on Vining's claim for an accounting

Plunkett & Cooney does not address Vining's accounting claim in either its motion for summary judgment or in its brief in opposition to the Vining's Motion for Summary Judgment.

### c.  The Comerica Defendants' position on Vining's claim for an accounting

The Comerica Defendants argue that Vining's accounting claim should be dismissed because: (a) Vining has not cited any provision of the Bankruptcy Code that entitles him to an accounting from Comerica; (b) "[t]he sale of real estate at private sale, personal property at

---

[896]  Compl. at ¶ 341.

[897]  Taunt Defs.' Br. (Docket # 658) at 49 ¶ 9 (relying on Docket # 601-45).  In their brief, the Taunt Defendants erroneously cite to Ex. 449.

[898]  *See* Docket # 601-45.

403

auction, and the collections of accounts receivable have been documented in court filings[;]"[899] and (c) "Taunt accounted to the Court after being ordered to disgorge fees."[900] And the Comerica Defendants pointed out, during oral argument, that Vining did not discuss the accounting claim in his briefs.[901]

### d. The Court's ruling

Vining's complaint provides no legal or equitable ground for his accounting claim against Taunt and Comerica. With regard to his accounting claim, Vining's complaint states:

> 341. [Taunt] and the Bank have failed and refused to provide complete and adequate information concerning the following matters:
>
> (A) The Bank's liquidation of each of the Debtor's assets;
>
> (B) The Bank's receipt of proceeds from the liquidation of each of the Debtor's assets;
>
> (C) [Taunt's] payments to the Bank; and
>
> (D) The Bank's payments to [Taunt], [Charles J. Taunt &] Associates, and Plunkett [&] Cooney.
>
> 342. [Vining] on his own cannot reasonably be expected to adequately ascertain and account for the foregoing matters.
>
> 343. [Vining] is entitled to separate and complete accountings from [Taunt] and the Bank on the foregoing matters."[902]

Vining's brief in support of his Summary Judgment Motion also fails to provide any legal

---

[899] Comerica Defs.' Br. (Docket # 584) at 48 (citing Docket ## 435, 449, 505, and 576 in the main bankruptcy case, Case No. 95-48268).

[900] *Id.*

[901] Tr. of Hr'g on Summ. J. Mots. (Docket # 682) at 27.

[902] Compl. at ¶¶ 340-43.

or equitable grounds for Vining's claimed entitlement to an accounting from Taunt and Comerica. Vining's brief does not even mention the accounting claim. Given the facts that (1) Vining's complaint contains only bare bones factual allegations; (2) the complaint's legal conclusion that Vining is entitled to the requested accounting relief is unsupported by any citation to legal authority; and (3) Vining failed to brief his claim for an accounting, the Court finds that Vining has waived this claim. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 618 n.9 (6th Cir. 2014) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) (internal citation and quotation marks omitted).'").

Even if Vining had not waived his accounting claim, the Court would find that Taunt and Comerica are entitled to summary judgment on this claim. Vining is not entitled to any relief, against either Taunt or Comerica, on his claim for an accounting.

First, Vining has failed to cite any Bankruptcy Code provision or any other applicable statute that gives him a right to an accounting from either Taunt or Comerica.

Second, with regard to Vining's request for an accounting from Comerica and Taunt of Comerica's "liquidation of each of [the] Debtor's assets;" and an accounting of Comerica's "receipt of proceeds from the liquidation of each of the Debtor's assets;" sufficient information regarding such matters has already been provided to Vining by Taunt; neither Comerica nor Taunt has a duty to provide the information requested; and Vining has not demonstrated a need for more information than he already has.

No legitimate purpose would be served by granting a request for a further accounting, for

the following reasons.

- Taunt filed his final Trustee's report, in a document entitled "Second Amended Final Report to the Successor Trustee" (Docket # 775 in Case No. 95-48268, Taunt's "Final Report"), which lists and accounts for the administration of all of the assets that were property of the estate, all cash receipts, and all cash disbursements. The filing of the Final Report satisfied Taunt's accounting duty under 11 U.S.C. § 704(a)(9), and nothing further is required of him.

- As the Comerica Defendants point out,"[t]he sale of real estate at private sale, personal property at auction, and the collections of accounts receivable have been documented in court filings."[903]

- Comerica does not have either a contractual or a fiduciary relationship with Vining that would give rise to any duty on its part to provide an accounting to Vining.

- As the Court described earlier in this Opinion, the evidence shows that "Comerica has always been a secured creditor with liens in virtually all of the assets of the bankruptcy estate, and Comerica's claim always far exceeded the value of those estate assets."[904] As the Court further stated above, "Comerica's secured claim turned out to be under-secured by more than $1.3 million. And Comerica likely has a valid super-priority administrative claim under § 507(b) of at least $444,475.17."[905] Therefore, the bankruptcy estate has no equity in any of the assets liquidated by Comerica, and there is no possibility that there will be surplus funds — *i.e.*, funds in excess of Comerica's secured claim — that can be returned to the estate. Vining therefore has no interest in the proceeds of any assets liquidated by Comerica.

- Vining has presented no evidence that Comerica liquidated any asset for an unreasonably low value; or that Comerica could have had any possible motive for doing so; or that if Comerica had received a greater value for the assets, there would have been a possibility that there would be any surplus funds to return to the bankruptcy estate.

- The Court now has found in favor Comerica on all of Vining's claims against it; denied Vining's request for damages against Comerica; denied Vining's request for an order requiring Comerica to disgorge any funds that it was paid on account of its secured claim; and denied Vining's request for an order requiring Comerica to pay to the estate profits Comerica earned from the funds it received on account of its claim.

---

[903] *See supra* Part VII.A.14.c of this Opinion.

[904] *See supra* Part VII.A.1.e.4.iii.c.1 of this Opinion.

[905] *See id.*

Given all of this, there is no valid reason to require an accounting from Comerica.

Third, with regard to Vining's request for an accounting of Taunt's "payments to the Bank," Taunt's filing of the his detailed Final Report[906] satisfied any obligation to account for all of his payments to the Bank.

Fourth, with regard to Vining's request for an accounting of the Bank's payments to Taunt and his attorneys, the Court's ruling in this Opinion requiring Taunt and his attorneys to disgorge all attorney fees paid by Comerica to them, "either directly or from the proceeds of Comerica's collateral, based on the Comerica Fee Agreement"[907] renders such an accounting unnecessary. The Court has quantified the amount of those fees that yet must be paid — $20,540.50 in fees that Comerica paid to Charles J. Taunt & Associates and $2,282.50 in fees that Comerica paid to Plunkett & Cooney.[908]

For all of these reasons, the Court will grant summary judgment to both Taunt and Comerica on Vining's claim for an accounting.[909]

## VIII. Conclusion regarding the Post-Petition Claims

With the following exceptions, the Defendants are entitled to summary judgment on all of Vining's Post-Petition Claims (Counts I through XIV of Vining's Complaint). The exceptions are that (1) Vining is entitled to summary judgment on Count I (the fraud on the court claim) for the limited monetary relief described in Part VII.A.1.e.4.iii.d and .e of this Opinion; and (2) Vining is

---

[906] Docket # 775 in Case No. 95-48268.

[907] *See supra* Part VII.A.1.e.4.iii.d of this Opinion.

[908] *See id.*

[909] Given the Court's ruling, it is not necessary for the Court to reach the Defendants' other arguments in seeking summary judgment on this claim.

entitled to summary judgment on Count XIII (the claim on the American Casualty Bond) for the limited monetary relief described in Part VII.A.13.f of this Opinion.  In all other respects, the Defendants are entitled to summary judgment on Counts I through XIV.  The Court will enter an order reflecting these summary judgment rulings.

**Signed on October 7, 2022**



/s/ Thomas J. Tucker

**Thomas J. Tucker**
**United States Bankruptcy Judge**

## REALITY – MTG ADVANCES WERE MADE W/O REPORTS BEFORE THE 6/21/95 RENAISSANCE CLUB MEETING

| Date | Advance $ | BBR? | Date | Advance | BBR? |
|------|-----------|------|------|---------|------|
| 4/17/95 | $392,000 | No | 6/2/95 | $229,000 | Yes - #64 |
| 4/18/95 | $16,000 | No | 6/5/95 | $88,000 | No |
| 4/19/95 | $5,000 | Yes – #54 | 6/7/95 | $13,000 | No |
| 4/20/95 | $89,000 | No | 6/9/95 | $89,000 | No |
| 4/24/95 | $17,500 | Yes - #55 | 6/13/95 | 20,000 | No |
| 4/25/95 | $3,000 | No | 6/14/95 | $11,500 | Yes - #65 |
| 4/26/95 | $48,500 | No | 6/16/95 | $110,000 | No |
| 4/28/95 | $108,000 | No | 6/17/95 | $63,000 | No |
| | | | 6/20/95 | $81,000 | No |
| | | | 6/22/95 | $82,500 | No |
| | | | 6/26/95 | $1,500 | Yes - #66 |

Between 5/1/95 and 6/1/95  MTG took  13 more advances, while it submitted 8 BBRs.

Sources:  Comerica 004504-004506; Taunt Ex. 43; Comerica Ex. 43

## TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. The Pre-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Post-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1. The root of the problem — the Comerica Fee Agreement . . . . . . . . . . . . . . . . . . 4

        2. Vining's Post-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C. This Court's April 16, 2007 Opinion and Order vacating orders
       procured by fraud on the court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D. The remaining claims to be decided in this adversary proceeding . . . . . . . . . . . . . 12

II. Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. The jury trial issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. Summary Judgment Motions regarding the Pre-Petition Claims . . . . . . . . . . . . . . . . . . . 15

    A. Facts relating to the Pre-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1. The Loan Documents between Comerica and MTG . . . . . . . . . . . . . . . . . . . . . . 15

            a. The $3.5 million Master Revolving Note . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            b. The Advance Formula Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            c. The $1.5 million Master Revolving Note . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            d. Other promissory notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2. MTG's financial distress following its acquisition of Sterling Mold &
           Engineering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        3. Preliminary negotiations with Chuck Becker and Bruce Becker of the Becker
           Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        4. The June 21, 1995 Renaissance Club meeting . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        5. The Loan Advances on MTG's $3.5 million Line of Credit after the
           Renaissance Club meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

6.  The advances under the $1.5 million Master Revolving Note . . . . . . . . . . . . . . 39

7.  The Asset Purchase Agreement between MTG and the Becker Group . . . . . . . 42

8.  The employment agreement between Vercnocke and the Becker Group . . . . . . . 48

9.  The due diligence period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    a. Vercnocke's version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    b.  Bensinger's version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    c.  Collins's version. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    d.  B. Becker's version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

10.  The impending termination of the Asset Purchase Agreement . . . . . . . . . . . . . 59

11. The Termination Letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

12.  The removal of tooling from the Mold Shop . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    a.  Schneider's version . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    b.  Vercnocke's version. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

13.  Injectronics takes possession of tooling from Multi Form . . . . . . . . . . . . . . . . 73

14.  Comerica's actions in August 1995 after learning of the removal
     of tooling from MTG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

   B.  MTG's Pre-Petition Claims in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

V.  Discussion of the Pre-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

   A.  Summary judgment standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

   B.  Vining's breach of contract claim against the Comerica Defendants
       (Count XV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

       1. Vining's position that the Debtor was not in default under the Loan
          Documents when Comerica declared a default . . . . . . . . . . . . . . . . . . . . . . . 79

2. The Comerica Defendants' position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

3. Explanation of the Court's rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    a.  All of the evidence in the record demonstrates that the over-formula
        loan advances Comerica made between June 21, 1995 and July 21, 1995
        were loan advances to MTG, not to the Becker Group . . . . . . . . . . . . . . . . 89

    b.  Comerica's declaration of default under the Loan Documents, based on
        MTG's failure to submit A/R Reports and MTG being out of formula,
        was not improper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

    c.  The Michigan statute of frauds bars all actions against Comerica or its
        agents based on an oral promise or commitment . . . . . . . . . . . . . . . . . . . . . 104

    d.  It was unnecessary for Comerica to declare a default in order to demand
        full payment on the promissory notes, and to stop advancing funds . . . . . . 118

    e.  Comerica's express contractual rights under the demand promissory
        notes were not limited by an implied duty of good faith and fair dealing . . 120

        i.  The duty of good faith under the Michigan UCC . . . . . . . . . . . . . . . . . 122

        ii.  Case law regarding application of the duty of good faith and fair
           dealing to demand notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

C.  Vining's promissory estoppel claim against the Comerica Defendants
    (Count XVI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

D.  Vining's equitable estoppel claim against the Comerica Defendants
    (Count XVII). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

E.  Vining's fraudulent misrepresentation claim against the Comerica Defendants
    (Count XVIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

F.  Vining's breach of fiduciary duty claim against the Comerica Defendants
    (Count XIX) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

G.  Vining's claim against the Comerica Defendants for tortious interference with
    contractual relations and business expectancies (Count XX) . . . . . . . . . . . . . . . . 175

H.  Vining's claim against the Comerica Defendants for business defamation
    (Count XXI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

iii

I.  Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

VI.  Conclusion regarding the Pre-Petition Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

VII.  Summary judgment motions regarding the Post-Petition Claims. . . . . . . . . . . . . . . . . . 184

A.  Discussion of Vining's Post-Petition Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

1.  Vining's fraud on the court claim (Count I). . . . . . . . . . . . . . . . . . . . . . . . . . . 184

a.  The Court's Fraud on the Court Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . 187

b.  The Taunt Defendants' position on an award of additional relief
against them based on Vining's fraud on the court claim . . . . . . . . . . . . . 190

c.  Plunkett & Cooney's position on an award of additional relief against
them based on Vining's fraud on the court claim . . . . . . . . . . . . . . . . . . . 191

d.  The Comerica Defendants' position on an award of relief against them
based on Vining's fraud on the court claim . . . . . . . . . . . . . . . . . . . . . . . . 195

e.  Explanation of the Court's ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

1.  Taunt and his attorneys committed fraud on the court. . . . . . . . . . . . . . 201

2.  The Comerica Defendants are not liable for fraud on the court. . . . . . . . 201

3.  The issue of intent to deceive by Taunt and his attorneys . . . . . . . . . . . 204

4.  The remedies for fraud on the court in this case . . . . . . . . . . . . . . . . . . 205

i.  Remedies available generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

ii.  Remedies already imposed in this case, or considered and
rejected . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209

iii.  What additional relief, if any, should be imposed . . . . . . . . . . . . . . 211

a.  Compensatory damages (other than attorney fees) . . . . . . . . . . 211

b.  Punitive damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

iv

       c. Disallowance of Comerica's claim . . . . . . . . . . . . . . . . . . . . . . . 214

          1. Comerica's claim in the *MTG* bankruptcy case . . . . . . . . . . 214

          2. Vining's request that Comerica's claim be disallowed . . . . . 219

       d. Disgorgement of the other fees and expenses paid to Taunt
          and his attorneys from the proceeds of Comerica's collateral . . 223

       e. Attorney fees incurred because of the fraud on the court. . . . . . 225

  2. Vining's breach of fiduciary duty claim (Count II) . . . . . . . . . . . . . . . . . . . . . . 229

     a. The Taunt Defendants' position on Vining's breach of fiduciary duty
       claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

     b. Plunkett & Cooney's position on Vining's breach of fiduciary duty
       claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233

     c. The Comerica Defendants' position on Vining's breach of fiduciary
       duty claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

     d. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

  3. Vining's inducing breach of fiduciary duty claim (Count III) . . . . . . . . . . . . . . 239

     a. The Comerica Defendants' position on Vining's breach of fiduciary
       claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 239

     b. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

  4. Vining's fraudulent misrepresentations claim (Count IV). . . . . . . . . . . . . . . . . 244

     a. The Taunt Defendants' position on Vining's fraudulent
       misrepresentations claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

     b. The Comerica Defendants' position on Vining's fraudulent
       misrepresentations claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

     c. Plunkett & Cooney's position on Vining's fraudulent
       misrepresentations claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

     d. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

5. Vining's equitable subordination claim (Count V) . . . . . . . . . . . . . . . . . . . . . . . 247

    a. Comerica's position on Vining's equitable subordination claim . . . . . . . . . . 247

    b. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 248

6. Vining's claim of collusive sales under 11 U.S.C. § 363(n) (Count VI) . . . . . . 249

    a. The Taunt Defendant's position on Vining's collusive sales claim under
       11 U.S.C. § 363(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

    b. Plunkett & Cooney's position on Vining's collusive sales claim under
       11 U.S.C. § 363(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

    c. The Comerica Defendants' position on Vining's collusive sales claim
       under 11 U.S.C. § 363(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 252

    d. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

       1. Taunt's disposition of the bankruptcy estate's potential claims
          against Richard May . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

       2. Discussion and ruling regarding § 363(n) . . . . . . . . . . . . . . . . . . . . . . . 255

7. Vining's claim of avoidable post-petition transfers (Count VII) . . . . . . . . . . . . 260

    a. The Taunt Defendants' position on Vining's claim of avoidable
       post-petition transfers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261

    b. Plunkett & Cooney's position on Vining's claim of avoidable post-
       petition transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263

    c. The Comerica Defendants' position on Vining's claim of avoidable
       post-petition transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

    d. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

8. Vining's claim of automatic stay violations (Count VIII) . . . . . . . . . . . . . . . . . 270

    a. The Taunt Defendants' position on Vining's claim of automatic stay
       violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272

  b.  Plunkett & Cooney's position on Vining's claim of automatic stay violations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

  c.  The Comerica Defendants' position on Vining's claim of automatic stay violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 276

  d.  The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 279

    1.  The Taunt Defendants and Plunkett & Cooney did not violate the automatic stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

      i.  Some automatic stay principles relevant to this case . . . . . . . . . . . 280

      ii.  Vining's theories of stay violations by Taunt and his attorneys fail as a matter of law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

    2.  With the minor and harmless exception of paying some MTG utility bills, the Comerica Defendants did not violate the automatic stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

    3.  The bankruptcy estate suffered no injury as a result of the Comerica Defendants' actions regarding the DIP Accounts . . . . . . . . . . . . . . . . . 295

  9.  Vining's common law and statutory conversion claims (Count IX) . . . . . . . . . 299

    a.  The Taunt Defendants' position on Vining's common law and statutory conversion claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

    b.  Plunkett & Cooney's position on Vining's common law and statutory conversion claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305

    c.  The Comerica Defendants' position on Vining's common law and statutory conversion claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 306

    d.  The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 309

  10.  Vining's conspiracy claim (Count X) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 313

    a.  The Taunt Defendants' position on Vining's conspiracy claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

    b.  Plunkett & Cooney's position on Vining's conspiracy claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

c. The Comerica Defendants' position on Vining's conspiracy claim
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

d. The Court's ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326

11. Vining's legal malpractice claim (Count XI). . . . . . . . . . . . . . . . . . . . . . . . 327

a. The Taunt Defendants' position on Vining's legal malpractice
claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328

1. The possible lender liability claims against Comerica. . . . . . . . . . . . . . 328

2. Possible claims against the Becker Group . . . . . . . . . . . . . . . . . . . . . . . 329

3. Possible  pre-petition claims against May . . . . . . . . . . . . . . . . . . . . . . . 331

4. Taunt's settlement of the estate's conversion claim against
Injectronics, May, and Schneider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

b. Plunkett & Cooney's position on Vining's legal malpractice claim . . . . . . 336

c. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337

1. The alleged possible loss of the claims against Comerica. . . . . . . . . . . 338

2. The alleged loss of the pre-petition claims against the Becker Group. . . 338

a. Any additional proceeds realized from the pre-petition claims
against the Becker Group would have been paid to Comerica
on its secured claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 341

b. The MTG bankruptcy estate had no valid pre-petition claim
against the Becker Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

3. The alleged loss of the pre-petition claims against May . . . . . . . . . . . . 348

a. Vining failed to plead the loss of the fraudulent conveyance
claim against May as a basis for his legal malpractice count
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 348

b. Vining has no valid legal malpractice claim relating to the
potential fraudulent conveyance claim against May. . . . . . . . . . . . 349

    c.  The bankruptcy estate had no viable fraudulent conveyance
        claim against May . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 349

        i.  Vining's allegations in the complaint regarding a fraudulent
            conveyance claim against May . . . . . . . . . . . . . . . . . . . . . . . . . 349

        ii.  Applicable fraudulent conveyance law in 1995 . . . . . . . . . . . . . 351

        iii.  Discussion of the potential claim against May . . . . . . . . . . . . . 352

    d.  Any additional proceeds of the bankruptcy estate's potential
        fraudulent conveyance claim against May would have been
        paid to Comerica on Comerica's § 507(b) super-priority claim . . . . 354

    4.  The alleged loss of the estate's conversion claim against Injectronics,
       May, and Schneider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 355

      a.  Any claim the bankruptcy estate may have had against Injectronics
        was part of Comerica's collateral . . . . . . . . . . . . . . . . . . . . . . . . 355

      b.  The bankruptcy estate had no valid claim against Injectronics, or
        against Schneider or May . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356

12.  Vining's claim for violations of the Racketeering and Corrupt Organizations
    Act (Count XII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 369

    a.  The Taunt Defendants' position on Vining's RICO claim . . . . . . . . . . . . 371

    b.  Plunkett & Cooney's position on Vining's RICO claim . . . . . . . . . . . . . 372

    c.  The Comerica Defendants' position on Vining's RICO claim . . . . . . . . . . 374

    d.  The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376

13.  Vining's claim on the American Casualty Bond (Count XIII) . . . . . . . . . . . . 377

    a.  Vining's motion for summary judgment . . . . . . . . . . . . . . . . . . . . . . . . . 378

    b.  American Casualty's motion for partial summary judgment . . . . . . . . . . . 379

    c.  Vining's response to American Casualty's Motion . . . . . . . . . . . . . . . . . . 381

1. Vining's argument that prejudgment interest can and should be awarded beyond the $1,000,000 Bond amount, and should be calculated according to Michigan law . . . . . . . . . . . . . . . . . . . . . . . . . 381

2. Vining's argument that attorney fees can and should be awarded beyond the $1,000,000 Bond amount . . . . . . . . . . . . . . . . . . . . . . . . . 382

d. American Casualty's reply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

1. American Casualty's argument that the Court should exercise its discretion not to award prejudgment interest. . . . . . . . . . . . . . . . . . 382

2. American Casualty's arguments that Vining is not entitled to any attorney fees from American Casualty, nor can an award of attorney fees increase American Casualty's liability to more than $1,000,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 385

e. American Casualty's oral argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 388

f. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 391

1. American Casualty is liable on the Bond. . . . . . . . . . . . . . . . . . . . . . . 391

2. The amount of American Casualty's liability on the Bond . . . . . . . . . . 396

3. The Court will not award Vining any additional attorney fees, or prejudgment interest, or any costs/expenses of "investigation" against American Casualty on the Bond. . . . . . . . . . . . . . . . . . . . . . . . . 399

4. Summary of ruling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

14. Vining's claim for an accounting (Count XIV) . . . . . . . . . . . . . . . . . . . . . . . . 402

a. The Taunt Defendants' position on Vining's claim for an accounting . . . . . 403

b. Plunkett & Cooney's position on Vining's claim for an accounting. . . . . . . 403

c. The Comerica Defendants' position on Vining's claim for an accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

d. The Court's ruling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 404

VIII. Conclusion regarding the Post-Petition Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . 407

x