UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the matter of:                                    Case No. 95-48268

MTG, Inc.,                                           Chapter 7
                        Debtor
_____/                    Judge Thomas J. Tucker

GUY C. VINING, etc.,

                Plaintiff,

vs.                                                  Adv. Pro. No. 03-4950

COMERICA BANK, et al.,

                Defendants.
_____/

**OPINION AND ORDER REGARDING CERTAIN
UNRESOLVED DISCOVERY MOTION ISSUES**

## I.  Introduction

        This adversary proceeding has come before the Court for several hearings on two motions

filed by the Plaintiff, Guy C. Vining, Trustee ("Vining"), seeking to compel discovery from

Defendants Plunkett & Cooney, P.C. ("Plunkett Cooney") and Comerica Bank ("Comerica").

These motions are: (1) "Trustee's Motion to Compel Defendant Plunkett Cooney to Answer

Interrogatories . . ." (Docket # 322, the "Plunkett Cooney Motion") and (2) "Trustee's Motion to

Compel Comerica Bank Defendants to Answer Interrogatories . . ." (Docket # 324, the

"Comerica Bank Motion") (These two motions are referred to collectively in this Opinion below

as the "Discovery Motions").

The Court held a total of eight hearings on the Discovery Motions, and ruled on most, but not all, of the issues involved in the Discovery Motions. The Court entered eight orders reflecting rulings and action taken during the eight hearings.[1]

As is described in the two other opinions the Court has entered today,[2] much has happened in this case after the Court entered the eight discovery orders just cited. But certain issues involved in the Discovery Motions are unresolved. The Court will now resolves those issues, in this Opinion and Order.

These unresolved issues fall into two general categories. The first category is Vining's request for attorney fees and other expenses under Fed. R. Civ. P. 37(a)(5) (made applicable in this adversary proceeding by Fed. R. Bankr. P. 7037), with respect to both of the Discovery Motions. Vining seeks fees and expenses against both Defendants Plunkett Cooney and Comerica. As several of the prior discovery orders indicate, the Court previously deferred ruling on this issue.

As the Court noted in one of the previous discovery orders, the Plunkett Cooney Motion is fully resolved, except for the Court's ruling on the issue of fees and expenses.[3]

The second category of unresolved issues is limited to the Comerica Bank Motion, and concerns certain attorney-client privilege issues. These privilege issues are referred to in several of the Court's previous discovery orders, and are discussed below.

---

[1]  Docket ## 347, 365, 403, 406, 414, 461, 472, and 480.

[2]  *See* "Opinion Regarding Summary Judgment Motions" and "Opinion and Order Denying Plaintiff's Contempt Motion (Docket # 505)," each filed today.

[3]  *See* "Fourth Order Regarding Plaintiff's Motions to Compel Discovery . . ." (Docket # 406) at 2, ¶ 1.

2

After the Court held the last of the eight hearings on the Discovery Motions, and entered the last of the eight previous discovery orders, Vining filed a motion entitled "Motion for Order Finding Comerica and Counsel in Contempt of Court and Granting Monetary Sanctions and Other Relief Based on Violations of Discovery Orders, Violations of Discovery Duties, and Discovery Fraud" (Docket # 505, the "Contempt Motion"). The Court has discussed the Contempt Motion at length, and has denied that motion, in an Opinion and Order filed today, entitled "Opinion and Order Denying Plaintiff's Contempt Motion (Docket # 505)."

After the Contempt Motion was briefed and argued, all of the parties filed motions for summary judgment. After extensive briefing and lengthy hearings, the Court has ruled on the summary judgment motions, in an Opinion and a separate Order filed today, entitled "Opinion Regarding Summary Judgment Motions," and "Order Regarding Summary Judgment Motions."

The Court refers the reader to the Court's two other, lengthy opinions filed today, for a detailed statement of the background, facts, and issues in this adversary proceeding, and for the Court's rulings on the two other motions.

## II. Discussion

The Court will discuss the privilege issues first. Vining seeks production of documents that Comerica has asserted are protected by the attorney-client privilege. These documents include two categories of attorney invoices, and documents listed in two privilege logs that Comerica created and served on Vining.[4] The documents also include certain documents that the Court ordered Comerica to submit to the Court for an *in camera* review.

---

[4] Copies of the privilege logs appear in several places in the record, including at Docket ## 343-6 and 343-7.

**A. Issues relating to Comerica's assertions of attorney-client privilege**

**1. Vining's argument that Comerica waived the privilege by failing to assert it on a timely basis**

Vining first argues that Comerica waived the attorney-client privilege with respect to the documents it has withheld on the grounds of privilege, because (1) Comerica did not timely assert the privilege, with respect to any documents other than certain attorney invoices (discussed below); and (2) because Comerica did not timely serve Vining with a privilege log.

The privilege dispute concerns Document Request Nos. 33, 37 and 38 of Vining's Second Request for Production of Documents to Comerica. Document Request Nos. 33 and 38 seek production of certain attorney invoices. Those requests, and Comerica's response to them, state:

> **DOCUMENT REQUEST NO. 33:**
>
> Produce all invoices from McCarthy Tetrault to the Bank and payments to McCarthy Tetrault relating to the Debtor, its bankruptcy case, or Canadian litigation.
>
> **ANSWER:**
>
> Objection. The invoices may contain privileged information, and the request is not relevant nor likely to lead to the discovery of relevant information.
> . . .
>
> **DOCUMENT REQUEST NO. 38:**
>
> Produce all invoices, including time entries and descriptions of services, of John D. Hcrtzbcrg, John D. Hertzbcrg, P.C., and Miller, Canficld, Paddock and Stone, P.L.C., d/b/a Miller Canfield, relating to the Dcbtor or its bankruptcy case.
>
> **ANSWER:**

4

> Objection. The invoices may contain privileged information, and the request is not relevant nor likely to lead to the discovery of relevant information.[5]

Vining argues that these requested attorney invoice documents are not privileged, and that they are discoverable. Comerica stands by its privilege objection, at least in part, and also argues that the invoices are not within the scope of discovery because they are not relevant.

The other document request at issue is Number 37. That request, and Comerica's response to it, state:

**DOCUMENT REQUEST NO. 37:**

> Produce all other documents relating to the Debtor which were not previously produced by the Bank pursuant to its Initial Disclosures and the Trustee's First Request for Production of Documents.

**ANSWER:**

> To the extent such documents exist and are in the possession, custody, or control of Comerica Bank, they have previously been produced.[6]

In the Comerica Bank Motion, in addition to disputing Comerica's assertion of privilege regarding the attorney invoices, Vining complained that he "believes that Comerica Bank has failed to serve a privilege log on the Trustee."[7] Vining then stated, "[i]f so, the Trustee moves

---

[5] Docket # 324-4 at pdf pp. 2, 3.

[6] *Id.* at pdf p. 3.

[7] Docket # 324 at 7.

5

the Court to compel Comerica Bank to served a privilege log with sufficient detail to enable the Trustee to determine the applicability of any privilege asserted."[8]

In its response, Comerica points out that several times over the years, Comerica permitted Vining and Halbert to inspect and copy Comerica's documents, in response to informal requests and in response to Vining's first requests for production of documents, and that on those previous occasions, and in Comerica's Civil Rule 26(f) initial disclosures, Comerica asserted its attorney-client privilege objections to Vining and Halbert.[9]  Comerica also states that it completed a detailed privilege log in July 2008, well before the Document Requests at issue here were served on Comerica, and that Comerica's counsel believes, though he "cannot be 100% certain," that he served that log on Vining's attorney Halbert at that time.[10]  Vining and his counsel Halbert deny this.  In any event, Comerica states that it *did* serve Vining with two detailed privilege logs the day after Vining filed the Comerica Bank Motion,[11] and Vining does not dispute this.

Under the circumstances, and in the exercise of its discretion, the Court finds and concludes that Comerica did *not* waive any attorney-client privilege by failing to timely assert the privilege.  These circumstances include the fact that Comerica did assert its attorney-client privilege numerous times before serving its written response to Vining's document requests at

---

[8] *Id.*

[9] "Supplemental Brief Concerning Trustee's Motion to Compel Production" (Docket # 405) at 2-4.

[10] *Id.* at 5.

[11] *Id.*  Copies of the two privilege logs appear at Docket ## 343-6 and 343-7.

issue, as described in detail in Comerica's brief,[12] and that Comerica served its two privilege logs on Vining no later than the day after Vining filed the Comerica Bank Motion demanding a privilege log. *See Laethem Equip. Co. v. Deere & Co.*, 261 F.R.D. 127, 137 (E.D. Mich. 2009) (declining to sanction a party for being tardy in serving a privilege log, in connection with a document production done informally); *In re In-Store Advert. Sec. Litig.,* 163 F.R.D. 452, 457 (S.D.N.Y. 1995) (finding that in that case the failure to provide a privilege log was "not flagrant enough" a violation of the rules to result in a waiver of the privilege); *Pem-America, Inc. v. Sunham Home Fashions, LLC,* No. 03 Civ. 1377(JFK)(RLE), 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (court found that party's "tardiness in providing a privilege log" was not a "'flagrant violation'" and therefore was not a waiver of the privilege).

### 2. The merits of Comerica's privilege claim

Vining argues that the two categories of attorney invoices requested in Document Request Nos. 33 and 38, quoted above, are not protected by the attorney-client privilege, and that the documents are relevant and discoverable. Comerica disagrees.

The parties agree that the following types of information in the attorney invoices are not privileged. Quoting *Chaudhry v. Gallerizzo,* 174 F.3d 394, 402 (4th Cir.1999), Comerica states: "'[G]eneral … information provided [in the invoices], e.g., information on the identity of the client, the case name for which payment was made, and the amount of the fee' is not

---

[12] "Supplemental Brief Concerning Trustee's Motion to Compel Production" (Docket # 405) at 2-4.

privileged."[13]  Vining agrees with that much.[14]  Citing *Chaudhry*, 174 F.3d at 403, however, Comerica argues that "descriptive information of the services provided, such as the nature of research and entries that 'would divulge confidential information regarding legal advice' is privileged."[15]  The Court agrees with this statement of the law, and more than this, the Court agrees more broadly that "bills that 'contain descriptions of services rendered' are privileged." *See Michigan First Credit Union v. Cumis Ins. Soc'y., Inc.,* No. 05-74423, 2007 WL 4327786, at *3 (E.D. Mich. Dec. 7, 2007), cited by Comerica;[16] *see also United States v. Keystone Sanitation Co.*, *Inc.*, 885 F. Supp. 672, 675 (M.D. Pa. 1994), which Vining correctly cites for the proposition that "attorney billing statements and time records are protected by the attorney-client privilege *only* to the extent that they reveal litigation strategy **and/or the nature of the services performed**." (italics in original) (bold added) (citations omitted).[17]

Thus, the attorney invoices are in part privileged and in part not privileged.  If these attorney invoices are otherwise discoverable, then, Comerica would need to produce the invoices, in redacted form, to reveal only information on the identity of the client, the case name for which payment was made, and the amount of the fee.  But as quoted above, Comerica also objected to producing the attorney invoices at issue on the ground that such information is not discoverable, because it is not "relevant nor likely to lead to the discovery of relevant information."  The Court

---

[13]  Comerica's Resp. to Trustee's Mot. to Compel Disc. (Docket # 331, "Comerica Resp.") at 11.

[14]  *See* Trustee's Reply to Comerica [etc.] (Docket # 343, the "Trustee's Reply") at 3.

[15]  *See* Comerica Resp. at 11.

[16]  *See id.* at 11-12.

[17]  *See* Trustee's Reply at 3 n.7.

8

agrees with Comerica on this point.  And the Court also concludes that these invoices are not "relevant to any party's claim or defense," within the meaning of the scope of permissible discovery as defined by current Fed. R. Civ. P. 26(b)(1).  The Court's conclusions about relevance here are shown and bolstered by the Court's extensive rulings regarding the merits of the parties' claims and defenses, made in the two other opinions the Court has filed today.

Vining did not timely raise any issue about the sufficiency of the two privilege logs that Comerica served on Vining.  For example, Vining raised no issue about this in his Reply Brief, which he filed many months after he had received the privilege logs, and in which Vining argued extensively about Comerica's privilege claims.[18]  As Comerica accurately pointed out in a supplemental brief that it filed well after Vining filed his Reply Brief, "*[t]he Trustee has never raised an objection concerning the sufficiency of the privilege log, nor has it made a claim that specific documents on the log are not entitled to privilege.*"[19]  Only in a later hearing, Vining's counsel argued belatedly, and with little elaboration, that Comerica's privilege logs did not provide sufficient information to establish that the documents listed are privileged.[20]

In any event, after reviewing the two privilege logs, which total 44 pages,[21] the Court disagrees with Vining, and rejects this argument.  The privilege logs are adequate and sufficient.

### 3.  Vining's argument that the "Crime/Fraud Exception" applies

---

[18]  *See* Trustee's Reply (Docket # 343).

[19]  "Supplemental Brief Concerning Trustee's Motion to Compel Production" (Docket # 405) at 5 (italics in original).

[20]  *See* Tr. of Hr'g on Disc. Mots. (Docket # 437) at 22.

[21]  Docket ## 343-6, 343-7.

### a. Vining's argument

Vining argues that the "crime/fraud exception" applies in this adversary proceeding, and "vitiates any privilege otherwise attaching to attorney-client communications relating to the Trustee's postpetition claims."[22]  Under what is commonly referred to as the "crime/fraud exception" to communications covered by the attorney-client privilege, "[a] communication is excepted from the attorney-client privilege if it is undertaken **for the purpose of committing or continuing a crime or fraud**."  *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997) (emphasis added).  The Sixth Circuit Court of Appeals has set forth "a two-part test for applying the crime/fraud exception" to what would otherwise be privileged attorney-client communications.  *Id.*

> "First, the [party seeking application of the exception] must make a prima facie showing that a **sufficiently serious crime or fraud** occurred to defeat the privilege; second, the [party seeking application of the exception] must establish some relationship between the communication at issue and the prima facie violation." *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir.1986). To satisfy its prima facie showing, the evidence presented by the [party seeking application of the exception] must be such that "a prudent person [would] have a reasonable basis to suspect the perpetration of a crime or fraud." *Id.*

*Id.* (emphasis added).  "'This showing must be made without reference to the allegedly privileged material.'"  *Laethem Equip. Co.*, 261 F.R.D. at 144 (citations omitted) (quoting *People v. Paasche,* 525 N.W.2d 914, 918 (Mich. Ct. App. 1994)).  As to the second part of the test,

> "the crime[-]fraud exception cannot be successfully invoked merely upon showing that the client communicated with counsel while the client was engaged in criminal or fraudulent activity."

---

[22] Trustee's Reply at 11.

> United States v. Davis, 132 F.R.D. 12, 15 (S.D.N.Y.1990); *see In re Grand Jury Subpoenas Duces Tecum,* 798 F.2d 32, 34 (2d Cir.1986). The party seeking disclosure must show not simply probable cause to believe that fraud has been committed, but that there is probable cause to believe that the communication between attorney and client or the work product produced by the attorney was *in furtherance of the fraud. See Davis,* 132 F.R.D. at 15.

*In-Store Advert. Sec. Litig.,* 163 F.R.D. at 459 (italics in original).

Vining argues that he has satisfied both elements of the crime/fraud exception as laid out in *Collis*. Vining argues that "[t]he record in this case establishes a *prima facie* case that a reasonably prudent person would have a reasonable basis to suspect Comerica was involved in . . . criminal, fraudulent, tortious and other improper conduct[.]"[23] The acts by Comerica on which Vining relies are: (1) Comerica's entering into an "illegal fee agreement" with Charles J. Taunt ("Taunt"), the former Chapter 7 Trustee (the "Comerica Fee Agreement"); (2) Comerica's failing to disclose the Comerica Fee Agreement to the Court; (3) Comerica's transferring of $81,842.45 from the Debtor-in-Possession accounts ("DIP Accounts") to an escrow account at Comerica; (4) Comerica's submitting a false affidavit of Paul G. Dufault, Vice President of Comerica; and (5) Comerica's spoliation of evidence.[24] Vining alleges that Comerica's acts and omissions were intentional and "for the express purpose of preventing the estate from funding lender liability litigation" and to prevent "the owners of MTG from pursuing themselves the lender liability claims."[25]

---

[23] *Id.*

[24] *Id*. at 11-12.

[25] Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 23, 25.

11

Comerica's entering into the Comerica Fee Agreement[26] and failing to disclose that agreement to the Court is the primary basis for most of the crimes, fraud, and other misconduct that Vining alleges Comerica committed. Vining argues that in entering into the Comerica Fee Agreement and failing to disclose that agreement to the Court, Comerica committed a fraud upon the court; "induced, aided and abetted, participated in and benefitted from Taunt and counsel's breaches of fiduciary duties and fraud on the court; and violated "at a minimum" the following criminal statutes: 18 U.S.C. § 152(6); 18 U.S.C. § 155; 18 U.S.C. § 2; and Mich. Comp. Laws Ann. § 750.119.[27] Vining argues that the Comerica Fee Agreement "on its face constitutes bankruptcy bribery" and "fee fixing" and provides for the "conversion and concealment of DIP [A]ccount proceeds which are used to secretly fund Mr. Taunt's fee."[28] Vining alleges that the "false" affidavit of Paul G. Dufault ("Dufault") was filed for the purpose of concealing "the fact that the DIP [A]ccounts were converted."[29] Vining argues that the statements in paragraphs 5 and 7 of the August 6, 2004 affidavit of Dufault are lies. Those paragraphs stated:

> 5. At no time did Comerica use the Surcharge Agreement (or any other approach) to gain advantageous treatment from Taunt, to

---

[26] A copy of the Comerica Fee Agreement can be found at Docket # 584-22.

[27] *Id.* In his brief, Vining mistakenly cites Mich. Comp. Laws Ann. § 750.199 ("Knowingly or willfully concealing or harboring persons who are escaping, have escaped or are the subject of arrest warrants or bench warrants for the purpose of concealment from a peace officer") rather than Mich. Comp. Laws Ann. § 750.119 ("Corruption of appraisers, receivers, trustees, etc.; promising or giving gifts").

[28] Tr. of Continued Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 437) at 6-7; *see also* Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 23-24.

[29] *Id.* at 7; *see also* Tr. of Hr'g on Mot. To Compel Plunkett, Conney and Comerica Defs. Disc. (Docket # 436) at 23.

exert influence over him or otherwise to compromise his
disinterestedness in the administration of Debtor's estate.
. . . .

7.  To the best of my knowledge, the [Comerica Fee] Agreement
was completely irrelevant to Taunt's negotiations with
Comerica concerning [c]ompromise of the estate's alleged
claims against Comerica. Similarly, it had no role in Taunt's
decision to propose the April 19, 1996 Order allowing
Comerica's claim, the April 30, 1996 Order granting Comerica
relief from the automatic stay and the August 29, 1996
Comerica Settlement Order, approving the settlement
agreement between Comerica and the estate.[30]

Vining relies on the deposition testimony of John D. Hertzberg ("Hertzberg"), former

counsel to Comerica, to support his allegation that the affidavit of Dufault contains false

statements. Regarding Paragraphs 5 and 7 of the Dufault affidavit, Hertzberg testified, in part:

I think [Dufault's] statements in Paragraph[s] 5 and 7 were just in-
your-face nonsense and/or lies.
. . . .

You'd have to be brain damaged to not understand the power and
influence that we were exerting over [Taunt], okay? We were well
aware of it. . . . .

All I can tell you is that the notion that Comerica did not
use the [Comerica Fee A]greement to gain advantageous treatment
from Taunt or exert influence over him is just nonsense. . . .
Knowing nonsense and a false statement.

Now the rest of [Paragraph 5], compromises,
disinterestedness, that's getting into technical terms. Nobody
thought about that, it wasn't our issue. That was the attitude. That
was my attitude. Disinterestedness, notice, whatever, I'm not the
[T]rustee's counsel. That's not my issue.

---

[30] Docket # 343-3 at 2.

13

Somebody else can go look at it like [Taunt] and his counsel, but the notion that this [Comerica Fee A]greement was not actively and intentionally used to gain advantageous treatment or exert influence, it's a load of crap.

. . . .

What I saw in Paul Dufault's affidavit was what I considered to be perjury, and I confirmed that it was, in fact, filed with the federal court; and yes, that angered me, and I'm like, That's just simply outrageous, how dare he say that.

. . . .

. . . There's the ethics rule that have a crime fraud exception to the attorney/client privilege.

. . . .

My understanding was to submit an affidavit to a federal court that lies is perjury, and that's a felony. So I figured, Well, that's okay, that's a crime; and I believe that my affidavit was tailored to addressing the perjury in the Dufault affidavit. [31]

But under questioning during his deposition, Hertzberg clarified what he meant by the "advantageous treatment" he was seeking to gain from Taunt:

> Q.   It'd be fair to say that the position Comerica was in regard to this estate would, under all circumstances, attempt to use its influence to get the maximum recovery?
>
> . . .
>
> A.   Emphatically, yes, that's our jobs.
>
> Q.   That's where you would perceive this, you were negotiating this with Mr. Taunt and Mr. Ball on basically an adversarial position?
>
> A.   Yes. It didn't have to be nasty and deeply personal the way the relationship between Mr. Halbert and I was.  To be adversarial, to be advocates, I can be colloquial with them, I can like them.

---

[31]   *See* Dep. Tr. of John D. Hertzberg ("Hertzberg Dep. Tr.") (Docket # 584-47) at 181, 183-84, 213-215.

. . . .

> Q. You said in response to one of Mr. Shreve's questions that in the course of negotiations with, . . . Taunt . . . over the [Comerica Fee A]greement, you were trying to gain advantage to [Comerica]; did I hear that testimony correctly?
>
> A. I think that's essentially it, yeah.
>
> Q. Okay, If I understand correctly, what you didn't want is for the trustee to dissipate [Comerica's] collateral pursuing claims that you considered to be frivolous; is that right?
>
> A. In part, yes.
>
> Q. Those were the claims against [Comerica] that Mr. Vercnocke kept making?
>
> A. In part, yes.[32]

In addition to violating criminal statutes by entering into the Comerica Fee Agreement and failing to disclose that agreement to the Court, Vining argues that Comerica violated, and induced Taunt to violate, Bankruptcy Code Section 362(a), and Comerica also violated 11 U.S.C. § 542 and "numerous provisions of the Michigan Rules of Professional Conduct."[33] Vining also argues that the record supports a finding that Comerica "engaged in other torts and wrongful misconduct, conspiracy, [and] conversion."[34] Vining argues that these violations can also satisfy the first element of the crime/fraud exception.

---

[32] *Id.* at 184, 217-18.

[33] Trustee's Reply at 11-12.

[34] Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 27.

15

Finally, Vining alleges that Comerica committed spoliation of evidence. Vining argues that Comerica's "wholesale spoliation of evidence" is another basis for the application of the crime/fraud exception to the attorney-client privilege in this adversary proceeding,[35]

### b. Comerica's response

Comerica argues that "[Vining] is unable to satisfy either element of the [crime/fraud] exception."[36] According to Comerica, Vining cannot satisfy the first element, because Vining has not made a "prima facie showing of crime or fraud by the Comerica Defendants."[37] Comerica notes that in the Court's opinion entitled "Amended Opinion Regarding 'Fraud on the Court' Issues," entered in the main bankruptcy case on April 16, 2007 (the "Fraud on the Court Opinion"), the Court held that "Comerica had not committed fraud on the court because the obligation to disclose the [Comerica Fee A]greement was Taunt's not Comerica's."[38] And according to Comerica, Vining cannot show that it committed any of the crimes he lists in his brief, because each of those crimes requires "'knowing' and 'intentional' fraud or falsity" and the record does not show that either Taunt or Comerica had any fraudulent intent.[39] Comerica relies, in part, on the deposition testimony of Hertzberg to show that Comerica had no fraudulent intent or intent to commit any crime, wrong, or other misconduct.

---

[35] Trustee's Reply at 12; Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 27-28.

[36] Suppl. Br. In Opp'n To Trustee's Reply to Comerica's Obj. To Mot. To Compel Comerica to Answer Interrogs. and Produc. Docs. (Docket # 396) at 6.

[37] *Id.*

[38] *Id.*

[39] *Id.*

16

Hertzberg testified in his deposition that there was nothing wrong with trying to influence Taunt not to dissipate Comerica's collateral, by pursuing what Hertzberg considered to be frivolous claims, including the claims that M.T.G.'s President, Kirk Vercnocke was making.[40] And Hertzberg testified that there was nothing wrong with Comerica trying to obtain the maximum recovery on its collateral. When asked whether he thought there was anything wrong with trying to influence Taunt not dissipate Comerica's collateral pursuing frivolous claims, Hertzberg testified: "No, I don't see anything wrong at all. As I said, I viewed that as my job, to make sure as best I could that that didn't happen."[41] Hertzberg also testified that in negotiating the Comerica Fee Agreement, he had no intention to commit any crime, to bribe Taunt, or to engage in any illegal or unethical conduct:

> Q.    When you were negotiating the terms of the surcharge agreement, was it your intention to commit a crime on behalf of your client, [Comerica]?
>
> A.    No, obviously it was not only not my intent to commit a crime. I had no belief or awareness that anything that I was doing was either legally or ethically incorrect, inappropriate, or even questionable.
>
> Q.    And you wouldn't -- I assume given your answer, that if you thought [Comerica] wanted to achieve some illegal, unethical, or inappropriate outcome, you wouldn't have wanted to be a participant in that; is that right?
>
> A.    That's correct, wouldn't have needed to. I'd already given notice, I was out of there.

---

[40]  Hertzberg Dep. Tr. (Docket # 584-47) at 217-18.

[41]  *Id.* at 218.

> Q.   I understand. You would have declined to participate in activity
>      you considered to be illegal and unethical in connection with
>      your dealings with Taunt or with M.T.G.?
>
> A.   Yes.
> . . . .
>
> Q.   Now, you didn't consider the [Comerica Fee A]greement to be
>      a bribe of a trustee, did you?
>
> A.   No.
>
> Q.   To this day you don't consider it to be a bribe of a trustee, do
>      you?
>
> A.   Absolutely not. I think it's an appropriate exercise in the
>      negotiating leverage available to a secured creditor.[42]

According to Comerica, Vining also cannot satisfy the second element of the crime/fraud

exception, because he cannot show that there is a relationship between a prima facie violation

and a privileged communication.[43]  According to Comerica, "[t]here is no evidence that Mr.

Hetzberg advised Comerica to do something illegal or fraudulent, or that he advised Comerica

not to do something illegal or fraudulent but Comerica did it anyway."[44]  Given the testimony of

Hertzberg, Comerica argues that the kind of allegations made by Vining are "offensive,"

---

[42]   Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at
51-52 (quoting pages 218-220 of the deposition testimony of Hertzberg).

[43]   *Id.*

[44]   Suppl. Br. In Opp'n to Trustee's Reply to Comerica's Obj. To Mot. To Compel Comerica to
Answer Interrogs. And Produc. Docs. (Docket # 396) at 6-7.

"outrageous" and his "claims are frivolous," and "there should never have been an argument made that there was a crime fraud exception applicable to these documents."[45]

### c. The Court's ruling

The Court agrees with Comerica that the crime/fraud exception does not apply. Vining has failed to show that either part of the two-part test articulated in *Collis* has been satisfied. Therefore, the crime/fraud exception does not apply to any of the documents Vining seeks.

### i. Vining has not made a a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege.

Vining has not satisfied the first part of the *Collis* test because he has not made a prima facie showing that a sufficiently serious crime or fraud occurred to defeat the privilege.

### a. Vining has not made a prima facie showing of fraud by any of the Comerica Defendants.

The issue of whether any of the Comerica Defendants had committed a fraud on the court was addressed by the Court's Fraud on the Court Opinion. In that opinion, the Court held that, on the record before it, it could not find that any of the Comerica Defendants committed a fraud on the court. The Court explained the reason for it holding as follows:

> [T]he fraud on the court was committed by Taunt and his counsel, not by Comerica or Comerica's counsel. Comerica itself was not an "officer of the court," the first element necessary for fraud on the court. Comerica's attorneys in the bankruptcy case were officers of the court. But even if one assumes that Comerica could be deemed to commit a fraud on the court because of fraudulent conduct by its attorneys, the present record does not permit the Court to find, based on the summary judgment motion filed by Halbert and Vining, that any of Comerica's attorneys committed a

---

[45] Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 52-53.

> fraud upon the court. The duty to disclose the Comerica Fee
> Agreement was a duty owed by Taunt, as the Chapter 7 trustee, and
> by his appointed counsel. The conflict of interest found by the
> district court was a conflict that Taunt had, as trustee, not a conflict
> of interest on the part of Comerica or its counsel.

*In re M.T.G., Inc.*, 366 B.R. 730, 756-57 (Bankr. E.D. Mich. 2007), *aff'd,* 400 B.R. 558 (E.D.

Mich. 2009). In its "Opinion Regarding Summary Judgment Motions," filed today, the Court

relied on and quoted the above language from its Fraud on the Court Opinion, and held that none

of the Comerica Defendants or their attorneys can be found liable, directly or indirectly, for fraud

on the court, for the following reasons:

> **First**, neither Comerica nor the other Comerica Defendants (who
> were bank officers, namely, Ronald Marcinelli; Steve Lyons; Paul
> Dufault; and Michael Collins) can be found to have committed
> fraud on the Court *directly*. Any *direct* theory of fraud on the Court
> against the Comerica Defendants fails because fraud on the court
> can only be committed by an officer of the court, which in this case
> means the Trustee Taunt and one or more of the attorneys in this
> case. None of the Comerica Defendants was such an officer of the
> Court. . . .
>
> None of Comerica's attorneys are Defendants in this case. And
> even if they were Defendants, Comerica's attorneys did not commit
> any acts or omissions that would satisfy the required elements for
> finding fraud on the court. Fraud on the court is limited, among
> other ways, to conduct by "an officer of the court" that is directed
> to the court itself, and "[t]hat is a positive averment or is
> concealment when one is under a duty to disclose." The Comerica
> attorneys were not in the same position as Taunt and his attorneys;
> it was Taunt and his attorneys, not Comerica's attorneys, who
> obtained the various orders at issue from this Court without
> complying with their duty to disclose the Comerica Fee
> Agreement. And the Court reiterates its previous point, that "[t]he
> duty to disclose the Comerica Fee Agreement was a duty owed by
> Taunt, as the Chapter 7 Trustee, and by his appointed counsel. The
> conflict of interest found by the district court was a conflict that
> Taunt had, as Trustee, not a conflict of interest on the part of
> Comerica or its counsel." The district court agreed with these

points in its 2009 opinion affirming this Court's Fraud on the Court Opinion.

**Second**, neither Comerica nor the other Comerica Defendants can be found liable *indirectly* for fraud on the court. Vining's *indirect* liability theories — aiding and abetting and conspiracy — fail as a matter of law. Even if Vining's theory that the Comerica Defendants aided  and abetted Taunt's fraud on the court could be viewed as a valid legal theory, it was not pled in Vining's complaint, as the Comerica Defendants point out. And this Court denied Vining leave to amend his complaint to add an aiding and abetting claim. The Court stands by that decision.

The Court also agrees with the Comerica Defendants that they cannot be liable for the fraud on the court by Taunt and his attorneys based on a conspiracy theory, for the following reason. Because the Comerica Defendants were not legally capable of directly committing the fraud on the court in this case (because they were not officers of the court), they cannot be held liable for fraud on the court based on a conspiracy theory, as a matter of law. The Court agrees  with this proposition, which is supported by the following cases cited by the Comerica Defendants. *CNH Capital America LLC v. Hunt Tractor*, Inc., 568 F. App'x. 461, 472-73 (6th Cir. 2014) (holding that a party not directly liable for a fraudulent transfer under Kentucky law could not be liable indirectly, for conspiracy to commit fraudulent transfer, because a party "cannot be liable for conspiring to perform a tort he could not commit as a matter of law"); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal.1994) ("By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, *i.e.*, that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty.").

For these reasons, the Comerica Defendants are not liable, either directly on indirectly, for fraud on the court.[46]

**b.   Vining has not made a prima facie showing of a sufficiently serious crime committed by any of the Comerica Defendants.**

---

[46]   Part VII.A.1.e.2 of the Court's Op. Regarding Summ. J. Mots., filed today (footnotes omitted) (bold and italics in original).

21

In his brief, Vining lists three federal criminal statutes and one Michigan criminal statute that the Comerica Defendants and their attorneys allegedly violated. Vining also alleged that Dufault committed perjury by submitting a false affidavit, and that Comerica converted estate funds when it transferred money out of the DIP Account into another account at Comerica. Vining has failed to make a prima facie showing that the Comerica Defendants or their counsel committed any crimes.

In his brief, Vining does not discuss the elements of any of the crimes he alleges, nor does he state which facts support each element of each particular crime. Vining's Reply Brief only contains bare legal conclusions that the Comerica Defendants and their attorneys committed a laundry list of crimes. Given the lack of development about these crimes in the brief, the Court concludes that Vining has waived his argument that the Comerica Defendants and their attorneys have committed serious crimes. In *Seoane-Vazquez v. Ohio State University*, 577 F. App'x 418, 434 (6th Cir. 2014), the court explained:

> We have cautioned that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (internal quotations and citation omitted); *see also United States v. Robinson*, 390 F.3d 853, 885–86 (6th Cir.2004); *United States v. Reed*, 167 F.3d 984, 993 (6th Cir. 1999) (invoking this rule to deem an issue forfeited).

But even if the Vining had not waived his argument regarding alleged crimes, the Court still would find that he has not established that a prudent person would have a reasonable basis to suspect that Comerica or its counsel committed any of the alleged crimes. This is so, because, as

22

all the parties agree, an element of each of the crimes listed in Vining's Reply Brief is fraudulent

intent, and the Court has never found any such fraudulent intent on the part of any of the

Comerica Defendants or their counsel, and cannot now find such intent, based on the record

before the Court.

### 1. The Comerica Fee Agreement is not evidence that a crime was committed.

As the Court held in its Fraud on the Court Opinion, the Comerica Fee Agreement

exceeded the scope of a mere surcharge agreement, and created a disqualifying conflict of

interest on the part of Taunt, the former Chapter 7 Trustee. But the Court cannot find, on the

present record, that Comerica had any fraudulent intent in entering into that agreement. Nor has

the Court ever found that Taunt or his attorneys had fraudulent intent, or the intent to deceive the

Court, in entering into or in failing to fully disclose the terms of the Comerica Fee Agreement.

On the present record, the Court cannot make such a finding now.

This Court described and discussed the Comerica Fee Agreement in detail,[47] in its Fraud

on the Court Opinion:

> The Comerica Fee Agreement provided that Taunt would liquidate
> the Debtor's estate assets (all of which Comerica claimed as its
> collateral,) with certain exceptions. Operating under an initial
> budget totaling $25,000.00, trustee's counsel was to bill Comerica
> for legal services each month. Fees were to be billed on an
> hourly-rate basis, at the Taunt firm's usual hourly rates, and
> "compensation [was] not contingent upon [the] actual or perceived
> degree of success." Comerica was to pay the monthly invoices
> through a special "cash collateral account" maintained by
> Comerica, "from which the Trustee [was permitted to] withdraw
> payments for all surchargeable items." The agreement further
> required that all net proceeds from Taunt's liquidation of the assets

---

[47] A copy of the Comerica Fee Agreement can be found at Docket # 584-22.

23

would be paid to Comerica. It further stated that "[a]ny unresolved disputes concerning any invoice [of trustee's counsel] shall be submitted to the Court for resolution pursuant to motion under 11 [U.S.C. §] 506(c)."

The agreement described the "[s]ervices for which Comerica shall be subject to surcharge" as including "the preservation and liquidation of all of the Debtor's machinery and equipment, the resolution of the Becker situation, and other lesser matters as detailed in the budget." The agreement stated that "[i]t is our understanding that the Bank does not wish the Trustee to pursue the recovery of escrowed funds, collection of accounts receivable, or the "Injectronics" litigation. Surchargeable services would include all services of the type described herein rendered on or after February 8, 1996."

With respect to claims the estate might have against Comerica, including possible lender-liability claims that Halbert and the Debtor believe existed, the Comerica Fee Agreement stated:

> Finally, it must be clearly understood that nothing in this proposal constitutes a waiver of any claims the estate might have against Comerica Bank. It is the Trustee's intention to investigate these claims fully, and we anticipate Comerica's full cooperation in that regard.

The Comerica Fee Agreement and its budget did not indicate that Comerica would pay for the [T]rustee's work in investigating or pursuing any claims against Comerica.

With respect to Comerica's secured claim, the agreement stated that Comerica would pay Taunt to evaluate the claim. It stated:

> Further, in order to fix the value of Comerica Bank's secured claim, we shall cause the Debtor's objection to that claim to be brought on for hearing as soon as possible.

The budget attached to the agreement allocated $2,000.00 of the $25,000.00 budget to the following:

Determination of Comerica Bank Secured Claim

24

> Obtain hearing date from Court and serve notice of same; **review/analyze Comerica Bank security documents and loan history; prepare written position on same for filing with Court**; appear at hearing; review/approve proposed order.

> Finally, the budget further stated that it "[a]ssumes all uncontested matters. In the event any matter becomes contested, the budget estimates do not apply."[48]

As quoted earlier in this Opinion, and discussed at length in the Court's summary judgment opinion filed today, Hertzberg's deposition testimony was that he did not have any fraudulent intent in negotiating the terms of the Comerica Fee Agreement on behalf of Comerica. He testified that he had no intention to commit any crime, to bribe Taunt, or to engage in any illegal or unethical conduct, and did not believe that he was doing anything wrongful whatsoever. Rather, Hertzberg testified that his main objectives in negotiating and entering into the Comerica Fee Agreement were to obtain the maximum recovery for Comerica on its collateral, and to make sure that the Chapter 7 Trustee did not unnecessarily dissipate his client's collateral by pursuing Vining's frivolous claims against Comerica.

Hertzberg further testified that he had reviewed all of Comerica's documents regarding its loans to MTG and all of the documents regarding Comerica's all-asset security interest, and was confident that Vining's claims against Comerica were frivolous and had no value. Hertzberg testified that he was also confident that Taunt would come to the same conclusion when he investigated Vining's claims.

---

[48] *M.T.G.*, 366 B.R. at 734-35 (footnotes omitted) (bold in original).

Hertzberg further testified that the negotiations over the terms of the Comerica Fee Agreement were adversarial with both sides representing their respective interests. And the terms of the Comerica Fee Agreement reflected the adversarial nature of those negotiations. The Comerica Fee Agreement explicitly left Taunt free to pursue lender liability claims or other claims against Comerica, if, after investigation, he thought they had merit, but Comerica was not going to pay to have Taunt investigate those claims.

Under the Comerica Fee Agreement, Taunt actually retained every incentive to pursue a lender liability type claim against Comerica, *if* he thought such a claim had merit. That is, in addition to performing the services covered by the Comerica Fee Agreement, Taunt also could have pursued a claim against Comerica. And if Taunt was successful on the multi-million dollar lender liability claim that Vining alleges the estate had against Comerica, Taunt and his attorneys could have earned very large fees from that work. This would have been in addition to fees paid by Comerica under the Comerica Fee Agreement.

The Comerica Fee Agreement required Comerica to pay for services Taunt performed in liquidating its collateral and for other services, and left Taunt free to take whatever actions he thought appropriate.

A prudent person could not reasonably construe the terms of the Comerica Fee Agreement as tending to show that Comerica intended to commit bribery or fix fees.

Paragraphs 5 and 7 of Dufault's affidavit, which, in essence, state that Comerica did not enter into or use the Comerica Fee Agreement with the intent to improperly influence Taunt in his administration of the bankruptcy estate, or to gain an unfair advantage for Comerica, are consistent with Hertzberg's testimony, and appear to be true statements of Dufault's beliefs.

26

This is especially so because the agreement stated that Taunt would investigate all of the estate's claims, including any claims the estate might have against Comerica, and left Taunt free to pursue any such claims. In any event, Vining has not demonstrated that Dufault lied in his affidavit.

The Court further notes that in its "Opinion Regarding the Summary Judgment Motions," filed today, the Court held, in relevant part, (1) that none of Vining's claims against the Comerica Defendants have any merit or value; (2) that in administering the bankruptcy estate, Taunt did no damage to the bankruptcy estate; and (3) that Taunt's settlement with Comerica, which required Comerica to pay the estate $10,000 for the release of worthless claims against Comerica, actually benefitted the estate. The Court also has held that Taunt's disposition of other claims the estate allegedly had was reasonable. For example, the Court agreed with Taunt that the estate had no valid claim against the Becker Group based on its termination of the Asset Purchase Agreement.

As the Court has held in its summary judgment opinion filed today, the Court also is unable to conclude, on the present record, whether Taunt had any fraudulent intent or any intent to deceive the Court in failing to fully disclose the Comerica Fee Agreement. A trial would be necessary for the Court to make a finding on that issue. But the point for purposes of this discussion of the crime/fraud exception is that there is evidence in the record tending to show that Taunt and his attorneys did ***not*** have such fraudulent intent. Such evidence prevents the Court from finding, on the present record, that Taunt or his attorneys had any such fraudulent intent.

27

For example, in the Court's Fraud on the Court Opinion, the Court noted that Taunt made several limited, albeit insufficient, disclosures of the Comerica Fee Agreement in several Court filings. These limited disclosures tend to show that Taunt did not intend to deceive the Court.

The first such filing was Taunt's limited objection to the motion by Comerica to lift the automatic stay ("Taunt's Lift-Stay Objection").[49] In its Fraud on the Court Opinion, the Court discussed the language in Taunt's Lift-Stay Objection which referred to the Comerica Fee Agreement, and the consent order settling Taunt's Lift-Stay Objection and an objection by the Debtor to Comerica's lift-stay motion:

> [Taunt's Lift-Stay Objection], filed March 28, 1996, was styled as a "limited objection." In this document, [Taunt] objected to lifting the stay with respect to the estate's Chapter 5 causes of action. But [Taunt] consented to stay relief permitting Comerica to liquidate "specifically defined collateral," including . . . general intangibles other than claims the estate may have against Comerica or against the Becker Group; and other personal property of the Debtor, "except for all of the Debtor's machinery, equipment, and inventory, **which pursuant to the agreement between [Taunt] and Comerica Bank are being liquidated by the Trustee."**
>
> While the language just quoted from the trustee's objection can be read as disclosing and referring to some sort of surcharge agreement between the trustee and Comerica, the trustee's objection did not reveal any further details. The objections of the Debtor and Taunt to the stay relief motion were settled and a consent order granting relief from stay was entered on April 30, 1996 (the "Comerica Relief from Stay Order"). That order was "approved for entry" by counsel for Comerica, the Debtor (through Halbert), and Taunt, and granted Comerica immediate stay relief with respect to the property for which Taunt consented to lifting the stay in his limited objection. The Order, in listing the categories of property covered by the stay relief, included: "*[o]ther personal property of the Debtor, except for the Debtor's machinery*

---

[49]  Docket # 392 in Case No. 95-48268.

*equipment, and inventory, which pursuant to the agreement*
*between the Trustee and Comerica Bank are being liquidated by*
*the Trustee.*" The Order did not reveal any other information about
the "agreement between the Trustee and Comerica Bank."[50]

In the Fraud on the Court Opinion, the Court also discussed a second limited disclosure of

the Comerica Fee Agreement by Taunt:

> Taunt referred to a surcharge agreement with Comerica in a motion
> filed on April 15, 1996, in which he sought authority to
> compromise the estate's claims against Becker Group, Inc. The
> application sought authority to compromise all disputes between
> the estate and Becker Group, Inc., including claims by the Debtor
> and Becker Group against each other under an agreement by which
> Debtor was to produce certain prototype molds and parts for
> Becker Group, and including "any claims arising out of the
> termination by Becker Group of a certain Asset Purchase
> Agreement between the Debtor and Becker Group." As to the latter
> claims, Taunt stated that he "ha[d] investigated the . . . transaction,
> and has determined that Becker Group's termination of the Asset
> Purchase Agreement was made in accordance with the terms of
> that agreement, and does not give rise to any claim by the estate
> against the [B]ecker Group." *The trustee's settlement motion*
> *disclosed to the Court that there was some sort of surcharge*
> *agreement between the trustee and Comerica, which pertained at*
> *least to the trustee's liquidation of the claims against Becker*
> *Group:*
>
> > The Trustee has determined that the proceeds of this
> > proposed settlement agreement are subject to the
> > security interest of Comerica Bank, and proposes
> > that he be authorized to disburse said proceeds to
> > Comerica Bank upon their receipt, after deduction
> > **for any outstanding expenses incurred by the**
> > **Trustee in connection with the resolution of**
> > **claims between the estate and Becker Group,**
> > **including attorney fees, subject to surcharge**
> > **pursuant to 11 [U.S.C. §] 506(c) and the separate**
> > **agreement of the Trustee and Comerica Bank.**

---

[50] *M.T.G.*, 366 B.R. at 735-36 (footnotes omitted) (italics added) (bold in original).

The settlement motion disclosed no further details regarding "the separate agreement" between Taunt and Comerica, and did not disclose whether that "separate agreement" relating to surcharge applied to anything other than the trustee's liquidation of the estate's claims against the Becker Group.

No one objected to the trustee's settlement motion, and on May 28, 1996, the Court entered an Order granting the motion. The Order, which was signed by Judge Graves, contained language identical to language contained in the "application" quoted above, referring to "the separate agreement" between the trustee and Comerica.[51]

In the Fraud on the Court Opinion, the Court also discussed a third "limited, vague disclosure of a surcharge agreement made in a December 18, 1996 fee application of Taunt's counsel:"

Taunt's law firm filed its first interim fee application on December 18, 1996. This was several months after entry of the last of the orders claimed to have been obtained by Taunt's fraud on the court (the last such order being the August 29, 1996 Comerica Settlement Order.) The fee application was filed jointly by Charles J. Taunt & Associates (which had merged into Plunkett & Cooney, P.C.) and Plunkett & Cooney, P.C. The application makes a limited, and vague, disclosure of a surcharge agreement between the trustee and Comerica. In paragraph 13 of the fee application, [Taunt's] counsel stated:

Applicant has received no prior payments and none have been promised for services rendered or to be rendered in any capacity whatsoever in connection with this case and no agreement or understanding exists between the Applicant and any other persons for the sharing of compensation received or to be received for services rendered in or in connection with this case, except normal compensation to employees of Applicant's firm, **except that the Trustee has entered into a surcharge agreement with Comerica Bank for compensation and**

---

[51] *Id.* at 736-37 (footnotes omitted) (italics added)(bold in original).

> **reimbursement of expenses for services rendered in connection with the liquidation of Comerica's collateral.**[52]

The fact that Taunt made these limited disclosures of the Comerica Fee Agreement in these multiple Court filings tends to show that Taunt did not intend to hide Comerica Fee Agreement from the Court.

But perhaps even more telling about Taunt's intent is the fact that the Comerica Fee Agreement stated that "[a]ny unresolved disputes concerning any invoice [of trustee's counsel] shall be submitted to the Court for resolution pursuant to motion under 11 [U.S.C. §] 506(c)."[53] This provision, contemplating that Taunt and Comerica would bring any disputes under the Comerica Fee Agreement before the Court for resolution, further tends to show that Taunt did not intend to hide the Comerica Fee Agreement from the Court. And this also tends to show that Comerica did not intend to hide the agreement from the Court.

For all of the reasons just stated, and for the reasons stated in the Court's summary judgment opinion filed today, the Court is unable to conclude that either Taunt or Comerica intended to defraud or deceive anyone in Taunt's entering into the Comerica Fee Agreement or in failing to disclose the Comerica Fee Agreement to the Court. Nor has Vining shown that "a prudent person would have a reasonable basis to suspect the perpetration of a crime or fraud" by any of the Comerica Defendants. *Collis*, 128 F.3d at 321. The Comerica Fee Agreement cannot

---

[52] *Id.* at 739 (footnotes omitted) (bold in original).

[53] Docket # 584-22 at 3.

therefore serve as a basis to establish the first part of the test for the crime/fraud exception to the

attorney-client privilege.[54]

### 2. Vining has not made a prima facie showing that Comerica committed the crime of conversion.

In Count IX of Vining's complaint, he alleges that Taunt and his counsel and the

Comerica Defendants committed common law and statutory conversion. Vining alleges

that the Taunt Defendants, Plunkett & Cooney, and the Comerica Defendants and/or agents of

these Defendants converted: "(A) The Lender Liability Claims; (B) The Becker [Group] Claims;

(C) The May chapter 5 Claim; (D) the Injectronics Claim; and (E) Certain accounts receivable,

equipment, general intangibles, real property and other property (the 'Other Assets')," by

unlawfully taking control of this property and the proceeds of this property for Comerica's

benefit.[55]

In Vining's Reply Brief, Vining's only statement or legal argument regarding conversion

is the following: "Pursuant to the illegal [Comerica F]ee [A]greement, Comerica with Taunt's

complicity converted the Debtor's assets including the asset sale and DIP [A]ccount

---

[54] Vining also alleged in his Reply Brief that "Comerica's counsel violated numerous provisions of the Michigan Rules of Professional Conduct and various Bankruptcy Code provisions, and that "Comerica was involved in . . . other improper conduct" that could be a basis for application of the crime/fraud exception to the attorney-client privilege. (Trustee's Reply at 11.) The Court notes that the test for application of the crime/fraud exception in the Sixth Circuit, as set forth in *Collis*, requires that the moving party make a prima facie showing of a "sufficiently serious crime" or fraud. *See Collis*, 128 F.3d at 321. Neither the violation of Michigan Rules of Professional Conduct, nor the violation of a Bankruptcy Code provision, nor the commission of a tort other than fraud satisfy this test. It is therefore unnecessary for the Court to determine whether the Comerica Defendants or Comerica's counsel violated such a professional conduct rule, a Bankruptcy Code provision, or committed any tort other than fraud.

[55] Compl. at ¶¶ 276, 279.

32

proceeds[.]"[56] This is a bare legal conclusion unsupported by any attempt to state the elements of whatever conversion claim Vining is alleging, and fails to argue how the facts in the case support each of the elements of such a claim. As such, Vining has waived this argument. But even if Vining had not waived such argument, the Court would find it to be without merit.

Under Michigan law, there are three types of conversion: (1) common law conversion;[57] (2) statutory conversion;[58] and (3) criminal conversion.[59] The first two types of conversion are torts that do not satisfy the "sufficiently serious crime or fraud" requirement of the first part of the *Collis* test. As noted above, Vining only pled claims of common law conversion and statutory conversion in his complaint. But even if common law and statutory conversion could have satisfied the first part of the *Collis* test for the crime/fraud exception to apply, that would not help Vining. This is because the Court has held in its summary judgment opinion, filed

---

[56] Vining's Reply Br. (Docket # 343) at 11.

[57] "Under the common law, conversion is "'any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'"" *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015).

[58] *See* Mich. Comp. Laws § 600.2919a(1)(a).

[59] *See, e.g.,* Mich. Comp. Laws § 750.362 (crime of larceny by conversion). Vining did not cite this statute in either his complaint or in his Reply Brief. The elements of larceny by conversion are:

> "1) the property at issue must have some value, (2) the property belonged to someone other than the defendant, (3) someone delivered the property to the defendant, irrespective of whether that delivery was by legal or illegal means, (4) the defendant embezzled, converted to his own use, or hid the property with the intent to embezzle or fraudulently use it, and (5) at the time the property was embezzled, converted, or hidden, the defendant intended to defraud or cheat the owner permanently of that property. [Quotation marks and citation omitted.]"

*People v. Spencer*, 909 N.W.2d 17, 21 (Mich. Ct. App. 2017) (quoting *People v. Mason*, 634 N.W.2d 382 (Mich. Ct. App. 2001)).

33

today, that Vining's claims for common law and statutory conversion are without merit.[60]  The

same conclusion applies to any claim of criminal conversion, for the same reasons discussed in

the summary judgment opinion.

### 3. Vining has not made a prima facie showing that Comerica committed spoliation.

Vining also alleges that Comerica committed spoliation of evidence and that this justifies

application of the crime/fraud exception to the attorney-client privilege.  But in the Court's

"Opinion and Order Denying the Plaintiff's Contempt Motion (Docket # 505)," filed today, the

Court has held that Vining had not established that any of the Comerica Defendants committed

spoliation of evidence.

### ii. Vining has not established any relationship between any communication at issue and the alleged prima facie violation.

While Vining cites to and quotes the two-part test in *Collis* in his Reply Brief, he does not

discuss or apply the second part of the two-part test — namely, that "the [party seeking

application of the exception] must establish some relationship between the communication at

issue and the prima facie violation."  Indeed, as noted in Part II.A.3.a of this Opinion, above,

Vining must show that "there is probable cause to believe that the communication between"

Comerica and its attorney(s) "was in furtherance of the fraud."  *In-Store Advert. Sec. Litig.,* 163

F.R.D. at 459.

After listing all of the alleged misconduct of Comerica, which he argues satisfies the first

part of the test (serious crime or fraud), Vining ignored the second part of the *Collis* test, and

jumped right to the legal conclusion that "[b]ecause of its unlawful conduct, Comerica must

---

[60]  *See* Part VII.A.9.d of Op. Re Summ. J. Mots.

produce all documents relating to [Vining's] postpetition claims."[61] Vining's failure to discuss or apply one of the required elements of the crime/fraud exception means that he waived any argument that this element is met.[62]

But even had Vining not waived such an argument, the Court would conclude that the second *Collis* requirement is not met. There is no evidence in the record showing that Comerica sought or obtained the assistance of its counsel in furtherance of some criminal or fraudulent activity. On balance, Hertzberg's deposition testimony, quoted and discussed in Parts II.A.3.a, II.A.3.b, and and II.A.3.c.i.b.1 of this Opinion, tends to negate this *Collis* element. Comerica's main objectives that were pursued by its counsel were to maximize its recovery on its collateral, and to make sure that Taunt did not dissipate its collateral in pursuing what it viewed as frivolous claims. According to Hertzberg, that was his "job." There are legitimate objectives, and there is nothing criminal, fraudulent, unethical, or wrongful about them. Vining has failed to show that any communication between Comerica and any of its attorney was "in furtherance of" any alleged crime or fraud.

In summary, Vining has failed to satisfy either part of the *Collis* test. Therefore, the crime/fraud exception to the attorney-client privilge does not apply.

### 4. Vining's argument that Comerica's production in discovery of the Collins-Main Memo waived the privilege

---

[61] Trustee's Reply at 12.

[62] In one of the hearings held after Vining filed his Reply Brief, the Court asked Vining's attorney about this second part of the *Collis* test. Counsel was not able to cite any particular document showing a communication in furtherance of any crime or fraud by Comerica or its counsel. Rather, Vining's counsel suggested that *the Court* would have to look for such documents by doing an *in camera* review of all the documents in Comerica's privilege logs — *i.e.*, over 1,000 documents. (*See* Tr. of Hr'g on Mot. To Compel Plunkett, Cooney and Comerica Defs. Disc. (Docket # 436) at 37-39).

Beginning in his reply brief in support of the Comerica Bank Motion,[63] Vining argued that Comerica waived the attorney-client privilege, by producing in discovery a detailed memorandum dated August 16, 1995 written by Defendant Michael Collins, a Comerica Vice President, to Michael Main, who was then in-house counsel for Comerica (the "Collins-Main Memo").[64] Vining argued that this document was privileged, until Comerica produced it in discovery without objection, and that by producing it, Comerica waived the attorney-client privilege as to all of the Collins-Main Memo's subject matters.

Comerica argues that the Collins-Main Memo did not contain any privileged information, so that Comerica did not waive any privilege by producing it. According to Comerica, the Collins-Main Memo was simply a recital of the events that occurred between MTG and Comerica up to the time of the memo's date; and it was done merely to record Mr. Collins's memory of the events while his memory was still fresh; and it was not written or given to Mr. Main for the purpose of obtaining any legal advice. Comerica argues that the Collins-Main Memo only states facts, and that such facts were not protected by the attorney-client privilege.

Ultimately, in one of the hearings held on the Discovery Motions, Vining's attorney conceded that (1) this document was not privileged; and (2) therefore, Comerica's production of this document in discovery did not waive any privilege.[65] But in a later hearing on the Discovery

---

[63] Docket # 343.

[64] A copy of the Collins-Main Memo appears in several places in the record, including Docket 343-1. It is discussed and cited in the Court's opinion entitled "Opinion Regarding Summary Judgment Motions," filed today. *See, e.g.*, Parts IV.A.9.c; IV.A.10; IV.A.14 of the Court's Op. Regarding Summ. J. Mots.

[65] *See* Tr. of Hr'g on Discovery Mots. (Docket # 417) at 105-06.

36

Motions, that same attorney in effect tried to take back his earlier concession, and to argue that the Collins-Main Memo *was* privileged, until Comerica produced it in discovery.[66]  In that later hearing, Vining's attorney argued that the "apparent purpose" of Collins's creation of the Collins-Main Memo was "to obtain legal advice concerning the claims against Comerica, its exposure and strategy going forward."[67]

But Vining's attorney cited no real evidence for that assertion, other than possibly the content of the Collins-Main Memo itself.  And as Comerica's counsel pointed out, when Collins was asked why he created this memo, Collins testified in his deposition that "I don't recall specifically what the purpose was, but I expect it was to recap a troubled loan situation."[68]

The Court agrees with Comerica's arguments.  Having reviewed the Collins-Main Memo, and the testimony of Collins, the Court finds that Collins did not generate the memo in order to obtain legal advice, but rather, he did so merely to record his detailed memory of facts and events while his memory was still fresh.  The Court concludes that neither the Collins-Main Memo nor any of its contents were covered by the attorney-client privilege.  *See, e.g., Sedco Int'l S.A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982), *cert. denied*, 459 U.S. 1017 (1982) (citation omitted) (explaining that without more, "the [attorney-client] privilege does not protect facts communicated to an attorney").  Comerica therefore did not waive the attorney-client privilege in any way by producing the Collins-Main Memo in discovery.

---

[66]  *See* Tr. of Hr'g on Discovery Mots. (Docket # 437) at 13-14.

[67]  *Id.* at 14.

[68]  *See id.* at 15-16; *see also* Dep. Tr. of Michael Collins (Docket # 584-38) at 13.

## 5. Vining's argument that Comerica waived the privilege by placing in issue the advice of counsel, and Comerica's good faith

Vining argues that the part of the Defendant Paul Dufault's affidavit, quoted in Part II.A.2 of this Opinion, and certain deposition testimony by Defendant Stephen Lyons, waived Comerica's attorney-client privilege. Vining argues that the Dufault affidavit and the Lyons deposition testimony had the effect of Comerica placing in issue in this case "Comerica's lawful conduct, good faith, and lack of fraudulent intent," and that this waived Comerica's attorney-client privilege.[69]

But Vining correctly concedes that "[m]ere denial of wrongful intent does not waive the privilege."[70] This is essentially what the Dufault affidavit and the Lyons deposition testimony cited by Vining are, so they did not waive Comerica's attorney-client privilege.

Vining also argues that certain deposition testimony by Lyons placed the "advice of counsel" in issue, and thereby waived Comerica's attorney-client privilege. The Court disagrees, for the reasons argued by Comerica in its brief.[71]

## 6. Vining's argument that the deposition testimony by John Hertzberg waived the privilege

After Vining obtained and filed an affidavit from Hertzberg, who at the time was a former attorney for Comerica, the parties deposed Hertzberg. Vining argues that certain deposition testimony given by Hertzberg waived Comerica's attorney-client privilege. Comerica disputes

---

[69] Trustee's Reply at 4, 6-7.

[70] *Id.* at 4.

[71] *See* Suppl. Br. In Opp'n to Trustee's Reply to Comerica's Obj. To Mot. To Compel Comerica to Answer Interrogs. and Produc. Docs. (Docket # 396) at 5-6.

Vining's argument that any waiver occurred. The Court agrees with Comerica that no waiver of the privilege occurred because of the deposition testimony given by Hertzberg.

Comerica is correct that the attorney-client privilege belongs to Comerica, not to any former attorney for Comerica like Hertzberg. As such, the privilege can be waived only by a representative of Comerica with authority to do so. *See, e.g., Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). And the Court finds that at the time of his deposition, Hertzberg had no express or implied authority to waive Comerica's attorney-client privilege. The Court already held this, at least implicitly, with respect to Hertzberg's affidavit, after Vining filed that affidavit in the main bankruptcy case. In its order filed October 14, 2004, the Court held that it would disregard certain portions of the Hertzberg affidavit, because they were "protected by Comerica Bank's attorney-client privilege."[72]

The same ruling applies to Hertzberg's deposition testimony, if and to the extent Hertzberg gave any deposition testimony that reveals information protected by Comerica's attorney-client privilege. Vining has not shown that Comerica ever authorized Hertzberg to waive Comerica's attorney-client privilege in any respect. To the contrary, at the beginning of Hertzberg's deposition, Comerica's counsel stated that Hertzberg was ***not*** authorized to waive Comerica's attorney-client privilege:

> MR. BROWER: Before we get started, let me just make one point so everybody's aware of the situation here. Comerica Bank has not waived and does not authorize Mr. Hertzberg to waive its attorney/client privilege with respect to any of Mr. Hertzberg's representation of the bank. So it would do everyone well if the

---

[72] *See* "Order Sustaining in Part and Overruling in Part Objections of Comerica Bank and Charles J. Taunt to the Affidavit of John D. Hertzberg" (Docket # 1344 in Case No. 95-48268) at 4-5.

39

examiners would respect Mr. Hertzberg's obligation to keep the privilege, and to not ask him questions that attempt to invade it.

. . .

[Addressing Hertzberg:] [G]enerally speaking, we shouldn't discuss conversations you had with people at the bank or advice that you gave them or requests that they asked you for advice. So those are kind of the general parameters -- I know [counsel for Taunt] assures me that he's not going to attempt to invade it, but [Vining] submitted an affidavit in the case, and part of that affidavit has already been ruled to have violated Comerica's privilege and Judge Tucker said it couldn't be used in prior proceedings. So I just want to make sure that everybody's aware that despite that erroneous disclosure of Comerica's privilege, I'm not going to allow to permit it again, and I'll suspend this deposition and ask for a protective order if anybody tries to invade that privilege.[73]

After making these statements at the beginning of Hertzberg's deposition, there was nothing that was done or not done by Comerica's counsel during the deposition that waived Comerica's attorney-client privilege, or that authorized Hertzberg to do so.

For these reasons, the Court must reject Vining's argument that Hertzberg's testimony waived Comerica's attorney-client privilege.

### 7. Vining's argument about alleged spoliation of evidence

To the extent Vining argues that Comerica waived its attorney-client privilege because it is guilty of spoliation of evidence, the Court rejects that argument. Vining cites no authority for the propostion that spoliation of evidence can be a basis for invading a party's attorney-client privilege. But even if it could be, the Court has discussed and rejected Vining's spoliation claim

---

[73] Hertzberg Dep. Tr. (Docket # 584-47) at 6-7.

against Comerica, in a separate opinion filed today,[74] and as a result, the Court cannot find spoliation to be a basis for invading Comerica's attorney-client privilege in this case.

### 8. The documents reviewed *in camera* by the Court

On three occasions, the Court ordered Comerica to submit certain documents to the Court for an *in camera* review, in order for the Court to determine the extent to which the documents are protected by the attorney-client privilege, as Comerica contends. These documents and the Court's *in camera* review were discussed during three of the hearings held on the Comerica Bank Motion,[75] and in three corresponding orders entered after those hearings.[76]

Comerica timely submitted the documents for the *in camera* review, and the Court reviewed them. In general terms, the documents may be described as falling into four categories: (1) emails between Comerica's attorney in this adversary proceeding ("Comerica's attorney"), on the one hand, and several other attorneys who may have represented Comerica in other bankruptcy cases during the time period 1992 to 2000, on the other hand (the "Attorney Emails"); (2) responses to a written questionnaire sent by Comerica's attorney, and given by several current and former employees of Comerica's Special Assets Group (the "Questionnaires"); (3) survey responses collected and written down by legal assistants at the law firm of Comerica's attorney, under instructions by Comerica's attorney, that were given over the telephone by several other attorneys who may have represented Comerica in other bankruptcy

---

[74] *See* "Opinion and Order Denying Plaintiff's Contempt Motion (Docket # 505)" at Part IV.F.

[75] *See* the following hearing transcripts: Docket # 463 at 44-45, 52-54, 63-66, 68; Docket # 474 at 56, 57-63; Docket # 484 at 39-40.

[76] The orders are the Sixth, Seventh, and Eighth Orders regarding Vining's Discovery Motions. (Docket # 461 at ¶ 5; Docket # 472 at ¶ 6; Docket # 480 at ¶ 3).

cases during the time period 1992 to 2000 (the "Attorney Telephone Responses"); and (4) a list of attorneys who were contacted, or with whom contact was attempted unsuccessfully, by Comerica's attorney or paralegals acting under the direction of Comerica's attorney (the "Attorney List").

The Questionnaires were designed to find out whether there were any bankruptcy cases, other than the *MTG* case, during the time period 1992 through 2000, in which either or both of the following occurred: (1) Comerica entered into a surcharge agreement with a bankruptcy trustee in which Comerica agreed to pay the fees of the trustee or the trustee's attorney to review and determine Comerica's claim against the bankruptcy estate; and/or (2) Comerica transferred money from a debtor-in-possession bank account without a court order authorizing such transfer.

The Attorney Emails, the Attorney Telephone Responses, and the Attorney List all concerned the same subject matters as the Questionnaires.

Having reviewed all the documents that Comerica submitted for *in camera* review, and having considered the arguments of the parties, the Court concludes that all of the documents are protected by Comerica's attorney-client privilege. As a result, the Court will not order Comerica to produce any of these documents.

There is an additional reason why the Court will not order Comerica to produce these documents. It is now clear that the subject matter of these documents, and Vining's purpose in seeking them, does not matter. As the Court's two other opinions filed today make clear, it does not matter whether there were any bankruptcy cases other than the *MTG* case during the time period 1992 through 2000, when either or both of the following occurred: (1) Comerica entered into a surcharge agreement with a bankruptcy trustee in which Comerica agreed to pay the fees of

42

the trustee or the trustee's attorney to review and determine Comerica's claim against the bankruptcy estate; and/or (2) Comerica transferred money from a debtor-in-possession bank account without a court order authorizing such transfer. The Court's summary judgment decision and the Court's decision to deny Vining's contempt motion do not in any way turn on or depend on this issue. So even if any or all of the documents at issue were not privileged, the Court would exercise its discretion now to decline to order Comerica to produce any of them.

**B. Vining's request for fees and expenses in connection with the Discovery Motions**

Vining seeks an award of attorney fees and expenses incurred in connection with his Discovery Motions, under Fed. R. Civ. P. 37(a)(5).[77]

---

[77] Rule 37(a)(5) states:

> **(a) Motion for an Order Compelling Disclosure or Discovery.**
> . . . .
>
> **(5)** *Payment of Expenses; Protective Orders*.
>
> **(A)** *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing)*. If the motion is granted--or if the disclosure or requested discovery is provided after the motion was filed--the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
>
> > **(i)** the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;
> >
> > **(ii)** the opposing party's nondisclosure, response, or objection was substantially justified; or
> >
> > **(iii)** other circumstances make an award of expenses unjust.
>
> **(B)** *If the Motion Is Denied*. If the motion is denied, the court may issue any protective order authorized under Rule 26(c) and must, after giving an opportunity to be heard, require the movant, the attorney filing the

43

Vining prevailed on many issues raised by his Discovery Motions against Comerica and Plunkett Cooney, and also succeeded in obtaining several discovery orders that netted Vining additional discovery. But Vining did not prevail on all issues, and as discussed above, Vining did not prevail at all in his extensive efforts to pierce Comerica's attorney-client privilege.

Rule 37(a)(5)(C) therefore applies. That rules states that where a motion to compel discovery is "granted in part and denied in part," as here, "the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Also relevant are the exceptions to the requirement that the court award sanctions in a situation where a motion to compel discovery is granted in full, or the requested discovery "is provided after the motion was filed." In that situation, the general rule is that the court must award "the movant's reasonable expenses incurred in making the motion, including attorney's fees," but there are exceptions. The rule states that the court "must not order this payment if: . . . (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A).

In the Court's discretion under Rule 37(a)(5), the Court will not award any sanctions (attorney fees or expenses) to either side. At least as to the privilege issues discussed above, the

---

motion, or both to pay the party or deponent who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

**(C) If the Motion Is Granted in Part and Denied in Part.** If the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion.

Fed. R. Civ. P. 37(a)(5).

Defendants' position was more than "substantially justified," since that position prevailed. And the Court concludes that under all the circumstances, including those discussed at length in the Court's two other opinions filed today, an award of expenses to Vining would be "unjust."

For these reasons, the Court will deny Vining's request for an award of fees and expenses incurred in connection with his Discovery Motions. Similarly, the Court will not award any fees or expenses to Comerica or Plunkett Cooney.

## III. Conclusion and Order

For the reasons stated above,

IT IS ORDERED that:

1. Vining's request for fees and expenses in connection with the Plunkett Cooney Motion (Docket # 322) is denied. No fees or expenses will be awarded in favor of either Vining or Plunkett Cooney in connection with the Plunkett Cooney Motion. The Plunkett Cooney Motion is now fully resolved.

2. Vining's request for fees and expenses in connection with the Comerica Bank Motion (Docket # 324) is denied. No fees or expenses will be awarded in favor of either Vining or Comerica in connection with the Comerica Bank Motion.

3. Vining's request for a ruling, in connection with the Comerica Bank Motion, that certain documents and certain categories of documents are not privileged and must be produced in discovery, is denied in its entirety.

4. To the extent that the Court has not otherwise ruled on any other request for relief in the Comerica Bank Motion, such other request for relief is denied in its entirety.

5. The Comerica Bank Motion is now fully resolved.

Signed on October 7, 2022



/s/ Thomas J. Tucker
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**